UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA

                              :

       - v. -

                              :

WESAM EL-HANAFI,                                S4 10 Cr. 162 (KMW)
       a/k/a "Khaled," and          :
SABIRHAN HASANOFF,
       a/k/a "Tareq,"              :

                   Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# THE UNITED STATES OF AMERICA'S OPPOSITION TO THE DEFENDANTS' MOTIONS FOR DISCOVERY AND FOR A BILL OF PARTICULARS

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

BRENDAN R. McGUIRE
JOHN P. CRONAN
AIMEE HECTOR
Assistant United States Attorneys
    - Of Counsel -

# TABLE OF CONTENTS

I.      Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        A.      The Charged Criminal Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        B.      The Defendants' Discovery Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

III.    Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        A.      El-Hanafi's Request For Additional Information Relating To The Circumstances
                Of His January 21, 2010 And February 5, 2010 Statements To The Government
                Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

                1.      The January 21, 2010 And February 5, 2010 Interviews Of El-Hanafi. . . .  5

                2.      Applicable Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

                3.      The Government Has Complied With Rule 16 With Respect To The
                        January 21, 2010 And February 5, 2010 Interviews of El-Hanafi. . . . . . .  10

        B.      The Government Will Continue With Its *Brady* And *Giglio* Obligations. . . . . . .  14

                1.      The Government Will Promptly Produce Any *Brady* Material That Comes
                        To Light. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

                2.      The Defendants' Request For Immediate Production Of *Giglio* Materials
                        Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

C.     The Defendants' Request For A Bill Of Particulars Should Be Denied. . . . . . . . 16

        1.     Applicable Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.     The Defendants Have Received Sufficient Notice Of The Basis For The Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

             a.     The Government Has Provided Voluminous Discovery. . . . . . . . 18

             b.     The Government's Arguments At The Defendants' Bail Hearings Discussed The Government's Proof In Detail. . . . . . . . . . . . . . . 22

             c.     The Indictment Alleges Thirteen Detailed Overt Acts. . . . . . . . 25

IV.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

                                :

       - v. -

                                :

WESAM EL-HANAFI,                     S4 10 Cr. 162 (KMW)
     a/k/a "Khaled," and       :
SABIRHAN HASANOFF,
     a/k/a "Tareq,"          :

                  Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### THE UNITED STATES OF AMERICA'S OPPOSITION TO THE DEFENDANTS' MOTIONS FOR DISCOVERY AND FOR A BILL OF PARTICULARS

#### I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motions filed by defendants Wesam El-Hanafi ("El-Hanafi") and Sabirhan Hasanoff ("Hasanoff") for additional discovery, immediate disclosure of *Brady* and *Giglio* material, and a bill of particulars.

El-Hanafi's request for additional discovery relating to his January 21, 2010 interview with the Federal Bureau of Investigation ("FBI") Legal Attache in Abu Dhabi and his February 5, 2010 interview with members of the FBI's New York Joint Terrorism Task Force ("JTTF") should be denied.  The Government already has provided El-Hanafi with all discovery necessary to prepare a motion to suppress these statements on the grounds that they were involuntary, including FBI reports summarizing the statements and the circumstances under which they were made.  The additional materials that El-Hanafi seeks – namely, documents regarding his suspected placement on a Government "no-fly list" and other materials concerning the policies that govern

the list – would not be relevant to any issue material to the voluntariness of El-Hanafi's statements, and therefore fall beyond the scope of the Government's discovery obligations under Rule 16 of the Federal Rules of Criminal Procedure.

Nor is there any basis for the Court to order immediate disclosure of *Brady* and *Giglio* material. The Government fully appreciates its obligations under *Brady* and *Giglio*, and will comply with those obligations. With regard to its *Brady* obligation, the Government is unaware of any exculpatory material relating to either of the defendants, but will promptly turn over such material should any come to light. With regard to *Giglio* material, the request for immediate disclosure is premature, as a trial date has not even been set and the Government has not yet identified its witnesses at trial. Mindful, however, that the Government will be calling at least one cooperating witness at trial, the Government intends to produce any *Giglio* material (as well as Jencks Act material) fourteen days before trial, which is well before the customary practice in this District. This early production of *Giglio* and Jencks Act material will provide defense counsel with ample time to prepare cross-examinations of the Government's witnesses.

Finally, Hasanoff's request for a bill of particulars should be denied, because the Government has provided the defense with enough information about the nature of the charges to permit the defendants to prepare their defense. The Government has turned over extensive discovery to the defense, the prosecutors have met on multiple occasions with defense counsel to discuss that discovery and the case in general, the Government outlined in detail the proof against the defendants at the May 2010 bail hearings, and the Indictment alleges thirteen specific overt acts committed by the defendants.

## II. BACKGROUND

**A.      The Charged Criminal Conduct**

The defendants were charged in Indictment S2 10 Cr. 162 (KMW), filed under seal on March 2, 2010, with one count of conspiring to provide material support and resources to a designed foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Section 2339B.  The defendants were arrested on these charges, and made their first appearance in the United States in the Eastern District of Virginia on April 30, 2010.  They were subsequently transferred by the United States Marshals Service to the Southern District of New York.  On May 17, 2010, Hasanoff was arraigned before The Honorable James C. Francis IV, and El-Hanafi was arraigned before The Honorable Debra C. Freeman on May 26, 2010.  Each defendant made a bail application at his arraignment, and both bail applications were denied.

