UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

WESAM El HANAFI, et al.,

Defendants.

Criminal Docket No.

10-CR-162 (KMW)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT
WESAM EL-HANAFI'S MOTION FOR DISCOVERY**

JaneAnne Murray
MURRAY LAW LLC
233 Broadway
New York, New York 11215
Tel.  (212) 941-9266

Justine A. Harris, Esq.
COLSON & HARRIS LLP
10 East 40th St., Suite 3307
New York, New York 10016
Tel: (212) 257-6455

Attorneys for Mr. Wesam El-Hanafi

## Introduction

Defendant Wesam El-Hanafi respectfully submits this reply memorandum of law in further support of his motion for discovery.

## Argument

### I

### THE GOVERNMENT SHOULD BE REQUIRED TO PRODUCE DOCUMENTS RELATING TO THE INDIVIDUAL AND POLICY CIRCUMSTANCES SURROUNDING MR. EL-HANAFI'S PLACEMENT ON THE "NO-FLY LIST"

The government opposes Mr. El-Hanafi's motion for production of materials relating to the circumstances surrounding his placement on the "No-Fly List" because they "would not be relevant to any issue material to the voluntariness of Mr. El-Hanafi's statements." Gov. Br. at 2.[1] The government concedes the factual crux of Mr. El-Hanafi's motion – that he believed he was on the No-Fly List and that the un-Mirandized FBI interviews were conducted under the "*pretext of assisting him in securing his removal from the no-fly list*." Gov. Br. at 10 (emphasis added). Yet the government nevertheless argues that these circumstances have no relevance because the issue at a suppression hearing will be "whether El-Hanafi subjectively and reasonably believed that his freedom had been so restricted as to render him in custody when he agreed to speak with the FBI on January 21, 2010 and February 5, 2010." Gov. Br. at 12. The government also suggests that conducting the interviews under the pretext of assisting Mr. El-Hanafi get off the No-Fly List and return to the country of his birth was not coercive because Mr. El-Hanafi was free to leave the interviews at any time, and in fact did so.

---

[1] Refers to the government's brief in opposition to the defendants' motions for discovery and a bill of particulars, dated February 1, 2011

The government misconstrues the question at the heart of this motion and thus misunderstands the relevance of the requested discovery.  The issue is not whether Mr. El-Hanafi was subject to custodial interrogation and granted the procedural protections of *Miranda*,[2] but rather whether his statements were compelled in the fundamental sense of the word:  that the defendant was subjected to conduct "likely to exert such pressure . . . as to disable [him] from making a free and rational choice."  *Garrity v. State of New Jersey*, 385 U.S. 493, 497-8 (1967) (noting that the coercive effect of the sanction placed the defendant between the "rock and the whirlpool").

As the cases cited by both the defense and the government make clear, when the government compels statements by threatening to impose sanctions, those statements are obtained in violation of the Fifth Amendment.  *See Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977).  In this line of "penalty" cases, the question of custodial interrogation or *Miranda* rights is utterly irrelevant.  Certainly, the defendants in *Stein* (KPMG employees attending proffers), *Garrity* (police officers), and *Lefkowitz* (an attorney testifying before the grand jury) were not in custody, yet the courts in all three cases ruled that the government had impermissibly penalized the right to remain silent and thus obtained statements in violation of the Fifth Amendment. Here, Mr. El-Hanafi was subjected to similar – we would argue greater – pressure:  the government secured Mr. El-Hanafi's statements by making clear that if he remained silent, and did not cooperate with questioning, he would have no way of returning to the United States to

---

[2] We may also move to suppress the statements on the grounds that Mr. El-Hanafi was subjected to custodial interrogation without being advised of his *Miranda* warnings, but that is not the basis for the requested discovery.

join his wife and children and would remain effectively banished from his home-country and thus "stateless" for an indefinite period of time.[3]

That Mr. El-Hanafi could have – and in fact at some point did – leave the interviews on his own volition is of no moment. Certainly the KPMG executives in *Stein* who attended proffers at the Southern District United States Attorney's Offices were similarly free to leave at any time. That Mr. El-Hanafi may have entered the "whirlpool" initially and then reversed course (perhaps when it became clear that the agents had lied to him) is immaterial to an exploration of whether the structural parameters of the two interviews were inherently coercive.

