UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

                                        :

             - v. -

                                          :

WESAM EL-HANAFI,                                            S4 10 Cr. 162 (KMW)
         a/k/a "Khaled," and                :
SABIRHAN HASANOFF,
         a/k/a "Tareq,"                     :

                          Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' PRE-TRIAL MOTIONS TO DISMISS AND TO SUPPRESS

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

BRENDAN R. McGUIRE
JOHN P. CRONAN
AIMEE HECTOR
Assistant United States Attorneys
       - Of Counsel -

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.   Hasanoff's Multiplicity Argument Is Foreclosed By Governing Second Circuit
           Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.   Hasanoff's Suggestion That Count Two Fails To Adequately Allege A Crime Is
           Belied By The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.   El-Hanafi's January And February 2010 Statements To The FBI Should Not Be
           Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

           1.   Factual Background: The January 2010 and February 2010 Interviews . 16

           2.   El-Hanafi's Statements Were Neither Coerced Nor Involuntary  . . . . . . 20

                a.   Legal Standards For The Voluntariness Of A Defendant's
                     Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                b.   El-Hanafi Was Not Coerced When He Spoke With American Law
                     Enforcement In The UAE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

           3.   El-Hanafi Was Never Interrogated In Violation Of *Miranda*  . . . . . . . . 37

                a.   Legal Standard For Custodial Interrogations . . . . . . . . . . . . . . . 37

                b.   *Miranda* Warnings Were Not Required Because El-Hanafi Was
                     Never In Custody . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

           4.   El-Hanafi's Demand For A *Kastigar* Hearing Should Be Denied . . . . . . 44

      D.   Evidence Obtained From The Email Search Warrants On The
           Welhanafi@live.com And Welhanafi@yahoo.com Email Accounts Should Not Be
           Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

           1.   The Warrants Were Not Overbroad And Complied With The Fourth
                Amendment's Particularity Requirement  . . . . . . . . . . . . . . . . . . . . . . 47

                a.   Legal Standards For Search Warrants . . . . . . . . . . . . . . . . . . . . . 47

          i.       Probable Cause  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

          ii.      Particularity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

          iii.     The Good Faith Exception to Suppression  . . . . . . . . . . 51

     b.     The Search Warrants Were Not Overbroad And Were Supported
          By Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

     c.     The Search Warrants Complied With The Fourth Amendment's
          Particularity Requirement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

     d.     Even If The Warrants Are Invalid, The Evidence Should Not Be
          Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

     e.     There Is No Basis For a *Franks* Hearing  . . . . . . . . . . . . . . . . . . 61

   2.     The Government Took Adequate Measures To Prevent Against Exposure
       To Privileged Communications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     a.     Privilege Review Of The Welhanafi@yahoo.com Account  . . . . 63

     b.     No Taint Hearing Is Required  . . . . . . . . . . . . . . . . . . . . . . . . . . 65

IV.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

# TABLE OF AUTHORITIES

**Federal Cases**

*Alexander* v. *State of Conn.*, 917 F.2d 747 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ball* v. *United States*, 470 U.S. 856 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Berkemer* v. *McCarty*, 468 U.S. 420 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Blackburn* v. *Alabama*, 361 U.S. 199 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Beckwith* v. *United States*, 425 U.S. 341 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 39

*Blockburger* v. *United States*, 281 U.S. 299 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Buonocore* v. *Harris*, 65 F.3d 347 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*California* v. *Beheler*, 463 U.S. 1121 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42

*Callanan* v. *United States*, 364 U.S. 587 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Campaneria* v. *Reid*, 891 F.2d 1014 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Colorado* v. *Connelly*, 479 U.S. 157 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 29

*Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Dickerson* v. *United States*, 530 U.S. 428 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 27

*Franks* v. *Delaware*, 438 U.S. 152 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 62

*Frazier* v. *Cupp*, 394 U.S. 731 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Garrity* v. *New Jersey*, 385 U.S. 493 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Green* v. *Scully*, 850 F.2d 894 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Harris* v. *New York*, 401 U.S. 222 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Illinois* v. *Gates*, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47, 49, 62

*Illinois* v. *Perkins*, 496 U.S. 292 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 30

*Illinois* v. *Vitale*, 447 U.S. 410 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Terrorist Bombings of U.S. Embassies in East Africa*,
  552 F.3d 177 (2d Cir. 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 30, 36

*Jones* v. *United States*, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kastigar* v. *United States*, 406 U.S. 441 (1972)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 44, 45, 46

*Lefkowitz* v. *Cunningham*, 431 U.S. 801 (1977)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*LaRoche* v. *Wainwright*, 599 F.2d 722 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Lewis* v. *United States*, 385 U.S. 206 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lynum* v. *Illinois*, 372 U.S. 528 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Massachusetts* v. *Upton*, 466 U.S. 727 (1984)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Miranda* v. *Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Minnesota* v. *Murphy*, 465 U.S. 420 (1984)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Miranda* v. *Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Moos* v. *Norton*, 789 F. Supp. 352 (D.Kan. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Nelson* v. *Walker*, 121 F.3d 828 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*North Carolina* v. *Pearce*, 395 U.S. 711 (1969)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Oliviera* v. *Mayer*, 23 F.3d 642 (2d Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Oregon* v. *Elstad*, 470 U.S. 298 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 40

*Orozco* v. *Texas*, 394 U.S. 324 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Port* v. *Heard*, 764 F.2d 423 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Santiago Ortiz* v. *Kelly*, 687 F. Supp. 64 (E.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Schneckloth* v. *Bustamonte*, 412 U.S. 218 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 36

-iv-

*Tankleff* v. *Senkowski*, 135 F.3d 235 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 41

*Texas* v. *Brown*, 460 U.S. 730 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Thompson* v. *Keohane*, 516 U.S. 99 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Thomson* v. *Trombley*, No. 06-12619, 2008 WL 4427790 (E.D. Mich. Sept. 30, 2008) . . . . . . . 43

*Townsend* v. *Sain*, 372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Trammel* v. *United States*, 445 U.S.40 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*United States* v. *281 Syosset Woodbury Rd.*, 862 F. Supp. 847 (E.D.N.Y. 1994) . . . . . . . . . . . 66

*United States* v. *Abu Ali*, 528 F.3d 210 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States* v. *Ali*, 68 F.3d 1468 (2d Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States* v. *Anderson*, 929 F.2d 96 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 31

*United States* v. *Biaggi*, 909 F.2d 662 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States* v. *Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Boskic*, 545 F.3d 69 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States* v. *Bowen*, 689 F. Supp. 2d 675 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . 55, 59, 60

*United States* v. *Braxton*, 112 F.3d 777 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Byram*, 145 F.3d 405 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

*United States* v. *Canfield*, 212 F.3d 713 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States* v. *Cortez*, 449 U.S. 411 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States* v. *Comprehensive Drug Testing*, 579 F.3d 989 (9th Cir. 2009) . . . . . . . . . . . . . 60

*United States* v. *D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . 60

*United States* v. *Deas*, 3:07-CR-73 (CFD), 2008 WL 5063903 (D. Conn. Nov. 24, 2008) . . . 6, 7

*United States* v. *Doe*, 478 F.2d 194 (1st Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

-v-

*United States* v. *Duvall*, 537 F.2d 15 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Farhane*, 634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

*United States* v. *Ferguson*, 478 F. Supp. 2d 220 (D. Conn. 2007) . . . . . . . . . . . . . . . . . . . . . . . 7

*United States* v. *Fernandez*, No. 00 Cr. 420 (SWK), 2000 WL 1409738
 (S.D.N.Y. Sept. 22, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States* v. *Fiore*, 821 F.2d 127 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States* v. *Flemmi*, 225 F.3d 78 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Foxworth*, No. 3:06CR81 (AHN), 2006 WL 3462657
 (D. Conn. Nov. 16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States* v. *George*, 975 F.2d 72 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 58

*United States* v. *Ghailani*, 743 F. Supp. 2d 242 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Guarno*, 819 F.2d 28 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42

*United States* v. *Hall*, 421 F.2d 540 (2d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42

*United States* v. *Hammoud*, 381 F.3d 316, 326 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Hashmi*, 06 Cr. 442 (LAP), 2009 WL 4042841 (S.D.N.Y. Nov. 18, 2009) . . . . 4

*United States* v. *Helmsley*, 941 F.2d 71 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States* v. *Irons*, 646 F. Supp. 2d 927 (E.D. Tenn. 2008) . . . . . . . . . . . . . . . . . . . . . . . 66

*United States* v. *Jahedi*, 681 F. Supp. 2d 430 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . 6

*United States* v. *Josephberg*, 459 F.3d 350 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States* v. *Kaba*, 999 F.2d 47 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Kirsh*, 54 F.3d 1062 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*United States* v. *Kurzer*, 534 F.2d 511 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States* v. *Lebrun*, 363 F.3d 715 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27

*United States* v. *Lee*, 916 F.2d 814 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*United States* v. *Lefkowitz*, 618 F.2d 1313 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*United States* v. *Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52, 59, 61

*United States* v. *Mackiewicz*, 401 F.2d 219 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*United States* v. *Maniatis*, No. 2:07-CR-0024 DLJ, 2007 WL 1795761
    (E.D. Cal. Jun. 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Mason*, 660 F. Supp. 2d 479 (W.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States* v. *Mast*, 735 F.2d 745 (2d Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 30

*United States* v. *Mitchell*, 966 F.2d 92 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States* v. *Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Moore*, 968 F.2d 216 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States* v. *Mustafa,* 406 Fed. Appx. 526 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Numisgroup Intern. Corp.*, 128 F. Supp. 2d 136 (E.D.N.Y. 2000) . . . . . . . . . . 63

*United States v. O'Brien*, 498 F. Supp. 2d 520 (N.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States* v. *Okwumabua*, 828 F.2d 950 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 32

*United States* v. *Orlandez-Gamboa*, 320 F.3d 328 (2d Cir. 2003) . . . . . . . . . . . . . . 20, 21, 29, 31

*United States* v. *Paracha*, 313 Fed. Appx. 347 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Paracha*, 03 Cr. 1197 (SHS), 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) . . . 4, 14

*United States* v. *Patane*, 542 U.S. 630 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Perea*, 986 F.2d 633 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States* v. *Pirro*, 212 F.3d 86 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States* v. *Pollaro*, 733 F. Supp. 2d 364 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Pomares*, 499 F.2d 1220 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

-vii-

*United States* v. *Riley*, 906 F.2d 841 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51, 59

*United States* v. *Rivera*, No. 09-CR-619 (SJF), 2011 WL 1429125 (E.D.N.Y. Apr. 13, 2011) . . 6

*United States* v. *Roberts*, 852 F.2d 671 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 61

*United States* v. *Rivieccio*, 919 F.2d 812 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States* v. *Ruggles*, 70 F.3d 262 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29, 31

*United States* v. *Santos*, 131 F.3d 16 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Schwimmer*, 882 F.2d 22 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Serrano*, 870 F.2d 1 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States* v. *Singh*, 390 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States* v. *Southland Corp.*, 760 F.2d 1366 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . 30, 34

*United States* v. *Tramunti*, 513 F.2d 1087 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *Travisano*, 724 F.2d 341 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

*United States* v. *Treacy*, No. 08 Cr. 366 (RLC), 2009 WL 47496 (S.D.N.Y. Jan. 8, 2009) . . . . . 6

*United States* v. *Ventresca*, 380 U.S. 102 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041
(S.D.N.Y. Apr. 4, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60, 61

*United States* v. *Villegas*, 899 F.2d 1324 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

*United States* v. *Volpe*, 42 F.Supp.2d 204 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States* v. *Waker*, 534 F.3d 168 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*United States* v. *Walsh*, 194, F.3d 37 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*United States* v. *Wellman*, 830 F.2d 1453 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Williams*, 504 U.S. 36 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Wyatt*, 179 F.3d 532 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Yarborough* v. *Alvarado*, 541 U.S. 652 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25


**State Case**
*Johnson* v. *United States*, 609 A.2d 1112 (D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46


**United States Constitution Provisions**
U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*


**Federal Statutes**
18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1182 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 15, 57

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

22 U.S.C. § 2656f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

50 U.S.C. § 1705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


**Federal Rules And Regulations**
Fed. R. Crim. P. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

31 C.F.R. § 595.204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 8, 9

31 C.F.R. § 595.205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

31 C.F.R. § 595.315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA

                               :

        - v. -

                               :

WESAM EL-HANAFI,                           S4 10 Cr. 162 (KMW)
     a/k/a "Khaled," and        :
SABIRHAN HASANOFF,
     a/k/a "Tareq,"            :

                   Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS AND TO SUPPRESS

### I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pre-trial motions filed by defendants Sabirhan Hasanoff ("Hasanoff") and Wesam El-Hanafi ("El-Hanafi") to dismiss and to suppress various pieces of evidence.[1]  The defendants' motions should be denied in their entirety.

Hasanoff's motion for dismissal of certain counts of the Indictment on multiplicity grounds is premature.  Because the Double Jeopardy Clause protects against successive prosecution and sentences, it is inappropriate to reach the merits of a multiplicity motion before

---

[1] In this memorandum of law, the following abbreviations will be used.  The Memorandum Of Law In Support Of Defendant Sabirhan Hasanoff's Pre-Trial Motions will be referred to as "Hasanoff Br."; the Memorandum Of Law In Support Of Defendant Wesam El-Hanafi's Motion To Dismiss And Suppress will be referred to as "El-Hanafi Br."; the Declaration of Wesam El-Hanafi, dated June 6, 2011, will be referred to as the "El-Hanafi Decl."; the Declaration of John P. Cronan, dated August 12, 2011, will be referred to as the "Cronan Decl."; and the Declaration of Richard H. Paugh, August 12, 2011, will be referred to as the "Paugh Decl."

trial under Second Circuit precedent.  *See United States* v. *Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006).  Additionally, Hasanoff's challenge to Count Two of the Indictment, as failing to adequately allege an offense under Title 18, United States Code, Section 2339B, mischaracterizes the Indictment, which does allege all required elements of that offense.[2]

El-Hanafi's motion to suppress statements he made to law enforcement officers in Abu Dhabi in January 2010 and February 2010 also should be denied.  Far from having his will overborne, El-Hanafi, an educated and sophisticated young man, initiated contact with the United States Government to obtain his removal from the "no-fly" list;[3] voluntarily met with law enforcement agents on both occasions at agreed upon times and locations; emphasized his willingness to cooperate with the Government; and was never physically restrained or otherwise even remotely in custody.  Furthermore, the interview settings – a cafeteria and a hotel room – lacked any indicia of coercion, and El-Hanafi left the interviews on his own accord when he decided to do so.

El-Hanafi's numerous challenges to the search warrants that were issued on his email accounts also should be rejected because the search warrants were well supported by probable cause, sufficiently particular, and not overbroad.  El-Hanafi's allegation that the Government's review of his emails violated the attorney-client privilege is without merit because both the

---

[2]   Hasanoff's objection to the inclusion of "physical assets" in the definition of "material support" in Count One of the Indictment is moot, as the Government intends to supercede, utilizing the language reflected in the December 2004 amendment to Section 2339A(b)(1).

[3]   Sensitivity surrounding the individuals named on any "no-fly" list precludes the Government from either confirming or denying that El-Hanafi in fact had been placed on a "no-fly" list in January 2010.  For purposes of this memorandum of law only, however, the Government will assume the accuracy of El-Hanafi's allegation that he was on the "no-fly" list.

United States Attorney's Office and the JTTF arranged for a "wall" review of the email account

to ensure that the prosecution team would not be exposed to any privileged communications

between El-Hanafi and his current or former attorneys.

## II. BACKGROUND

The defendants initially were charged in Indictment S2 10 Cr. 162 (KMW), filed under

seal on March 2, 2010, with conspiring to provide material support and resources to an FTO,

namely, al Qaeda, in violation of Title 18, United States Code, Section 2339B. The defendants

were arrested on these charges, and together made their first appearance in the United States in

the Eastern District of Virginia on April 30, 2010. Hasanoff made his first appearance in the

Southern District of New York on May 17, 2010, and El-Hanafi made his first appearance in this

District on May 26, 2010, on which dates the defendants were arraigned before a United States

Magistrate Judge.

