UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Docket No. |
| - against - | 10-CR-162 (KMW) |
| WESAM El HANAFI, et al., | |
| Defendants. | |

---

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT WESAM EL-HANAFI'S MOTION TO DISMISS AND SUPPRESS

---

JaneAnne Murray
MURRAY LAW LLC
233 Broadway
New York, New York 11215
Tel.  (212) 941-9266

Justine A. Harris, Esq.
COLSON & HARRIS LLP
10 East 40th St., Suite 3307
New York, New York 10016
Tel: (212) 257-6455

Attorneys for Mr. Wesam El-Hanafi

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................1

   I.  MR. EL-HANAFI'S STATEMENTS SHOULD BE SUPPRESSED BECAUSE
      THEY WERE INVOLUNTARY ...............................................................................1

      A.  Mr. El-Hanafi's Choice to Speak with FBI Agents was Not Voluntary ....................2

      B.  The Government's Distinction Between Seeking a "Benefit" and Avoiding a
           "Penalty" is Artificial and of No Legal Consequence .................................................3

      C.  *Minnesota v. Murphy* Supports a Finding that Mr. El-Hanafi's Statements
           Were Involuntary ............................................................................5

      D.  Far from Advancing the Government's Position, the Fact that the Agents Lied
           to Mr. El-Hanafi Makes the Conduct of the Officers More Coercive, Not Less .........7

      E.  There is Ample Evidence that Mr. El-Hanafi's Statements Were the Product
           of Coercive State Action .........................................................................9

      F.  The Threat of Continued Banishment from One's Country of Birth and
           Prolonged Separation from One's Wife and Children is Sufficiently Severe to
           Render Mr. El-Hanafi's Choice Coerced ..............................................................11

      G.  Alternatively, the Court Should Hold an Evidentiary Hearing ................................12

  II.  THE COURT SHOULD ALSO SCHEDULE A HEARING TO DETERMINE
      WHETHER DURING THE FEBURARY 5, 2010 INTERROGATION, THE
      AGENTS SUBJECTED MR. EL-HANAFI TO CUSTODIAL
      INTERROGATION AND OBTAINED STATEMENTS IN VIOLATION OF
      *MIRANDA* ........................................................................................14

 III.  THE WARRANTS LACKED PROBABLE CAUSE AND PARTICULARITY,
      AND WERE EXECUTED IN A MANNER TO ENSURE VIOLATIONS OF
      PRIVACY...........................................................................................15

      A.  The Warrants Lacked Probable Cause ...................................................................16

      B.  The Warrants Lacked the Particularity Required by the Second Circuit in *Rosa* .......17

      C.  The Government's Efforts to Protect Privacy Interests Were Inadequate..................19

      D.  The Alleged "Walls" Were Either Too Little or Too Late .........................................20

      E.  The Government Cannot Rely on the Good Faith Exception .....................................22

F.  A Hearing is Required ............................................................................................24

CONCLUSION ........................................................................................................................25

**Introduction**

Defendant Wesam El-Hanafi respectfully submits this reply memorandum of law in further support of his motion to suppress.

**Argument**

I.

MR. EL-HANAFI'S STATEMENTS SHOULD BE SUPPRESSED BECAUSE
THEY WERE INVOLUNTARY

The primary ground for suppression is that Mr. El-Hanafi's statements were coerced in violation of the Fifth Amendment of the United States Constitution.   The government compelled Mr. El-Hanafi's statements by first placing him on the no-fly list, effectively banishing him from the country of his birth and separating him from his wife and children, and then falsely telling him that the only way to return home was to cooperate with interviews and answer the questions of FBI agents.

In opposition, the government largely ignores the principal legal issues and tries to distinguish the controlling cases with semantics, rather than facts.  But neither its effort to shift the legal focus or the government's more benign word choice alters the key facts:  the government itself – most likely the agents involved in this case – put Mr. El-Hanafi on the no-fly list, depriving him of one of the fundamental rights of citizenship, the right to return home. Thereafter, the government, through State Department employees and FBI agents, concocted an elaborate ruse to convince Mr. El-Hanafi to speak; they told Mr. El-Hanafi that the only way to return home was to cooperate with FBI interviews.  Accordingly, the statements he gave were coerced in violation of the Fifth Amendment and should not be introduced at trial.

A.   Mr. El-Hanafi's Choice to Speak with FBI Agents was Not Voluntary

Instead of discussing the controlling line of "penalty" cases – *Garrity v. State of New Jersey*, 385 U.S. 493 (1967) and its progeny – the government devotes the bulk of its "voluntariness" discussion on factors such as Mr. El-Hanafi's age and sophistication, the agents' conduct during the actual questioning, and the physical setting in which the questioning took place.  (*See* Government's Opposition to the Defendant's Pre-Trial Motions to Dismiss and to Suppress ("Gov. Opp..") at 24-28.   But in the context of this case, these factors are largely irrelevant.  In all of the "penalty" cases, the defendants were sophisticated, the interview settings non-coercive, and the interrogators presumably polite and non-violent.  *See, e.g., Garrity*, 385 U.S. 493 (police officers questioned by the Attorney General); *United States v. Stein,* 440 F. Supp. 2d 315 (S.D.N.Y. 2006) (KPMG executives who made statements with counsel at proffer meetings at the United States Attorney's Office for the SDNY).  Nor does it matter that Mr. El-Hanafi may have initiated some of the contact with government officials or walked to meetings on his own volition.  Indeed, in *Stein*, it would not have mattered if counsel for the defendants had called the U.S. Attorney's office to schedule the proffer sessions, and certainly the *Stein* KPMG executives and the police officers in *Garrity* attended the meetings on their own volition.