On September 14, 2010, a federal grand jury sitting in this District returned a superseding indictment that charges both defendants in four counts.  Count One charges a conspiracy to provide material support and resources to a designed foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Section 2339B.  Count Two charges the defendants with providing and attempting to provide material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Sections 2339B and 2.  Counts Three and Four allege violations of the International Emergency Economic Powers Act ("IEEPA"), and the federal regulations promulgated thereunder.  Count Three charges an IEEPA conspiracy by conspiring to make and receive a contribution of funds, goods, and services to, and for the benefit of, al Qaeda, in violation of Title 50, United States Code, Section 1705(a), and Title 31, Code of Federal Regulations, Sections

595.204 and 595.205.  Count Four charges the defendants with making and receiving a

contribution of funds, goods, or services to, and for the benefit of, al Qaeda, in violation of Title

50, United States Code, Section 1705(a); Title 31, Code of Federal Regulations, Sections 595.204

and 595.205; and Title 18, United States Code, Section 2.

**B.**     **The Defendants' Discovery Motions**

On January 18, 2010, both defendants filed pretrial motions.  El-Hanafi seeks two forms of

relief.  First, El-Hanafi petitions for additional discovery pertaining to the circumstances of his

interviews with FBI agents on January 21, 2010, and February 5, 2010.  *See* Memorandum of Law

in Support of Wesam El-Hanafi's Motion for Discovery ("El-Hanafi Br.") at 2-9.  Second, El-

Hanafi requests that the Court order the Government to produce immediately any *Brady* material

and any *Giglio* material for the witnesses that the Government intends to call in its case-in-chief.

*See id.* at 9-15.  Hasanoff moves for the Court to compel the Government to respond to his bill of

particulars, arguing that a bill of particulars is necessary to allow him to prepare his defense.  *See*

Memorandum of Law in Support of Defendant Sabirhan Hasanoff's Bill of Particulars Motion

("Hasanoff Br.") at 2-11.  Each defendant seeks leave to join in the other defendant's motion.

### III.  ARGUMENT

**A.**     **El-Hanafi's Request For Additional Information Relating To The Circumstances Of His January 21, 2010 And February 5, 2010 Statements To The Government Should Be Denied**

El-Hanafi has moved for the Court to order the Government to produce additional

documents relating to statements that he made to law enforcement agents on January 21, 2010 and

February 5, 2010.  Explaining that he anticipates filing a motion to suppress on the grounds that

these statements were involuntary, El-Hanafi asserts that the Government should be directed "to

produce documents relevant to determining whether the government coerced Mr. El-Hanafi to speak in violation of his rights under the Fifth Amendment." El-Hanafi Br. at 2. El-Hanafi seeks (1) documents and the substance of communications that El-Hanafi had with the Government concerning his suspected placement on the no-fly list[1] and his interviews with the FBI on January 21, 2010 and February 5, 2010; and (2) documents relating to the no-fly list generally, including criteria for placement on and removal from the list, and policies concerning Government interviews of individuals named on the no-fly list. *See* El-Hanafi Br. at 6.

The Government has complied with Rule 16 and has produced "documents relevant to determining whether the government coerced Mr. El-Hanafi to speak in violation of his rights under the Fifth Amendment." El-Hanafi Br. at 2. As to the first category of documents requested by El-Hanafi, the Government has produced to the defense numerous documents relating to communications between El-Hanafi and the Government concerning his suspected placement on the no-fly list and his meetings with the FBI in January 2010 and February 2010. However, the second category of documents sought by El-Hanafi – documents concerning the general polices for the no-fly list – are completely irrelevant to a motion to suppress El-Hanafi's statements as coerced, and therefore do not fall within the scope of Rule 16.

### 1.    The January 21, 2010 And February 5, 2010 Interviews Of El-Hanafi

On January 17, 2010, El-Hanafi sent an email to the American Citizen Services Unit of the U.S. Embassy in Abu Dhabi to request assistance after he was denied travel to the United States

---

[1]    Sensitivity surrounding the individuals named on any Government "no-fly list" preclude the Government from either confirming or denying that El-Hanafi in fact had been placed on a no-fly list in January 2010. However, for the reasons stated below, the Government does not consider that fact to fall within the purview of Rule 16, or to be relevant to a potential defense motion.

on January 15, 2010.  El-Hanafi subsequently provided the American Citizen Services Unit copies of his passport, his wife and children's passports, and his U.A.E. residency visa.  A few days later, on January 20, 2010, El-Hanafi emailed the Department of Homeland Security ("DHS") copies of these passports as well as a signed DHS Traveler Redress Inquiry Program form.  El-Hanafi also reached out to a Citizen Services Specialist with the U.S. Department of State, who recommended to El-Hanafi in a January 28, 2010 email that he contact the Transportation Security Administration office responsible for denial of boardings.

On January 21, 2010, El-Hanafi met with the FBI Legal Attache, at the Embassy in Abu Dhabi, to discuss his inability to travel to the United States.  During this interview, which was not preceded by *Miranda* warnings, El-Hanafi provided background information regarding himself, his family, and his employment.  El-Hanafi also recited the circumstances of his unsuccessful attempt to travel to the United States earlier that month, including being advised by an airline representative that he would not be permitted to board the plane.  Following their January 21, 2010 meeting, El-Hanafi and the Legal Attache exchanged several emails concerning El-Hanafi's travel status.  These emails have been produced to the defense in discovery.