While maintaining that the requested discovery is irrelevant, the government also claims that it has provided sufficient discovery in response to the first category of requested documents – documents relating to the two interviews of Mr. El-Hanafi. But that is not the case. While the government has provided emails it retrieved from Mr. El-Hanafi's own email account reflecting correspondence between Mr. El-Hanafi and an FBI Agent, as well as an individual at the Embassy in Abu Dhabi, we do not believe that this reflects the complete universe of relevant documents. At minimum, the government should inquire of all the government employees with whom Mr. El-Hanafi (or his attorney, Victor Knapp) had any contact to determine what additional documents exist concerning his communications with them. Beyond that, the defense is entitled to receive any documents relating to Mr. El-Hanafi's placement on the No-Fly List to the extent that such documents reflect an intent or desire to interview him or obtain information from him. Certainly, if the FBI put Mr. El-Hanafi on the No-Fly List in order to create

---

[3] The defense now has reason to believe that Mr. El-Hanafi was also on a "No-Exit" list – i.e. not permitted to leave the UAE – perhaps at the behest of United States law enforcement. Thus, in addition to documents about the No-Fly list, the defense seeks any documents relating to Mr. El-Hanafi's placement on a "No-Exit" list, to the extent that such documents reflect an intent to interview or obtain information from him.

opportunity to question him, the government should provide any related documents.  The defense

should also receive any documents that relate to or reflect the purpose of the two interviews,

and/or what the FBI agents intended to tell Mr. El-Hanafi, or did in fact tell Mr. El-Hanafi, the

purpose of the interview was.  In short, to the extent the government is conceding the essential

facts, but arguing that the predicament – talk or stay on the No-Fly List – was not sufficiently

coercive to violate the Fifth Amendment, it is imperative that all the details concerning Mr. El-

Hanafi's placement on the No-Fly List and the circumstances leading up to the interviews be

fully disclosed and explored.

With respect to the second category of requested documents – documents reflecting

general policies or practices concerning interviewing and de-briefing individuals placed on the

No-Fly List – the government claims simply that such material is not relevant to whether Mr. El-

Hanafi had a "subjective and objectively reasonable belief that he was coerced into speaking

with the FBI." Gov. Br. at 11.  While accurately reciting the two-pronged test (subjective and

objective), the government places undue emphasis on the subjective component.  Whatever the

defendant believes, it must still be objectively reasonable, and general policies, rules or laws that

impose a penalty for invoking Fifth Amendment rights bear precisely on whether a defendant's

belief is reasonable.  In fact, in *Garrity,* the lower court suppressed based merely on the

existence of a statute mandating termination if police officers invoked their Fifth Amendment

rights.  It would thus be highly relevant in this case if there were a policy that any individual

placed on the No-Fly List had to be interviewed before being able to be removed from the list.

Similarly, it would be material if there were training materials or other manuals instructing State

Department employees to tell individuals on the No-Fly List that they would have to come in for

an interview in order to travel home.

As the court pointed out in *United States v. Stein*, 440 F. Supp. 2d 315 (2006), the inquiry

relevant to our suppression motion is both a subjective and an objective one. *Id.* at 328

(defendant's belief that threatened sanction "would follow a refusal to speak [must be] both

objectively reasonable and subjectively held"). Thus, while the government is correct that the

discovery we seek has limited bearing on what Mr. El-Hanafi subjectively believed, it does have

a bearing on the objective aspect of the analysis, and any relevant discovery should be produced.

Finally, the notion that pretext or trickery can sometimes be a lawful form of obtaining

statements is a red-herring. Trickery or deceit is not always tolerated. *See, e.g.*, *United States v.*

*Anderson*, 929 F.2d 96, 100-02 (2d Cir. 1991) (confession involuntary where suspect told that if

he asked for lawyer, he would be precluded from cooperating with the government); *see also*

*United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("[m]aterial representations based on

unfulfillable or other improper promises might perhaps overbear a defendant's will.") (*dictum*).