On September 14, 2010, a federal grand jury sitting in this District returned a superseding

indictment (the "Indictment") that charges both defendants in the same four counts. Count One

charges a conspiracy to provide material support and resources to a designed FTO, namely, al

Qaeda, in violation of Section 2339B. Count Two charges the defendants with providing and

attempting to provide material support and resources to a designated FTO, namely, al Qaeda, in

violation of Sections 2339B and 2. Counts Three and Four allege violations of the International

Emergency Economic Powers Act ("IEEPA"), and the federal regulations promulgated

thereunder. Count Three charges that the defendants participated in an IEEPA conspiracy, by

conspiring to make and receive a contribution of funds, goods, and services to, and for the

benefit of, al Qaeda, in violation of Title 50, United States Code, Section 1705(a), and Title 31,

Code of Federal Regulations, Sections 595.204 and 595.205.  Count Four charges the defendants

with a substantive IEEPA count, by making and receiving a contribution of funds, goods, or

services to, and for the benefit of, al Qaeda, in violation of Title 50, United States Code, Section

1705(a); Title 31, Code of Federal Regulations, Sections 595.204 and 595.205; and Title 18,

United States Code, Section 2.

Trial is scheduled for January 23, 2012.

### III. ARGUMENT

**A.**      **Hasanoff's Multiplicity Argument Is Foreclosed By Governing Second Circuit Law**

Like many prior terrorism defendants in this District and in other districts, the defendants

here are charged with both conspiracy and substantive under Section 2339B (Counts One and

Two, respectively) and conspiracy and substantive under IEEPA (Counts Three and Four,

respectively).  *See, e.g.*, *United States* v. *Hashmi*, 06 Cr. 442 (LAP), 2009 WL 4042841

(S.D.N.Y. Nov. 18, 2009); *United States* v. *Paracha*, 03 Cr. 1197 (SHS), 2006 WL 12768

(S.D.N.Y. Jan. 3, 2006); *United States* v. *Abu Ali*, 528 F.3d 210, 225-26 (4th Cir. 2008).

Hasanoff argues that these charges are improper – that Counts One and Two are lesser included

offenses of Counts Three and Four and therefore are multiplicitous.  *See* Hasanoff Br. at 15-22.

This argument is not persuasive.  The Supreme Court has held that the Double Jeopardy Clause

protects against multiple *convictions* for the same offense – not simultaneous *prosecutions* for

the same offense.  It follows from this bed-rock principle that the time for a "multiplicity"

challenge is post-trial (after multiple convictions have been returned) not pre-trial (before any

convictions have been returned).  That is the holding of *United States* v. *Josephberg*, 459 F.3d

350 (2d Cir. 2006), as well as many District Judges in this Circuit – all of which is ignored by

Hasanoff.

The multiplicity doctrine is predicated on the Double Jeopardy Clause of the Fifth Amendment, which, among other things, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court has explained that the Double Jeopardy Clause consists

> of three separate guarantees: (1) It protects against a second prosecution for the same offense after acquittal. (2) It protects against a second prosecution for the same offense after conviction. (3) And it protects against multiple punishments for the same offense.

*Illinois* v. *Vitale*, 447 U.S. 410, 415 (1980) (citing *North Carolina* v. *Pearce*, 395 U.S. 711, 717 (1969)) (internal alterations omitted). Because the concern of the Fifth Amendment's Double Jeopardy Clause is with the imposition of "multiple punishments for the same offense" and successive "prosecution for the same offense after conviction," the multiplicity doctrine is not implicated by simultaneous prosecution of multiple offenses that might arguably be the "same" for constitutional purposes. Therefore, the Second Circuit has flatly held that dismissal of multiplicitous counts should occur, if at all, *after* conviction, not before trial – when, by definition, there is no danger of either multiple punishment or successive prosecution. *See United States* v. *Josephberg*, 459 F.3d at 355.

While Hasanoff cites to *Josephberg* in his brief, he neglects to mention, let alone address, the Second Circuit's clear guidance that multiplicity arguments should not be resolved prior to conviction.[4] In *Josephberg*, the Second Circuit vacated the district court's pre-trial dismissal of a count on multiplicity grounds, concluding that the dismissal was premature. *See Josephberg*,

---

[4] Hasanoff cites *Josephberg* only for the general legal standards that control the multiplicity analysis. *See* Hasanoff Br. at 15-16.

459 F.3d at 354-55.  The court held that, "[w]here there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed."  *Id.* at 355.  The court explained:

> If the jury convicts on no more than one of the multiplicitous counts, there has been no violation of the defendant's right to be free from double jeopardy, for he will suffer no more than one punishment.  If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts.  Or, if judgment of conviction has been entered on more than one such count, the district court should vacate the conviction on all but one.

*Id.* (internal citations omitted).

In the wake of *Josephberg*, it is crystal clear that the remedy in this Circuit for multiplicity is not pre-trial dismissal of counts; the remedy, if any, must be imposed after conviction.  *See, e.g.*, *United States* v. *Rivera*, No. 09-CR-619 (SJF), 2011 WL 1429125, at *4 (E.D.N.Y. Apr. 13, 2011) ("Since it is possible that the jury will convict defendants on only one (1) of the respective counts that they allege are multiplicitous, and acquit defendants on all of the counts with which they allege that count is multiplicitous, the issue of whether the counts are multiplicitous in violation of the Double Jeopardy Clause is premature at the pretrial stage"); *United States* v. *Jahedi*, 681 F. Supp. 2d 430, 437 (S.D.N.Y. 2009) (declining to decide the defendant's multiplicity motion pre-trial in light of *Josephberg*); *United States* v. *Treacy*, No. 08 Cr. 366 (RLC), 2009 WL 47496, at *3 (S.D.N.Y. Jan. 8, 2009) (finding defendant's pre-trial motion to compel Government to elect between counts to be premature under *Josephberg*); *United States* v. *Deas*, 3:07-CR-73 (CFD), 2008 WL 5063903, at *2 (D. Conn. Nov. 24, 2008) (finding that the dismissal of a multiplicitous count before trial is premature because the proper

remedy is for the district court to vacate one of the multiplicitous convictions); *United States* v.

*Ferguson*, 478 F. Supp. 2d 220, 233 (D. Conn. 2007) (finding that the defendants' Double

Jeopardy rights were only at risk of violation after their conviction on multiplicitous charges, not

pre-trial); *United States* v. *Foxworth*, No. 3:06CR81 (AHN), 2006 WL 3462657, at *4 (D. Conn.

Nov. 16, 2006) (holding that "it is clear that the Second Circuit has held that the appropriate time

to decide whether counts in an indictment are multiplicitous is after the jury convicts on more

than one of the multiplicitous counts," and explaining that this is because "[t]he only way

multiplicitous counts in an indictment can violate the Double Jeopardy Clause of the Fifth

Amendment is if a jury convicts on both counts, which can result in two punishments for the

same crime").

      Against *Josephberg* and its progeny, Hasanoff seems to argue that this Court should not

wait until a conviction is attained to reach his multiplicity argument, suggesting that the mere

filing of the Indictment results in "inherent jeopardy." Hasanoff Br. at 27-28. Hasnaoff's

inability to provide offer any legal support for this concept of pre-conviction "inherent jeopardy"

is not surprising, because the law in this Circuit is flatly to the contrary. *See Josephberg*, 459

F.3d at 354-55. Also unavailing is Hasnaoff's citation to the Supreme Court's decision in *Ball* v.

*United States*, 470 U.S. 856 (1985), to support his request for pre-trial resolution of his

multiplicity motion. *See* Hasanoff Br. at 27-28. Far from lending support to Hasanoff's

position, the Supreme Court in *Ball* made clear that multiplicitous counts should be dismissed

only after a conviction is attained. Noting "the Government's broad discretion to conduct

criminal prosecutions, including its power to select the charges to be brought in a particular

case," the Court found "no bar to the Government's proceeding with prosecution simultaneously

under the two statutes," which the Court found to be multiplicitous. *Ball* v. *United States*, 470

U.S. at 859-60.

Moreover, Hasanoff's pre-trial multiplicity argument essentially invites the Court to issue

an advisory opinion. Without the benefit of the evidence adduced at trial, it is impossible to

determine whether any of the counts are multiplicitous.

In addition, there are of course a host arguments that the Government could assert as to

why the various counts of the Indictment, even in the abstract, are not multiplicitous. Applying

the test established by the Supreme Court in *Blockburger* v. *United States*, 281 U.S. 299 (1932),

the Section 2339B and IEEPA offenses plainly contain elements missing from the other.[5] For

instance, Section 2339B has broad extraterritorial reach, whereas the IEEPA violation applies to

"U.S. person[s]," 31 C.F.R. § 595.204, which is defined to include "any United States citizen,

permanent resident alien, entity organized under the laws of the United States or any jurisdiction

within the United States (including foreign branches); or any person in the United States," 31

C.F.R. § 595.315. To cite another example, IEEPA requires an absence of authorization that is

missing from Section 2339B. *See* 31 C.F.R. § 595.204 (prohibiting a United States person from

---

[5]   The Second Circuit has adopted a three-step inquiry to assess post-conviction multiplicity challenges:  (1) if the offenses charged are set forth in different statutes or in distinct sections of a statute, and each section authorizes punishment, it is ordinarily to be inferred that Congress intended to authorize separate punishment; (2) whether each statutory provision requires proof of a fact absent in the other, *i.e.*, the *Blockburger* test; and (3) if the offenses are distinct under *Blockburger*, the multiplicity challenge fails unless the court finds clear congressional intent to bar prosecuting a defendant for both offenses. *See United States* v. *Fiore*, 821 F.2d 127, 130 (2d Cir. 1985). The first and third prongs of this analysis clearly weigh against a finding of multiplicity, because Section 2339 and IEEPA contemplate their own punishment schemes, and because, as Hasanoff acknowledges, *see* Hasanoff Br. at 22, the legislative history appears to be silent as to any congressional intent to bar prosecuting a defendant under both Section 2339B and IEEPA.

dealing in property or interests in property of a specially designated terrorist, "[e]xcept as otherwise authorized").  In addition, Section 2339B requires proof that the defendant knew that the subject terrorist organization was either designated an FTO by the Secretary of State or that the organization engages or has engaged in or engages in terrorist activity, *see* 18 U.S.C. § 1182(a)(3)(B)(iii), or terrorism, *see* 22 U.S.C. § 2656f(d)(2).  *See* 18 U.S.C. § 2339B(a)(1). IEEPA does not require proof of the same level of knowledge by the defendant.

It also is worth noting that Hasanoff's argument that the Section 2339B attempt in Count Two charges the same offense as the Section 2339B conspiracy in Count One, *see* Hasanoff Br. at 23-27, stands in direct conflict with Supreme Court and Second Circuit precedent.  The Supreme Court has rejected the notion that it is even "an open question whether conspiracy and its substantive aim merge into a single offense."  *Callanan* v. *United States*, 364 U.S. 587, 597 (1961).  Consistent with *Callanan*, the Second Circuit has held that convicting a defendant of both an attempt and a conspiracy under Section 2339B does not violate a defendant's double jeopardy rights.  *See United States* v. *Farhane*, 634 F.3d 127, 153 (2d Cir. 2011).  Indeed, *Farhane* is directly on point and dispositive with respect to the ultimate merits of the Count One/Count Two multiplicity argument.  In *Farhane*, the defendant was convicted of attempting to provide and conspiring to provide material support to a designated FTO, al Qaeda, in violation of Section 2339B.  The proof in *Farhane* established that the defendant agreed to provide medical support to al Qaeda and attempted to provide himself as "personnel" based on that same agreement.  *See Farhane*, 634 F.3d at 133-34, 153.  In affirming the verdict, the majority rejected a concern raised *sua sponte* in the dissent regarding the double jeopardy implications of dual convictions under the attempt and conspiracy provisions of Section 2339B.  *See id.* at 153.

-9-

The court explained:

> An attempt to provide personnel does not require proof of concerted action, an essential element of conspiracy. Moreover, a conspiracy requires only proof of an agreement to provide personnel, not any substantial step toward such provision.

*Id.*; *see United States* v. *Bin Laden*, 91 F. Supp. 2d 600, 617 (S.D.N.Y. 2000) (rejecting argument "that the inclusion of a substantive offense and a prohibition on conspiring to commit that offense in the same section of a statute alters the fundamental rule that a conspiracy and the substantive offense are separate crimes").[6]

Hasanoff cites extensively from then-Chief Judge Raymond J. Dearie's dissent in *Farhane* to suggest that the majority was wrong. *See* Hasanoff Br. at 26-27. The Second Court's majority decision in *Farhane*, of course, is what controls. Further, notwithstanding Hasanoff's implicit criticism of the Second Circuit's holding in *Farhane*, *see* Hasanoff Br. at 24-25, the *Farhane* majority's analysis was correct and appropriately distinguished between conspiracy and attempt offenses under Section 2339B. Convictions under a statute's conspiracy and substantive provisions are hardly uncommon. *See Callanan*, 364 U.S. at 597 ("This is an ordinary case of a defendant convicted of violating two separate provisions of a statute, whereby Congress defined two historically distinctive crimes composed of differing components.").[7]

_____

[6] Because Section 2339B conspiracy and substantive charges are distinct offenses, there is no basis to apply the rule of lenity, as Hasanoff urges. *See* Hasanoff Br. at 26. The rule of lenity "operates only where there is a fair basis for the construction urged by the defense," *United States* v. *Southland Corp.*, 760 F.2d 1366, 1374 (2d Cir. 1985), and the Second Circuit in *Farhane* repudiated the very construction of Section 2339B that Hasanoff advocates.

[7] While immaterial to the issue of whether attempt and conspiracy offenses under Section 2339 are multiplicitous, Hasanoff incorrectly asserts that, in this case, "the alleged conspiracy is the sole evidence of the alleged attempt." Hasanoff Br. at 27. The Government expects to prove at trial that the defendants entered into an agreement to support to al Qaeda. El-Hanafi entered into this agreement when he met with members of al Qaeda in Yemen in

In sum, the constitutional protection against Double Jeopardy will be implicated here, if at all, only after trial. Thus, Hasanoff's motion for pre-trial dismissal based on multiplicity of counts is premature and should be denied.

**B.      Hasanoff's Suggestion That Count Two Fails To Adequately Allege A Crime Is Belied By The Indictment**

Next, Hasanoff argues that Count Two should be dismissed because it fails to allege two essential elements of Title 18, United States Code, Section 2339B: (1) that the defendants provided or attempted to provide material support *to a foreign terrorist organization*, as opposed to an individual; and (2) that the defendants acted with the required *mens rea*. *See* Hasanoff Br. at 5-6. Hasanoff further argues that the Indictment is unconstitutionally vague because it fails to allege the requisite knowledge. *See id.* at 7-10. Each of these arguments rest on a mischaracterization of the Indictment, which properly alleges all elements of Section 2339B.

It is a basic principle of criminal law that a defendant is entitled to an indictment that states the essential elements of the charge against him. *See Jones* v. *United States*, 526 U.S. 227, 232 (1999); *United States* v. *Pirro*, 212 F.3d 86, 91-92 (2d Cir. 2000). But little more is required. *See* Fed. R. Crim. P. 7(c)(1) (describing indictment as a "concise . . . statement of the essential facts."). Indeed, the Court of Appeals has "consistently upheld indictments that 'do little more

---

February 2008, and Hasanoff joined the conspiracy after El-Hanafi returned from Yemen to the UAE. In addition to this meeting of the minds, the Government expects to prove that both defendants attempted to provide, and in fact provided, material support and resources to al Qaeda in a number of ways, including providing technical advice and guidance, sending financial support, purchasing items that they understood to be desired by al Qaeda, and attempting to travel to fight in support of the jihad. Thus, like the defendant in *Farhane*, both Hasanoff and El-Hanafi entered into a conspiratorial agreement and subsequently took "substantial step[s] manifesting [their] 'firm disposition' to provide" material support to al Qaeda. *Farhane*, 634 F.3d at 153.

than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States* v. *Walsh*, 194, F.3d 37, 44 (2d Cir. 1999) (citing *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).  The indictment in this case plainly exceeds this standard.