Ultimately, all of the defendants in the penalty cases "chose" to make statements; the problem was that the choice – between the "rock and the whirlpool," *Garrity*, 385 U.S. at 498 -- was not a voluntary one.  As the Supreme Court explained:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves.  The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda v. State of Arizona*, is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice."

*Id.* at 497 (internal citations omitted).  Thus, far from being an "irrational" choice (Gov. Opp. at 24), Mr. El-Hanafi's decision to speak was extraordinarily rational – the constitutional problem was that it was not a free and unconstrained choice.[1]

B.   The Government's Distinction Between Seeking a "Benefit" and Avoiding a
     "Penalty" is Artificial and of No Legal Consequence

When the government does finally address *Garrity* and its progeny (*see* Gov. Opp. at 33-36), it tries to distinguish those cases by merely re-labeling the underlying conduct.  Ignoring the factual reality that the absence of a "penalty" is equivalent to a "benefit," the government argues that the statements were voluntary because Mr. El-Hanafi was seeking "assistance" from the government and spoke in order to achieve a "desired goal."  (*See* Gov. Opp. at 34).

But on the facts of this case, there is no legal difference between seeking to procure a benefit, and avoiding the kinds of penalties threatened in *Stein* (loss of attorney fees), *Garrity* (loss of employment), and *Cunningham* (divestment of political party offices).  *See Lefkowitz v. Cunningham*, 431 U.S. 801 (1977).  Because of what government officials and the agents told him – that they could in fact get him off the no-fly list if he cooperated – Mr. El-Hanafi reasonably believed that he faced a "prospective penalty" if he remained silent, namely, continued banishment from the country of his birth and prolonged separation from his wife and children.

---

[1] Moreover, the government's argument is premised on the assumption that the absence of overt indicia of coercion is proof that the statements were voluntary.  Not only is such an assumption at odds with the law – "the blood of the accused is not the only hallmark of an unconstitutional inquisition," *Garrity v. State of New Jersey*, 385 U.S. 493, 496 (1967) – but it is wrong as matter of common sense.  Coercive pressures that do not employ traditional law enforcement devices – handcuffs, visible gun, arrest – may in fact be more insidious because defense mechanisms are less likely to be triggered.

The government's claim that Mr. El-Hanafi faced "no *additional*" penalty because he was "already unable to fly" (Gov. Opp. at 34) is disingenuous when it was the government itself (and very likely FBI agents involved in investigating this case) that put him on the list and effectively exiled him.  The voluntariness question does not turn on whether the penalty is imposed before or after the statements are made.  Indeed, it is hard to imagine that the proffer statements in *Stein* would have been "voluntary" had KPMG, at the government's behest, *first* cut off attorney's fees, and the defendants, in an effort to have them restored, had then proffered to the government.   The flaws in the government's logic are clear when applied to the facts of *Lynumn v. Illinois*, 372 U.S. 528 (1963).  There, the Supreme Court found involuntary statements made to officers who had threatened to deprive the defendant of her welfare benefits and custody of her children.  Under the government's theory, those statements would have been voluntary had the defendant first lost custody of her children, as well as her welfare benefits, and then, in order to induce her to speak, law enforcement had falsely promised to return her children and restore her benefits if she in fact cooperated.  That cannot be, and is not, the constitutional rule.

In any event, that Mr. El-Hanafi may have sought a "benefit" by talking to the government makes no difference to the legal analysis. At the proffer sessions in *Stein*, the KMPG executives, whose attorney's fees were conditioned on the government perceiving them as cooperative, were undoubtedly seeking to "curry favor" with the government, just as the government alleges Mr. El-Hanafi sought to do here.  *See Stein*, 440 F. Supp. at 332 (once Mr. Watson returned for the proffer sessions, "he no doubt sought to achieve the best possible outcome").  As in *Stein*, the fact that Mr. El-Hanafi may have been seeking to obtain a benefit from the government does "not undercut the conclusion that [the government] coerced his

appearance" by conditioning return to his home country on attendance at interviews and cooperation with FBI agents. *Id.*

      C.  <u>*Minnesota v. Murphy* Supports a Finding that Mr. El-Hanafi's Statements Were Involuntary</u>

As further support for its notion that Mr. El-Hanafi's statements were not coerced, the government analogizes to the facts at issue in *Minnesota v. Murphy*, 465 U.S. 420 (1984). But its reliance on that case is misplaced. In *Murphy*, the defendant sought to suppress statements made to his probation officer on the grounds that the statements were the product of custodial interrogation in violation of *Miranda*, and that they were involuntary because they were made under threat that his probation could be revoked. While the Court rejected both of Murphy's claims, the passage cited by the government relates to the Court's determination that Murphy was not subjected to custodial interrogation. *See Murphy*, 465 U.S. at 429-434 (discussing whether Murphy was in "custody"). In determining that Murphy had not been in custody at the time of his statements to probation, the Court noted several factors, and concluded that because Murphy "was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." *Id.* at 433. Here, we are not claiming that placement on the no-fly list subjected Mr. El-Hanafi to custodial interrogation, and thus that part of the *Murphy* decision has little bearing on this motion.