After El-Hanafi's meeting with the Legal Attache, members of the FBI's New York JTTF traveled to the UAE.  The Legal Attache arranged for El-Hanafi to meet with the JTTF members on February 5, 2010 in a hotel room at the Abu Dhabi Hilton, under the pretext that El-Hanafi was speaking with the officers about his denial of travel.  During the interview, which was not preceded by *Miranda* warnings, El-Hanafi discussed his employment and travel history, including his travel to Yemen in February 2008, which El-Hanafi claimed was for two job interviews.  The Government expects to argue at trial that El-Hanafi used the cover story of going to Yemen for

job interviews to mask the actual purpose of his trip, which was to meet with members of al Qaeda. El-Hanafi also discussed the email accounts and telephone numbers that he was using at the time, and provided information on individuals that he knows in the United States.

The officers also asked El-Hanafi about any money transfers he made. In answering these questions, El-Hanafi made what the Government expects to prove were a number of false exculpatory statements about his money transfers. For example, when asked whether he made any wire transfers, El-Hanafi stated that he had only sent two wire transfers to his family in the United States and two transfers to his wife's family in Egypt. When asked directly, El-Hanafi denied ever sending money to Yemen. The Government expects to establish at trial that El-Hanafi made a number of wire transfers to support al Qaeda, and that he both delivered money to Yemen and sent money via courier to Yemen, also to support al Qaeda.

El-Hanafi also admitted to knowing an individual in Denmark ("CC-2"), whom the Government intends to argue was one of the defendants' primary contacts with al Qaeda. El-Hanafi changed his story about how he encountered CC-2 in the UAE. After initially claiming that he met CC-2 in a park in Sharjah, UAE, upon further questioning, El-Hanafi said that he was introduced to CC-2 by another man, whom he knew from a local mosque. El-Hanafi said that he keeps in touch with CC-2 every few months and that he last spoke with CC-2 while CC-2 was in Malaysia. When questioned further about Malaysia, El-Hanafi tried to change the subject and declined to discuss the topic further.

At this point in the interview, the officers observed El-Hafani become visibly uncomfortable, sweating and fidgeting in his seat. El-Hanafi stated that he thought he should have a lawyer present, but did not state that he wanted his lawyer present. The officers then

showed El-Hanafi various wire transfer records, including some records that the Government expects to establish at trial were sent by El-Hanafi to support al Qaeda.  In particular, El-Hanafi was shown Western Union wire transfers that, the Government will argue, he sent, using a fake name, to CC-2.  El-Hanafi then stated that he wanted to contact his lawyer, at which point the interview was terminated.

After the interview ended, one of the JTTF officers escorted El-Hanafi to the elevator and then to the hotel lobby.  While being escorted, El-Hanafi continued to speak to the officer.  The officer advised El-Hanafi that he had asked to speak to his attorney, and commented that El-Hanafi was refusing to tell the officers the truth anyway, such as about his wire transfers to CC-2.  El-Hanafi then admitted "that it wasn't that much money and he (CC-2) was broke and needed some money."

Each of the above conversations with El-Hanafi were memorialized in FBI reports that have been turned over to the defense.

## 2.      Applicable Legal Standards

Law enforcement authorities must advise an individual of his or her *Miranda* rights if two preconditions are met, namely, custody and interrogation.  *See Thompson* v. *Keohane*, 516 U.S. 99, 102 (1995).  Thus, "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977).  "[A] custodial setting is one providing inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak."  *United States* v. *Mitchell*, 966 F.2d 92, 98 (2d Cir.1992) (internal quotation marks omitted).

The Second Circuit has explained that "[t]he test used in determining whether a defendant

was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be 'subjected to restraints comparable to those associated with a formal arrest,' and (b) 'focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.'" *United States* v. *Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (quoting *United States* v. *Mitchell*, 966 F.2d at 98). In determining whether an individual is in custody for *Miranda* purposes, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California* v. *Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon* v. *Mathiason*, 429 U.S. at 495). Where there is no actual arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States* v. *Guarno*, 819 F.2d 28, 31–32 (2d Cir. 1987) (quoting *United States* v. *Hall*, 421 F.2d 540, 545 (2d Cir. 1969)).

The use of ruses by law enforcement has long been held to be proper. *See, e.g.*, *Lewis* v. *United States*, 385 U.S. 206 (1966) ("Indeed, it has long been acknowledged by the decisions of this Court, . . . that, in the detection of many types of crimes, the Government is entitled to use decoys and to conceal the identity of its agents."). As the Supreme Court has further explained, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois* v. *Perkins*, 496 U.S. 292, 297 (1990) (holding that *Miranda* warnings were not required when suspect gave a voluntary statement to a law enforcement officer acting undercover as a fellow inmate); *Alexander* v. *State of Conn.*, 917 F.2d 747, 751 (2d Cir. 1990) (finding no Fifth Amendment violation when the defendant made statements in prison to a visiting acquaintance who was serving as a

-9-

Government informant; "[d]eception which takes advantage of a suspect's misplaced trust in a friend does not implicate the right against self-incrimination").