Here, in any event, Mr. El-Hanafi was not "lulled into any false sense of security." Gov. Br. at 9.

Just the opposite: Mr. El-Hanafi was lulled – or tricked -- into a false coercive trap. The fact

that the coercion was staged does not make it any less coercive. Indeed, the government would

have fared no better in *Stein* or *Garrity* if the threats conveyed had not been real.

II

THE GOVERNMENT SHOULD BE DIRECTED IMMEDIATELY
TO CATEGORIZE AND PRODUCE *BRADY/GIGLIO* MATERIAL

The government responds to our motion for immediate production of *Brady* material by

stating that it has "conducted an extensive *Brady* review by searching materials that relate to the

defendants and their co-conspirators in the possession of the FBI and various other federal

agencies" and is "unaware of any Brady material in this case." Gov. Br. at 14. The government

acknowledges that a "volume" of *Giglio* material exists relating to its chief cooperating witness

in this case (Gov. Br. at 16), but nonetheless opposes production of this material now, citing the

absence of legal duty and necessity.

As the Second Circuit has pointed out, the prosecution and defense do not always agree

on what is "material" exculpatory evidence.  *See*, *e.g.*, *Disimone v. Phillips*, 461 F.3d 181 (2d

Cir. 2006) (rejecting government's argument that a prosecutor need not disclose exculpatory

information that the prosecutor believes is mistaken or false, noting that the "if there [are]

questions about the reliability of the exculpatory information, it [is] the prerogative of the

defendant and his counsel – and not of the prosecution – to exercise judgment in determining

whether the defendant should make use of it . . . To allow otherwise would be to appoint the fox

as henhouse guard"); *see also United States v. Bagley*, 473 U.S. 667 (1985) ("Evidence that is of

doubtful worth in the eyes of the prosecutor could be of inestimable value to the defense, and

might make the difference to the trier of fact") (Marshall, J. dissenting).  Here, the defense has

listed in detail examples of evidence it views as material.  We ask that the government be

directed to clarify that it has no documents responsive to these specific requests.  To the extent

the government has responsive documents, but has unilaterally determined that the information is

not material, we submit that the government should be directed to turn over such material "as a

matter of sound case management."  *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir.2001);

*see also United States v. Stein*, 424 F.Supp.2d 720, 727 (S.D.N.Y.2006) (ordering briefing on

whether "sound case management . . . warrants pretrial disclosure" of all evidence favorable to

the accused, even if defendants not otherwise entitled to it); *United States v. Giffen*, 379

F.Supp.2d 337, 347 (S.D.N.Y.2004) (the Government's responsibility to determine when *Giglio*

material should be disclosed "is subject to the authority of the court to determine, as a matter of

sound case management").

With respect to *Giglio* material, contrary to the government's position, its *Giglio* obligations are not co-extensive with its obligations under the Jencks Act, and the Second Circuit has never so held.  In *Coppa*, the Court made clear that *Giglio* material is a subset of *Brady* material, subject to the disclosure requirements of *Brady* and its progeny: specifically, that it "be disclosed in time for its effective use at trial."  *Coppa*, 267 F.3d at 139;[4] *see also Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir.2001) (*Brady* disclosures must be made "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously").

To the extent the *Brady/Giglio* material is also Jencks Act material, the Second Circuit has repeatedly emphasized that the government's constitutional obligations to disclose material exculpatory or impeaching evidence trump Section 3500's constraints on the disclosure of witness statements.  *See also United States v. Rittweger*, 524 F.3d 171, 181 n. 4 (2d Cir.2008) ("[c]omplying with the Jencks Act, of course, does not shield the government from its independent obligation to timely produce exculpatory material under *Brady* – a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500."); *Coppa*, 267 F.3d at 146 (where "witness statements ... fall within the ambit of *Brady/Giglio*" they "may be required to be produced in advance of trial despite the Jencks Act").