As an initial matter, the Indictment clearly alleges the required elements in this case. First, the Indictment specifically charges that Hasanoff and El-Hanafi provided material support to an FTO:

> WESAM EL-HANAFI, a/k/a "Khaled," and SABIRHAN HASANOFF, a/k/a "Tareq," the defendants, and others known and unknown, unlawfully, willfully, and knowingly *did provide and attempt to provide "material support or resources,"* as that term is defined in Title 18, United States Code, Section 2339A(b)(1), namely, property, tangible and intangible, and services, including currency and physical assets, *to a foreign terrorist organization, to wit, al Qaeda,* which has been designated by the United States Secretary of State as a foreign terrorist organization . . . .

Indictment S4 10 Cr. 162 (KMW) (emphasis added).  Hasanoff's suggestion to the contrary simply runs aground on the language of the Indictment.

Second, the Indictment also alleges the require *mens rea*, stating that defendants provided, and attempted to provide, material support and resources  "knowing that al Qaeda was designated a terrorist organization . . . that al Qaeda had engaged and was engaging in terrorist activity . . . and that al Qaeda had engaged in and was engaging in terrorism." *Id*.  Again, this passage of the Indictment is fully dispositive of Hasanoff's claims.  The Indictment tracks the language of the relevant statute – in spite of Hasanoff's suggestion to the contrary, and in compliance with *Walsh*.

Despite this clear recitation of the required elements, Hasanoff purports to challenge the legality of the Indictment – which is sufficient on its face – by questioning the Grand Jury's

-12-

factual conclusion that the defendants provided material support to al Qaeda by "provid[ing] financial support, equipment, and technical advice to al Qaeda associates in Yemen and elsewhere." Based on this language, Hasanoff asserts that the Indictment is faulty because providing material support to "persons in their individual capacity" is not a violation of Section 2339B. Hasanoff Br. at 5. This challenge is entirely improper in this context. The Indictment satisfactorily alleges that the defendants provided material support to an FTO, and the Grand Jury concluded that the defendants accomplished that end by providing financial support, equipment and technical advice to specific al Qaeda associates located in Yemen and elsewhere. The defendants can of course take issue with the Grand Jury's faction conclusion at trial. But at this stage, there is no basis for arguing to the Court, as the defendant essentially does, that providing support to a particular al Qaeda associate did not amount to support to al Qaeda. *See United States* v. *Williams*, 504 U.S. 36, 54 (1992) (holding that, in the pretrial context, the factual inferences drawn by the Grand Jury must be taken as true).

Moreover, there can be no suggestion that the Grand Jury was somehow legally precluded from making the factual inferences it did. Terrorist organizations such as al Qaeda of course operate through their members and associates; they do not operate as a corporate entity. One wishing to support al Qaeda financially would not simply write a check made out to "al Qaeda." Rather, that person would give the money to someone affiliated with the organization, with the knowledge that the person is affiliated with the terrorist group. Support rendered to an FTO through its members certainly can constitute support to the organization itself. No one would suggest that knowing support to Usama bin Laden could not be found by a Grand Jury to be support to al Qaeda. In fact, a scenario like the one at issue in this case has provided the

-13-

factual basis for many convictions under Section 2339B.  *See, e.g.*, *United States* v. *Mustafa,* 406 Fed. Appx. 526, 530 (2d Cir. 2011) (conviction under Section 2339B upheld for, *inter alia*, providing training to aspiring jihadists for the benefit of al Qaeda); *United States* v. *Hammoud*, 381 F.3d 316, 326, 374 (4th Cir. 2004) (conviction for violating Section 2339B for providing $3,500 to Hizballah "by transmitting $ 3,500 to Sheik Abbas Harake via Said Harb").  Because, in this case, Hasanoff and El-Hanafi provided material support to al Qaeda through individuals, the Government intends to prove that the defendants did so believing that the individuals were associates of al Qaeda.  Neither the language in the Indictment, nor the evidence that the Government plans to present at trial, suggests otherwise.  To the extent the defendants wish to defend against this claim by asserting that they were providing support to these individuals solely in their individual capacity, they can of course do so at trial.

Finally, the only relevant case cited by Hasanoff, *United States* v. *Paracha*, 2006 WL 12768, further demonstrates the sufficiency of the Indictment in this case.  In *Paracha*, the defendant was convicted of violating Section 2339B by taking possession of identification documents and other items in the name of a person that the defendant knew to be an al Qaeda associate, conducting financial transactions involving that al Qaeda associate's bank account, and posing as that person when seeking information concerning the issuance of immigration documents.  *See United States* v. *Paracha*, 313 Fed. Appx. 347 (2d Cir. 2008) (affirming conviction); *Paracha*, 2006 WL 12768, at *2 (describing charged conduct).  Similarly, the defendants in this case are charged with providing material and support and resources to al Qaeda through individuals that they knew to have been associated with al Qaeda.

For the same reasons, Hasanoff's argument that Section 2339B is unconstitutionally

-14-

vague because the defendants lacked notice that assistance to an individual member of al Qaeda could violate Section 2339B, also fails.  Again, the Indictment clearly states that the defendants provided material support to al Qaeda.  Accordingly, the material support charges are not impermissibly vague and the defendants have been sufficiently informed of the offense with which they are charged.[8]

## C.  El-Hanafi's January And February 2010 Statements To The FBI Should Not Be Suppressed

Next, El-Hanafi moves to suppress the statements he made to the FBI in the UAE on January 21, 2010 and February 5, 2010 (the "January 2010 interview" and the "February 2010 interview," respectively), on the grounds that (1) the Government forced him to make

---

[8]  Hasanoff also asserts that the inclusion of the term "physical assets" in Count One of the Indictment should be stricken, as that term is not included in the definition of "material support" in Section 2339A(b)(1), as amended in December 2004.  Title 18, United States Code, Section 2339B(g)(4) adopts the definition of "material support or resources" in Section 2339A(b)(1).  In December 2004, the definition of "material support or resources" was amended to, *inter alia*, remove "physical assets" and now is defined to mean:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

Pub. L. No. 108-458, § 6603(b), 118 Stat. 3638 (Dec. 17, 2004) (codified as amended at 18 U.S.C. § 2339A(b)(1)); *see* 18 U.S.C. § 2339B(g)(4) (adopting definition of "material support or resources" in Section 2339A(b)(1) for use in Section 2339B).

In the upcoming weeks, the Government intends to seek a superseding indictment which tracks the revised definition of "material support or resources" in Section 2339A(b)(1) for Counts One and Two.  If the Grand Jury does not return a superseding indictment with such revision, the Government will agree to strike the "physical assets" language from Counts One and Two of the Indictment.  Accordingly, Hasanoff's challenge to the "physical assets" language of the Indictment will be moot shortly.

involuntary statements under threat of continued exile from his place of birth, *see* El-Hanafi Br.

at 22-27, and that (2) he was subjected to custodial interrogation at the February 2010 interview

without being advised of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436 (1966), *see id.*

at 27-29.  El-Hanafi thus make two related, but legally distinct, arguments for suppression of his

statements.  First, El-Hanafi argues that, separate and apart from whether he was in custody, his

statements to the FBI during the January 2010 and February 2010 interviews were coerced in

violation of the Fifth Amendment and should be suppressed.  Second, El-Hanafi contends that at

some point the February 2010 interview turned custodial and any questioning after that point

occurred in violation of *Miranda*.  El-Hanafi further claims that the Indictment must be

dismissed unless the Government establishes at a *Kastigar* hearing that no direct or derivative

use was made of his statements.  *See id.* at 29-30.

Even assuming the truth of the factual allegations contained in El-Hanafi's affidavit – as

the Government does solely for the purposes of this memorandum of law – El-Hanafi's motion

can and should be denied without a hearing for the reasons set forth below.

**1.      Factual Background:  The January 2010 and February 2010 Interviews**[9]

On January 15, 2010, about 3 ½ months prior to his arrest in this case, El-Hanafi called

the United States Embassy in Abu Dhabi to request assistance after he had been denied

permission to fly to the United States earlier that day.  *See* El-Hanafi Decl. ¶¶ 3, 4.  Two days

later, on January 17, 2010, El-Hanafi sent an email to the American Citizen Services Unit

_____

[9] The recitation of the events surrounding El-Hanafi's January 2010 and February 2010
interviews in the UAE is based primarily on El-Hanafi's declaration in support of his motion to
suppress.  *See generally* El-Hanafi Decl.  The summary of El-Hanafi's statements to the agents is
based primarily on reports prepared by the interviewing officers.  *See* Cronan Decl. Exhs. D-G.

-16-

("ACS") of the Embassy again seeking assistance in being allowed to fly to the United States. *See id.* ¶ 5. El-Hanafi subsequently provided the ACS copies of his passport, his wife and children's passports, and his UAE residency visa. *See id.* The next day, on January 18, 2010, El-Hanafi traveled to the Embassy and discussed his situation with a woman at the ACS information window. *See id.* ¶ 6. A couple of days later, on January 20, 2010, El-Hanafi emailed the Department of Homeland Security ("DHS") copies of his family's passports as well as a signed DHS Traveler Redress Inquiry Program ("TRIP") form. *See id.* ¶ 9. Also on January 20, 2010, El-Hanafi again reached out to the same Embassy employee whom he had spoken with on January 18, 2010, and that employee supplied El-Hanafi with contact information for Gary Price, explaining that Price would be able to help El-Hanafi arrange for his travel. *See id.* ¶ 7. At the time, Price was an FBI Special Agent, serving as the FBI's Legal Attaché at the United States Embassy in Abu Dhabi.

On January 21, 2010, El-Hanafi and Legal Attaché Price met at the cafeteria of the Embassy in Abu Dhabi, and discussed El-Hanafi's inability to travel to the United States. *See* El-Hanafi Decl. ¶ 10. During this interview, which was not preceded by *Miranda* warnings, El-Hanafi provided background and family information, and related the circumstances of his unsuccessful attempt to travel to the United States earlier that month. *See id.*; Cronan Decl. Exh. B at 1-2. At the conclusion of the conversation in the cafeteria, El-Hanafi told Legal Attaché Price that he "was willing to do whatever necessary to get off the ["no-fly"] list, including cooperate with interviews." El-Hanafi Decl. ¶ 10; Cronan Decl. Exh. B at 2. According to El-Hanafi, it was at this point that he first realized Legal Attaché Price's affiliation with the FBI. *See* El-Hanafi Decl. ¶ 10.

-17-

Following their January 21, 2010 meeting in the cafeteria, El-Hanafi and Legal Attaché Price exchanged several emails concerning El-Hanafi's travel status.  *See* El-Hanafi Decl. ¶ 12. El-Hanafi also followed up with DHS regarding the TRIP form that he had submitted, spoke with a Citizen Services Specialist with the Department of State about his inability to travel, and contacted the Transportation Security Administration.  *See id.* ¶¶ 15, 16, 17.  On February 4, 2010, El-Hanafi spoke with Legal Attaché Price again, and Legal Attaché Price advised El-Hanafi that he could arrange for an interview the next day, February 5, 2010, with individuals responsible for the "no-fly" list.  *See id.* ¶ 18.

On February 5, 2010, El-Hanafi met with Detective Daniel Withers and Special Agent Joseph Landers at the Abu Dhabi Hilton, to speak with the officers about El-Hanafi's denial of travel.  *See* El-Hanafi Decl. ¶ 20.[10]  During the interview, which was not preceded by *Miranda* warnings, El-Hanafi discussed his employment and travel history, including a February 2008 trip to Yemen, which El-Hanafi claimed was for job interviews.  *See* Cronan Decl. Exh. C at 1-2.  El-Hanafi also discussed the email accounts and telephone numbers that he was using at the time, and provided information on various individuals.  *See id.* at 3-4.

El-Hanafi also made a number of false exculpatory statements about his money transfers during the February 2010 interview.  For example, when asked whether he made any wire transfers, El-Hanafi stated that he had only sent two wire transfers to his family in the United States and two transfers to his wife's family in Egypt.  *See* Cronan Decl. Exh. C at 3.  When asked directly, El-Hanafi denied ever sending money to Yemen.  *See id.*  The Government will

_____

[10]     El-Hanafi does not allege that Special Agent Landers or Detective Withers ever displayed any weapons, that he was ever placed in handcuffs or other physical restraints, or that any local law enforcement officers were present for the interview.  *See generally* El-Hanafi Decl.

establish at trial that El-Hanafi made a number of wire transfers to support al Qaeda, and that he both delivered money to Yemen and sent money via courier to Yemen, also to support al Qaeda.

El-Hanafi also admitted to knowing an individual ("CC-2"), whom the Government intends to argue was one of the defendants' primary contacts with al Qaeda.  *See* Cronan Decl. Exh. C at 6.  El-Hanafi changed his story about how he encountered CC-2 in the UAE, initially claiming that he met CC-2 in a park in Sharjah, UAE, and then claiming that he was introduced to CC-2 by someone he knew from a local mosque.  *See id.*  El-Hanafi said that he last spoke with CC-2 while CC-2 was in Malaysia.  *See id.*  When questioned further about Malaysia, El-Hanafi tried to change the subject and declined to discuss the topic further.  *See id.*

El-Hanafi and the law enforcement officers disagree about what happened next. According to El-Hanafi, after Detective Withers accused him of making inconsistent statements, El-Hanafi "asked for an attorney," and Detective Withers and Special Agent Landers continued to question him.  El-Hanafi Decl. ¶ 22.  El-Hanafi claims that Detective Withers then showed him copies of Western Union wire transactions and continued to interrogate him, at which point El-Hanafi asked to speak to a lawyer for a second time and the interview ended.  *See id.* ¶ 23.

The law enforcement officers, however, would offer a slightly different version of these last events.  According to the officers, El-Hanafi commented that he thought he should have a lawyer present, but did not ask for a lawyer or state that he wanted one present.  *See* Cronan Decl. Exh. C at 6.  The officers then showed El-Hanafi various wire transfer records, including some records that the Government expects to establish at trial that El-Hanafi sent to CC-1 to support al Qaeda.  *See id.*  El-Hanafi then stated that he wanted to contact his lawyer, at which point the interview was terminated.  *See id.* at 6-7.

After the interview ended, Detective Withers and El-Hanafi walked out of the hotel room, to the elevator, and then to the hotel lobby.  *See* El-Hanafi Decl. ¶¶ 23, 24; Cronan Decl. Exh. D at 1.  According to Detective Withers, El-Hanafi then made certain statements spontaneously, without being interrogated or otherwise prompted.  *See* Cronan Decl. Exh. D at 1.  In particular, El-Hanafi admitted to sending money to CC-1, claiming "that it wasn't that much money and he [CC-2] was broke and needed some money."  *See id.*

### 2.       El-Hanafi's Statements Were Neither Coerced Nor Involuntary

#### a.       Legal Standards For The Voluntariness Of A Defendant's Statement

Under the Fifth Amendment, a confession is admissible only if it is made voluntarily. *See, e.g.*, *Dickerson* v. *United States*, 530 U.S. 428, 433-34 (2000); *United States* v. *Orlandez-Gamboa*, 320 F.3d 328, 332 (2d Cir. 2003). The test for voluntariness requires evaluation of "the totality of the circumstances . . . to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined," *United States* v. *Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (internal quotation marks and citations omitted); *see generally Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973).  Relevant circumstances include "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics."  *Nelson* v. *Walker*, 121 F.3d 828, 833 (2d Cir. 1997); *accord United States* v. *Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) (factors to determine voluntariness of a defendant's statement "include the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of

-20-

interrogation") (citing *United States* v. *Mast*, 735 F.2d 745, 749 (2d Cir.1984)).  "'No single

criterion controls'" this analysis.  *Nelson* v. *Walker*, 121 F.3d at 833 (quoting *Green* v. *Scully*,

850 F.2d 894, 901 (2d Cir. 1988)).

It is well established that "the presence of a direct or implied promise of help or leniency

alone" does not "bar[] the admission of a confession where the totality of the circumstances

indicates it was the product of a free and independent decision."  *United States* v.