In fact, what *Murphy* says about the involuntariness claim actually advances Mr. El-Hanafi's position. The Court found that Murphy's confession to his probation officer was voluntary only because there was no requirement that he in fact had to answer questions; the only condition of his probation was that he appear and, if he did answer questions, to do so

"honestly." *Murphy*, 465 U.S. at 437.  The conditions of probation "said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Id.*  Because Minnesota "did not attempt to take the extra, impermissible step" of requiring Murphy to "choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent," there was no violation of the Fifth Amendment.  *Id.*

Here, on the other hand, government officials did "take the extra, impermissible step;" they made it amply clear to Mr. El-Hanafi that he *was* required to answer questions in order to avoid indefinite banishment from the United States and prolonged separation from his family. The United States Embassy specifically told Mr. El-Hanafi that Gary Price could help him get off the no-fly list.  (June 6, 2011 Declaration of Wesam El-Hanafi ("El-Hanafi Decl.") at ¶ 7). Over the phone, Mr. Price then told Mr. El-Hanafi that in order to assist him get off the no-fly list, he needed to meet with Mr. El-Hanafi in-person.  (*Id.* at ¶ 8).  At the meeting, Mr. Price led Mr. El-Hanafi to believe that, although it might not happen immediately, he would help Mr. El-Hanafi get off the no-fly list, but that to do so, he would have to cooperate with interviews.  (*Id.* at ¶ 9).  Mr. Price subsequently arranged for Mr. El-Hanafi's wife and children to fly, and then arranged for Mr. El-Hanafi to meet with the agency responsible for putting him on the list   (*Id.* at ¶¶ 15, 18).  On top of that, at the start of the February 5, 2010 interview, the agents outright lied to Mr. El-Hanafi, telling him that they wanted to ask him questions in order to help him get off the no-fly list, and that they were there to "fix" what had become an administrative problem after the Christmas bomber.  (*Id.* at ¶ 20).  Thus, in stark contrast to the situation in *Murphy*, where the defendant simply assumed that he was required to speak when in fact he was not, here

it was clearly communicated to Mr. El-Hanafi, both explicitly and implicitly, that he had to speak in order to avoid remaining on the no- fly list indefinitely.

    D.  <u>Far from Advancing the Government's Position, The Fact that the Agents Lied to Mr.</u>
        <u>El-Hanafi Makes the Conduct of the Officers More Coercive, Not Less</u>

       As the government has conceded, the entire scheme was a ruse.  The government had no intention of removing Mr. El-Hanafi from the no-fly list, but deliberately lied in order to convince him to answer the FBI's questions.  Perplexingly, the government seeks comfort in the fact that the coercion exerted on Mr. El-Hanafi was the product of a series of lies and pretexts. But while lies and ruses are tolerated only where the consent obtained was voluntary.  *United States v. Pollaro*, 733 F. Supp. 2d 364, 369 (E.D.N.Y. 2010)  (ruse tolerated when "deception in question was the use of an undercover agent who obtained *otherwise voluntary consent* through the use of his adopted identity") (quoting *United States v. Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008)) (emphasis added); *See also* Gov. Opp. at 33.  If the conduct is coercive, the fact that the conduct was also deceptive certainly does not lessen its coercive effect.  *See, e.g., United States v. Anderson*, 929 F.2d at 100 ("serious constitutional problem" posed by "misleading statement" to suspect that if he asked for a lawyer, he would be precluded from cooperating with the government).

       In fact, in many circumstances, it is the *lie* that makes the interrogation unconstitutionally coercive.  Law enforcement officials are properly allowed to tell suspects accurate information about the benefits of cooperation, *see, e.g.*, *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("statements to the effect that it would be to suspect's benefit to cooperate are not improperly coercive").  They cannot, however, falsely exaggerate the potential sentence.  *See United States v. Duvall*, 537 F.2d 15, 25 (2d Cir. 1976) (coercion found where, among other

factors, suspect was told by prosecutor – accurately although unrealistically that he faced "a possible sentence of a hundred years").

While the government argues that the agents did nothing more than "persuad[e]" Mr. El-Hanafi to speak with a "ruse" that made "cooperation an attractive option" (*see* Gov. Opp. at 30), this is just a politer way of saying that they pressured him into speaking by presenting him with no alternative.  Indeed, in *Stein* and *Garrity*, the government also did nothing more than make "cooperation an attractive option."  The constitutional problem was that the government made cooperation *too* attractive, threatening to impose drastic penalties if the "option" was not taken.  Here, the fact that the unpalatable and coercive choice given to Mr. El-Hanafi was a false one, makes the situation worse from a constitutional perspective, not better.

To the extent the government claims that Mr. El-Hanafi's belief that he had no choice but to speak was not objectively reasonable, such a claim borders on preposterous.  (*See* Gov. Opp. at 29: "The interviews simply did not present a situation where, as El-Hanafi argues, 'he had no choice but to answer their questions'").  The government agents in fact *intended* to communicate this very message to Mr. El-Hanafi.  As the government conceded in opposition to the motion for discovery, the FBI and other government officials conducted the interviews under the "pretext" of assisting Mr. El-Hanafi get of the no-fly list.  There can be no other explanation for that pretext except that it was concocted for the *sole purpose* of inducing – or put another way, pressuring -- Mr. El-Hanafi to speak.  And indeed, the lie had the desired effect.  Based on what he was told by Embassy officials and FBI agents, Mr. El-Hanafi came to the reasonable conclusion that in order to get off the no-fly list he would have to cooperate with the FBI.  The government cannot now suggest such a conclusion was unwarranted or unreasonable, when it was exactly the message the agents sought to convey.