    **3.**    **The Government Has Complied With Rule 16 With Respect To The January 21, 2010 And February 5, 2010 Interviews Of El-Hanafi**

        In response to a motion to suppress El-Hanafi's statements to the FBI on January 21, 2010 and February 5, 2010 as involuntary or coerced, the Government would concede that (1) El-Hanafi believed that he had been placed on a no-fly list; (2) the interviews were conducted under the pretext of assisting him in securing his removal from the no-fly list; and (3) El-Hanafi was not advised of his *Miranda* rights prior to either interview.  The Government would argue, however, that the absence of *Miranda* warnings did not render his statements involuntary, because El-Hanafi was never in custody and he understood that he was free to leave both interviews at any time.  Indeed, the fact that El-Hanafi elected to stop talking to the officers and terminate the February 5, 2010 interview makes clear that he understood that he was not compelled to speak and that he was not in any type of law enforcement custody.

        El-Hanafi seeks two categories of discovery that he claims are necessary for his anticipated suppression motion.  First, El-Hanafi seeks "documents, or the substance of any oral statements, relating to communications between El-Hanafi and the government concerning his placement on the 'No-Fly' list and the interviews that took place on January 21, 2010 and February 5, 2010." El-Hanafi Br. at 6.  As noted above, these materials have been produced.  In particular, the Government has provided to the defense FBI reports that summarize the substance of the statements that El-Hanafi made to the FBI during the January 21, 2010 and February 5, 2010 interviews, as well as the circumstances surrounding those interviews.  *See* Declaration of John P.

Cronan, Feb. 1, 2011, ("Cronan Decl.") Exhs. A-C; *see also supra* pp. 6-8.[2]  In addition, the

Government has produced in discovery several emails between El-Hanafi, using his personal

email account, and U.S. Government officials regarding his efforts to receive clearance to travel to

the United States.  *See supra* pp.5-6.

El-Hanafi's second category of discovery requests – "documents relating to the No-Fly list

generally," El-Hanafi Br. at 6 – is not relevant to any determination of whether El-Hanafi had a

subjective and objectively reasonable belief that he was coerced into speaking with the FBI.  El-

Hanafi's request for these materials fails to appreciate the nature of the Fifth Amendment inquiry

into whether his statements were involuntary.  As El-Hanafi himself acknowledges, this inquiry

turns on what the defendant actually believed, and whether that belief was objectively reasonable.

*See* El-Hanafi Br. at 5 (arguing that to find that a statement was the product of coercion, "[f]irst,

the defendant must have subjectively believed that he was compelled to give a statement, and

second, that belief must be reasonably held").  And, as noted above, the Government would

concede for purposes of a suppression motion that El-Hanafi believed that he had been placed on

a no-fly list.

Accordingly, whether El-Hanafi was in fact on a no-fly list, and the reasons for his

placement on the list, are irrelevant.  Materials relating to any decision by the Government to

place El-Hanafi on the no-fly list, the general policies governing the no-fly list, and the internal

rules for interviewing individuals on that list, would have no bearing on whether El-Hanafi

---

[2]        The Government also has produced in discovery reports that memorialize two
telephone conversations that El-Hanafi had with one of the JTTF officers on February 5, 2010
and February 6, 2010.  The Government does not intend to offer at trial any statements made by
El-Hanafi during these two calls.

believed he was coerced into speaking with the FBI.  The issue at a suppression hearing would be whether El-Hanafi subjectively and reasonably believed that his freedom had been so restricted as to render him in custody when he agreed to speak with the FBI on January 21, 2010 and February 5, 2010.  *See Mitchell*, 966 F.2d at 98; *United States* v. *Kirsh*, 54 F.3d at 1067.

None of the cases cited by El Hanafi – each of which presents clearly distinguishable facts – alters this analysis.  *See* El-Hanafi Br. at 3-4 (citing *Garrity* v. *New Jersey*, 385 U.S. 493 (1967); *Gardner* v. *Broderick*, 392 U.S. 273 (1968); *United States* v. *Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006)).  Rather than lend support to El-Hanafi's request for additional discovery, these decisions actually support the Government's position that these materials fall outside the scope of Rule 16, because each case confirms that the relevant inquiry at the suppression hearing would be what El-Hanafi believed when he spoke with the FBI.

Judge Kaplan's holding in *Stein*, which is cited by El-Hanafi, is particularly instructive.  In finding that proffer statements made by some of the defendants were coerced because of threatened termination of payment of legal fees, Judge Kaplan held "that an individual claiming that a statement was compelled in violation of the Fifth Amendment must adduce evidence *both* that the individual subjectively believed that he or she had no real choice but to speak *and* that a reasonable person in that position would have felt the same way."  *United States* v. *Stein*, 440 F. Supp. 2d at 328, 330-334 (emphasis in original).  Thus, the voluntariness of the statements in *Stein* turned on the belief that the defendants had as to whether they had a choice not to speak at the time they spoke with the Government.

The Supreme Court conducted similar analyses in *Garrity* and *Gardner*.  In *Garrity*, the police officers were advised that their statements could be used against them and that they could

refuse to answer, but also were told that if they refused to answer, they would be subject to

removal from office.  *See Garrity*, 385 U.S. at 494.  Because the officers were faced with this

choice between losing their means of livelihood or face the penalty of self-incrimination, the

Supreme Court found that "the statements were infected by the coercion" and therefore were not

voluntary.  *Id.* at 497-98.  The police officer in *Gardner* was faced with a similar choice, after

being subpoenaed before a grand jury, advised of his privilege against self-incrimination, and

informed that he would be fired if he did not waive that immunity.  *See Gardner* v. *Broderick*, 392

U.S. at 274.  When the officer refused to sign the waiver, he was terminated.  *See id.* at 275.  The

*Gardner* Court held that this discharge was improper, explaining that "the great privilege against

self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a

waiver of the immunity it confers on penalty of the loss of employment."  *Id.*  at 279.