Importantly, effective "use" of *Brady/Giglio* is not limited merely to facilitating the drafting of cross-examinations, but includes an opportunity to investigate and develop leads to additional evidence.  *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir, 2007) ("*Brady*

---

[4] The government misreads *Coppa*.  In *Coppa*, the Court held only that the government need only produce impeachment documents that "do not rise to the level of materiality prescribed by *Agurs* and *Bagley* for mandated production" at the same time as it produces documents under the Jencks Act.  *Id.* at 146.  *Giglio* evidence – i.e. impeachment evidence that is material "in the *Agurs/Bagley* sense,"– must be produced under the same criteria for production of *Brady* evidence, "in time for its effective use at trial."  *Id.*

information must be disclosed . . . in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial *or to use the information to obtain evidence for use in the trial*") (emphasis added); *see also Leka*, 257 F.3d at 103 ("The opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought").[5]

Moreover, even in the context of *Brady/Giglio* material that does not require additional investigation, the Court has emphasized the importance of earlier disclosure, "particularly when earlier discovery would not have had the potential to harm the witness." *Rittweger*, 524 F.3d at 182  (finding no *Brady* violation but admonishing the government for delayed disclosure of exculpatory proffer statements, noting that "the government produced 200 boxes of materials in the fall of 2002 to defense counsel, but withheld until May 1, 2003 (the eve of trial) the evidence that the government counsel surely should have known defense counsel was most interested in"); *cf.* United States Attorney's Criminal Resource Manual 165, Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010) ("Due process requires that disclosure of exculpatory and impeachment evidence material to guilt or innocence be made in sufficient time to permit the defendant to make effective use of that information at trial . . . In most cases, the disclosures required by the Constitution and this policy will be made in advance of trial").

Not only is there a legal duty to turn over the *Giglio* material earlier than Jencks Act material, there is a clear necessity in this case.  As we anticipated and the government concedes,

---

[5] To the extent *United States v. Greyling*, 2002 WL 434655 (S.D.N.Y. 2002) and *United States v. Gallo*, 1999 WL 9848 (S.D.N.Y. 1999), two cases cited by the government, are read to say that *Giglio* material need just be provided in sufficient time to facilitate the drafting of cross-examinations as opposed to using it as investigation leads to additional impeachment material, they are therefore incorrect statements of law.  Notably in *Greyling*, the government had already produced well in advance of trial "copious amounts" of *Giglio* material relating to its main cooperating witness. *See id.* at 2.

there is a wealth of impeachment material relating to its chief cooperating witness (CC-1) – an individual with a lengthy history of fraud, theft and deception, who is also the primary if not exclusive source for many of the allegations in the indictment.  Given his centrality to the government's case, investigation of his prior bad acts is imperative, and, indeed, an issue implicating Mr. El-Hanafi's right to counsel.  *See Greiner v. Wells*, 417 F.3d 305, 320 (2d Cir. 2005) ("The duty to investigate is essential to the adversarial testing process 'because the testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies'") (*quoting Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)).  Early disclosure of *Brady/Giglio* material relating to CC-1 is crucial for another reason: he has personal, family, real-estate and business connections all over the world.  Effective investigation into his prior conduct and background, therefore, will require a significant investment of time and resources.

## Conclusion

For the foregoing reasons, Mr. El-Hanafi respectfully request that the Court (a) grant the

discovery requested in this motion, (b) permit Mr. El-Hanafi to join the Motion for a Bill of

Particulars filed by Defendant Sabhiran Hasanoff, and (c) grant leave to make additional

discovery motions as and if they become appropriate in light of further discovery.

Date:   New York, New York
        February 8, 2011

JaneAnne Murray
MURRAY LAW LLC
233 Broadway
New York, New York 11215
Tel.  (212) 941-9266


        /s/


Justine Harris, Esq.
COLSON & HARRIS LLP
10 East 40th St., Suite 3307
New York, New York 10016
Tel: (212) 257-6455

Attorneys for Mr. Wesam El-Hanafi