*Orlandez-Gamboa*, 320 F.3d at 333 (internal quotation marks omitted).  "[S]tatements to the

effect that it would be to a suspect's benefit to cooperate," for example, "are not improperly

coercive."  *United States* v. *Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995).[11]  Nor does the use of

trickery by law enforcement officers render a confession involuntary.  *See, e.g.*, *United States* v.

*Anderson*, 929 F.2d 96, 99 (2d Cir. 1991); *see also, e.g.*, *United States* v. *Byram*, 145 F.3d 405,

408 (1st Cir. 1998) ("[T]rickery is not automatically coercion . . . .  [I]t would be very hard to

treat as coercion a false assurance to a suspect that he was not in danger of prosecution.").

Indeed, as a general matter, "ploys to mislead a suspect or lull him into a false sense of security

that do not rise to the level of compulsion or coercion to speak" do not render a defendant's

statements involuntary.  *Illinois* v. *Perkins*, 496 U.S. 292, 297 (1990) (declining to suppress

un-*Mirandized* statements made to an undercover officer posing as a fellow inmate).  That is

---

[11]   Indeed, unfulfilled promises of non-prosecution are not even impermissibly coercive
where the circumstances are otherwise non-coercive.  *See, e.g.*, *United States* v. *Lebrun*, 363
F.3d 715, 725-27 (8th Cir. 2004) (en banc) (assurances of non-prosecution did not render a
confession involuntary where questioning was brief and the defendant, who was relatively
sophisticated, understood his *Miranda* rights); *United States* v. *Flemmi*, 225 F.3d 78, 91-92 (1st
Cir. 2000) (despite agents' promises of use and derivative use immunity, the defendant's
statements subsequently intercepted on a wire were not involuntary, where he was not
incarcerated, there were no threats of violence, and no "consciously misleading conduct" by the
agents).

because of the axiomatic principle that the Fifth Amendment "forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust." *Id.*; *see also, e.g.*, *Frazier* v. *Cupp*, 394 U.S. 731, 739 (1969) (holding that a misrepresentation by police that the defendant's cousin had already confessed to a homicide did not make the defendant's confession involuntary); *Tankleff* v. *Senkowski*, 135 F.3d 235, 244, 245 (2d Cir. 1998) (holding that a suspect's statements were not involuntary even though, among other things, the police falsely told him that a victim had awakened from a coma and implicated him). Thus, the use of ruses by law enforcement has long been held to be proper. *See, e.g.*, *Lewis* v. *United States*, 385 U.S. 206, 209 (1966) ("in the detection of many types of crimes, the Government is entitled to use decoys and to conceal the identity of its agents"); *Alexander* v. *State of Conn.*, 917 F.2d 747, 751 (2d Cir. 1990) (explaining that "[d]eception which takes advantage of a suspect's misplaced trust in a friend does not implicate the right against self-incrimination").

> **b.    El-Hanafi Was Not Coerced When He Spoke With American Law Enforcement In The UAE**

While conceding, as he must, that law enforcement ruses can be appropriate at times, El-Hanafi insists that the Government's ruse in this case was unacceptable because of "the highly coercive effect of the pretext used to induce him to meet and speak with the FBI."  El-Hanafi's Br. at 25.  El-Hanafi contends that his statements were coerced because "if he wanted to travel home, he had no choice but to answer the questions posed by the FBI."  *Id.* at 24.  But there is a complete absence – even on El-Hanafi's account – of anything that might plausibly be labeled coercive conduct on the part of the interviewing officers.  This is a fatal flaw.

Indeed, the Supreme Court has made clear that only confessions procured by coercive official tactics should be excluded as involuntary.  *See Colorado* v. *Connelly*, 479 U.S. 157, 167

(1986) ("We hold that coercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); *id.* at 170 ("The sole concern of the Fifth Amendment . . . is governmental coercion."); *Oregon* v. *Elstad*, 470 U.S. 298, 304-05 (1985) (Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion"); *see also, e.g.*, *Townsend* v. *Sain*, 372 U.S. 293, 298-99 (1963) (finding confession involuntary where it was obtained after the police administered a truth-serum drug); *Blackburn* v. *Alabama*, 361 U.S. 199, 207-08 (1960) (finding confession involuntary where police engaged in coercive tactics to exploit the suspect's mental issues). In *Connelly*, the Court held that a confession was admissible, even though a psychiatric expert opined that the statement was the product of a psychotic state that undermined the individual's ability to make a free and rational choice to speak with law enforcement. *See Colorado* v. *Connelly*, 479 U.S. at 161-62. The *Connelly* Court rejected the state supreme court's failure to require a link between coercive activity of law enforcement and the resulting confession, which would have inserted "a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that government conduct coerced his decision." *Id.* at 165-66. The Court continued, "[o]nly if we were to establish a brand new constitution right – the right of a criminal defendant to confess to his crime only when totally rational and properly motivated – could respondent's present claim be sustained." *Id.* at 166. The Court therefore refused to require that courts conduct "sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State." *Id.* at 166-67. Accordingly, after *Connelly*, the inquiry into "'[f]ree

choice' is no longer a touchstone" in the voluntariness analysis; rather, "only confessions procured by *coercive official tactics* should be excluded as involuntary." *United States* v. *Byram*, 145 F.3d at 407 (citing *Connelly*, 479 U.S. at 167; *United States* v. *Santos*, 131 F.3d 16, 19 (1st Cir. 1997)) (emphasis in original).

Similar to the situation in *Connelly*, El-Hanafi's own description of the January 2010 and February 2010 interviews simply lack any indicia whatsoever of coercive police tactics. Quite the opposite, El-Hanafi desired to speak with the offers, and in fact initiated the contact with the United States Government that led to the interviews. Even assuming *arguendo* that El-Hanafi's desire to travel to the United States to be with his wife made his decision to speak with the FBI an irrational decision, that consideration is not part of the voluntariness equation after *Connelly*. The proper question is simply whether the Government's ruse, as employed, constituted "coercive police activity." *Connelly*, 479 U.S. at 168.

In this case, there was no official coercion on the part of the interviewing officers. The totality of the circumstances – including the conditions and terms of the questioning, the conduct of the agents, and El-Hanafi's background and characteristics, *see Nelson*, 121 F.3d at 833 – makes clear that El-Hanafi's statements were voluntarily made and in an effort to curry favor with the United States government to allow him to fly to the United States. The facts as alleged by El-Hanafi himself demonstrate that his statements to the FBI were not the product of coercion or an overborne will. Accordingly, while the Government would dispute some of El-Hanafi's factual allegations, his motion to suppress the statements should be denied without a hearing, even crediting the veracity of those allegations.

First, the environment of El-Hanafi's meetings with the officers weighs heavily in favor

of finding voluntariness.  El-Hanafi was not interviewed in a jail cell, a police station, or some other coercive environment typically associated with law enforcement.  *See, e.g.*, *United States* v. *Newton*, 369 F.3d 659, 671 (2d Cir. 2004).  El-Hanafi alleges that his January 21, 2010 interview with Legal Attaché Price occurred at the cafeteria of the United States Embassy in Abu Dhabi, *see* El-Hanafi Decl. ¶ 10, and that his second interview, on February 5, 2010, occurred in a room at the Hilton hotel in Abu Dhabi, *see id.* ¶ 19.  El-Hanafi describes the setting of this February 5, 2010 interview as follows:

> John [from the FBI's office at the Embassy] told me that I should go to the Hilton Hotel.  I did, and met Daniel Withers from the FBI in the lobby of the hotel.  He escorted me upstairs to a room, where I also met Joe Landers.  He used a key to unlock the hotel room.  The room appeared to be a suite, and there was another room adjacent to the room where I was questioned.  I never went inside the other room, or saw whether there were additional individuals inside of that room.  During the interview, Agents Withers and Landers often got up and went back and forth between the rooms.

*Id.* ¶ 19.

A cafeteria and a Hilton suite are distant cries from coercive environments like a jail cell or a police station.  In both settings, El-Hanafi was entirely free to leave the interview at any point.  El-Hanafi in fact did leave the hotel room interview – at his request, and before the agents completed their questions of him.  *See* El-Hanafi Decl. ¶ 23.  Accordingly, there cannot be any question that El-Hanafi realized that he was voluntarily present in the hotel room, was speaking under his own accord, and was free to leave when he saw fit.  Thus, from the perspective of someone in El-Hanafi's position – which is what matters under the Fifth Amendment, *see, e.g.*, *Yarborough* v. *Alvarado*, 541 U.S. 652, 662 (2004) – the setting of both interviews lacked the indicia of compulsion or custody that would tend to coerce an individual into speaking involuntarily.  Indeed, once El-Hanafi decided that he no longer wanted to speak with the agents

during the February 2010 interview, he simply left the room, walked out to the lobby, and

departed the hotel.  To suggest that such an interview was unconstitutionally "coercive" is

extravagant.

In addition, the conduct of Legal Attaché Price, Detective Withers, and Special Agent

Landers during El-Hanafi's two interviews cuts heavily in favor of voluntariness.  Far from

engaging in any "physical abuse, . . . restraint in handcuffs, . . . [or] use of psychologically

coercive tactics," *Nelson*, 121 F.3d at 833, the officers treated El-Hanafi in a friendly and

nonthreatening manner throughout the interviews.  El-Hanafi recounts in his declaration what

clearly was a cordial meeting with Legal Attaché Price at the Embassy cafeteria on January 21,

2010.  *See* El-Hanafi Decl. ¶ 10.  They discussed El-Hanafi's job, family, travel, and desire to be

able to fly to New York.  *See id.*  The cordial nature of the January 2010 interview was further

demonstrated by the fact that, as he acknowledges, El-Hanafi told Legal Attaché Price that he

"was willing to do whatever necessary to get off the ["no-fly"] list, including cooperate with

interviews."  *Id.*  While El-Hanafi characterizes his February 5, 2010 interview with Detective

Withers and Special Agent Landers as taking a less friendly turn at one point, *see id.* ¶¶ 22-23,

notably El-Hanafi does not allege any actions that restrained his freedom to leave the interview.

After El-Hanafi said that he wanted to speak with an attorney, the agents concluded the interview

(even though they were not required to do so because El-Hanafi was not in custody), and

Detective Withers walked El-Hanafi out of the room to the hotel lobby.  *See id.* ¶ 23.  El-

Hanafi's conversations with the agents were a far cry from coercion.

El-Hanafi's age and sophistication further weigh in favor of a determination that his

statements on January 21, 2010 and February 5, 2010 were voluntary.  *See, e.g.*, *Dickerson* v.

-26-

*United States*, 530 U.S. at 434 (noting relevance of the characteristics of the accused to the voluntariness inquiry).  El-Hanafi, who was 35-years old at the time of the interviews, was hardly some naive young man when he spoke with the FBI in early 2010.  He is a well-educated adult with extensive dealings and experiences in the real world.  As his counsel emphasized in the bail argument in this case, El-Hanafi is a United States citizen, born and raised in Brooklyn, who lived in New York City for most of his life before moving to the UAE around 2006.  *See* Cronan Decl. Exh. G at 16.  El-Hanafi continued to gain real world experience in the UAE, holding corporate jobs in Dubai for approximately four years before his arrest.  *See id.*; *see also* El-Hanafi Decl. ¶ 2.[12]  In short, at the time of his interview, El-Hanafi was an educated and experienced man, with experience living in the major cities of New York and Dubai.  This background and experience hardly made El-Hanafi "susceptible to having his will overborne." *United States* v. *Lebrun*, 363 F.3d at 726; *see also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 214 (2d Cir. 2008) (holding that a defendant's statements during "incommunicado detention lasting for fourteen days" were voluntary in part because he was "a well-educated and intelligent individual . . . [whose] demeanor before the Americans was one indicative of confidence, not of intimidation" (internal quotation marks omitted)); *United States* v. *Boskic*, 545 F.3d 69, 80-81 (1st Cir. 2008) (finding confession given during an interview at which the nature of the investigation was not disclosed to be voluntary because, among other

---

[12]   During the January 2010 interview, El-Hanafi told Legal Attaché Price that he received a Bachelor's Degree in Computer Information Systems from Baruch College – CUNY, and traveled to the UAE around the age of 30 in 2005 or early 2006.  *See* Cronan Decl. Exh. B at 1.  He stated that, in Dubai, he worked for the Gold Commodity Exchange, the Dubai Mercantile, and the Abu Dhabi System and Information Center, which is the information technology arm of the UAE government.  *See id.*

facts, the defendant "was a well-educated, mature adult of forty years who had a general familiarity with the American legal system and was in good mental and physical health").

Finally, as El-Hanafi makes clear in his declaration, El-Hanafi himself initiated contact with the United States Embassy about the "no-fly" issue.  His repeated efforts to reach out to multiple employees at the Embassy, his visits to the Embassy, and his willingness to talk to the officers demonstrate that the interviews were not the product of coercion.  *See* El-Hanafi Decl. ¶ 4 (after being denied flight on January 15, 2010, "I called the United States Embassy in Abu Dhabi"); *id.* ¶ 5 ("On either Sunday January 17, 2010, or Monday, January 18, 2010, I sent an email to the American Citizen Services (ACS) desk at the United States Embassy in Abu Dhabi, requesting the Embassy's assistance in traveling back to the United States, and attaching a copy of my United States passport."); *id.* ("Shortly thereafter, I sent another email to ACS, attaching the United States passports of my wife and three children, and received another automatic response."); *id.* ¶ 6 ("On Monday, January 18, 2010, I went to the Embassy and spoke to a woman working at the ACS information window."); *id.* ¶ 7 ("Two days later, I called and spoke with [an Embassy employee] again."); *id.* ¶ 8 ("I called Mr. Price and told him that I needed help getting off the no-fly list."); *id.* ¶ 9 ("On January 20, 2010, I also sought assistance from the U.S. Department of Homeland Security (DHS).  That same day, I completed and filed on-line a Traveler Inquiry Form with the DHS Travelers Redress Inquiry Identity Program ("TRIP")."); *id.* ¶ 10 ("On January 21, 2010, I went to meet with Mr. Price at the Embassy.").

Even if, as El-Hanafi claims, he was told at the close of the February 2010 interview that if he did not cooperate with questioning, he would risk losing the opportunity to receive the agents' assistance, this would not amount to coercion.  "Certainly, statements to the effect that it

would be to a suspect's benefit to cooperate are not improperly coercive." *United States* v.