8

Moreover, the lies in this case were not limited to the false promise to assist Mr. El-Hanafi in getting off the no-fly list.  Contrary to the government's assertion, the agents did "affirmatively inform" Mr. El-Hanafi that he was not a suspect of any criminal wrongdoing.  At the outset of the February 5, 2010 interview, Mr. El-Hanafi asked the agents whether his placement on the no-fly list was "particular" to him – i.e. whether it was because he in particular was under suspicion – and the agents responded "no," explaining in sum or substance that the President put "everyone" on the list after the Christmas bomber.  Moreover, they reiterated that they were there to fix the problem and would give him priority because he was a United States citizen.  (*See* El-Hanafi Decl. ¶ 20).  In addition, the government seems to concede that, just as in *United States v. Anderson*, 929 F.2d at 100, the agents lied and told Mr. El-Hanafi that his silence would preclude subsequent cooperation.  (*See* Gov. Opp. at 29, n.13).  In short, the government's cumulative deceptions, all designed to coerce Mr. El-Hanafi to speak, crossed the constitutional line and rendered Mr. El-Hanafi's statements involuntary.[2]

E.   There is Ample Evidence that Mr. El-Hanafi's Statements Were the Product of Coercive State Action

The government also argues that the pressure Mr. El-Hanafi faced was not the product of "coercive official tactics" – somehow suggesting that there is an insufficient link between his statements and the coercive activity of law enforcement – and that inquiries into the defendant's "state of mind" are not the "touchstone" of the voluntariness analysis.  (*See* Gov. Opp. at 25).  In making this argument, the government relies heavily on *Colorado v. Connelly*, 479 U.S. 157, 161-62 (1986).  But aside from its reiteration of the bedrock principles underlying the Fifth

---

[2] In footnote 13 at p. 29, the government half suggests that perhaps the statements that followed the agents' lies about cooperation should be suppressed.  It is far from clear, however, whether the parties agree as to what statements were made after those lies, and this factual dispute should be addressed at an evidentiary hearing.

Amendment, *Connelly* has little bearing on this case.  In *Connelly*, the defendant sought to suppress his statements on the grounds they were the product of his own mental insanity. Because there was no allegation that the government had done anything wrong at all, there was no state action casually connected to defendant's statements.  *See Connelly*, 479 U.S. at 163-64, 165-66 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.")  Thus, the Supreme Court held that a defendant's mental insanity could not, standing alone, render statements involuntary, and concluded that "mere examination of the confessant's state of mind can never conclude the due process inquiry."  *Id.* at 165.[3]

Here, there is ample proof that Mr. El-Hanafi's statements were the product of deliberatively coercive state action.  The government put him on the no-fly list, and prevented him from leaving the country.  Various government officials made it crystal clear to Mr. El-Hanafi – through orchestrated lies -- that cooperating with FBI interviews was the only way to get off the no-fly list and return home to the United States and his wife and children.  Unlike *Connelly*, therefore, here the claim is that Mr. El-Hanafi's statements were the product of government conduct.

Ultimately, this argument is yet a further effort to distract from the proper legal standard. As the government repeatedly insisted in its opposition to our prior motion for discovery, Mr. El-Hanafi's state of mind *is* central to the court's inquiry.  At that time, the government argued that the standard for voluntariness was whether Mr. El-Hanafi had a "subjective and objectively reasonable belief that he was coerced into speaking with the FBI."  (*See* U.S.A.'s Opposition to

---

[3] In *Connelly*, therefore, the requirement that there be "coercive official tactics" means only that there be official tactics that had a causal connection to resulting statements.

the Motions for Discovery and For a Bill of Particulars at 11).  That standard is indeed the proper

one, and satisfied by the facts stated in Mr. El-Hanafi's declaration.[4]

     F.   The Threat of Continued Banishment from One's Country of Birth and Prolonged
          Separation from One's Wife and Children is Sufficiently Severe to Render Mr. El-
          Hanafi's Choice Coerced

While the government does not argue it explicitly, it suggests throughout its opposition

that the prospect of indefinite banishment from one's home country is not a significant enough

penalty to be deemed coercive.  (*See, e.g.*, Gov. Opp. at 33:  "El Hanafi's [sic] is unable to

articulate what renders the Government's trickery so overbearing . . .").  That is simply not true,

and no cases support that claim.  The right to travel is inherent in the right to citizenship, s*ee*

*Nguyen v. INS*, 533 U.S. 53, 67 (2001); *Balzac v. Porto Rico*, 258 U.S. 298, 308-09 (1922), and

courts assume that banishment from one's country, when the issue arises in deportation cases, is

an unquestionably severe and drastic penalty.  *See Fong Yue Ting v. United States*, 149 U.S. 698,

740-41 (1893); *see also Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948) ("deportation is a

drastic measure and at times the equivalent of banishment of exile");  *Delgadillo v. Carmichael*,

332 U.S. 388 (1947) ("[d]eportation can be the equivalent of banishment or exile");  *Bridges v.*

*Wixon*, 326 U.S. 135, 147 (1945) ("although deportation technically is not criminal punishment,