　　　　In each of these cases, the relevant inquiry turned on the individual's belief that he or she

was being coerced to talk.  The question is whether El-Hanafi believed he was stuck between a

"rock and the whirlpool," *Garrity*, 385 U.S. at 500, when he agreed to speak with the FBI, or,

alternatively, whether it would have been unreasonable for him to think that he was speaking

under coercion.  *Cf. Stein*, 440 F. Supp. 2d at 328 (explaining that cases subsequent to *Garrity*

"have made clear that an employee claiming that a statement was coerced by a threat of

employment termination must demonstrate that the belief that termination would follow a refusal

to speak was both objectively reasonable and subjectively held").  The answer depends on what he

understood when he spoke with the FBI, and what would have been objectively reasonable for

him to think.  It does not turn on whether he was in fact on the no-fly list and the policies

governing that list.

**B.**     **The Government Will Comply With Its *Brady* and *Giglio* Obligations**

El-Hanafi also requests that the Court "direct the government immediately to turn over all *Brady* material in its possession, including impeachment material, so that the defense can conduct appropriate investigation and analysis for effective use both in suppression motions and at trial." El-Hanafi Br. 9.  El-Hanafi argues that there is a need for early production of these materials "given that much of the [defense] investigation will be international – involving countries such as Yemen, Egypt and the UAE – and thus cannot reasonably or effectively be conducted in a short time frame."  *Id.*  The Government appreciates its obligations under both *Brady* and *Giglio*. While the Government is unaware of any *Brady* material, if any comes to light, the Government will produce the material to the defense immediately.  With respect to *Giglio*, El-Hanafi's request is premature, as a trial date has not even been set.  Moreover, other than possibly foreign law enforcement or custodian witnesses, the Government does not expect to call at trial any witnesses who are located in Yemen, Egypt, the UAE, or any other foreign country.

**1.**     **The Government Will Promptly Produce Any *Brady* Material That Comes To Light**

The Government recognizes its obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny.   The Government has conducted an extensive *Brady* review by searching materials that relate to the defendants and their co-conspirators in the possession of the FBI and various other federal agencies.  To date, the Government is unaware of any *Brady* material in this case.  In the event the Government learns of the existence of any *Brady* material, the Government will produce any such material immediately to the defense.

Because the Government has made a good-faith representation to the Court and defense

-14-

counsel that it recognizes and has complied with its disclosure obligations under *Brady*, the request for *Brady* material should be denied. *See, e.g.*, *United States* v. *Seabrook*, No. 10 Cr. 87 (DAB), 2010 WL 5174353, *4 (S.D.N.Y. Dec. 14, 2010); *United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999); *United States* v. *Yu*, No. 97 Cr. 102 (SJ), 1998 WL 57079, at **4-5 (E.D.N.Y. Feb. 5, 1998); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996).

### 2.   The Defendants' Request For Immediate Production Of *Giglio* Materials Should Be Denied

The Government likewise is aware of its obligations under *Giglio* v. *United States*, 405 U.S. 150, 154 (1972), and its progeny, and will provide *Giglio* material in a timely manner prior to trial.  However, the defendants' request for "immediate" production of *Giglio* material, *see* El-Hanafi Br. at 9, where a trial date has not even been set, is unsupported by the law, and should be denied.

Production of *Giglio* material at this stage is premature.  While the Government anticipates extensive testimony from a cooperating witness, the Government has not yet identified which other witnesses it intends to call at trial.  Disclosure of *Giglio* material also implicitly and unavoidably entails the disclosure of the Government's witness list, to which the defendants are not entitled at this stage.  *Cf. United States* v. *Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990) (explaining that "Federal Rule of Criminal Procedure 16 does not require the Government to furnish the names and addresses of its witnesses"); *United States* v. *Alessi*, 638 F.2d 466, 481 (2d Cir. 1980) ("[T]he prosecution [is] under no obligation to give [the defendant] advance warning of the witnesses who would testify against him . . . ." (citing *Weatherford* v. *Bursey*, 429 U.S. 545,

-15-

559 (1977))).

Courts in this Circuit have repeatedly refused to compel disclosure of impeachment or *Giglio* material well in advance of trial.  In *United States* v. *Coppa*, 267 F.3d 132 (2d Cir. 2001), the Second Circuit held that the Government is not required to produce *Giglio* material until it produces "3500 material" pursuant to the Jencks Act, so long as the Government provides the Giglio material in time for its effective use at trial.  *Id.* at 145-46; *see also United States* v. *Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States* v. *Greyling*, 00 Cr. 631 (RCC), 2002 WL 424655, at *2 (S.D.N.Y. Mar. 18, 2002) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *United States* v. *Gallo*, 1999 WL 9848, at *8 (denying defendants' motions to require early production of *Giglio* and 3500 material based on the Government's representations that it would provide the information sufficiently in advance of each witness's testimony to allow adequate time to prepare for cross-examination).

Recognizing the volume of the Jencks Act material and *Giglio* material for the Government's witnesses, especially for its cooperating witness, the Government intends to deviate from its customary practice of producing such impeachment material the Friday before the first day of trial (assuming trial begins on a Monday), and produce the materials fourteen days in advance of trial.  This timing will allow defense counsel adequate time to prepare for cross-examination of Government witnesses at trial.