*Ruggles*, 70 F.3d at 265 (citing *United States* v. *Pomares*, 499 F.2d 1220, 1222 (2d Cir. 1974));

*see also, e.g.*, *Orlandez-Gamboa*, 320 F.3d at 333 ("presence of a direct or implied promise of

help or leniency alone" does not "bar[] the admission of a confession where the totality of the

circumstances indicates it was the product of a free and independent decision" (internal

quotation marks omitted)).[13]

 Consideration of all these factors demonstrates that El-Hanafi was not at all coerced into

speaking with the agents in January 2010 or February 2010, and the statements should not be

suppressed. *See Connelly*, 479 U.S. at 167 (holding that only confessions procured by coercive

official tactics should be excluded as involuntary). The interviews simply did not present a

situation where, as El-Hanafi argues, "he had no choice but to answer their questions." El-

Hanafi Br. at 19. To the contrary, El-Hanafi was the one who initiated the interviews, and he

made the decision to participate in the interviews out of his own self-interest. It was this self-

interested desire to curry favor with the United States Government to get removed from the "no-

---

 [13] Even crediting El-Hanafi's allegation that, at the end of the February 2010 interview, the agents told him that if he spoke with an attorney, the agents would not be able to help him, it still does not follow that El-Hanafi's statements were involuntary. *See* Hasanoff Br. at 26. The interview occurred in a non-custodial setting at which El-Hanafi was not entitled to an attorney. *See infra* Part III.C.B.3.b. In any event, this would be just "one data point" in the "totality-of-the-circumstances analysis." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 214. Moreover, El-Hanafi's argument that comments made to him at the close of the February 2010 interview regarding the ramifications of not cooperating were coercive, would only impact the statements that occurred after that point. *See* El-Hanafi Decl. ¶ 24; Cronan Decl. Exh. C at 6. It would not impact, for instance, El-Hanafi's statements regarding his travel to Yemen in February 2008, his arguably false exculpatory statements about money transfers, or his statements about knowing CC-1. Moreover, El-Hanafi's statement in the lobby of the hotel about CC-1, according to Detective Withers's account, was a spontaneous utterance that was not prompted by any questioning by Detective Withers. *See* Cronan Decl. Exh. D at 1.

fly" list – not coercion – that, even on his own account, induced El-Hanafi to speak with the officers.  *See, e.g.*, *In re Terrorist Bombings*, 552 F.3d at 214 (finding that the defendant's statements were voluntary based, in part, on "the District Court's conclusion that what truly motivated [him] to inculpate himself was his own overriding desire that he be tried in the United States" rather than coercion (internal quotation marks omitted)).  The agents persuaded El-Hanafi to speak with a ruse that made cooperation an attractive option.  This is simply not impermissible.  *See United States* v. *Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) ("Inculpatory statements are not involuntary when they result from a desire to cooperate.") (citing *United States* v. *Mast*, 735 F.2d at 750).

In the face of the foregoing, El-Hanafi insists that his statements were involuntary because "the trick deployed *coerced* Mr. El-Hanafi such that he felt that he had no choice but to speak."  El-Hanafi Br. at 26 (emphasis in original).  It is well established, however, that "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion are not within *Miranda*'s [or the Fifth Amendment's] concern."  *Illinois* v. *Perkins*, 496 U.S. at 297; *see United States* v. *Boskic*, 545 F.3d at 80 ("Although the fact that the agents allowed [the defendant] to believe that he was not under investigation may have made him less guarded and self-protective, that deception alone did not make his statements involuntary.").  And El-Hanafi cannot shift around this basic rule by simply asserting that he felt "coerced."  *See, e.g.*, *United States* v. *Stein*, 440 F. Supp. 2d 315, 328 (S.D.N.Y. 2006) ("[A]n individual claiming that a statement was compelled in violation of the Fifth Amendment must adduce evidence both that the individual subjectively believed that he or she had no real choice but to speak and that a reasonable person in that position would have felt the same way."); *see*

*also United States* v. *Newton*, 369 F.3d at 671 ("The test for custody is an objective one: whether

a reasonable person in defendant's position would have understood himself to be subjected to the

restraints comparable to those associated with a formal arrest." (citation and internal quotation

marks omitted).  El-Hanafi alleges that Legal Attaché Price asked him if he "was willing to

cooperate with interviews in order to get off the no-fly list" and then arranged for the February

2010 interview.  This is plainly allowed, *see Orlandez-Gamboa*, 320 F.3d at 333; *Ruggles*, 70

F.3d at 265, and is not remotely comparable to the sort of false or misleading threats of

exaggerated penalties for silence that the Supreme and the Second Circuit have found to be

coercive.  *See, e.g.*, *Lynum* v. *Illinois*, 372 U.S. 528, 534 (1963) (threats to family and family's

financial security); *United States* v. *Anderson*, 929 F.2d at 100 (threat that silence would entirely

preclude later cooperation); *United States* v. *Duvall*, 537 F.2d 15, 25 (2d Cir. 1976) (threat of a

one-hundred-year sentence).

        In addition, El-Hanafi does not allege that any United States official affirmatively

informed him that he was not a suspect of any criminal wrongdoing or that he would never be

prosecuted by the United States.  By the time of the February 2010 interview, El-Hanafi realized

that Legal Attaché Price, who arranged the meeting with Detective Withers and Special Agent

Landers, was with the FBI.  *See* El Hanafi Decl. ¶ 11.  In fact, El-Hanafi appears to acknowledge

that he realized that Detective Withers was an American law enforcement officer when they met

at the Hilton for the February 2010 interview.  *See* El-Hanafi Decl. ¶ 19 (explaining that he went

to the Hilton on February 5, 2010, "and met Daniel Withers from the FBI in the lobby of the

hotel"); El-Hanafi Br. at 23 ("Prior to these interviews (*i.e.*, the January 2010 and February 2010

interviews), a series of government officials made it abundantly clear to Mr. El-Hanafi that in

order for him to travel home to the United States and be reunited with his wife and children, he would need to meet with, and answer the questions of, the FBI – the agency that was purportedly responsible for putting him on the list in the first place."). In any event, the agents certainly had no duty to inform El-Hanafi that he was the target of a criminal investigation, or the subject matter of that investigation, prior to interviewing him. *See United States* v. *Okwumabua*, 828 F.2d at 953 (agent had "no legal or moral duty" to inform the interviewed subject that he was being criminally investigated); *Boskic*, 545 F.3d at 80; *see also United States* v. *Wellman*, 830 F.2d 1453, 1460-61 (7th Cir. 1987) (rejecting argument that statements made during civil investigation should be suppressed because the Government failed to inform the defendant that he was under criminal investigation); *United States* v. *Braxton*, 112 F.3d 777, 784 (4th Cir. 1997) ("law enforcement officers have no duty to inform suspects of the nature of offense under investigation); *United States* v. *Maniatis*, No. 2:07-CR-0024 DLJ, 2007 WL 1795761, at **2-3 (E.D. Cal. Jun. 21, 2007) (denying motion to suppress statements because inspectors had no duty to inform defendants on ongoing criminal investigation). As the Second Circuit has instructed, the "[s]imple failure to inform [a] defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless [the] defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *Okwumabua*, 828 F.2d at 953 (internal quotation marks omitted). El-Hanafi does not allege that he inquired about the scope of the FBI's investigation, or that the agents affirmatively told him that he was not under investigation.

El-Hanafi's citation to *United States* v. *Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008), for the proposition that "a coercive ruse that overbears a defendant's free will is not"

sanctioned, El-Hanafi Br. 26, in no way changes this analysis.  In *Montes-Reyes*, the agent

"created a false sense of exigent circumstances" by telling the suspect that the agents were

looking for a missing child, *United States* v. *Montes-Reyes*, 547 F. Supp. 2d at 291.  In contrast,

El-Hanafi initiated contact with the United States Government to obtain his removal from the

"no-fly" list and he voluntarily spoke with the FBI in the hopes of being removed from that list.

Further, it is well settled that "trickery does not automatically render the statements thereby

obtained inadmissible."  *Santiago Ortiz* v. *Kelly*, 687 F. Supp. 64, 66 (E.D.N.Y. 1988)

(confession voluntary despite affirmative police deception claiming that the murder victim was

alive and able to identify the defendant).  El-Hanafi's is unable to articulate what rendered the

Government's trickery so overbearing such that it was on par with *Montes-Reyes* and deprived

him of the ability to make a voluntary and informed decision to speak with the agents.  *Cf.*

*United States* v. *Pollaro*, 733 F. Supp. 2d 364, 369 (E.D.N.Y. 2010) (noting that the court in

*Montes-Reyes* "was careful to distinguish between cases in which the kind of extreme

misrepresentation of investigatory purpose by which a person is deprive[d] . . . of the ability to

make a fair assessment of the need to surrender his privacy and those in which the deception in

question was the use of an undercover agent who obtained otherwise voluntary consent through

the use of his adopted identity" (internal quotation marks and citation omitted)).

El-Hanafi additionally cites a number of cases where the suspects were coerced into

speaking, each of which present facts clearly distinguishable from those present here.  *See, e.g.*,

El-Hanafi Br. at 20-21, 24, 26 (citing *Lefkowitz* v. *Cunningham*, 431 U.S. 801 (1977); *Garrity* v.

*New Jersey*, 385 U.S. 493 (1967); *United States* v. *Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006)).

Each of these cases, which dealt with the Fifth Amendment privilege against self-incrimination,

-33-

concerned situations where individuals were coerced into waiving that privilege, at the risk of

facing the prospective loss of position or livelihood.  *See Lefkowitz* v. *Cunningham*, 431 U.S. at

801 (attorney was threatened with the loss of his political party office if he refused to waive his

constitutional immunity in response to a subpoena); *Garrity* v. *New Jersey*, 385 U.S. at 494-95

(police officers under investigation were told that, under the terms of an existing state statute,

they would be fired if they refused to answer what they were told were potentially incriminating

questions); *United States* v. *Stein*, 440 F. Supp. 2d at 326-33 (employees threatened to be denied

attorney's fees and adverse employment action for failing to cooperate with the Government).  In

contrast to these cases, the law enforcement agents who interviewed El-Hanafi did not exert an

coercive pressure on El-Hanafi that "was severe" and deprived him "of his free choice to admit,

to deny, or to refuse to answer."  El-Hanafi Br. at 24 (quoting *Stein*, 440 F. Supp. 2d at 326

(alterations and quotation marks omitted)).  Far from being threatened with loss of employment

or liberty if he did not make incriminating statements, El-Hanafi desired to speak with the

Government officials and spoke voluntarily in hopes of achieving a desired goal.  Nor did El-

Hanafi face some "threat[] to penalize silence."  El-Hanafi Br. at 22.  He faced no additional

penalty if he chose not to speak to the agents, since he already was unable to fly and he was

seeking assistance from the Government to change that.

       While the Government is unaware of situations presenting closely identical facts to those

of El-Hanafi's interviews with the FBI in the UAE, several decisions have held statements to be

voluntary and not coerced where the individual's will was much more overborne than is even

arguably the case here.  For example, in *Minnesota* v. *Murphy*, 465 U.S. 420 (1984), the

Supreme Court held that statements given by a suspect during a probation interview were not

given in violation of the Fifth Amendment.  The *Murphy* Court explained that "[i]t is unlikely that a probation interview, arranged by appointment at a mutually convenient time, would give rise to" the message that the suspect had no choice but to submit to the officers and confess.  *Id.* at 433.  The Court explained that, because the defendant "was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator."  *Id.*  Just like in *Murphy*, El-Hanafi arranged to meet the officers at a mutually convenient time and location.  Just like in *Murphy*, El-Hanafi was never physically restrained by the officers.  Just like in *Murphy*, El-Hanafi was free to leave the meeting – and he in fact did leave the meeting when he decided he no longer wished to speak with the officers.  In fact, the situation in *Murphy* was significantly more potentially coercive, because that meeting occurred in a probation officer, rather than a cafeteria or a hotel room, and the defendant in *Murphy* was at risk of losing his liberty through the revocation of probation, if he terminated the meeting.  El-Hanafi never faced the potential loss of his liberty were he to decide not to speak to the officers.

In fact, perhaps the most compelling proof of the fact that El-Hanafi's will was never overborne during these interviews comes from what he said during the interviews.  El-Hanafi did not give a full confession to Detective Withers and Special Agent Landers.  El-Hanafi certainly made some statements that are useful to the Government and that the Government intends to offer at his trial.  But he did not, for instance, admit to joining al Qaeda or to performing services on behalf of the organization.  Far from having his will overborne, El-Hanafi had enough self-possession during the interview to fabricate and minimize and, when he decided he was done

-35-

talking, to leave the interview.

In sum, the factors discussed above prevent a finding of coercion or involuntariness. "Weighing against the potentially coercive circumstances" of the false assurances given to El-Hanafi are his "personal characteristics" (his age, education, and sophistication); "the restrained conduct of his" interviewers (who never resorted to physical restraint, threats, promises, or coercion to obtain statements); and that his desire to be removed from the "no-fly" list is what "truly motivated [El-Hanafi] to inculpate himself." *In re Terrorist Bombings*, 552 F.3d at 214 (internal quotation marks omitted); *see Schneckloth* v. *Bustamonte*, 412 U.S. at 226 (discussing various considerations that determine "whether a defendant's will was overborne in a particular case," to include the person's age, intelligence, advice of constitution rights, length of any detention, repeated and prolonged nature of questioning, use of physical punishment, and deprivation of food or sleep, and noting that inquiring totality of the circumstances does not "turn[] on the presence or absence of a single controlling criterion"); *Nelson*, 121 F.3d at 833 (listing relevant circumstances to consider in evaluating whether a confession was coerced to include "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics").  Taking into account all these factors, it simply cannot be said that just because El-Hanafi believed that his interviewers would help remove him from the "no-fly" list, the statements he made were involuntary or coerced.  Accordingly, El-Hanafi's motion to suppress his statements should be denied without a hearing.

     **3.**       **El-Hanafi Was Never Interrogated In Violation Of *Miranda***

El-Hanafi also argues that, at the point during the February 2010 when Detective "Withers confronted Mr. El-Hanafi, accused him of lying, and told him that his life 'was about to change,'" the interview transformed into one that was custodial in nature, and any statements after this point were made in violation of *Miranda* and should be suppressed. *See* El-Hanafi Br. at 28-29. El-Hanafi, however, was never in custody "or otherwise deprived of his freedom of action in a significant way," *Beckwith* v. *United States*, 425 U.S. 341, 347 (1976), even after the point when he expressed a desire to speak to an attorney, and therefore at no point was he entitled to *Miranda* warnings.

### a.    Legal Standard For Custodial Interrogations

Law enforcement authorities must advise an individual of his or her *Miranda* rights if two preconditions are met: custody and interrogation. *See Thompson* v. *Keohane*, 516 U.S. 99, 102 (1995). Thus, "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977). The *Miranda* Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona*, 384 U.S. at 444; *see United States* v. *Mitchell*, 966 F.2d at 98 ("[A] custodial setting is one providing inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." (internal quotation marks omitted)).

The Second Circuit has explained that "[t]he test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be 'subjected to restraints comparable to those associated with a

formal arrest,' and (b) 'focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.'"  *United States* v. *Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (quoting *Mitchell*, 966 F.2d at 98).  In determining whether an individual is in custody for *Miranda* purposes, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *California* v. *Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon* v. *Mathiason*, 429 U.S. at 495).  Where there is no actual arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."  *United States* v. *Guarno*, 819 F.2d 28, 31-32 (2d Cir. 1987) (quoting *United States* v. *Hall*, 421 F.2d 540, 545 (2d Cir. 1969)).

### b.    *Miranda* Warnings Were Not Required Because El-Hanafi Was Never In Custody

At no point during the February 2010 interview were *Miranda* warnings required because El-Hanafi never suffered a restriction on his freedom as to render him in custody.  To begin with, the interview took place in a non-coercive physical environment – a hotel room at the Abu Dhabi Hilton, *see* El-Hanafi Decl. ¶ 19 – that could not be mistaken for custody.  El-Hanafi was free to leave the hotel room and, in fact did, at the point when he decided he no longer wished to speak to the agents.[14]  The Supreme Court's decision in *Beckwith* is instructive.  There, the Court held

---

[14] El-Hanafi alleges in his brief that the hotel room was locked.  *See* El-Hanafi Br. at 28. El-Hanafi's declaration, however, only alleges that the agents had to unlock the door to enter the room, and does not allege that he was unable to exit the room whenever he saw fit.  *See* El-Hanafi Decl. ¶ 19.  There is no reason to think that this hotel room was unlike others, and individuals inside the room were not able to exit the room by simply opening the door without the need for a key.

that questioning of a defendant in his house by special agents of the Internal Revenue Service investigating criminal tax violations did not occur in a custodial setting and therefore *Miranda* warnings were not required.  *See Beckwith* v. *United States*, 425 U.S. 341 at 346-47.  The Court rejected the defendant's argument that he was "placed in the functional, and, therefore, legal, equivalent of the *Miranda* situation" as it would require "ignor[ing] completely that *Miranda* was grounded squarely in . . . the peculiar "nature and setting of . . . in-custody interrogation." *Id.* at 346 (citations and internal quotation marks omitted).