---

[4] The government's arguments that that the agents did not engage in any coercive official tactics cannot
be reconciled with its prior insistence that further discovery and an evidentiary hearing are unnecessary.
The government successfully resisted the prior discovery requests for more information about Mr. El-
Hanafi's placement on the no-fly list by arguing that the reasons for restricting Mr. El-Hanafi's travel and
any underlying law enforcement strategy leading up to the interviews was irrelevant because all that
mattered was the effect on the listener (i.e. Mr. El-Hanafi's subjective belief), and whether that effect was
objectively reasonable (judged only by what was communicated to Mr. El-Hanafi).  Now, in opposing the
motion to suppress and seeking to avoid a hearing and presumably further disclosures, the government
advances a factual assertion that lacks any support in the record – namely, that the agents were merely
taking advantage of a situation that that it had no role in creating.  Given this argument, and its centrality
to the government's opposition, the government should now be required to produce discovery relating to
Mr. El-Hanafi's placement on the no-fly list and a full evidentiary hearing should be held to address who
placed Mr. El-Hanafi on the no-fly list and for what reason.  *See* Part I.G, *infra*.

it may nevertheless visit as great a hardship as the deprivation of the right to pursue a vocation or a calling"); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (Brandeis, J.) (deportation "may result also in loss of both property and life, or of all that makes life worth living").

While there is no bright line that demarcates the difference between a constitutional and unconstitutional penalty, there can be little doubt that requiring cooperation with interviews under threat of prolonged exile from one's home country is unconstitutionally coercive.  In *United States v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974), the Second Circuit found voluntary statements made by an individual who was threatened with the loss of a transient manual laborer job he had held for only two days.  The Second Circuit rejected the argument that "the mere risk of any adverse economic consequence, however slight or insubstantial," will amount to unconstitutional coercion.  *Id.* at 415.  Rather, the Court explained that:

> A statement challenged on the ground that it was obtained as the result of economic sanctions must be rejected as involuntary only where the pressure reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his "free choice to admit, to deny or to refuse to answer."

500 F.2d at 415 (emphasis added; citation omitted).

Indefinite banishment from one's home country is a penalty of "sufficiently appreciable size and substance" to amount to unconstitutional coercion.  Under no-one's definition is the inability to return home either "slight" or "insubstantial," and the government's suggestion otherwise lacks support in both law and common sense.

G.  <u>Alternatively, the Court Should Hold an Evidentiary Hearing</u>

Throughout its opposition, the government fastidiously maintains that there is no factual dispute with respect to the voluntariness question, and thus no need for hearing.  However, even in the absence of a pointed factual dispute, we respectfully submit that a hearing is necessary to make a ruling in this matter.  It is the content and context of the statements made by government

officials, as well as how they were delivered, that will establish that Mr. El-Hanafi's subjective belief that he had no choice but to speak was "objectively reasonable." Without hearing from, and subjecting to cross-examination, those who made the statements, there is an insufficient record to make an accurate legal determination on the question of voluntariness.[5]

Moreover, while the government claims to accept the facts in Mr. El-Hanafi's declaration, many of their arguments are premised on rejecting those facts, or accepting only some of them. In fact, for pages the government argues that the "fatal flaw" in the argument is the absence of any "coercive conduct" or "coercive official tactics" on the part of the officers. (*See* Gov. Opp. at 22-25). But to make that argument, the government has to ignore the undisputed fact that government officials concocted a deliberate ruse to convince Mr. El-Hanafi that it order to get off the no-fly list and return home he would have to answer the questions of the FBI agents. In fact, the claim that there were no "coercive official tactics" itself triggers the need for a hearing, as well as further discovery. If, as the government claims, suppression turns on the character and extent of the government's coercive tactics, certainly it would be relevant to know the full extent of those tactics, and, in particular, whether Mr. El-Hanafi was placed on the no-fly list for the purpose, in whole or in part, of making him more susceptible to the agents' pressure tactics. This, of course, was the subject of the prior discovery motion, which the government opposed as irrelevant. Its current argument claiming that the government did not engage in any coercive conduct not only makes the previously discovery relevant, it requires scheduling a hearing at which a full factual record can be established.

---

[5] Notably, the government's "factual background" section, which purportedly recites the facts as stated in Mr. El-Hanafi's affidavit, leaves out all of the statements and communications made by the U.S. government officials,

II.

THE COURT SHOULD SCHEDULE A HEARING TO DETERMINE WHETHER DURING
THE FEBRUARY 5, 2010 INTERROGATION, THE AGENTS SUBJECTED MR. EL-
HANAFI TO CUSTODIAL INTERROGATION AND OBTAINED STATEMENTS IN
VIOLATION OF MIRANDA

Even if the Court concludes that Mr. El-Hanafi's statements were voluntary, some of his statements should still be suppressed on the independent ground that they were obtained in violation of *Miranda*. As we set out in our moving papers, during the course of the February 5, 2010 interview, the agents' questioning turned hostile, and they ignored Mr. El-Hanafi's request for an attorney and desire to terminate the interview. The agents' questions thereafter constituted custodial interrogation, and any statements made after that juncture were obtained in violation of *Miranda*.