## C.    The Defendants' Request For A Bill Of Particulars Should Be Denied

Hasanoff has moved for the Court to order the Government to produce a bill of particulars, arguing that he has insufficient notice of the charges he faces and needs a bill of particulars to

identify and locate witnesses and conduct a meaningful investigation of the alleged offenses.  *See*
Hasanoff Mot. at 3.

1.      **Applicable Legal Standards**

The proper scope and function of a bill of particulars is to provide sufficient information
about the nature of the charges to enable a defendant to prepare for trial, to avoid unfair surprise,
and to preclude a second prosecution for the same offense.  *See* Fed. R. Crim. P. 7(f); *accord*
*United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *United States* v. *Bortnovsky*, 820 F.2d
572, 574 (2d Cir. 1987).  "A bill of particulars should be required only where the charges of the
indictment are so general that they do not advise the defendant of the specific acts of which he is
accused."  *United States* v. *Torres*, 901 F.2d at 234 (internal quotation marks omitted).

If the information a defendant seeks "is provided in the indictment or in some acceptable
alternate form," such as discovery, no bill of particulars is required.  *United States* v. *Bortnovsky*,
820 F.2d at 574; *United States* v. *Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003).  In other
words, the defense cannot use a bill of particulars as a general investigative tool, *see United States*
v. *Salazar*, 485 F.2d 1272, 1277-78 (2d Cir. 1973), or as a device to compel disclosure of the
Government's evidence prior to trial, *see United States* v. *Triana-Mateus*, No. 98 Cr. 958 (SWK),
2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing *United States* v. *Gottlieb*, 493 F.2d 987,
994 (2d Cir. 1974)).  "The Government is not required to disclose the manner in which it will
attempt to prove the charges, nor the means by which the crimes charged were committed,
[therefore] 'the Government is not required to provide information that would, in effect, give the
defendant a preview of the Government's case before trial.'"  *Id.* at *5 (quoting *United States* v.
*Conley*, No. 00 Cr. 0816 (DAB), 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002)).

Thus, under the relevant legal standard, the Government is not required to (a) "particularize all of its evidence," *United States* v. *Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.3d at 233-34 (demands for "whens" and "wheres" and "by whoms" within charged conspiracy are improper attempts at general pretrial discovery); or (c) provide the defendant with a preview of the Government's case or legal theory.  *See United States* v. *Muyet*, 945 F. Supp. 586, 598-599 (S.D.N.Y. 1996).  The ultimate test of whether a bill of particulars is appropriate depends on whether the information sought is necessary, not whether it is helpful.  *See United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001).

**2.      The Defendants Have Received Sufficient Notice Of The Basis For The Charges**

 The defendants cannot claim that they do not realize what this case is about: their alleged support for al Qaeda.  Nor can they claim that they do not appreciate what evidence will support those charges.  The defendants have received more than adequate notice of the basis for the charges that they are facing from a number of sources, including the voluminous discovery that the Government has exchanged, the representations made by the Government as to its proof during the bail arguments, and the thirteen overt acts alleged in the Indictment.  In short, there is no danger in this case that the defendants will suffer from unfair surprise at trial.  Moreover, the extensive amount of information already made available to defense counsel provides a sufficiently detailed picture of the charged offenses to alleviate any risk of double jeopardy.

**a.      The Government Has Provided Voluminous Discovery**

The Government has provided voluminous discovery of unclassified materials so far,

including approximately 1,000 pages of documents and eight CDs.  This discovery has included

travel records, bank records, other business records, wire transfer records, evidence from physical

surveillance, results from email search warrants, and Internet chats among the defendants and

CC-1.  The discovery, some of which is discussed below, gives the defendants a clear picture of

the conduct that underlie the charges that they are facing.

*Travel Records*.  The Government has turned over travel records that reflect several trips

taken by the defendants.  The Government produced Emirates Air records that reflect, among

other things, El-Hanafi's travel to Yemen in February 2008.  El-Hanafi made this February 2008

trip to meet with representatives of al Qaeda in Yemen, where he swore allegiance to the terrorist

organization and received assignments.  The Government also turned over records that show the

following trips taken by the defendants, during which they provided support for al Qaeda: (1) on

May 16, 2008, El-Hanafi traveled from Dubai to New York, and, on May 30, 2008, he returned to

Dubai; (2) on June 2, 2008, CC-1 traveled from New York to Dubai, and on July 10, 2008, CC-1

returned to New York; (3) on July 29, 2008, Hasanoff traveled from Dubai to New York, and, on

August 15, 2008, he returned to Dubai; and (4) on April 17, 2009, El-Hanafi traveled from Dubai

to New York, and, on April 30, 2009, he returned to Dubai.  Notably, El-Hanafi's April 2009 trip

to New York corresponds with a shipment of Casio watches that he had delivered to his residence

in Brooklyn.

*Records Reflecting Purchases*.  The Government has produced records reflecting

purchases that were made by the defendants to support al Qaeda.  The Government has produced

Amazon.com records showing that, on April 15, 2009, El-Hanafi ordered, among other things,

seven Casio digital watches.  Those records show that, on April 16, 2009, these watches were

shipped to "Wesam Elhanafi," at his residence in Brooklyn.  The Government also has turned over records for El-Hanafi's Citibank Mastercard, which likewise confirm that El-Hanafi made this purchase.  In addition, the Government has produced records from El-Hanafi's checking account, which show that he made debit card purchases on March 12, April 14, and May 12, 2008, for "2CO.COM*HOTSPOTVP."  A hotspot VPN allows users to mask the Internet Protocol ("IP") address from which they are accessing the Internet, thereby preventing law enforcement from identifying the IP address they are actually using.