Second, not only was El-Hanafi never placed under arrested during the February 2010 interview, but he was in no way physical restrained or otherwise had his movements restricted. In fact, El-Hanafi unilaterally ended the interview before the agents had completed their questioning.  At the point when El-Hanafi decided to stop speaking with the agents, he was able to walk out of the hotel room, to the hotel lobby, and presumably out of the hotel.  El-Hanafi's ability to end the interview once he no longer wished to speak with the officers, and then walk out of the room at will, demonstrates he was not subject to "inherently coercive pressures" that undermined his "will to resist and [compelled] him to speak."  *Mitchell*, 966 F.2d at 98.  To the contrary, El-Hanafi was free to leave and did in fact leave.  *Cf. Orozco* v. *Texas*, 394 U.S. 324, 326-27 (1969) (finding defendant to have been in custody for purposes of *Miranda* in his bedroom because he "was under arrest and not free to leave when questioned").

Further evidence that the February 2010 interview was not custodial comes from the fact that El-Hanafi voluntarily attended the interview.  El-Hanafi initiated contact with Government officials to discuss his placement on the "no-fly" issue, met with Legal Attaché Price at the Embassy, and then arranged with Legal Attaché Price to interview with the FBI at the Abu

Dhabi Hilton.  He then traveled on his own accord to the Hilton to meet with the FBI.  In

*Mathiason*, for instance, the Supreme Court held that a police station – a setting far more likely

to present a custodial environment than a hotel room – was non-custodial, because the defendant

voluntarily went to the station for questioning.  *See Mathiason*, 429 U.S. at 495; *see Newton*, 369

F.3d at 671 (characterizing the police station in *Mathiason* as "precisely the 'coercive

environment' highlighted in *Miranda*" (quoting *Miranda*, 384 U.S. at 461)).  The *Mathiason*

Court reasoned that the defendant "came voluntarily to the police station, where he was

immediately informed that he was not under arrest," and at the conclusion of the interview, "did

in fact leave the police station without hindrance."  *Mathiason*, 429 U.S. at 495.  In such

circumstances, there was "no indication that questioning took place in a context where [the

defendant's] freedom to depart was restricted in any way."  *Id.*

A number of other considerations further confirm that El-Hanafi was not in custody at

any point of the February 2010 interview.  There is no allegation that any of the officers

physically threatened El-Hanafi or displayed weapons, made any physical contact with El-

Hanafi, took possession of any of El-Hanafi's physical effects or identification, or requested that

El-Hanafi travel to a police station or other custodial location.  *Cf. United States* v. *Lee*, 916 F.2d

814, 819 (2d Cir. 1990) (setting forth criteria for determining whether an individual has been

"seized" by the police, to include: "[1] the threatening presence of several officers; [2] the

display of a weapon; [3] physical touching of the person by the officer; [4] language or tone

indicating that compliance with the officer was compulsory; [5] prolonged retention of a person's

personal effects, such as airplane tickets or identification; [6] and a request by the officer to

accompany him to the police station or a police room" (internal quotation marks, citations

omitted)); *accord Oliviera* v. *Mayer*, 23 F.3d 642, 645 (2d Cir. 1994) (enumerating similar

factors); *United States* v. *Perea*, 986 F.2d 633, 645 (2d Cir. 1993) (same).

El-Hanafi's references to the supposedly "hostile and aggressive" questioning during the

February 2010 interview are insufficient to transform a Hilton hotel room into the functional

equivalent of a coercive environment.  El-Hanafi Br. at 28-29.  The Second Circuit has instructed

that "custody remains the touchstone for application of" the *Miranda* warning requirement,

noting that "the Supreme Court has resisted efforts to shift attention from the custodial status of

the person questioned to the coercive pressures of a particular interrogation."  *Newton*, 369 F.3d

at 671 (citing *Orozco* v. *Texas*, 394 U.S. at 326-27).  El-Hanafi's complaint that the tone of the

interview became hostile therefore does not change the fact that the interview clearly was not

custodial in nature.  *See Mitchell*, 966 F.2d at 99 (finding defendant's testimony about the

intimidating facial features, particularly the "cold eyes," of the questioning agent to be "clearly

insufficeint to establish the existence of custody under *Miranda*").

El-Hanafi's reliance on *Tankleff* to argue that he did not feel free to leave the hotel room

without an escort when the questioning turned hostile and aggressive is misplaced.  *See* El-

Hanafi Br. at 28; *see Tankleff*, 135 F.3d 244 ("An accused is in custody when, even in the

absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the

message that they would not permit the accused to leave.").  First, El-Hanafi of course did leave

the hotel room at this point of the interview.  Moreover, the Second Circuit in *Newton* clarified

that the free-to-leave standard espoused in *Tankleff* is "a necessary, but not determinative, first

step in establishing *Miranda* custody."  *Newton*, 369 F.3d at 669.  The "ultimate inquiry" for

determining custody for purposes of *Miranda*, the Second Circuit explained, "is that articulated

-41-

by the Supreme Court in *California* v. *Beheler*: 'whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *Id.* (quoting *California* v. *Beheler*, 463 U.S. at 1125).  This guidance is consistent with *Berkemer* v. *McCarty*, 468 U.S. 420 (1984), where the Supreme Court held that a motorist subjected to routine traffic stops was not in custody for *Miranda* purposes, even though he did not feel free to leave the scene.  *See id.* at 436 (describing the "comparatively nonthreatening character of [noncustodial] detentions").  Moreover, even applying a free-to-leave inquiry, El-Hanafi suffered no restraint on his movements in the hotel room, nor was he told that he was not free to leave.  *See Mitchell*, 966 F.2d at 98 (finding that "in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave") ((citing *Campaneria* v. *Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989); *United States* v. *Guarno*, 819 F.2d at 31-32); *United States* v. *Hall*, 421 F.2d at 545).  At most, El-Hanafi alleges that they described to him what he stood to lose should he decide to leave, which demonstrates that he understood that he had the option of terminating the interview and leaving the hotel room.

Lastly, although El-Hanafi's allegation that the agents disregarded his request for an attorney during the interviews constitutes an area of factual dispute,[15] it is not a material one because, even if El-Hanafi's allegation were to be credited, it would not form the basis for a finding that his statements were obtained in violation of *Miranda*.  Even if El-Hanafi had requested an attorney before the interview ended, the fact remains that El-Hanafi was not in

---

[15]  As explained above, the interviewing agents have reported that, at one point in the interview, El-Hanafi stated that he thought he should have a lawyer present, but did not state that he wanted his lawyer present.  *See* Cronan Decl. Exh. C at 6.  The interview continued and, a little while later, El-Hanafi stated that he wanted to contact his lawyer, at which point the interview was terminated.  *See id.* at 6-7.

custody at the point when he said he wished to speak with an attorney. *Miranda* requires law enforcement to cease questioning when a suspect requests counsel only if that request occurs during a custodial interrogation. *See Miranda*, 384 U.S. at 474. "Where the defendant is not in custody, there is no prohibition" against continued questioning after a request for counsel because "the prohibition against resumption of questioning applies only to *custodial* interrogation." *United States* v. *Mason*, 660 F. Supp. 2d 479, 489 (W.D.N.Y. 2009) (emphasis in original); *see also United States* v. *Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999) (defendant "could not invoke his *Miranda* right to counsel when he was not in custody"); *Thomson* v. *Trombley*, No. 06-12619, 2008 WL 4427790, at *18 (E.D. Mich. Sept. 30, 2008) ("[B]ecause petitioner's interrogation was not custodial, the police were not required to cease questioning him when he purported to invoke his right to remain silent or to counsel."); *Moos* v. *Norton*, 789 F. Supp. 352, 359 (D.Kan. 1992) ("[Suspect not subject to custodial interrogation] had no right to counsel pursuant to *Miranda*; therefore, [he] could not force the proceedings to a halt by requesting counsel.").

In sum, under the conditions of the February 2010 interview, no "reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest" during the February 2010 interview. *Newton*, 369 F.3d at 671 (citing *United States* v. *Ali*, 68 F.3d 1468, 1472 (2d Cir.1995)).

4.      El-Hanafi's Demand For A *Kastigar* Hearing Should Be Denied

Next, El-Hanafi seeks a *Kastigar* hearing to address whether "the evidence used to prosecute Mr. El-Hanafi derives from sources other than his coerced statements."  El-Hanafi Br. at 29-30.  In *Kastigar*, the Supreme Court held that, when a potential criminal defendant is compelled to testify under immunity, the Government must show in future prosecutions of that defendant that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."  *Kastigar* v. *United States*, 406 U.S. 441, 460 (1972). The "general "practice" in the Second Circuit is to defer a *Kastigar* "hearing until after trial." *United States* v. *Fernandez*, No. 00 Cr. 420 (SWK), 2000 WL 1409738, at *3 (S.D.N.Y. Sept. 22, 2000) (citing *United States* v. *Helmsley*, 941 F.2d 71, 80 (2d Cir. 1991); *United States* v. *Rivieccio*, 919 F.2d 812, 814 (2d Cir. 1990); *United States* v. *Volpe*, 42 F.Supp.2d 204, 219 (E.D.N.Y. 1999)); *see also United States* v. *Biaggi*, 909 F.2d 662, 690 (2d Cir. 1990) (holding that District Judge did not err in declining, after assessing trial record, to hold a *Kastigar* hearing, where defendant failed to sustain burden of showing that immunized testimony related to the charges); *United States* v. *Volpe*, 42 F.Supp.2d at 219 (deferring *Kastigar* hearing until after trial, if necessary, after concluding that the court had "no reason to doubt the government's affidavits that the prosecution team in this case has had no access to the contents of [defendant's] compelled statements").

Initially, because El-Hanafi's statements at the January 2010 and February 2010 interviews were made voluntarily, *see supra* Part III.C.2., and not while in custody, *see supra* Part III.C.3, his request for a *Kastigar* hearing should be denied.  Moreover, as El-Hanafi concedes, *see* El-Hanafi Br. at 29, *Kastigar* clearly would be inapplicable to statements obtained

-44-

in violation of *Miranda* (but not otherwise coerced) because statements obtained in violation of *Miranda* can be used to pursue leads or for impeachment at trial.  *See United States* v. *Patane*, 542 U.S. 630, 637-44 (2004) (failure to administer *Miranda* warnings to suspect did not require suppression of physical fruits of the suspects unwarned but voluntary statements); *Harris* v. *New York*, 401 U.S. 222, 225-26 (1971) (defendant's credibility appropriately impeached by earlier non-*Mirandized* statements).

In addition, even if this Court were to find some of El-Hanafi's statements to have been coerced, *Kastigar* would not apply in the circumstances presented here.  *See United States* v. *Ghailani*, 743 F. Supp. 2d 242, 251-52 (S.D.N.Y. 2010) (rejecting the defendant's "attempt to import *Kastigar* into th[e] case and noting that "there is good reason for treating evidence derived from a coerced confession differently from evidence gained as a result of testimony compelled by a grant of immunity").[16]  In the 38 years since *Kastigar* was decided, not a single federal court has applied the decision and its progeny to a coerced confession outside the context of a confession coerced by a grant of immunity.  Instead, courts — including the Supreme Court — have routinely applied more conventional fruit-of-the-poisonous-tree analyses in cases involving coerced confessions.  Further, the Supreme Court has expressly held that a remedy long accepted in the immunity context — dismissal of the indictment — is not applicable in the coerced-confession context.  Accordingly, *Kastigar* simply does not apply to coerced

---

[16]  Judge Kaplan conducted a hearing in *Ghailani* to determine whether testimony of a witness identified and located as a result of the defendant's coerced statements without the presence of counsel was sufficiently attenuated from illegal government action "so as to dissipate taint of illegal conduct" and render the testimony admissible.  *United States* v. *Ghailani*, 743 F. Supp. 2d at 261.  In this trial, the Government does not plan to call any witnesses who were identified as a result of El-Hanafi's January 2010 and February 2010 interviews.

confessions of the sort involved in this case.

Indeed, courts, including the Second Circuit, have expressly acknowledged that stricter standards apply in the immunized-testimony context than in the coerced-confession context.  *See United States* v. *Kurzer*, 534 F.2d 511, 516-17 & n.8 (2d Cir. 1976) (refusing to apply the fruit-of-the-poisonous-tree doctrine to immunized testimony on the ground that "a coerced confession differs from immunized testimony"); *Johnson* v. *United States*, 609 A.2d 1112, 1118 n.7 (D.C. 1992) (assuming *arguendo* that the defendant's statement had been involuntary, the defendant's reliance on *Kastigar* in a case involving an alleged coerced confession "is misplaced because they address immunized testimony, a subject matter clearly distinct from the one presented in this case"); *see also United States* v. *Serrano*, 870 F.2d 1, 18 (1st Cir. 1989) (noting that, while some courts had prohibited the non-evidentiary  use of immunized testimony, "no case involving a coerced confession has prohibited the nonevidentiary use of an involuntary statement").

For all these reasons, El-Hanafi's request for a *Kastigar* hearing concerning his February 2010 statements in the UAE should be denied.

### D.     Evidence Obtained From The Email Search Warrants On The Welhanafi@live.com And Welhanfi@yahoo.com Email Accounts Should Not Be Suppressed

El-Hanafi moves to suppress two nearly identical email search warrants that were authorized by two separate United States Magistrate Judges in the Southern District of New York, each of whom, after reviewing the warrants and affidavits, concluded that the applications met all requirements of law.[17]  On March 12, 2010, United States Magistrate Judge James C.

---

[17]   Hasanoff lacks standing to join El-Hanafi's motion challenging the search warrants on El-Hanafi's email accounts.  *See United States* v. *Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990)

Francis IV issued a warrant authorizing the seizure of e-mails in the account

welhanafi@live.com.  On March 22, 2010, United States Magistrate Judge Gabriel W.

Gorenstein issued a warrant authorizing the seizure of emails in the account

welhanafi@yahoo.com.  Neither should be suppressed.  First, the Magistrate Judges' probable

cause determinations were reasonable and justified by the evidence before them, and those

probable cause findings are entitled to substantial deference.  Second, the warrants complied

with the Fourth Amendment's requirement of particularity because they were reasonably limited

to emails related to the terrorist offenses alleged.  Third, even if the warrants suffered from some

infirmity, nothing undermines the Government's good-faith reliance on the warrants in order to

carry out the seizure.  Accordingly, El-Hanafi's request to suppress e-mails seized from the

welhanafi@live.com and welhanafi@yahoo.com accounts should be denied.

Further, despite El-Hanafi's baseless speculation to the contrary, *see* El-Hanafi Br. at 17,

both the prosecutors and the law enforcement officers took sufficient steps to protect the

attorney-client privilege when reviewing the contents of the welhanafi@yahoo.com account,

including the creation of a "wall" or "taint" team to conduct an initial review of the emails.

> **1.      The Warrants Were Not Overbroad And Complied With The Fourth Amendment's Particularity Requirement**
>
> > **a.      Legal Standards For Search Warrants**

As the Supreme Court has explained, a request for a search warrant calls for "a practical,

common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is

a fair probability that contraband or evidence of a crime will be found in a particular place."

---

(noting that "[a] defendant has no right to have evidence suppressed on Fourth Amendment
grounds unless the breached privacy expectation was his own rather than that of a third party").

*Illinois* v. *Gates*, 462 U.S. 213, 238 (1983).  Accordingly, a commonsense showing of probable

cause for the search, and a practical statement of particularity of the place to be searched, satisfy

the Fourth Amendment.