In opposing this portion of the motion, the government again reiterates the so-called volitional character of the interview – *e.g.,* Mr. El-Hanafi was not under arrest, there were no physical threats, and he attended the interview on his own accord. But the fact that the interview may have started off as non-custodial does not end the inquiry. *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir.1998) (murder suspect who voluntarily accompanied police to station but then was subjected to "increasingly hostile questioning" was in custody). As set out in Mr. El-Hanafi's declaration, approximately one hour into the interview, the agents' questioning turned combative, and Mr. El-Hanafi sought to end the interview by asking for an attorney. In response, the Agents continued asking him questions, making it clear that the interview was not over and that he was not free to leave. Moreover, they lied to Mr. El-Hanafi, threatening that if he got a lawyer, "all deals would be off." (*See* Decl. at 22).

14

As the government concedes, even in the absence of a formal arrest, a defendant is in custody if law enforcement officials "act or speak in a manner that conveys the message that they would not permit the accused to leave." *Tankleff*, 135 F.3d at 244. Here, Mr. El-Hanafi claims that the agents did convey such a message, in part by refusing to honor his request for an attorney, a claim that the government denies. (*See* Gov. Opp. at 42). Accordingly, given the fact sensitive nature of the inquiry, the Court should also schedule an evidentiary hearing to address the question of custodial interrogation.

III

THE WARRANTS LACKED PROBABLE CAUSE
AND PARTICULARITY, AND WERE EXECUTED
IN A MANNER TO ENSURE VIOLATIONS OF PRIVACY

Without setting forth a single connection between the email accounts to be searched and terrorist activity, and without conducting any "search" of the accounts for the purpose of seizing only pertinent material, the government nonetheless disputes that the Warrants authorized an unconstitutional rummaging through Mr. El-Hanafi's personal communications and affairs, unlimited by scope, time or number of searches. On the one hand, the government relies on the purported parameters of the Warrants to justify its search of the contents of the accounts. On the other, the government relies on the alleged inability of Yahoo and Hotmail – despite their status as custodians of records – to conduct impartial searches of the contents of their files, to justify its seizure of the entirety of Mr. El-Hanafi's emails. The government cannot have it both ways. As the government concedes, the Warrants contemplated a selection process, and it is undisputed that no such selection took place. If the parameters set forth in the Warrants were to have any limiting effect (something we dispute, in any event), then that limiting effect was erased by the government's failure to limit itself to one bite at the apple. In the end, the government seized

everything in the accounts, on the dubious basis that everything was equated with terrorist activity, and thus ensured that Mr. El-Hanafi's communications and thought processes as expressed in these emails would be at the prosecutor's disposal in perpetuity.  This result was in patent violation of well-established principles of Fourth Amendment jurisprudence.  The only remedy is suppression.

A.    The Warrants Lacked Probable Cause

The government does not dispute that it must have probable cause to search the specific email accounts at issue.  It takes the position, however, that if it has probable cause to search *one* email account allegedly utilized by the defendant for criminal activity, there is probable cause to search *all* email accounts utilized by the defendant – despite the absence of any evidence connecting the additional accounts to any criminal activity.  The government's theory contradicts a fundamental principle of Fourth Amendment jurisprudence - that there must be a fair probability that contraband will be seized at the location of the search.  *United States v. Clark*, 638 F.3d 89, 94 (2011) (noting that the "required nexus between the items sought and the 'particular place' to be searched protects against the issuance of general warrants, instruments reviled by the Founders who recalled their use by Crown officials 'to search where they pleased'") (*quoting Stanford v. State of Texas*, 379 U.S. 476, 481 (1965)).

Simply put: probable cause to search one of a defendant's spheres of privacy does not constitute probable cause to search his others.  *Cf., Clark*, 638 F.3d at 95 (a demand that a search warrant for a multiple-occupancy building must be supported by a showing of probable cause as to each unit).  Moreover, given the distinct privacy concerns involved in email accounts, several district courts have specifically required a nexus between an email account to be searched and the criminal activity alleged.  *See* Def. Br. at 35-36.  In short, an agent's speculation regarding

16

(or desire to rummage in) a defendant's email account does not translate into probable cause, however broad, common-sensical or practical that concept may be.  *See Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) ("bare suspicion" not enough to establish probable cause).[6]

B.      The Warrants Lacked the Particularity Required by the Second Circuit in *Rosa*

Even if the Warrant Applications could satisfy the probable cause requirement, the Warrants fail to satisfy the particularity prong of Fourth Amendment analysis.  The government's reliance on statements in the Warrants allegedly limiting the e-mail seizures to items relating to terrorist activities is unavailing for several reasons.

First, because the government sought, obtained and *kept* a mirror image of both email accounts, any limitation in the Warrants was effectively rendered null and void.  Even accepting the government's representation that the search of the accounts had to occur post-seizure at law enforcement offices, it is readily apparent – and the government concedes – that no such "search" occurred.  Yahoo and Hotmail provided the entire contents of the target email accounts to the government, but instead of then conducting a search in accordance with what the government describes as the "parameters" of the Warrants, government agents seized the entirety of the accounts, which were then turned over in their entirety to the defendants in discovery.  This result is hardly surprising, since the Warrants effectively equated every single email with terrorist activity: directing Hotmail and Yahoo simultaneously to produce all emails and emails evidencing, respectively, evidence of terrorist activity or violations of the material support statutes.

---

[6] In any event, it appears that the probable cause offered relates to a single email account used by Sabir Hasanoff, not Mr. El-Hanafi.  (*See* Gov. Opp. at  53 (referring to emails sent by Mr. Hasanoff)).