*CC-1's Money Transfer To Hasanoff.*  The Government has produced Bank of America records for CC-1's business checking account, which show that, on November 27, 2007, CC-1 sent $50,000 to Hasanoff's HSBC Middle East bank account.  The Government plans to prove at trial that $6,500 of this amount was sent by CC-1 to Hasanoff to support al Qaeda.  In addition, the Government has produced a November 29, 2007 email between CC-1 and Hasanoff, which references this money transfer and states that $6,500 of the funds was intended for a "business venture," which the Government intends to establish was a coded reference for al Qaeda.

*Wire Transfer Records.*  The Government has produced records of various wire transfers that were made by the defendants.  These wire transfers, which were made in fake names, were sent by the defendants to another individual associated with al Qaeda in Denmark.  The Government plans to prove at trial that the defendants made these wire transfers with the understanding that the funds would support al Qaeda.

*Hasanoff's Australian Passport.*  The Government intends to offer testimony establishing that Hasanoff and El-Hanafi made a previous trip to Turkey and Syria, when they attempted to enter Iraq to join the fighting.  The Government has turned over Hasanoff's Australian passport,

which reflects travel to both Turkey and Syria in 2005, and to Syria in 2006.

*Electronic Chats.*  The Government has turned over four Gmail "chats" between El-Hanafi

and Hasanoff, on one end, and CC-1, on the other end, which occurred throughout 2009.  During

these chats, the defendants used coded language to discuss their efforts to support al Qaeda.  For

instance, they discussed losing contact with some of their al Qaeda associates, and their concern

that those individuals had been "hospitalized," which was code for being in prison.  They also ran

through their options, including traveling to Yemen to attempt to establish new al Qaeda contacts,

travel to Afghanistan or another country in the region to join fighting in support of al Qaeda, or

travel to Somalia to support al-Shabaab, the designated foreign terrorist organization operating

primarily out of Somalia.  They further discussed obtaining the travel documents necessary for

them to meet with other al Qaeda members in another country, as well as their efforts to re-

establish contact with the member of al Qaeda who initially put them in contact with the al Qaeda

members in Yemen.  They also expressed concern that they were not taking sufficient security

precautions while communicating, and they indicated that they feared their communications were

being surveilled.  El-Hanafi also discussed his suspicion that he was placed on the no-fly list, and

suggested that his association with CC-1 was the reason for that placement.

*Emails*.  The Government has turned over results from search warrants that were executed

on eight email accounts used by the defendants, as well as certain emails between Hasanoff and

CC-1.  This production includes several emails in which Hasanoff urged CC-1 to send him

money, grew increasingly frustrated when CC-1 did not initially send money, and mentioned to

CC-1 that he and El-Hanafi had committed to sending money.  The Government plans to establish

at trial that this commitment to send money was to support al Qaeda.  For instance, on September

10, 2007, Hasanoff wrote to CC-1, "U coming to dubai anytime soon?  Perhaps instead of wiring money you can come with it as I've got zero cash to front for you and the same with Wesam since we've been committed ourselves to monthly commitments."  Then, on October 2, 2007, Hasanoff wrote to CC-1, "We also told the bros. about your contribution to the business and they're expecting it – what do I say to them as Wesam and I just don't have the money to advance all of it.  We're already committing on a monthly basis a significant portion of both our salaries."  On October 11, 2007, Hasanoff sent an email to CC-1 telling him, "It's about time you put your akhirah [afterlife] before your dunya [present life] - akhi, when is it going to end?  You have my wiring instructions, let me know once you've sent so I'll check my bank."  In another email on November 29, 2007, Hasanoff advised CC-1 that he received money from him and that $6,500 of that money would go toward the "business partnership" contribution.  In this same email, Hasanoff told CC-1 that "there's a very important decision we all need to take on the business joint venture that the partners have asked us to commit and decide upon.  I'll really need you there to discuss it and agree it as I'd like all the partners, you, me and Abu Yousef [El-Hanafi's alias] to make a consultation and single decision.  this [sic] is a big one and worth your trip to NY."

The prosecutors have had a number of meetings with attorneys for both defendants, at which the prosecutors discussed the Government's proof, including both the classified and unclassified discovery, in detail.

### b.   The Government's Arguments At The Defendants' Bail Hearings Discussed The Government's Proof In Detail

At his arraignment on May 17, 2010, Hasanoff sought his release on bail and, after a relatively lengthy bail hearing, Judge James C. Francis IV ordered Hasanoff detained pending

trial.  *See* Cronan Decl. Exh. D ("Hasanoff Bail Tr.").  Similarly, at El-Hanafi's arraignment nine

days later on May 26, 2010, El-Hanafi also made a bail application before Judge Debra C.

Freeman, and after a bail argument, he too was ordered detained pending trial.  *See* Cronan Decl.

Exh. E ("El-Hanafi Bail Tr.").

At both bail arguments, the Government laid out many of the key pieces of evidence that it

would offer at trial to prove the charges.  Among the proof discussed by the Government at these

bail hearings were:

- A cooperating witness would be able to "tell the whole story," by testifying about
  El-Hanafi's trip to Yemen to join al Qaeda, El-Hanafi's efforts to recruit others
  into the terrorist group, and the various services that were provided to al Qaeda.
  *See* El-Hanafi Bail Tr. at 11-12; Hasanoff Bail Tr. at 9.