### i.      Probable Cause

Commonsense, flexibility, and practicality are the hallmarks of the probable cause

inquiry underlying the issuance of a search warrant.  *See Texas* v. *Brown*, 460 U.S. 730, 742

(1983) ("[P]robable cause is a flexible, common-sense standard. . . .  A practical, nontechnical

probability that incriminating evidence is involved is all that is required." (internal quotation

marks omitted)).  The Second Circuit reiterated this standard, holding that "affidavits for search

warrants must be tested and interpreted by magistrates and courts in a commonsense and realistic

fashion.  It follows that courts should not invalidate a warrant by interpreting the affidavit in a

hypertechnical, rather than a commonsense, manner."  *United States* v. *Waker*, 534 F.3d 168,

171 (2d Cir. 2008) (per curiam) (quoting *United States* v. *Ventresca*, 380 U.S. 102, 108-09

(1965)) (internal quotation marks, ellipses, and brackets omitted); *see also United States* v.

*Moore*, 968 F.2d 216, 222-23 (2d Cir. 1992) ("Nor are there mechanical criteria for assessing the

amount of information necessary for a probable cause finding: In dealing with probable cause[,]

as the very name implies, we deal with probabilities.  These are not technical; they are factual

and practical considerations of everyday life on which reasonable and prudent men, not legal

technicians, act." (internal quotation marks and ellipses omitted)).

A showing of a sufficient nexus between the alleged criminal activities and the premises

to be searched "does not require direct evidence and may be based on reasonable inference[s]

from the facts presented based on common sense and experience."  *United States* v. *Singh*, 390

F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted).  The evidence presented to the

Magistrate Judge in support of this showing "must be seen and weighed not in terms of library

analysis by scholars, but as understood by those versed in the field of law enforcement."  *Illinois*

v. *Gates*, 462 U.S. at 232 (quoting *United States* v. *Cortez*, 449 U.S. 411, 418 (1981)) (internal

quotation marks omitted).

Accordingly, reviewing courts should "not test the validity of search warrants and their

supporting affidavits in a vacuum."  *United States* v. *Waker*, 534 F.3d at 171.  It is improper to

focus on any particular passage of a search warrant affidavit in isolation to determine whether it

establishes probable cause standing alone.  Rather, each passage must be taken together with

other passages in the affidavit to determine, in context, whether probable cause has been

established.  *See, e.g., Massachusetts* v. *Upton*, 466 U.S. 727, 732 (1984) (faulting reviewing

court for "judging bits and pieces of information in isolation" when conducting probable cause

analysis).

Finally, a reviewing court must give "substantial deference" to a Magistrate Judge's

finding of probable cause.  *United States* v. *Singh*, 390 F.3d at 181.  In fact, the review is limited

to whether "the magistrate had a substantial basis for concluding that probable cause existed."

*Gates*, 462 U.S. at 238 (internal quotation marks, ellipses, and brackets omitted).  After a

"neutral and detached magistrate" issues a search warrant upon a finding of probable cause, that

finding "is entitled to substantial deference, and doubts should be resolved in favor of upholding

the warrant."  *United States* v. *Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (internal quotation marks

omitted).  That finding also lends an additional measure of probity to the resulting search.  "[A]

search based upon a magistrate's determination will be upheld by a reviewing court on less

-49-

persuasive evidence than would have justified a police officer acting on his own.  Further, the

magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity

of this warrant."  *United States* v. *Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (internal citations

omitted).

ii.      <strong>Particularity</strong>

In addition to probable cause, the Fourth Amendment requires that search warrants

"particularly describ[e] the things to be seized."  U.S. Const. amend. IV.  The particularity

requirement of the Fourth Amendment "guards against general searches that leave to the

unguided discretion of the officers executing the warrant the decision as to what items may be

seized."  *United States* v. *Riley*, 906 F.2d 841, 844 (2d Cir. 1990); *see also Coolidge* v. *New*

*Hampshire*, 403 U.S. 443, 467 (1971) (particularity requirement prevents a "general, exploratory

rummaging in a person's belongings").

While courts do not require precise specification of every item to be seized, they do

require that a warrant reasonably channel the discretion of those charged with executing it.  "The

warrant must enable the executing officer to ascertain and identify with reasonable certainty

those items that the magistrate has authorized him to seize."  *United States* v. *George*, 975 F.2d

72, 75 (2d Cir. 1992).  A warrant is not sufficiently particularized if it authorizes "the seizure of

'evidence' without mentioning a particular crime or criminal activity to which the evidence must

relate."  *Id.* at 77.

Although some particularity is required, the Fourth Amendment does not require that the

warrant specifically identify every item to be seized.  "Once a category of seizable papers has

been adequately described, with the description delineated in part by an illustrative list of

-50-

seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *United States* v. *Riley*, 906 F.2d at 845.  As the Second Circuit explained in *Riley*:

> It is true that a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category.  But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'

*Id.* at 845.

### iii.     The Good Faith Exception to Suppression

The invalidation of a duly issued search warrant does not automatically result in the suppression of evidence seized pursuant to that warrant.  The Supreme Court has held that evidence obtained pursuant to a facially valid search warrant, later found to be invalid, is admissible if the executing officers acted in good faith and in objectively reasonable reliance on the warrant.  *See United States* v. *Leon*, 468 U.S. 897, 920 (1984).  The *Leon* Court reasoned that the sanction of suppression would serve no useful deterrent purpose where the officers who conducted the search acted in reasonable reliance on a warrant issued by a detached judicial officer.  *Id.* at 919-20.  Therefore, the pivotal question to be asked in each case is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Id.* at 922 n.23; *see also United States* v. *Moore*, 968 F.2d at 222.  If the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression should not be ordered.  *See, e.g., United States* v. *Roberts*, 852 F.2d 671, 675 (2d Cir. 1988).

The only instances where the good faith exception will not apply are where: (1) the Magistrate Judge was misled by information that the affiant knew was false; (2) the Magistrate Judge wholly abandoned his or her judicial role; (3) the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *United States* v. *Leon*, 468 U.S. at 923.

> **b.    The Search Warrants Were Not Overbroad And Were Supported By Probable Cause**

El-Hanafi argues that the warrants should be suppressed as "overbroad" because they "set forth no probable basis for believing that these email accounts were repositories of any terrorist-related communications." El-Hanafi Br. at 30-31; *see id.* 34-36. The crux of defendant's argument, however, is that the affidavits did not set forth direct proof that the accounts *were in fact* used for such objectives. This is not required. Rather, as required, the affidavits provided sufficient basis for the Magistrate Judges' conclusions that there was a "probability" that incriminating evidence would be found in the target accounts, as described below. *See Singh*, 390 F.3d at 182 (explaining that probable cause "does not require direct evidence and may be based on reasonable inference[s] from the facts presented based on common sense and experience").

Because the factual allegations in both of the affidavits supporting the Magistrate Judges' finding of probable cause for the welhanafi@live.com and welhanafi@yahoo.com accounts are identical, they will be addressed in tandem. In the affidavits in support of the warrants, the

Affiant[18] describes the origin of the investigation and the agreement amongst El-Hanafi, Hasanoff, and a cooperating witness ("CW-1") to support al Qaeda, with the ultimate goal of fighting on al Qaeda's behalf.  The affidavits detail the defendants' growing commitment to al Qaeda over time, which is demonstrated through swearing oaths of allegiance to al Qaeda, providing monetary funds and other items requested by al Qaeda, such as Casio watches, and ultimately engaging in attempts to travel to locations from which they could join al Qaeda's front lines to fight.

Pertinent to the instant motion, throughout the affidavit, the Affiant described several ways in which the defendants and CW-1 utilized email and Internet communications to: (1) confirm payment of money intended for the support of al Qaeda; (2) discuss their terrorist plans, goals and support for al Qaeda; and (3) attempt to conceal their activities from law enforcement.

First, the Affiant described one instance in which El-Hanafi utilized an email account to confirm the receipt of money which was to be provided to al Qaeda.  According to the Affiant, CW-1 provided funds to Hasanoff, which Hasanoff then provided to al Qaeda.  Affid. ¶ 12(b).[19] Hasanoff confirmed receipt of those funds via an email to CW-1.  *Id*.

Second, the Affiant described how CW–1, Hasanoff, and El-Hanafi "used electronic

_____

[18] Detective Richard Paugh of the JTTF was the affiant for the welhanafi@yahoo.com account and Special Agent Landers of the JTTF was the affiant for the welhanafi@live.com account.  For ease of reference and because the facts averred are identical, both affiants will be referred to herein as "the Affiant."  Copiers of both these affidavits were attached as Exhibits D (Special Agent Landers' affidavit) and F (Detective Paugh's affidavit) to the declaration of JaneAnne Murray, dated June 6, 2011, which was submitted in support of El-Hanafi's motion to suppress.

[19] Where the citation for each affidavit in support of the warrants is identical, it will only be provided once and referred to as "Affid.".

communications and email accounts to communicate with each other, sometimes employing coded language, regarding their efforts to support and join al Qaeda." Affid. ¶ 12(g). Specifically, the Affiant detailed communications between CW-1, El-Hanafi, and Hasanoff over two email accounts, mahkabab1@gmail.com and mahkabab2@gmail.com. *Id.* ¶ 16-17.  In these extensive communications, the three men discussed the fact that they had lost contact with an al Qaeda operative whom they believed would help them achieve their goal of fighting for al Qaeda, and strategized options for continuing their pursuit of that goal.  The three men also discussed a plan to travel to Saudi Arabia to meet with members of al Qaeda.  In a subsequent chat, the defendants discussed the fact that they suspected law enforcement was aware of their plans to travel to Saudi Arabia and the need to be careful so as to avoid arrest.  *Id.*

Finally, the Affiant described how the defendants utilized email and Internet communications to attempt to conceal their unlawful activities from law enforcement.  The Affiant noted that El-Hanafi met with members of al Qaeda in or about February 2008 and instructed them on ways to covertly communicate over the internet.  *See* Affid. ¶ 12(d).  El-Hanafi provided similar instructions to CW-1 for use in their own communications.  *Id.* ¶ 12(e).  As further corroboration for these efforts, the Affiant stated that he had reviewed bank records for El-Hanafi which revealed his purchase of subscription to a "hotspot VPN," which would allow a person to mask the Internet protocol address from which the person accessed the Internet, thereby preventing identification.  *Id.* ¶ 13, 14.

Having described the defendants' use of email communications to further their unlawful terrorist objectives, the Affiant then provided the basis for his belief that El-Hanafi was using the target email accounts.  The Affiant explained that El-Hanafi had used one of his email accounts,

welhanafi@yahoo.com, to communicate with an FBI Special Agent regarding his placement on the "no-fly" list.  *See* Affid. ¶ 19.  According to the Affiant, law enforcement officers then traveled to the UAE to interview El-Hanafi.  During that interview, El-Hanafi admitted to using three email accounts to communicate with individuals in the United States and elsewhere: welhanafi@yahoo.com, welhanafi@live.com, and welhanafi@gmail.com.  *Id*. ¶ 20.

In conclusion, the Affiant stated that he is "familiar with the practices and methods by which persons involved in terrorist activities often use the Internet and electronic mail in furtherance of terrorism offenses" in order to communicate with others in the course of "planning, executing and concealing terrorist activities" and, based on that knowledge, believed that there was probable cause to believe that the target email account would contain such evidence.  *Id*. ¶ 22; *see Singh*, 390 F.3d at 182 (giving deference, in upholding probable cause determination, to experienced agents statement that the materials sought were the kind often found in a defendant's residence); *see also United States* v. *Bowen*, 689 F. Supp. 2d 675, 679 (S.D.N.Y. 2010) (noting that agent's statement that based on training and experience, perpetrator's of fraud often possess materials used in the fraud in their residence, among other things, supported finding of probable cause).

In sum, the Affidavit set out sufficient probable cause for the Magistrate Judges' findings.  The Affidavit established that El-Hanafi used email extensively to communicate with others concerning his terrorist objectives to further the goals of and provide support for al Qaeda. Specifically, many of those criminal communications were with CW-1, who was located in the United States.  Further, El-Hanafi admitted to Agents that he not only used the welhanafi@yahoo.com and welhanafi@live.com accounts, but specifically stated that he used

-55-

them to communicate with individuals in the United States.  These facts provide a reasonable

basis to conclude that the contents of the welhanafi@yahoo.com and welhanafi@live.com

accounts were likely to contain additional evidence of El-Hanafi's terrorism-related activities.

Accordingly, there was a "substantial basis" for the Magistrate Judges' finding of probable cause

in this case.  *See United States v. O'Brien*, 498 F. Supp. 2d 520, 538 (N.D.N.Y. 2007) ("The

standard does not demand certainty but only a fair probability that contraband or evidence of a

crime will be found. . . .  Further, courts recognize that experience and training may allow a law

enforcement officer to discern probable cause from facts and circumstances where a layman

might not.") (internal citation and quotation omitted).

> ### c.    The Search Warrants Complied With The Fourth Amendment's Particularity Requirement

El-Hanafi also argues that the warrants lacked "particularity" because: (1) they

authorized an "unlimited search" of the entire contents of the email accounts, similar to that

proscribed by the Second Circuit in *Rosa*; and (2) because they authorized agents to obtain the

entirety of the email accounts so that a subsequent review could be conducted for emails subject

to seizure.  *See* El-Hanafi Br. at 37-39.  Both arguments should be rejected.

First, El-Hanafi simply is incorrect to argue that the warrants were akin to those at issue

in *Rosa*.  In *Rosa*, the email search warrant provided no description whatsoever of the criminal

activity alleged or the type of digital evidence sought.  *See United States* v. *Rosa*, 626 F.3d at 61.

Accordingly, the Second Circuit held that the warrant was defective because it failed to link the

items to be searched and seized to the suspected criminal activity in that case.  The Second

Circuit provided an example of the kind of parameters that would have fulfilled the particularity

requirement in that case, which involved allegations of child pornography, as follows: "*i.e.*, any

-56-

and all electronic equipment potentially used in connection with the production or storage of

child pornography and any and all digital files and images relating to child pornography

contained therein." *Id*. at 62.[20]  Notably, the kind of parameters described as satisfactory by the

Second Circuit are exactly the kind of parameters contained in the warrants at issue here.

> The welhanafi@live warrant lists the items for seizure as any items:

>> related to: terrorism or terrorism-related activities; violence; efforts to contact and/or
>> support al Qaeda or other terrorist organizations; the relationship between Wesam
>> El-Hanafi, a/k/a "Khaled," and Sabirhan Hasanoff, a/k/a "Tareq,"; travel; financial
>> transactions; use of aliases; ownership and/or use of the accounts; and efforts to
>> thwart or avoid law enforcement scrutiny.[21]

The welhanafi@yahoo.com warrant is not as specific, but instead limits the items to be seized as

all materials in the account:

>> which constitute[] evidence of violations of Title 18, United States Code, Sections
>> 2339A(a) (providing material support to terrorists), and 2339B(a)(1)(A) (providing
>> material support or resources to a designated foreign terrorist organization), among
>> other offenses.

By contrast with *Rosa*, these parameters – which clearly identify the types of emails relevant to

---

[20]  It should be noted that despite finding that the warrant lacked particularity, the Second
Circuit nonetheless refused to exclude the fruits of the search because the officers had acted
reasonably in reliance upon the search warrant and no deterrence rationale supported exclusion.
*See Rosa*, 626 F.3d at 65.

[21]  Attachment A to the welhanafi@live.com warrant describes in detail the search
procedure to be implemented by Hotmail (Section I), and the items that are sought for seizure
(Section II).  Section I sets out that Hotmail shall provide a duplicate of the email account to law
enforcement for review and Section II specifies the items to be seized.  Although the heading to
Section II, which states "Files and Accounts to be Produced," would have been more clear if it
had read "Files and Accounts to be Seized," the context nonetheless makes it clear that Section II
describes the subset of the items provided in Section I that are subject to seizure pursuant to the
warrant.  El-Hanafi implicitly agrees, noting that "the Warrants clearly contemplated some kind
of selection process, whereby emails and account information related to terrorist activity would
be seized, and implicitly, whatever was left over would be returned."  El-Hanafi Br. at 39.