Even if a search had occurred, the vague descriptions in the Warrants of the items to be seized amounted to no limitation at all.  This is especially true of the Yahoo warrant, which directed the government to seize evidence of violations not only of the material support statutes but "other statutes" as well, *see* Yahoo Warrant, Attachment B, Section II, rendering it precisely the kind of general warrant rejected in *United States v. Rosa*, 626 F.2d 56 (2d Cir. 2010).  *See id*. at 62 (warrant lacked particularity where it provided the government with "unrestrained access to electronic records of [defendant's] daily activities and private affairs").

In the end, the critical issue is that no search occurred at all – only a wholesale, indiscriminate seizure.  The government does not even address the critique that the seizure of Mr. El-Hanafi's entire email accounts subjected him to a continuing, open-ended warrant, unprecedented in Fourth Amendment jurisprudence, whereby the "file cabinet" of six years of his private thoughts and communications may be searched anew by the government whenever a new piece of evidence or investigatory lead arises.  The government concedes that the Warrants contemplated a selection process once the emails had been received from Hotmail and Yahoo, but no such selection process occurred.  As a result, the government has the contents of Mr. El-Hanafi's email accounts at its disposal indefinitely – free to execute search upon search of those accounts at will, without any obligation to seek an additional warrant.  The government cites to no precedent to support such an outcome, and it should not be sanctioned by this Court.  *See Doane v. United States*, 2009 WL 1619642 (S.D.N.Y. 2009) (noting the absence of authority for the proposition that "the Government may seize folders containing documents outside the scope of a warrant and then retain and utilize these documents without demonstrating that they fit within one of the recognized exceptions to the search-warrant requirement").

C.   <u>The Government's Efforts to Protect Privacy Interests Were Inadequate</u>

The government defends the egregious privacy and privilege violations that occurred here by pointing out that there is no requirement in the Second Circuit that the government specify its search protocol in advance.  But the government is constitutionally-mandated to conduct any search in a reasonable manner to limit intrusions on privacy.  *See Andresen v. Maryland*, 427 U.S. 463, 481 (1976) (in searches of an individual's private papers, "responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes intrusions upon privacy").  The government, however, took no efforts here to avoid the kinds of intrusions prohibited in *Andreson*, as evidenced by the seizure and retention of scores of marital and attorney-client privileged communications.

The government seeks to minimize the protections afforded marital communications – describing the spousal privilege as merely an evidentiary one.  But Mr. El-Hanafi uses the phrase spousal privilege in its broad sense – the shroud of inviolability that protects an individual's most intimate relationship and communications from exposure.  *See Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) (in the context of the marital relationship, the law is dealing "with a right of privacy older than the Bill of Rights.... Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects").

Here, despite knowing that Mr. El-Hanafi was married, and knowing that he had retained counsel in connection with his placement on the no-fly list, it is readily apparent that the government failed to protect marital and attorney-client communications from unnecessary

19

intrusion, because all such communications were seized, were never returned to the subpoenaed party once their privileged nature was identified, and there is no evidence that these communications were segregated prior to delivery to the prosecution team.  This conclusion flows inexorably from the fact that the entire contents of Mr. El-Hanafi's email accounts were turned over to both defense teams in discovery, and accordingly, one assumes reviewed by members of the prosecution team prior to such disclosure.

Finally, the fact that the government does not intend to use most of these emails at trial, or call Mr. El-Hanafi's wife as a witness, misses the point.  The emails should never have been seized in the first place, and the remedy is not exclusion at trial but blanket suppression of the entire fruits of the seizure.  *See United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (government agents "flagrantly disregard" the terms of a warrant requiring wholesale suppression when "(1) they effect a 'widespread seizure of items that were not within the scope of the warrant," . . . and (2) do not act in good faith") (*quoting United States v. Mattias*, 836 F.2d 744, 748 (2d Cir. 1988)).

D.    The Alleged "Walls" Were Either Too Little or Too Late

Labeling defense claims that the government failed to take steps to protect the privacy of attorney-client communications as "baseless speculation," Gov. Opp. at 47, the government now maintains for the first time, that it established two separate "wall teams" to review the contents of Mr. El-Hanafi's email accounts.  Neither alleged wall rescues the seizures that occurred here from suppression: the first was patently so poorly established as to amount to no wall at all; the second came after the prosecution team had already been tainted with knowledge of the communications at issue.

20

As an initial matter, it is important to point out that the defense's conclusion that no "wall" protocol was in place is based on the government's own representations to El-Hanafi's defense team.  On October 25, 2010, counsel for Mr. El-Hanafi requested the following information from the government:

> Please provide any documents, records, notes, reports, photographs, drawings, communications, audio or video recordings relating to or reflecting the procedures used or the protocol followed (if any) by the government and/or the service providers in executing the search warrants for each and every email address that was the subject of search warrant applications, including but not limited to: welhanafi@yahoo.com, welhanafi@live.com, welhanafi@gmail.com, welhanafi1@gmail.com, mahkabab1@gmail.com, mahakabab2@gmail.com, shasanoff@yahoo.com, abuilyas@gmail.com, and funoraman@msn.com.

El-Hanafi Discovery Letter, October 25, 2010 at ¶ 4(b) (a copy of which was faxed to the Court on February 16, 2011).  This letter was followed by a teleconference between Mr. El-Hanafi's counsel and A.U.S.A.s Brendan McGuire and John Cronan in or about December 17, 2010, in which the government advised that all relevant documents had been provided and made no mention of any "wall team" established by the Joint Terrorism Task Force based "on the advice of FBI counsel."  Paugh Declaration, ¶ 2.  Notably, none of the documents provided in discovery made mention of the JTTF's wall team, the alleged advice from F.B.I. counsel or the alleged initial search protocol.