- After making contact with a member of al Qaeda, El-Hanafi traveled to Yemen in
  February 2008 with the specific purpose of joining al Qaeda.  In Yemen, El-Hanafi
  was picked up at a predetermined location, a hood was placed over his head, and
  he was transported to another house to meet with a senior member of al Qaeda.  At
  that house, El-Hanafi swore an oath of allegiance to al Qaeda and taught the al
  Qaeda members on how to communicate covertly over the Internet through
  encryption techniques.  *See* El-Hanafi Bail Tr. at 6, 12; Hasanoff Bail Tr. at 6-7.

- The defendants purchased various items desired by al Qaeda, and made some of
  these purchases in New York where the items were easier to obtain.  Travel records
  show multiple trips taken by the defendants to New York.  *See* El-Hanafi Bail Tr.
  at 7; Hasanoff Bail Tr. at 5-6, 9.

- El-Hanafi made an online purchase of Casio digital watches, which were requested by al Qaeda.  Those watches were shipped to his residence in Brooklyn on April 16, 2009.  On April 17, 2009, El-Hanafi traveled to New York, where he remained for two weeks.  *See* El-Hanafi Bail Tr. at 9-10, 12, 26; Hasanoff Bail Tr. at 18.

- The defendants made international wire transfers to support al Qaeda.  Hasanoff used coded language in emails to discuss the transfer of funds to support al Qaeda.  El-Hanafi gave money to a courier, who was supposed to deliver the money to al Qaeda in Yemen.  *See* El-Hanafi Bail Tr. at 9; Hasanoff Bail Tr. at 6, 9.

- The defendants, who are very technologically sophisticated, communicated by using encryption software and by using code words in Internet chats to conceal the actual content of their communications.  Bank records reflect that El-Hanafi purchased software that conceals the IP address from where the Internet is accessed.  *See* El-Hanafi Bail Tr. at 6, 8, 12, 18.

- El-Hanafi used anonymous prepaid telephones that he would discard to avoid detection from law enforcement.  *See* El-Hanafi Bail Tr. at 8.

- The defendants made efforts to travel to fight in the jihad.  In 2005 or 2006, Hasanoff unsuccessfully attempted to travel to Iraq.  El-Hanafi awaited instructions from his Yemen al Qaeda contacts as to where he would travel to fight.  In several Internet chats in 2009, the defendants and CC-1 discussed in coded terms their interest in traveling to fight in the jihad.

- The defendants discussed in Internet chats that their al Qaeda contacts had disappeared and may have been arrested, and their need to seek out new contacts in

-24-

the terrorist group.  *See* El-Hanafi Bail Tr. at 10-11; Hasanoff Bail Tr. at 7, 9.

These representations, made in open court, gave both defendants insight, immediately

upon their arrival in this District, as to the nature of the charges against them, as well as how the

Government would prove those charges.

<strong>c.       The Indictment Alleges Thirteen Detailed Overt Acts</strong>

The defendants were not charged in a bare-bones indictment that gives no insight as to the

conduct that will be the subject matter for this trial.  The indictment alleges thirteen detailed overt

acts committed by the defendants and CC-1.  Each overt act alleges which defendant or

defendants committed the particular act, specifies either the approximate month or date when that

act was committed, and discusses the conduct.

<strong>IV.  CONCLUSION</strong>

For the foregoing reasons, the defendants' pretrial motions for additional discovery,

immediate disclosure of *Brady* and *Giglio* material, and a bill of particulars should be denied.

Dated:       New York, New York
            February 1, 2011

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York,
                              Attorney for the United States of America


                       By:    _____/s/_____
                              Brendan R. McGuire
                              John P. Cronan
                              Aimee Hector
                              Assistant United States Attorneys
                              Tel.:  (212) 637-2220/2779/2203

-25-

**AFFIRMATION OF SERVICE**

JOHN P. CRONAN, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury, that he is employed as an Assistant U.S. Attorney in the Southern District of New York, and that, on February 1, 2011, he caused copies of The United States Of America's Opposition To The Defendants' Motions For Discovery And For A Bill Of Particulars and the Declaration of John P. Cronan, to be served via electronic notification and by e-mail on:

JaneAnne Murray, Esq.
Murray Law LLC
233 Broadway
New York, New York 11215
Tel.: (212) 941-9266
jmurray@murraylawny.com
*Attorney for Wesam El-Hanafi*

Justine A. Harris, Esq.
Colson & Harris LLP
10 East 40th Street, Suite 3307
New York, New York 10016
Tel.: (212) 257-6455
jharris@colsonharris.com
*Attorney for Wesam El-Hanafi*

David A. Ruhnke, Esq.
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
Tel.: (973) 744-1000
davidruhnke@ruhnkeandbarrett.com
*Attorney for Sabirhan Hasanoff*

Joshua L. Dratel, Esq.
Joshua L. Dratel, P.C.
2 Wall Street, 3rd Floor
New York, New York 10005
Tel.: (212) 732-0707
dratellaw@joshuadratel.com
*Attorney for Sabirhan Hasanoff*

Anthony L. Ricco, Esq.
20 Vesey Street
New York, NY 10007
Tel.: (212)-791-3919
tonyricco@aol.com
*Attorney for Sabirhan Hasanoff*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
        February 1, 2011

_____/s/_____
JOHN P. CRONAN
Assistant United States Attorney