-57-

the charged crimes and subject to seizure – were sufficiently particular to "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States* v. *George*, 975 F.2d at 75.

Second, El-Hanafi contends that the warrants are unlawful because they authorized agents to seize the entire accounts, rather than searching the data produced and then determining what to seize, thereby they "essentially authorized whole-sale rummaging through Mr. El-Hanafi's personal communications and affairs, unlimited by scope, time or number of searches." El-Hanafi Br. at 31. The procedures described and employed here, however, are entirely reasonable given the practical realities of executing email search warrants and have been approved by other judges in this District.

The evidence sought by a search warrant for e-mail accounts held by third party service providers must be obtained and searched through means different from other search warrants involving premises or other searches of property. Unlike the search of a house or physical space, where law enforcement officers directly search the location, in the case of a search warrant for e-mails, law enforcement must rely on the third party service provider to provide records. Law enforcement cannot rely, however, on third party service providers to perform a substantive search to determine which, if any, of the electronic communications stored on the third party service provider's servers is relevant to the criminal investigation and responsive to the warrant. Indeed, such a delegation of responsibility for the execution of the warrant to private third parties would not only be unworkable because the private parties lack the investigational background necessary to identify emails subject to seizure, but also because it would be unduly burdensome, and perhaps unconstitutional. *See, e.g.*, *Buonocore* v. *Harris*, 65 F.3d 347, 356

(4th Cir. 1995) (holding that there was "no doubt that the Fourth Amendment prohibits

government agents from allowing a search warrant to be used to facilitate a private individual's

independent search of another's home for items unrelated to those specified in the warrant"); *see*

*also* 18 U.S.C. § 3105 (limiting execution of search warrants to law enforcement officers).

Accordingly, in the case of e-mail search warrants directed at private third party service

providers, practical considerations militate in favor of the Government obtaining the entire copy

of the seized records maintained by the third party, to ensure the integrity of the search process.

For these reasons, the Honorable Leonard B. Sand upheld a similar procedure to that

employed here in *Bowen*.  In *Bowen*, the court held that in the context of an email search

warrant, the particularity requirement does not require law enforcement to specify a search

methodology *ex ante* and only seize those items that fulfill the search criteria.  The court

explained that "there is no way for law enforcement or the courts to know in advance how a

criminal may label or code its computer files and/or documents which contain evidence of

criminal activities."  *United States* v. *Bowen*, 689 F. Supp. 2d at 681; *see also United States* v.

*Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *35 (S.D.N.Y. Apr. 4, 2007) ("[I]t is

frequently the case with computers that the normal sequence of 'search' and then selective

'seizure' is turned on is head, as computer hardware is seized from a suspect's premises before

its content is known and then searched at a later time.") (internal quotation omitted); *cf. Riley*,

906 F.2d at 845 (describing similar concerns in the search of papers and documentary evidence) .

In *Bowen*, like here, the search warrant at issue provided that a copy of the target account would

be provided to law enforcement officers, who would then search the account thereafter.  *See*

*United States* v. *Bowen*, 689 F. Supp. 2d at 681 n.5.[22]

El-Hanafi also contends that the warrants should have required that the search be conducted by a team of "walled agents" as required by the Ninth Circuit in *United States* v. *Comprehensive Drug Testing*, 579 F.3d 989 (9th Cir. 2009) (en banc).  El-Hanafi Br. at 39.  To date, *Comprehensive Drug Testing* has not been adopted within this Circuit and this court should not do so here.  *See United States* v. *D'Amico*, 734 F. Supp. 2d 321, 367 (S.D.N.Y. 2010).  In any event, the JTTF did employ a "wall agent" review to ensure that no officers assigned to the case were exposed to any privileged attorney-client communications, and that procedure was in place as of March 1, 2010, prior to the issuance of either the search warrant on the Welhanfi@live.com account or the Welhanafi@yahoo.com account.  *See* Paugh Decl. ¶¶ 2-4; *infra* Part III.D.2.a. Furthermore, numerous courts have commented that electronic searches raise unique issues given that relevant documents are often intermingled with thousands of other files, technical limitations do not permit the searches to be conducted when the warrant is executed on the premises, but rather in computer laboratories, and effective searches require multiple hours of sifting through electronic documents.  *See United States* v. *D'Amico*, 734 F. Supp. 2d at 365.  In fact, it is often precisely because computer files can be encrypted and intermingled that criminals utilize these mediums.  Accordingly, while the Second Circuit has not explicitly addressed how the Fourth Amendment particularity requirement applies to computer searches, it

---

[22] El-Hanafi also argues that the Government seized all data that was produced in response to the search warrants, rather than just those items that fell within the scope of the warrant.  *See* El-Hanafi Br. at 40-41.  The entire contents of the accounts, which consist of almost eight thousand emails, were produced to El-Hanafi in accordance with Rule 16 of the Federal Rules of Criminal Procedure.  The Government does not intend to use any emails at trial that do not fall within those subject to seizure under the warrants.  Further, at the conclusion of the criminal proceedings, all email search warrant results will be destroyed.

is clear that the ultimate Fourth Amendment standard for any search, including computer searches, is that of "reasonableness."  *United States* v. *Vilar*, 2007 WL 1075041, at *36.  The search protocol and description of items to be seized – which provided the Magistrate Judges with probable cause to believe the accounts contained evidence of criminal activity and sufficiently described the types of items to be seized – were reasonable and passed constitutional muster in this case.[23]

> ### d.      Even If The Warrants Are Invalid, The Evidence Should Not Be Suppressed

Even where a search warrant is not supported by probable cause, evidence collected pursuant to a search warrant signed by a neutral Magistrate Judge is still admissible if the agents acted in good faith in executing the warrant.  *See Leon*, 468 U.S. at 920; *Singh*, 390 F.3d at 183; *Rosa*, 626 F.3d at 65; *United States* v. *Roberts*, 852 F.2d at 675.  In this case, the good faith exception applies.  There is absolutely no credible evidence, and El-Hanafi does not contend, that Magistrate Judges Francis and Gorenstein were misled or wholly abandoned their judicial roles in determining that the warrants established probable cause and were sufficiently particular. Nor were the warrants so facially deficient such that the executing officers could not reasonably presume them to be valid.  *See Leon*, 468 U.S. at 923.

> ### e.      There Is No Basis For A *Franks* Hearing

Lastly, El-Hanafi asserts that a *Franks* hearing is required.  *See* El-Hanafi Br. at 43. Because a *Franks* hearing is only required when a defendant has made a "substantial preliminary

---

[23]  El-Hanafi also argues that law enforcement officers failed to satisfy the notice requirement.  Although the warrants mistakenly contained a check mark indicating the notice was required, notice was not required in this instance, pursuant to Title 18, United States Code, Sections 2703(b)(1)(A) and (c)(2), as described in the Affidavits.  *See* Affid. ¶ 8(b), (c ).

showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and that "the allegedly false statement is necessary to the finding of probable cause," this Court should deny his request.  *See Franks* v. *Delaware*, 438 U.S. 152, 155-56 (1978).  Here, the only claim made by El-Hanafi that even remotely falls within this standard is that the Government failed to advise the Magistrate Judges that the cooperating witness had previously engaged in fraudulent business activities.  El-Hanafi's allegation falls far short of the burden established in *Franks*.

The determination of whether to grant a *Franks* hearing based on failure to address the reliability of a confidential informant in a search warrant application is considered by looking at a totality of the circumstances, with particular consideration as to whether the information is independently corroborated and whether the informant's information is based on first-hand knowledge.  *See Gates*, 462 U.S. at 230-31, 233; *United States* v. *Canfield*, 212 F.3d 713, 720-21 (2d Cir. 2000).  In this case, the Government did in fact alert the Magistrate Judges that CW-1 had engaged in criminal activity in the past.  Specifically, the Affiant noted that CW-1 has been charged with federal crimes and is cooperating with the Government in the hopes of receiving a reduced sentence.  *See* Affid. ¶ 11.  El-Hanafi provides no basis from which this Court could conclude that the omission of the specific crimes with which CW-1 was charged was knowing or intentional or material to the finding of probable cause – and the Magistrate Judge could have of course asked for clarification with respect to what crimes CW-1 had committed before signing off on the warrant.  The Affiant set out extensive corroboration for CW-1's information.  Specifically, the Affiant noted that CW-1 has provided "reliable and independently corroborated evidence."  *Id.* ¶ 11.  The Affiant buttressed this claim by including abundant corroboration for

the information provided by the CW-1, such as review of bank statements and emails, as described above.  Thus, even if the Magistrate Judges had been made aware that CW-1's past criminal activities included fraudulent business transactions, the Magistrate Judges could have found CW-1's information credible.  In sum, because the Affiant not only alerted the Magistrate Judges to CW-1's past involvement in criminal activity, but also provided a basis to credit his information and independent corroboration of that information, the omission of his specific criminal activity is not material to the finding of probable cause.  *See United States v. Numisgroup Intern. Corp.*, 128 F. Supp. 2d 136, 145 (E.D.N.Y. 2000) (refusing *Franks* hearing on grounds of omission of confidential informants mail fraud conviction in light of corroboration and first-hand knowledge) .  Accordingly, no *Franks* hearing is required.

### 2. The Government Took Adequate Measures To Prevent Against Exposure To Privileged Communications

#### a. Privilege Review Of The Welhanafi@yahoo.com Account

The results of the welhanafi@yahoo.com search warrant were returned to Detective Paugh on or about April 9, 2010, and subsequently produced to the defense in discovery.  *See* Cronan Decl. ¶ 2.  Both the prosecutors and the agents took affirmative measures to protect against exposure to any attorney-client communications in reviewing the substance of this email account.  On or about December 17, 2010, two of the prosecutors assigned to this case had a telephone conversation with El-Hanafi's attorneys, who advised the prosecutors that the emails obtained from the welhanafi@yahoo.com search warrant might contain privileged communications between El-Hanafi and his former attorney, Victor Knapp, Esq.  *See* Cronan Decl. ¶ 3.  Immediately after this conversation, another prosecutor, who has never been involved in the prosecution of this case, was assigned to serve as the "wall" attorney to review the results

from the search warrant on the welhanafi@yahoo.com account.  *Id.* ¶ 4.  The "wall" attorney

reviewed the results of the welhanafi@yahoo.com search warrant, and identified and segregated

any emails that, based on keyword searches and recipient information, appeared to potentially

contain privileged conversations.  *Id.* ¶ 5; Exh. A (memorandum prepared by the "wall"

attorney).  Any emails that might have fallen into this category of containing privileged

communications were placed in a separate electronic folder, to ensure that the prosecution team

would avoid viewing those emails.  *Id.*  At no point did any of the prosecutors assigned to this

case view any of the emails that were segregated by the "wall" attorney, or otherwise view any

privileged emails or other communications between El-Hanafi and any of his current or former

attorneys.  *Id.* ¶ 6.

    The JTTF undertook similar protective measures to prevent the agents assigned to this

case from being exposed to any privileged communications.  On or about March 1, 2010, before

the search warrant on the welhanafi@yahoo.com email account was issue, the JTTF established

a "wall" team of JTTF officers to review email communications of the defendants that would be

obtained in the course of this investigation.  *See* Paugh Decl. at ¶ 2.  Like the "wall" attorney, the

officers assigned to the JTTF's "wall" review were not assigned to the investigation into the

defendants, nor have they ever been assigned to the investigation.  *Id.*  The "wall" officers

conducted an initial review of email communications obtained in the investigation to ensure that

the communications did not contain any privileged attorney-client communications and, if they

did, segregated such communications from the eyes of the investigating officers.  *See id.*  By the

time the results of the welhanafi@yahoo.com search warrant were obtained on or about April 9,

2010, the JTTF had this "wall" review procedure in place.  *See id.* ¶ 4.  As a result, none of the

-64-

JTTF officers assigned to this case were exposed to any communications between El-Hanafi or Hasanoff and any of their current or former attorneys.  *See id.*

### b.      No Taint Hearing Is Required

In this case, the prosecutors and the law enforcement agents took sufficient cautionary measures to avoid any exposure to privileged attorney-client communications.  Both the prosecutors and the agents arranged for individuals, not associated with the case, to conduct an initial review of the materials for purposes of identifying and segregating any communications that appeared to be privileged.  The Second Circuit recommended a similar procedure in *United States* v. *Schwimmer*, 882 F.2d 22 (2d Cir. 1989), suggesting that, to avoid the prosecutors being improperly exposed to coerced grand jury testimony, the Government take "steps to ensure that any subsequent proceedings are not tainted by individual prosecutorial access to the coerced testimony."  *Id.* at 26 ("[I]t would appear prudent for the government in the event of a retrial to establish a so-called 'Chinese wall' between its prosecutors exposed to the present grand jury testimony . . . and those prosecutors who may be assigned to retry defendant.").

El-Hanafi also complains that, in executing the email search warrants, law enforcement may have seized emails between El-Hanafi and his wife.  *See* El-Hanafi Br. at 31, 41.  The Government does not intend to use any of the emails to/from El-Hanafi's wife as evidence at trial or to call El-Hanafi's wife as a witness.  *See* 3-505 Weinstein's Federal Evidence § 505.09 (noting that the confidential marital communication privilege is testimonial and prohibits one spouse from testifying as to conversations with another spouse made in confidence during marriage).  To the extent that El-Hanafi suggests that any evidence obtained as a result of the Government's review of communications between El-Hanafi and his spouse is tainted and

should be excluded under a "fruit of the poisonous tree" type analysis, such argument is not

viable.  First, the Government does not believe there was any such derivative evidence.  Second,

the fruit-of-the-poisonous tree doctrine does not apply.  The marital communications privilege is

a product of federal common law, not of any constitutional guarantee.  In fact, numerous courts

have held that "there is no constitutional underpinning to the marital communications privilege."

*United States* v. *281 Syosset Woodbury Rd.*, 862 F. Supp. 847, 853 (E.D.N.Y. 1994) (citing

*United States* v. *Lefkowitz*, 618 F.2d 1313, 1319 (9th Cir. 1980); *LaRoche* v. *Wainwright*, 599

F.2d 722, 726 (5th Cir. 1979); *United States* v. *Doe*, 478 F.2d 194, 195 (1st Cir. 1973); *see also*

*Port* v. *Heard*, 764 F.2d 423, 430 (5th Cir. 1985) ("The marital  privilege has never been placed

on a constitutional footing. While its origins are somewhat obscure, we know that the marital

privilege is bequeathed to us by the long evolution of the common law, not by constitutional

adjudication.").  Given that the marital privileges are testimonial in nature, courts have held that

they do not "prevent[] the Government from enlisting one spouse to give information concerning

the other or to aid in the other's apprehension," *Trammel* v. *United States*, 445 U.S.40, 53 n.12

(1980), or from presenting admissible testimony regarding one spouse's out-of-court statements

against another spouse, presuming they are otherwise admissible, *see United States* v.

*Mackiewicz*, 401 F.2d 219, 225 (2d Cir. 1968).  Accordingly, suppression of such derivative

evidence is unwarranted.  *See United States* v. *Irons*, 646 F. Supp. 2d 927, 956-58 (E.D. Tenn.

2008) (excluding use of recorded conversations between husband and wife at trial on grounds of

marital communications privilege but not excluding any derivative evidence).

## IV. CONCLUSION

For the foregoing reasons, the defendants' motions to (1) dismiss certain counts on multiplicity grounds; (2) dismiss Count Two fo the Indictment for failure to state an offense and as unconstitutionally vague; (3) suppress statements El-Hanafi made to JTTF officers in the UAE in January 2010 and February 2010; (4) suppress the results of search warrants issued on El-Hanafi's email accounts; and (5) dismiss the Indictment because the Government obtained El-Hanafi's privileged email communications, should be denied.

Dated:      New York, New York
            August 12, 2011

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America

By:     _____
                              Brendan R. McGuire
                              John P. Cronan
                              Aimee Hector
                              Assistant United States Attorneys
                              Tel.: (212) 637-2220/2779/2203

-67-