In any event, whatever wall team was established, it failed to perform its basic function: to segregate out privileged emails.  Whether the review was simply never performed, was performed so sloppily as to amount to non-performance, or was performed and then ignored, it is apparent that the entire contents of Mr. El-Hanafi's email accounts made their way to the prosecution team, since it turned over the entire contents to both defense teams in discovery.

Notably, in the discovery process, there is no evidence of any effort to segregate privileged emails, much less any evidence of actual segregation.  While A.U.S.A. Cronan, on his own behalf and that of the other prosecutors assigned to the case, makes the startling admission that no prosecutor apparently reviewed the materials seized as a result of the Warrants and later turned over in discovery, it simply beggars belief that the materials were not at least reviewed by investigating agents prior to disclosure.  It is a well-established principle that the knowledge of investigating agents is imputed to the prosecutors in charge of the case.  See *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995) ("The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation."); *United States v. Morell*, 524 F.2d 550 (2d Cir.1975) (law enforcement agent's knowledge of confidential file concerning Government's principal witness imputed to the prosecution, where the agent "not only supervised [the principal Government witness] and participated actively in this investigation, but also was present at counsel's table throughout all or most of the trial, indicating that he was intimately involved in the prosecution").

The government's installation of a prosecutorial wall team months after the emails had already been reviewed by investigating agents and provided in discovery is entirely irrelevant to the analysis.  The issue is whether the prosecution team had already been tainted with knowledge of the privileged communications.  Forming a taint team in December 2010 – *after* defense counsel had informed prosecutors of their intention to move to suppress the email seizures on the grounds that privileged emails had been seized and reviewed illegally – is a classic example of closing the door of an empty stable.  In fact, we would argue that A.U.S.A. Michael Rosensaft's December 29, 2010 review of Mr. El-Hanafi's emails was a warrantless search that did not come within any of the exceptions to the Warrant Clause.

E.    The Government Cannot Rely on the Good Faith Exception

Here, not one of the good faith exceptions set forth in *United States v. Leon*, 468 U.S. 897 (1984), apply.  *See United States v. Moore*, 968 F.2d 216, 222 (2d Cir.1992) ((1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable) (citing *Leon*, 468 U.S. at 923).

First, the issuing magistrate was knowingly misled: (a) by statements in the Warrant Applications that could be construed as stating that the government had actual evidence that Mr. El-Hanafi had used the targeted email accounts to engage in terrorist activities; (b) by the failure affirmatively to advise the magistrates that the government had no such evidence; (c) by the failure to advise the magistrates that the cooperating witness had a lengthy history of perpetrating frauds; (d) the failure to advise the magistrates that the government had no intention, much less a plan in place, to conduct a segregated search of the emails, or to return unresponsive ones to Hotmail and Yahoo; and (e) by the preposterous claim that Yahoo and Hotmail cannot be charged with conducting more targeted searches than a dump of an individual's entire email account.  For example, Yahoo and Hotmail could have been directed to copy only email correspondence between certain individuals.

Second, the issuing magistrates wholly abandoned their judicial roles in authorizing warrants that patently failed to ensure the protection of marital and attorney-client privileged communications.  *See Andresen*, 427 U.S. at 481 (noting obligation of "responsible" judicial official to ensure that searches of private papers "are conducted in a manner that minimizes intrusions upon privacy").

23

Third, as more fully set forth in our opening memorandum, Def. Br. at 34-36 and above, the Warrant Applications were lacking in indicia of probable cause.

Finally, it was unreasonable for the agents to rely on Warrants that on their face required wholesale seizure of thousands of emails unrelated to any terrorist activity.   As the Second Circuit held in *United States v. George*, 975 F.2d 72 (2d Cir. 1992), the good faith exception does not apply because a "warrant not limited in scope to any crime at all is so unconstitutionally broad that no reasonably well-trained police officer could believe otherwise." *Id.* at 78; *see also Groh v. Ramirez*, 540 U.S. 551 (2004) ("even a cursory reading of the warrant in this case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal").  Here, unlike in *Rosa*, the government cannot rely in some good faith intention to select responsive material from the items seized, because it is patently clear that no selection was ever intended.

F.    A Hearing is Required

At the very least, a hearing is required to elucidate the issues raised in this motion, including the inaccuracies and omissions in the Warrant Applications, outlined in El-Hanafi's moving brief (at pp. 42 – 43), the protocol followed by the JTFF wall team, who on the prosecution team was exposed to privileged communications, and to explore whether any evidence obtained in this case was tainted by the illegal searches and seizures that occurred here.

## **Conclusion**

For the reasons stated here, and in our moving papers, we respectfully request that the

Court grant Mr. El-Hanafi's motion to suppress, or, in the alternative, schedule an evidentiary

hearing.

Dated:  New York, New York
        September 7, 2011

JaneAnne Murray
MURRAY LAW LLC
233 Broadway
New York, New York 11215
Tel.  (212) 941-9266


           /s/


Justine Harris, Esq.
COLSON & HARRIS LLP
10 East 40th St., Suite 3307
New York, New York 10016
Tel: (212) 257-6455

Attorneys for Mr. Wesam El-Hanafi