LAW OFFICES OF

# DRATEL & MYSLIWIEC, P.C.

A PROFESSIONAL CORPORATION

2 WALL STREET
3rd Floor
NEW YORK, NEW YORK  10005
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
www.dratelmys.com

JOSHUA L. DRATEL                                      STEVEN WRIGHT
AARON MYSLIWIEC                                       *Office Manager*
—
LINDSAY A. LEWIS

May 17, 2013

**BY HAND**

**FILED UNDER SEAL**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Hasanoff,*
        S7 10 Cr. 162(KMW)

Dear Judge Wood:

This letter is submitted on behalf of Sabirhan Hasanoff, the defendant in the above-entitled action, in connection with his sentencing, which is scheduled for Tuesday, June 18, 2013, at 11 a.m.  For all the reasons set forth below, it is respectfully submitted that Mr. Hasanoff should be sentenced to a term of imprisonment significantly below his Sentencing Guidelines range and the statutory maximum sentence of 20 years' imprisonment, and commensurate with the recommendation of 13 years' imprisonment in the Pre-Sentence Report (hereinafter "PSR"), which represents a reasonable sentence in this case.[1]

Those reasons include:

(a)       the nature of the sentencing Guidelines for terrorism offenses, which Guidelines

---

[1]  Mr. Hasanoff has also submitted financial affidavits to the U.S. Office of Probation which evidence his inability to pay a fine in this case, but which were not in the Probation Office's possession by the time they submitted their second disclosure and recommendation.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 2 of 54

automatically apply Draconian enhancements – particularly §3A1.4, with respect to both the offense level and Criminal History Category – that significantly increase the Guidelines range in *every* terrorism-related case, and grossly overstates Mr. Mostafa's criminal record in this case (which is otherwise non-existent);

(b)  Mr. Hasanoff's offense conduct did not result in any injury or harm to any person or property;

(c)  comparison of Mr. Hasanoff's conduct, and potential sentence, with that of other persons convicted of material support, and other terrorism-related offenses, including defendants whose conduct has been far more violent, dangerous, and directly connected to terrorist activity, demonstrates that Mr. Hasanoff's sentence should be markedly below the 20-year statutory maximum.  Otherwise, his sentence would constitute an unwarranted *uniformity*, which, as the Supreme Court has noted, is just as contrary to sentencing policy and practice as an unwarranted *disparity*;

(d)  Mr. Hasanoff's exemplary personal history and characteristics, as attested to by the more than 50 letters submitted herewith on his behalf (attached hereto as Exhibit 1).[2]  Described as extremely generous and charitable, hard working and well-respected in the accounting field, a mentor and role model to many, and a devoted family man, Mr. Hasanoff's life and work provide ample justification for a sentence dramatically below the 20-year statutory maximum (and his advisory Guidelines range).  The instant offense represents but a single blemish on an otherwise law abiding and admirable life;

(e)  the punishment Mr. Hasanoff has already suffered as a result of the investigation, prosecution, and conviction in this case, which have cost him his Certified Public Accountant (hereinafter "CPA") license and therefore his livelihood and his financial health, and the opportunity to help his wife to raise and care for their children, including his son        9, and daughter        6, both of whom are in treatment for separation anxiety and adjustment issues, and his daughter, who was born extremely premature after -- and likely because of the fact that --

_____

[2]  While all of the letters are included under Exhibit 1, each has been individually tabbed (*i.e.*, Exhibit 1, Letter 1) such that if specific reference is made to a letter in this submission, it can be easily referenced.  It should also be noted that due to the considerable volume of letters received, not all of the letters included with the submission are cited within.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 3 of 54

Mr. Hasanoff's wife boarded a plane in her third trimester to travel from Dubai to New York in order to support Mr. Hasanoff after his arrest.  While Mr. Hasanoff is aware that his own conduct is the root cause of these issues, he has nonetheless suffered and further punishment is unnecessary for either general or specific deterrence;

(f)    Mr. Hasanoff was exposed to tuberculosis as a result of his arrest and confinement in inhumane and unsanitary conditions in the United Arab Emirates, and has endured extended pretrial confinement – three years – at the Metropolitan Correctional Center (hereinafter "MCC"), which has been recognized as constituting harsh conditions and as a result of which he contracted a bacterial infection known to be brought on by confined and/or unsanitary conditions;

(g)

and

(h)    the Court should not consider the FBI 302s of interviews with "Detainee-1" and "Detainee-2" because to do so would violate Mr. Hasanoff's Fifth and Sixth Amendment rights.

I.    *The PSR, the Sentencing Guidelines, and the Principles Governing Federal Sentencing Since* **United States v. Booker***, 543 U.S. 220 (2005)*

The PSR calculates an total offense level of 37 and places Mr. Hasanoff in Criminal History Category VI, resulting in an advisory Guidelines range of 360 months to *life imprisonment*.  PSR at ¶¶ 37 & 56.  However, as detailed below, both the offense level and Criminal History Category – both comprised principally of the 12-point terrorism enhancement pursuant to §3A1.4, which also places a defendant in Criminal History Category VI regardless of his criminal record – prescribe a sentence above the statutory maximum sentence of 20 years; imprisonment, but also well in excess of that "sufficient but not greater than necessary" to achieve the purposes of sentencing enumerated in 18 U.S.C. §3553(a)(2).

The PSR recommendation of 13 years' imprisonment thus provides some guidance in navigating and evaluating the relevant considerations under §3553(a), and arriving at a sentence "sufficient but not greater than necessary" to achieve the goals listed in §3553(a)(2).  Indeed, last year, in *Pepper v. United States*, ___ U.S. ___, 131 S. Ct. 1229 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)."  *Id.*, at 1242, 1243.  *See also United States v. Dorvee*, 616 F.3d 174, 182-83 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 4 of 54

court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. § 3553(a)(2)")," *quoting United States v. Samas,* 561 F.3d 108, 110 (2d Cir. 2009).

As the Second Circuit explained in *Dorvee,*

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. *See* [*United States v.*] *Cavera,* 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

616 F.3d at 182. *See also Pepper,* ___ U.S. at ___, 131 S. Ct. at 1244-45 (statute – 18 U.S.C. §3742(g)(2) – precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases").

In that context, the PSR takes into account *United States v. Booker,* 543 U.S. 220 (2005), its progeny, and the sentencing factors identified in §3553(a), including the qualitative, individualized analysis that post-*Booker* sentencing demands, in order to arrive at a recommended sentence that is not premised upon analysis of the Guidelines exclusively, nor a flawed presumption that the Guidelines, and *only* the Guidelines, prescribe a reasonable sentence.

Indeed, as the Supreme Court declared in *Nelson v. United States,* 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts;  they are also not to be *presumed* reasonable." *Id.*, at 351 (emphasis in original).[3] *See also Dorvee,* 616 F.3d at 183 ("[i]n conducting this review [of the §3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the 'Guidelines are guidelines – that is, they are truly advisory'"), *quoting United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).

Thus, in *Pepper,* Justice Sotomayor again hearkened back to *Koon v. United States,* 518 U.S. 81 (1996) – as Justice Stevens had in *Rita v. United States,* 551 U.S. 338, 364 (2007)

---

[3] While the Supreme Court's ruling in *Rita v. United States,* 551 U.S. 338 (2007), established that a within-Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (*citing United States v. Booker,* 543 U.S. 220, 259-60 (2005)). *See also Nelson,* 550 U.S. at 351.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 5 of 54

(Stevens, J., *concurring*) – repeating that

> "[i]t has been uniform and constant in the federal judicial tradition
> for the sentencing judge to consider every convicted person as an
> individual and every case as a unique study in the human failings
> that sometimes mitigate, sometimes magnify, the crime and the
> punishment to ensue."

___ U.S. at ___, 131 S. Ct. at 1239-40, *quoting Koon*, 518 U.S. at 113.

Accordingly, while sentencing judges must still consider the Guidelines, *see* 18 U.S.C.
§3553(a)(4), nothing in the statute provides any reason to treat that calculation as more
controlling of the final sentencing decision than any of the other factors a court *must* consider
under §3553(a) as a whole. *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir.
2005); *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), *explaining United States v.
Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005).

Moreover, the Supreme Court has been vigilant in ensuring that the Guidelines are
genuinely advisory, and not merely a default sentence ratified by appellate courts by rote. For
example, in *Nelson*, 550 U.S. at 350, the Court *twice* remanded the Fourth Circuit's decision(s)
that affirmed a sentence even though the District Court had stated that while the Guidelines were
not mandatory, they enjoyed a presumption of "reasonableness."[4] *See also Pepper*, ___ U.S. at
___, 131 S. Ct. at 1236-40.

Thus, in *Nelson*, the Court reiterated that "district judges, in considering how the various
statutory sentencing factors apply to an individual defendant 'may not presume that the
Guidelines range is reasonable.'" 550 U.S. at 351, *quoting Gall*, 552 U.S. at 50; *see also id.*
("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable
Guidelines range is reasonable").[5]

---

[4] *See* 237 Fed.Appx. 819 (4th Cir. 2007) and 276 Fed.Appx. 331 (4th Cir. 2008).

[5] Conversely, the Supreme Court has also been active in protecting the district courts'
discretion at sentencing, and insulating them from undue interference by appellate courts. For
instance, in *United States v. Thurston*, 544 F.3d 22, 25 (1st Cir. 2008), the First Circuit
understood the "clear message that the sentencing decisions of the district courts should
generally be respected."   Indeed in that case, the Supreme Court twice remanded for further
consideration (in light of first *Booker* and then *Gall*) following the First Circuit's vacating the
sentence (twice) for being too lenient, and affirmed the sentence ("given *Gall*'s broader

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 6 of 54

    The broad discretion afforded district courts to determine a sentence also conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990); *Jones*, 531 F.3d at 172, n. 6.

    In fact, in *Pepper*, the Court cited §3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" ___ U.S. at ___, 131 S. Ct. at 1240, *quoting Wasman v. United States,* 468 U.S. 559, 564 (1984).[6]

**II.**    *Analysis of the §3553(a) Factors Compels a Sentence Substantially Below Mr. Hasanoff's Statutory Maximum Sentence of 20 Years' Imprisonment (And Also Thus Below His Sentencing Guidelines Range)*

    As discussed below, in applying to Mr. Hasanoff both §3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), and the sentencing factors set forth in §3553(a)(1)-(7), it is respectfully submitted that a sentence substantially below the applicable Guidelines range is appropriate.[7]

―――――――――――――――――

definition of the deference given to district judges' sentencing decisions") – even though the First Circuit maintained its disagreement with the sentence and the district court's rationale for it. *Id.*, at 26.

    [6] Indeed, the Court's opinion in *Pepper* opened with the following statement:

> [t]his Court has long recognized that sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant-if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

___ U.S. at ___, 131 S. Ct. at 1235, *quoting Williams v. New York,* 337 U.S. 241, 246-247 (1949).

    [7] The sentencing factors enumerated in §3553(a) are:

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 7 of 54

In considering those prescribed sentencing factors and identified purposes of sentencing,[8]

_____

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    need for the sentence imposed –

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for –

(A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [. . .];

(5)     any pertinent policy statement [. . .];

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;  and

(7)    the need to provide restitution to any victims of the offense.

[8]  Section 3553(a)(2) lists the following purposes of sentencing:

(2)    the need for the sentence imposed –

LAW OFFICES OF
## DRATEL & MYSLIWIEC, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 8 of 54

several aspects of Mr. Hasanoff's circumstances are relevant.  Either independently or in combination, they amply justify a sentence well below life imprisonment.

> **A.    *The Terrorism Enhancement Always and Automatically Increases a Defendant's Guidelines Range Regardless of the Nature of His Conduct***
>
> **1.    *The Automatic Application of the Guidelines' Terrorism Enhancement Should Be Remedied By Resort to the §3553(a) Sentencing Factors***

The mere applicability of §3A1.4 does not end the analysis or dictate the sentence, as the other §3553(a) sentencing factors, and the parsimony clause,[9] must be considered in counterpoint to the drastic impact of §3A1.4.  In that context, the Second Circuit's decision in *Dorvee*, in which the Court addressed essentially automatic but severe Guidelines enhancements in child pornography cases that placed Guidelines ranges at or near the statutory maximum(s), is particularly pertinent here, too.

In *Dorvee*, addressing enhancements relating to possession of child pornography (§2G2.2), the Circuit noted that "the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what §3553 requires."  616 F.3d at 184.[10]

-------------------------------------------------

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.

[9]  In *Dorvee*, in discussing the "parsimony clause," the Second Circuit reiterated that "[p]lainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of §3553, it could not . . . impose the higher."  616 F.3d at 184, *quoting United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2d Cir.2006).

[10]  *See also United States v. Tutty*, 612 F.3d 128, 130-33 (2d Cir. 2010) (applying *Dorvee*);  *United States v. Bonilla*, 618 F.3d 102, at 110 (2d Cir. 2010) (extending *Dorvee* doctrine to the 16-point enhancement related to illegal reentry conviction);  *United States v. Hernandez*, 2010 WL 2522417, at *1 (E.D.N.Y. May 28, 2010) (acknowledging *Dorvee,* but

LAW OFFICES OF
## DRATEL & MYSLIWIEC, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 9 of 54

Similarly, in *Dorvee* the Court noted the high frequency with which §2G2.2's component enhancements applied in child pornography cases ("to the vast majority of defendants sentenced under §2G2.2"), "resulting in a typical total offense level of 35[,]" which in turn led to Guidelines ranges at or beyond the statutory maximum even in routine cases.  616 F.3d at 186. In the terrorism context, too, the scope of the terrorism enhancement in §3A1.4, as interpreted by the Second Circuit, is so broad that it invariably applies in every terrorism case.  *See, e.g., United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009);  *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010).

The Circuit also explained in *Dorvee* that §2G2.2 is different from most Guidelines in that it is not based on empirical data.  616 F.3d at 186.  Indeed, that was a defect in the crack-cocaine Guidelines at issue in *Kimbrough v. United States*, 552 U.S. 85 (2007).  The same is true with respect to §3A1.4 as well:  it represents merely a point in space chosen arbitrarily, and is not the result of the Sentencing Commission's core function, *i.e.*, assigning Guidelines levels that conform with conclusions based on data compiled from a statistically significant number of cases.

In *Dorvee*, the Court further examined the extent to which a sentencing court owes deference to the Guidelines when a particular enhancement is not the product of empirical evidence, explaining that the ordinary

> deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [] (1944); *see Kimbrough,* 552 U.S. at 109 [] (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role").

616 F.3d at 188.

---

noting that §3553(a) analysis would not alter sentence because defendant received the mandatory minimum term of five years).

.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 10 of 54

In evaluating §2G2.2 in *Dorvee*, the Court identified specific problems with such enhancements. For example,

> [a]n ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction.

616 F.3d at 186.

As a result, the Court in *Dorvee* recognized that under such circumstances

> adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories.

616 F.3d at 187.

Confronted with that situation in *Dorvee*, the Court concluded that "[t]his result is fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in §3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" *Id.*

In language particularly relevant here with respect to Mr. Hasanoff, the Court in *Dorvee* added that mechanical application of such Guidelines enhancements

> violates the principle, reinforced in *Gall*, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. *See Gall*, 552 U.S. at 55 [] (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated" (emphasis in original)).

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 11 of 54

*Id*.[11]

Thus, as the Court in *Dorvee* lamented with respect to §2G2.2, "sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." 616 F.3d at 186. Yet, as the Court cautioned, "[i]n all events, even a statutory maximum sentence must be analyzed using the §3553(a) factors." 616 F.3d at 184.

Ultimately, the Court in *Dorvee* reminded that

> [d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 – ones that can range from non-custodial sentences to the statutory maximum-bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.

616 F.3d at 188.

That "broad discretion" exists here as well, even when the specter of terrorism is present. As the Court concluded in *Dorvee*, "[w]hile we recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let Dorvee's sentence stand." *Id*. Here, the same is true with respect to applying §3A1.4 to Mr. Hasanoff notwithstanding the importance of counterterrorism policy and practice.

Here, as in *Dorvee*, "adherence to the Guidelines results in virtually no distinction between sentences for the most dangerous offenders," and someone like Mr. Hasanoff who did not commit any violent acts and has not committed any offenses in the past. 616 F.3d at 187. Sentencing Mr. Hasanoff within the Guidelines range would result in a sentence that is "fundamentally incompatible with § 3553(a)." *Id*.

---

[11]  In *Dorvee*, the Court offered an example of how Guidelines like §2G2.2 create – via automatic substantial enhancements applied across a broad spectrum of a specific offense conduct – unwarranted *similarities* among dissimilar defendants: "[e]ven with no criminal history, this [defendant's] total offense level of 23 would result in a Guidelines sentence of 46 to 57 months. This is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury.[]" 616 F.3d at 187 (footnote omitted).

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 12 of 54

>    2.    *Increasing Mr. Hasanoff's Criminal History Category From
>          Category I to Category VI Grossly Overstates His Criminal History*

Notwithstanding application of the enhancement in §3A1.4 to Mr. Hasanoff, the Court should depart downward a significant amount, or impose a non-Guidelines sentence substantially below the Guidelines range, because the prong of the enhancement that assigns Mr. Hasanoff to Criminal History Category VI, §3A1.4(b),  constitutes a gross overstatement of his criminal history, which otherwise would be Category I (lacking any prior criminal history, and therefore having zero criminal history points).  Also, as discussed below, the enhancement undermines the structure of the Guidelines, and the role and purpose of the Criminal History Category in maintaining individualized sentencing determinations.

As a result, the Court should correct the inequity created by §3A1.4(b) with a substantial "horizontal" downward departure with respect to Mr. Hasanoff's Criminal History Category.  As the Guidelines instruct, the Court may depart downward if:

> reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]

USSG § 4A1.3(b)(1).

In addition, even without a formal departure on that ground, the distortion created by §3A1.4(b) provides further compelling justification for a non-Guidelines sentence, dramatically below the Guidelines range, based on the factors set forth in 18 U.S.C. §3553(a).

As one District Court has recognized, "[a]fter applying § 3A1.4, Defendant's criminal history is maximized at category VI.  For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history."  *United States v. Benkahla*, 501 F.Supp.2d 748, 759 (E.D.VA 2007) (granting a departure pursuant to USSG §4A1.3, and reducing the defendant's criminal history category from VI to I) (*affirmed*, 530 F.3d 300 (4th Cir. 2008).

Encouraging flexibility in addressing the impact of §3A1.4 on a defendant's Criminal History, the Second Circuit has instructed that "[a] judge determining that §3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart downward in sentencing."  *United States v. Meskini*, 319 F. 3d 88, 92 (2d Cir. 2003).

LAW OFFICES OF
## DRATEL & MYSLIWIEC, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 13 of 54

Moreover, as the Introductory Commentary to Chapter Four of the Sentencing Guidelines (entitled "Criminal History and Criminal Livelihood") states, "[t]he Comprehensive Crime Control Act sets forth four purposes of sentencing. (*See* 18 U.S.C. § 3553(a)(2).) *A defendant's record of past criminal conduct is directly relevant to those purposes.* A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment." (Emphasis added).

Here, although the PSR's recommendation is reasonable, the balance between the offense and the offender has been irremediably disrupted by the PSR's reflexive placement of Mr. Hasanoff in Criminal History Category VI. In addition to ignoring the mandate of §3553(a)(1), and overstating Mr. Hasanoff's Criminal History score as much as possible under the Guidelines (from zero to the maximum), the enhancement precludes any retention of individualized sentencing of Mr. Hasanoff because it effectively removes from advisory Guidelines consideration the only axis that integrates a defendant's background and history into the advisory Guidelines equation.[12]

_____

[12] Justice Breyer, who chaired the Sentencing Commission, recounted the "trade-offs" that were part of the initial Sentencing Commission's compromises in formulating the Guidelines and their framework, including how the Criminal History Category was designed as the sole element that considered *offender* characteristics:

> [o]ne important area of such compromise concerns "offender" characteristics. The Commission extensively debated which offender characteristics should make a difference in sentencing; that is, which characteristics were important enough to warrant formal reflection within the Guidelines and which should constitute possible grounds for departure. Some argued in favor of taking past arrest records into account as an aggravating factor, on the ground that they generally were accurate predictors of recidivism. [] Others argued that factors such as age, employment history, and family ties should be treated as mitigating factors. [] [e]ventually, in light of the arguments based in part on considerations of fairness and in part on the uncertainty as to how a sentencing judge would actually account for the aggravating and/or mitigating factors, the Commission decided to write its offender characteristics rules with an eye towards the Parole Commission's previous work in the area.[] As a result, the current offender characteristics rules look primarily to past records of

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 14 of 54

     The only means of restoring any equilibrium to Mr. Hasanoff's sentencing, and complying with the dictates of §3553(a)(1), is by departing downward based on Mr. Hasanoff's lack of any prior criminal record, and/or imposing a non-Guidelines sentence well below Mr. Hasanoff's statutory maximum sentence of 20 years' imprisonment grounded in the other §3553(a) sentencing factors listed **ante**, at 8 n.8.

     Because the exclusion of consideration of the defendant's background and history in the ordinary advisory Guidelines calculation is typically offset by the Criminal History score, it is respectfully submitted that here the imbalance created by assigning Mr. Hasanoff to Criminal History Category VI can be rectified only by a substantial "horizontal" downward departure. *See, e.g., Czernicki v. United States*, 270 F.Supp.2d 391, 393 (S.D.N.Y. 2003) (downward departure granted upon a finding that the Criminal History Category had overstated the defendant's criminal history).

     In the alternative, the automatic placement of Mr. Hasanoff in Category VI should be remedied by a non-Guidelines sentence below the statutory maximum sentence that accounts for the other §3553(a) factors that greatly outweigh the arbitrary application of the absolute and extreme horizontal Guidelines enhancement applied via §3A1.4(b). *See also* United States Sentencing Commission March 2006 *Final Report on the Impact of* United States v. Booker *on Federal Sentencing* , at 78 (excessive Criminal History Category constitutes one of the four most common reasons post-*Booker* for non-Guidelines sentences imposed below the calculated range).

     Accordingly, the effect of the terrorism enhancement, §3A1.4, should be neutralized, both vertically (regarding his offense level) and/or horizontally (regarding his Criminal History Category), through consideration of the §3553(a) factors consistent with the principles and concerns expressed in *Dorvee*.

---

     convictions.   They examine the frequency, recency, and seriousness of past  crimes, as well as age, treating youth as a mitigating factor. The  rules do not take formal account of past arrest records or drug use,  or the other offender characteristics which Congress suggested that  the Commission should, but was not required to, consider.[] In a  word, the offender characteristics rules reflect traditional  compromise.

*See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (Fall 1988), at 19-20 (footnotes omitted).

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 15 of 54

> **B.**  *The Lack of Harm Caused By Mr. Hasanoff's Offenses Is A Factor*
> *Contributing to a Sentence Substantially Below the Guidelines Range*

As noted **ante**, among the problems identified by the Second Circuit in *Dorvee* is the manner in which enhancement applied in every instance with respect to a certain offense eliminates distinctions in the nature and severity of offense conduct by different defendants in different cases.  616 F.3d at 186-187.

Even at the inception of the Guidelines, Justice Breyer, in his capacity as Chair of the Sentencing Commission, assured the legal community that the system was intended to recognize that "particular crimes may be committed in different ways, which in the past have made, and still should make, an important difference in terms of the punishment imposed."  *See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. at 9.

Yet, here, the onerous and automatic character of the terrorism enhancement obscures any variance between Mr. Hasanoff's offense conduct and that in which harm occurred as a result.  That distinction is a legitimate basis for a lower sentence, even in a case involving terrorism offenses.  For example, in *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), Judge Sack, writing for the majority, concluded that "it was not unreasonable for the district judge to decide that the fact that no injury occurred in the case mitigated the gravity of [a defendant's] offense."  *Id*., at 139 (footnote omitted).

As Judge Sack explained,

> [t]he criminal law often punishes the substantive commission of a
> crime more severely than an attempt to commit the same crime,
> even when that which separates an attempt from the substantive
> commission of an offense is not culpability but fortuity.  Fortuitous
> events are not categorically irrelevant to the determination of a just
> punishment nor is their consideration necessarily inappropriate.

*Id*., at 139-140.

Elaborating, Judge Sack pointed out that the Supreme Court had recently noted that

> although "[i]t is unusual to impose criminal punishment for the
> consequences of purely accidental conduct[,] it is not unusual to
> punish individuals for the unintended consequences of their
> unlawful acts."  *See, e.g., Dean v. United States,* 556 U.S. 568, 129

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 16 of 54

> S.Ct. 1849, 1857-58 (2009);  *id*. at 1852 (concluding that a
> defendant who carried a firearm during and in relation to a bank
> robbery in violation of 18 U.S.C. § 924(c)(1)(A) is subject to a 10
> year mandatory minimum pursuant to 18 U.S.C. §924(c)(1)(A)(iii)
> because his "firearm [was] discharged" in the course of the
> robbery, even though "the gun [went] off accidentally," was not
> pointed at anyone when it discharged, and nobody was hurt).

*Id*., at 140 (brackets added by opinion in *Stewart*).

Concurring, Judge Calabresi agreed that while grounds propounded by the defendant did not "render the terrorism enhancement inapplicable in determining the relevant Guidelines range," nonetheless "the lack of evidence that any victim was harmed as a result of the charged offense[,] . . . if properly articulated, is, as a procedural matter, within the district court's discretion to consider in its application of the §3553(a) factors."  *Id*., at 153 (Calabresi, J., *concurring*) (footnote omitted).

Judge Calabresi noted he was "more ambivalent about the degree to which absence of harm is a valid ground on which to mitigate a sentence[,]" stating his "general view . . . that while a district court ought to be careful about giving too much weight to a factor like harm that might vary based on events beyond the defendant's control, we should not preclude a district court from giving lack of harm some weight, even for some crimes of terrorism."  *Id*., at 155 (Calabresi, J., *concurring*).  *See also id*., at 139, n. 33 (Judge Sack commenting that "[t]he weight that such a factor can bear in any particular instance, however, is an analytically separate, and substantive, question" from whether lack of harm can be considered).

Examining the issue conceptually, Judge Calabresi pointed out that

> [w]hether it is fair to assign different levels of culpability in
> criminal sentencing to the same criminal conduct based on the
> fortuity of whether harm results has long been a contested question
> in Anglo-American jurisprudence.  *See* H.L.A. HART, THE
> CONCEPT OF LAW 131 (1968) ("Why should the accidental fact
> that an intended harmful outcome has not occurred be ground for
> punishing less a criminal who may be equally dangerous and
> equally wicked?").

*Id*., at 155 (Calabresi, J., *concurring*).

However, turning to the practical, Judge Calabresi recognized that "whatever significance

LAW OFFICES OF
## DRATEL & MYSLIWIEC, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 17 of 54

the consequences of a defendant's actions ought to have, it is an inevitable part of human nature – and our law – that we as a society *do* give consequences considerable weight when we mete out punishment and blame." *Id.* (footnote omitted).[13] Judge Calabresi noted that "[t]his is deeply entrenched in our legal system," adding that "[t]he majority opinion identifies the law of attempts as one generally accepted instantiation of this tendency, Maj. Op. at 139-140**,** but there are many others-such as crimes of culpable risk creation, like vehicular homicide." *Id.*

Regarding the offense at issue in *Stewart,* and here as well, Judge Calabresi reasoned that

> while it is true that material support to terrorism is a complete crime rather than an inchoate one, and so fully punishable even if no further harm results, it simply does not follow that the amount of punishment may not at least in part depend on the harm that occurred.  The level of punishment for a completed crime varies all the time based on the amount of harm that has occurred, and the Guidelines themselves often directly embrace such a policy.

*Id.* (footnote omitted).[14]

In answer to Judge Walker's dissent that "suggests terrorism is different[,]" Judge Calabresi responded that

> [e]ven if the Guidelines do not themselves make lack of harm relevant for the application of the terrorism enhancement – and they fail to do so only in the narrow sense that the enhancement does not positively reflect the existence of injury – the Supreme

---

[13]  The footnote cited the following sources:  Sanford H. Kadish, *The Criminal Law and the Luck of the Draw,* 84 J. CRIM. L & CRIMINOLOGY 679, 688 (1994) ("While in principle it's difficult to find good reasons for making desert turn on chance, here's the rub:  most of us do in fact make judgments precisely of this kind");  *see generally* PAUL H. ROBINSON & JOHN DARLEY, JUSTICE, LIABILITY AND BLAME: COMMUNITY VIEWS AND THE CRIMINAL LAW (1995) (presenting studies suggesting public judgments about criminal culpability turn significantly on the level of harm that results from an action).

[14]  Judge Calabresi acknowledged that Judge Walker, in partial dissent, "identifies several [Guidelines] examples in his opinion, though he reaches a different conclusion about their import."  590 F.3d at 155, n.5 (Calabresi, J., *concurring*), *citing id.*, at 175, n.11 (Walker, J., *dissenting in part*).

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 18 of 54

> Court has made clear that a district court, which has "greater
> familiarity with [ ] the individual case and the individual
> defendant," may properly decide that sentencing judgments made
> by the Guidelines fail properly to reflect the § 3553(a)
> considerations.  *See Rita v. United States,* 551 U.S. 338, 351
> (2007).

*Id.*, at 156 (Calabresi, J., *concurring*).

In addition, Judge Calabresi pointed out that "it is not at all unprecedented for a district court to consider lack of harm relevant to sentencing in a terrorism case." *Id.*, at 156, n.6.  As Judge Calabresi continued, "[i]ndeed, in a case that Judge Walker cites, the Eleventh Circuit affirmed a district court decision that did just that." *Id.*, *citing United States v. Garey,* 546 F.3d 1359, 1363-64 (11th Cir.2008) (per curiam).  As Judge Calabresi recounted, in *Garey*, "the district court found that the terrorism enhancement applied, but then granted a downward variance based in part on the fact that the defendant had not carried out any violent acts at the time of his apprehension." *Id.*  (Calabresi, J., *concurring*), *citing United States v. Garey,* 383 F.Supp.2d 1374, 1379 (M.D.Ga.2005) ("It is . . . troubling that another defendant who carried out a threat to bomb public facilities, injuring and maiming (but not killing) thousands of people, would face the same sentence as this Defendant who did not cause physical injury to a single person").

Moreover, "[i]n upholding the defendant's sentence as not unreasonable, the Eleventh Circuit specifically noted that the district court had already considered the defendant's arguments about the lack of actual harm and, on the basis of the §3553(a) factors, imposed a reasonable sentence below the advisory Guidelines range." *Id.* (Calabresi, J., *concurring*), *citing Garey,* 546 F.3d at 1364.

Expanding the analytical framework, Judge Calabresi cautioned that,

> [w]hat is more, the Court has evidenced profound skepticism
> toward arguments that certain policy judgments, which require
> departing from the Guidelines, have implicitly been taken off the
> table as a result of congressional silence or inaction. *See
> Kimbrough v. United States,* 552 U.S.85, 102-106 (2007).

590 F.3d at 156-57 (Calabresi, J., *concurring*).

Again citing *Kimbrough*, Judge Calabresi commented that "[a]s the Court [in *Kimbrough*] explained, it is usually inappropriate to draw inferences from congressional silence

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 19 of 54

on sentencing practices because Congress has shown that, when it wants to, it knows how to direct levels of sentencing in express terms." 590 F.3d at 156 (Calabresi, J., *concurring*), *citing Kimbrough*, 552 U.S. at 103 (citing 28 U.S.C. § 994(h), which required Sentencing Commission to set Guidelines sentences for recidivist offenders at or near the statutory maximum).

Thus, as Judge Calabresi concluded,

> the fact that Congress increased the statutory maximum in 2001 for material support convictions that caused death, *see* Op. of J. Walker at 175**,** and did so without saying anything whatever about how a district court may treat harm when issuing a sentence that is less than the applicable maximum, cannot be read to diminish the discretion the district court otherwise has under § 3553(a).

*Id*.  (footnote omitted).

"Indeed," Judge Calabresi continued, "that Congress saw fit to increase the maximum sentence for material support based solely on whether death results can easily be understood to suggest that Congress thought amount of harm *does* matter in this context, even if, at times, that harm is largely fortuitous."  *Id*., at 157, n. 7 (emphasis in original).

Drawing on the Circuit's *en banc* reminder that "sentencing discretion is like an elevator in that it must run in both directions[,]" *United States v. Cavera,* 550 F.3d 180, 194 (2010) (*en banc*), in *Stewart* Judge Calabresi determined that, in the context of evaluating the impact of harm, or lack thereof, on sentencing in terrorism cases,

> [t]o concede, as I think we must, that when hundreds of people are injured or killed rather than just one a district court may take the amount of harm into account and impose a higher sentence, but then to deny the court that same discretion to reach a lower sentence when, through fortuity, no harm results, would manifestly contravene that principle [set forth in *Cavera*].

*Id*., at 157,  n. 8 (Calabresi, J., *concurring*).

Indeed, unwarranted *uniformity* is just as antithetical to a just and individualized sentencing system as is the unwarranted disparity condemned in 18 U.S.C. §3553(a)(6).  *See, e.g., Kimbrough*, 552 U.S. at 88 (noting that its opinion in *Booker*, 543 U.S. at 263, "recognized that some departures from uniformity were a necessary cost of the remedy [] adopted").  *See also* Paul J. Hofer & Mark H. Allenbaugh*, The Reason Behind the Rules: Finding and Using the*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 20 of 54

*Philosophy of the Federal Sentencing Guidelines*, 40 AM. CRIM. L. REV. 19, 20-21, 24, 83 (2003) (appellate courts have enforced the Sentencing Guidelines more rigidly than expected or required, creating "'unwarranted uniformity,' which is really just another type of unwarranted disparity").

Proportionality, and/or gradation of sentences, accomplishes several objectives without compromising any of the statutory purposes of sentencing (incapacitation, punishment, deterrence, and rehabilitation):[15]  (1)  achieving individualized sentencing that matches the punishment to the offender as well as the offense;  (2)  recognizing the connection between relative culpability (and responsibility) for criminal conduct and severity of punishment;  (3) matching relative penalty to relative profit from the criminal activity;  and (4)  serving notice upon offenders and the public that once a single serious crime is committed, there are disincentives to commit further crimes (as opposed to the belief that since the maximum sentence will be imposed for the initial offense, there is no advantage to forgoing subsequent crimes because, if committed, they will not generate further punishment).

In that context, the influential 18th Century Italian philosopher and criminologist Cesare Beccaria, whose analysis was praised and quoted with favor by such varied readers as Voltaire, Jeremy Bentham, and John Adams, provided three incontestable reasons why proportionality in punishment represents an essential component of any justice system:

(1)     punishment should be only that severe enough necessary to deter crime, and any penalty in excess of that objective constitutes an abuse of power by the state;

(2)     the lack of any distinction between punishments for crimes of inequal kind or degree creates a dangerous and counterproductive equation:  an offender contemplating two offenses, a greater and a lesser, that are punished alike is presented no disincentive to forego the greater for the lesser.  If the punishments

---

[15]  *See United States v. Shortt*, 485 F.3d 283 (4th Cir. 2007).  *See also* §3553(a)(2)(A)-(D); *United States v. Siegel*, 271 Fed. Appx. 115, 118 (2d Cir. 2008) (internal quotations omitted) ("the purposes [of sentencing] to be considered include punishment, deterrence, incapacitation, and the provision of necessary medical care or other correctional treatment");  *United States v. Denardi*, 892 F.2d 269, 276 (3d Cir. 1989) (Becker, J., *separate opinion*) ("the four purposes of sentencing set forth in subsection 3553(a)(2)"are "retribution, deterrence, incapacitation, and rehabilitation").

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 21 of 54

are identical, there is no greater risk in attempting the greater;[16]  and

(3)    the punishment should fit the crime, *i.e.*, those who defraud the public should
build public works.

Cesare Beccaria, *On Crimes and Punishments* (1764), translated from the French edition by
Edward D. Ingraham (Seven Treasures Publications: Lexington, Kentucky 2009), at 70-71, 97.[17]
*See also United States v. Canova*, 412 F. 3d 331, 351 (2d Cir. 2005) (citing *Booker*, 541 U.S. at
263, for the proposition "that post-*Booker* sentencing contemplates consideration of Guidelines
to serve goals of 'avoiding unwarranted sentencing disparities' and 'proportionality'").

Here, the lack of any negative consequences resulting from Mr. Hasanoff's offense
conduct constitutes a valid and compelling basis for a sentence that distinguishes his conduct
from that generating any harm, much less *serious* harm.  As the sentences in other terrorism-
related cases, discussed **post**, at 31-40, demonstrate, Mr. Hasanoff's offense conduct is at the
least serious end of the spectrum, and his sentence should reflect that remote placement along the
conduct continuum.

C.    ***The Government Should Not Be Permitted to Use, and the***
***Court Should Not Consider, the FBI Form 302's of the***
***Interviews of Two Persons Detained In***

---

[16]  *See also* Richard Posner, *An Economic Theory of the Criminal Law*, 85 Colum.L.Rev.
1193 (1985), at 1207 (footnote omitted) (noting, in regard to punishment of different crimes by
the same, severe fine[,]" that "[t]his uniformity, however, eliminates marginal deterrence the
incentive to substitute less for more serious crimes.[ ]  If robbery is punished as severely as
murder, the robber might as well kill his victim to eliminate a witness.  Thus, one cost of making
the punishment of a crime more severe is that it reduces the criminal's incentive to substitute that
crime for a more serious one.  To put this differently, reducing the penalty for a lesser crime may
reduce the incidence of a greater crime.  If it were not for considerations of marginal deterrence,
more serious crimes might not always be punishable by more severe penalties than less serious
ones").  *See also id.*, at 1206 n. 25 (noting that an increase in the length of prison sentences
would not correspond to a commensurate decrease in the crime rate, and that the larger the
increase in sentences, the larger the gap in crime reduction).

[17]  Beccaria also postulated that it was *certainty* of punishment, and not its *severity*, that
deterred crime.  *Id.*, at 69-70.  *See also* Bernard E. Harcourt, *The Illusion of Free Markets:*
*Punishment and the Myth of Natural Order* (Harvard University Press:  2011), at 106.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 22 of 54

The government has placed the defense on notice that it wishes to use at sentencing a series of FBI Form 302's (hereinafter "302's") detailing interviews conducted by the FBI in 2009 of two persons incarcerated in          (hereinafter collectively "the          detainees," or individually "Detainee 1" and "Detainee 2"). *See* February 13, 2013, Cover Letter attached hereto as part of Exhibit 19, which also includes the 302's themselves).

Mr. Hasanoff objects on a number of grounds to the government's use of those 302's, and any information provided by the          detainees. As detailed below, the 302's constitute hearsay – in some instances, multi-level hearsay – and their use at sentencing would violate Mr. Hasanoff's Fifth and Sixth Amendment rights because (a) there are not sufficient indicia of reliability to permit them to be considered at sentencing; (b) an evidentiary hearing would be meaningless because the          detainees cannot be produced to testify, and therefore cannot be cross-examined, thus denying Mr. Hasanoff his Sixth Amendment right to confrontation; and (c) given          's sordid history and reputation with respect to torture and maltreatment of prisoners – designed to obtain confessions – the information from the          detainees is inherently unreliable. As a result, the government's use of the 302's should be precluded.

### 1.   *The Usual Means of Resolving Disputed Factual Contentions at Sentencing*

Due process requires that a trial court rely only on accurate and reliable facts and information when sentencing a defendant. *United States v. Fatico*, 458 F.Supp. 388, 397-398 (E.D.N.Y. 1978), *aff'd in part, rev'd in part*, 603 F.2d 1053 (2d Cir. 1979), *citing United States v. Malcolm*, 432 F.2d 809, 816 (2d Cir. 1970). As a result, if a defendant disputes material facts the government argues should be considered at sentencing, a hearing – colloquially called a "*Fatico* hearing" – is conducted wherein the government shoulders the burden of demonstrating the reliability and accuracy of those facts alleged. *United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979).

Thus, ordinarily the solution to contested facts at sentencing is an evidentiary hearing from which the sentencing court can determine the facts and make findings. However, here such a *Fatico* hearing would be an entirely empty exercise, as the          detainees cannot be produced to testify, thereby depriving Mr. Hasanoff of the opportunity to cross-examine them.

Consequently, even a *Fatico* hearing would be insufficient to protect against the risk that Mr. Hasanoff will be sentenced based on facts that are "materially untrue," or "misinformation." *United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir. 1987), quoting *Townsend v. Burke*, 334 U.S. 736, 741 (1948).

### 2.   *A* **Fatico** *Hearing Would Not Adequately Protect Mr. Hasanoff's Rights*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 23 of 54

a.   *Mr. Hasanoff's Fifth Amendment
Due Process Rights at Sentencing*

Consideration of the 302's would deny Mr. Hasanoff his Fifth Amendment Due Process right to be sentenced only on the basis of accurate information, and his Sixth Amendment right to confrontation. Mr. Hasanoff's Fifth Amendment right is firmly established by *Fatico* and its progeny, and the 302's lack of reliability is addressed **post**, at 25-28.

While corroboration can buttress factual contentions at issue in a *Fatico* hearing, the statements at issue here cannot attain sufficient reliability because any such corroboration cannot offset the "enormous handicap" which results from the unavailability of the            detainees who made the statements. 458 F. Supp. at 412.

Also, even if the Court were to conduct a *Fatico* hearing, the government would be unable to demonstrate the necessary corroboration or indicia of reliability required to justify a "finding that [Mr. Hasanoff] participated in a crime infinitely more serious than those to which he admitted in his guilty plea." *Lee,* 818 F.2d at 1055. The statements by the detainees provide only a tenuous link between themselves and Mr. Hasanoff, as he did not have any direct communication with the            detainees.

In addition, the overriding concern in determining the reliability of these particular statements is the manner by which they were obtained, a matter about which only the detainees themselves could testify sufficiently. *Bruton v. United States*, 391 U.S. 123, 136 (1968). As detailed **post**, at 25-28,          's history of abusing detainees casts dispositive doubt on the circumstances under which the statements were obtained and, in turn, their reliability.

While the connection between coercion and unreliability is most often analyzed when the government uses a defendant's coerced statement against him, the link between coerced statements and unreliability generally is undeniable. *See Brown v. Mississippi*, 297 U.S. 278 (1936); *Chambers v. Florida*, 309 U.S. 227 (1940); *White v. Texas*, 310 U.S. 530 (1940). *See also United States v. Ghailani*, 743 F. Supp.2d 261 (S.D.N.Y. 2010). When reliability is the deciding factor governing whether information can be relied upon, the fact that information was obtained through physical and/or psychological abuse, including torture, dispositively proscribes consideration of that information.

As a result, the statements fail to satisfy the Fifth Amendment Due Process requirements of reliability and accuracy that might otherwise be established at an ordinary *Fatico* hearing. *Fatico*, 603 F.2d at 1055.

b.   *Mr. Hasanoff's Sixth Amendment*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 24 of 54

### *Confrontation Rights at Sentencing*

Regarding his Sixth Amendment right to confront witnesses and evidence, although the Second Circuit has not explicitly extended the protections of the Sixth Amendment Confrontation Clause to the sentencing phase, Judge Weinstein recognized in *Fatico* that sentencing "in the vast majority of cases which result in a plea of guilt . . . is, for the defendant, the only critical stage." 458 F.Supp. at 396; *United States v. Varacalli,* 117 Fed.Appx. 801, 802 (2d Cir. 2005).

Also, when "the critical fact was litigated for the first time" at sentencing after a guilty plea, a defendant will be "irreparably disadvantaged" by a lack sufficient adversarial tools, namely cross-examination of the detainee witnesses. *Fatico*, 458 F.Supp. at 400. Indeed, it would be anomalous to protect a defendant only at the pretrial and trial phases, but then to permit enhancement of punishment – in many instances, the ultimate material determination – based on information that was not subject to the "crucible" of cross-examination that is essential to determining reliability and accuracy. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004).

In addition, the language of the Sixth Amendment does not distinguish between stages at which the rights therein are applicable, and it is axiomatic that the right to counsel in the Sixth Amendment applies at sentencing (and at all "critical stages" of a criminal prosecution, which includes sentencing).

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the opportunity to confront witnesses against him, thereby prohibiting "testimonial statements of witnesses absent from trial . . . [unless] the declarant is unavailable and . . . the defendant has had a prior opportunity to cross examine." *Crawford*, 541 U.S. at 59; *see also United States v. Jones*, 393 F.3d 107, 110 (2d Cir. 2004).

The Confrontation Clause's protection is premised on an issue separate from reliability. In fact, as the Court explained in *Crawford*, the fundamental requirement of confrontation is not predicated on *reliability*, but rather on the procedural necessity of cross-examination, by which reliability of evidence is "assessed in a particular manner[.]" *Crawford*, 541 U.S. at 61.

Clearly, the statements at issue here are testimonial in nature as they were made during an interrogation by U.S. law enforcement personnel. *Id.,* at 53 ("interrogations by law enforcement officers fall squarely within that class" of testimonial statements); *see also United States v. Saget*, 377 F.3d 223, 225 (2d Cir. 2004).

Yet the            detainees are currently outside U.S. jurisdiction and not subject to any, much less compulsory, process.  It is equally clear that the statements do not meet the Sixth Amendment standard of reliability, as the            detainees have never been subjected to cross

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 25 of 54

examination, much less by Mr. Hasanoff's counsel. *Saget*, 377 F.3d at 225. Accordingly, a *Fatico* hearing would not adequately protect Mr. Hasanoff's Sixth Amendment confrontation rights. *Crawford*, 541 U.S. at 62-63.

> **3.** **_The Statements Are Inherently Unreliable Because They May Well Have Been Obtained Through Coercion, Including Physical and Psychological Abuse_**

The statements at issue were made during an FBI interrogation of the                detainees suspected of terrorist activities, who were detained for an indeterminate period by authorities, within the borders of              . *See* 302's at 1140. Yet              has been a notorious offender with respect to the treatment of detainees, a fact that fatally undermines any assertion that the 302's possess the requisite credibility to be considered at Mr. Hasanoff's sentencing.

For example, as recently as 2012, the U.S. Department of State issued an extensive Country Report detailing the brutal conditions detainees and prisoners face at the hands of                    authorities and security forces, including "beatings, electric shock, threats of death or rape, extended periods of time in solitary confinement, and exposure to extreme temperatures," whippings, threats of harm to the prisoner or detainee's family members, compounded by overcrowded and unsanitary prisons. U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2012:              , available at*

In addition to the Department of State Country Report cited above, a 2010 Amnesty International report on the state of human rights in            not only referenced the numerous reports of torture and abuse of detainees and prisoners, but also specifically found that the "purpose appeared to be . . . to extract 'confessions' from detainees that could be used against them in court." Amnesty International,            - *Amnesty International Report 2010: Human Rights in Republic of            , available at http://www.amnesty.org/en/region/            /report-2010; see also* Amnesty International,            - *Amnesty Internation Report 2009: Human Rights in Republic of            , available at http://www.amnesty.org/en/region/            /report-2009* ("confessions allegedly obtained under torture or other duress were accepted as evidence by the courts without being investigated adequately").

Since the unavailability of the detainee witnesses limits the inquiry into the conditions of their detention and interrogation to only that period when FBI representatives were present, it is impossible to conclude with any confidence that the            detainees' statements were voluntary, and/or not the product of abuse and coercion by            authorities. As a result, they cannot be deemed sufficiently reliable; indeed, they are categorically *un*reliable. *See Fatico,*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 26 of 54

458 F.Supp. at 400.

Although FBI personnel may be able to testify to the conditions of detention and the interrogation techniques used during the actual FBI interviews, the reliability of the statements cannot be satisfactorily established without the presence of the detainees themselves. *Bruton*, 391 U.S. at 136.  Moreover, a report issued by the            Civil Society Organizations, in addition to detailing specific incidents of abuse and torture between 2003 and 2009, found that detainees are often interrogated by            officials at night and outside the presence of an attorney.            Civil Society Organizations on            's Compliance with the Convention against All Forms of Torture and Other Forms of Inhuman and Degrading Treatment ("CAT"), *The Status of Torture in            : Second Parallel Report*, *available at http://www2. ohchr.org/english/bodies/cat/docs/ngos/SAF_            43.pdf* (October 12, 2009).

Thus, FBI personnel would be unable to testify even as to the three days of their own interrogation (because during those three days the            detainees were in sole custody of            authorities other than during the period of the FBI's questioning), let alone the period of detention before and after the FBI interrogation.

For instance, according to the 302's, at 1140, there was a two-day gap between the second and third interviews, and the interviews were only conducted until late evening each day. Certainly since torture, night interrogation, and interrogation without notification to an attorney, let alone anyone else, constitutes the general practice of            authorities, it is not possible that a complete picture of the manner by which the statements were obtained can be acquired without the presence of the detainees who made them, rendering the statements inherently unreliable.  *See* CAT, *The Status of Torture in            : Second Parallel Report*.[18]

Accordingly, it is extremely unlikely that the two            detainees in this case escaped what is reported to be a commonplace method of interrogation in            .  Although the statements may have been obtained during an FBI interrogation in            , without the ability to cross examine the detainee witnesses about the conditions of detention and interrogation techniques, the statements cannot even be effectively tested for reliability.  *Bruton*, 391 U.S. at 136.  Given that the correlation between unreliable information and coercion is indisputable, the

---

[18]   The            CAT also reported that "lawyers are persistently blocked by the General Prosecutor's failure to cooperate in cases relating to torture and forced disappearance."  CAT, *The Status of Torture in            Second Parallel Report*.  Although the prevalence of torture by            officials and the extremely harsh conditions of detainment and imprisonment in            are extensively documented, the problems are largely ignored by those with authority to remedy it.  *See* U.S. Department of State, 2012 *Country Report:            *.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 27 of 54

statements obtained from the detainees are inherently unreliable, and thus, cannot be considered at Mr. Hasanoff's sentencing.

In that context, it is well-established that evidence obtained as the result of a coerced confession or pursuant to an illegal search or seizure, as well as the fruits of that evidence, are generally not admissible against a defendant. *Nardone v. United States*, 308 U.S. 338, 340 (1939); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 278 (1983). However, such inadmissibility is not a *per se* rule, and if the government can demonstrate that the illegal actions were far enough removed from the evidence "as to dissipate the taint," the evidence is admissible. *Id.* at 341; *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

The facts and result in *Ghailani* are also instructive. In *Ghailani*, evidence obtained through torture was the subject of litigation, an evidentiary hearing, and a ground-breaking decision by the trial court: whether a witness whose identity the government had learned only through its mistreatment of the defendant (who made statements as a result) would be permitted to testify against that defendant at trial. 743 F. Supp.2d at 264.

In precluding that witness's testimony, the trial court in *Ghailani* held that "[i]f the government is going to coerce a detainee to provide information . . . it may not use that evidence – or fruits of that evidence that are tied as closely related to the coerced statements as [the witness's] testimony would be [in Mr. Ghailani's case] – to prosecute the detainee for a criminal offense." 743 F. Supp.2d at 287-88. The Court in *Ghailani* also concluded that the witness at issue was not sufficiently credible. *Id*., at 282.

Accordingly,          's deplorable record with respect to detainee maltreament and coercion to obtain confessions renders the          detainees' statements inherently unreliable, and precludes their consideration at Mr. Hasanoff's sentencing.

**D.    *Mr. Hasanoff's Status as an Outsider and Novice Vastly Reduced His Chances of Completing the Charged Offenses***

As is clearly established by the discovery in this case, the defendants never had any authentic access to terrorism networks or Islamic extremists, and were victims of a rudimentary fraud to a greater degree than they ever were perpetrators of terrorism-related crimes. Indeed, Mr. Hasanoff, a Muslim accountant from Brooklyn who only recently had adopted an orthodox approach to Islam, and who could not speak Arabic and lacked sophistication when it came to his perceptions of the extremist community, but possessed funds he was willing to devote to the perceived cause, was easily duped by his alleged "*al Qaeda*" contacts in          .

Accordingly, while Mr, Hasanoff provided those contacts with a substantial sum of cash

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 28 of 54

over time, and performed a number of random and often (principally) mundane tasks for them, in the hopes that they might facilitate his travel for the purpose of engaging in armed *jihad* overseas, his lack of knowledge and access vastly reduced his chances of ever completing any of the charged offenses.

Mr. Hasanoff never had any military or firearms training, or knowledge of or expertise with explosives or other weapons.  He did not have any genuine contacts in the world of violent *jihad* or terrorism (which explains in part why he was so easily deceived and manipulated by the Yemeni contacts).  He also lacked the means to communicate with the vast majority of individuals in that world because of his lack of Arabic language skills.  He did not join any particular terrorist organization, or swear allegiance thereto.  It is also unclear whether any of his material support even reached any such organization.

Like many young Muslims in Western developed nations, Mr. Hasanoff was very effectively guilt-tripped by the bellicose rhetoric of radical cleric Anwar Al-Awlaki, who preyed upon the privileges and comfortable lifestyle of those young men to propel them to armed assistance to less fortunate Muslims abroad in order to fulfill their religious commitment.

However, there remained a fundamental disconnect between Mr. Hasanoff's adoption of *jihadist* ideology rhetoric, and his lack of aggressive, affirmative, objective conduct in furtherance of such goals.  Indeed, Mr. Hasanoff never left Dubai, never left his job, never left his family, and never engaged in a form of *jihad* more direct than the contribution of money and material goods from a remote – and decidedly safe – distance.

Accordingly, it is respectfully submitted that based on the evidence, as well as Mr. Hasanoff's, background and character, his utter lack of both sophistication and concerted effort substantially reduced his chances of completing the charged offenses, and that his sentence should reflect that practical reality.

Moreover, if the Court does consider the 302's, they do provide certain information that serves to mitigate Mr. Hasanoff's sentence.  For example, it is clear from the 302's that the two           did *not* intend to facilitate Mr. Hasanoff's (and the others') passage to *jihad*, but rather to dupe them into funding the            detainees' personal business and financial projects.

In that context, the 302's state that:

- Detainee 1 admitted the            detainees' plan "was to take the Americans' money."  302's at 1150;

- Detainee 1 informed the FBI agents that "Detainee 2 was planning on using the

LAW OFFICES OF
## DRATEL & MYSLIWIEC, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 29 of 54

$45,000 [provided by Mr. Hasanoff and the others] to open an appliance store in [redacted]." *Id.*;

- Detainee 1 advised that "in October/November 2008 [Detainee 1], the Americans [], and Detainee 2 began to disagree . . . due to Detainee 2's perceived manipulation and deception." *Id.* That perception, which was mutual between Mr. El-Hanafi and Detainee 1, was that "Detainee 2 was using the money . . . sent to only help Detainee 2's 'needy friends.'" *Id.* Detainee 1 "stated that Detainee 2 was 'stringing' the Americans along in order to keep the flow of money coming into [redacted]." *Id. See also id.*, at 1174 (Detainee 2 conceded that " in November 2008, a problem arose . . . which appears to revolve around [Detainee 2's] use of the money and equipment sent to [Detainee 2]." *Id.*;

- Mr. El-Hanafi and Detainee 1 "both agreed that Detainee 2 was taking the money for his own agenda." *Id.*, at 1151;

- regarding the material goods provided, the            detainees kept many of them for their own personal use, and it is unclear whether any were forwarded to any "*mujahideen.*" *Id.*, at 1151-54. Also, some of the items were unsuitable for any combat or other extraordinary use, *id.*, and the more sophisticated items were never purchased or provided. *Id.*, at 1154; and

- Detainee 2 acknowledged that he "gave some of the $12,000 given to him [by the Americans] to the families in need and bought two cars with the remainder." *Id.*, at 1174. Detainee 2 also kept other materials provided by the Americans "at his house . . ." *Id.*

Thus, exploiting Mr. Hasanoff's (and the others') inexperience and amateurish approach to participating in *jihad* overseas, the            detainees bilked Mr. Hasanoff of money and material (instead of forwarding those contributions to persons or organizations engaged in *jihad*). In addition, the 302's description of information Mr. Hasanoff provided regarding the New York Stock Exchange (hereinafter "NYSE") requires discussion. While the 302's contend that Mr. Hasanoff was asked to "check out" the NYSE and "the biggest dam" in the U.S., Detainee 1 "advised that [Mr. Hasanoff] sent back, via email, 'silly' and simple information on the NYSE and never actually visited any dam, and therefore, no information was provided concerning any dam." *Id.*, at 1149.

As the 302's continue, Mr. Hasanoff's "report on the NYSE was sent to Khaled by email." *Id.* However, Mr. Hasanoff did not send that e-mail, as he never had direct contact with the            detainees, and did not prepare any written report, or see any such report. According

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 30 of 54

to the 302's, "[t]he report was less than one page and written in English, which Detainee 1 translated into Arabic using computer software." *Id.* Also, "[t]he report contained information stating [that] it was forbidden for automobiles to park next to the NYSE, and Police dogs and 'civilian' police conducted patrols." *Id.*

As a result, the 302's report that Detainee 1"stated (sarcastically) that [Detainee-2] probably burned the report and 'warmed his hands with it,' and did not transmit it to any one." *Id.*, at 1149-50. Thus, the recipients of the information recognized that it lacked any utility with respect to any designs they had on NYSE. Indeed, "[w]hen asked if there was a planned operation against the NYSE by the Americans, [Detainee 1] responded with a definitive 'No.'" *Id.*, at 1150.

In addition, Detainee 1 "stated that the three Americans had no experience in 'security or movement[,]'" and that "Detainee 2 did not have any real intention to plan or coordinate such an operation." *Id.* Rather, as noted **ante**, "Detainee 2's plan was to take the Americans' money." *Id.*

Mr. Hasanoff did not at any time join, participate in, or attempt or intend to join or participate in, any plan to conduct any violent activity within the U.S. In fact, Mr. Hasanoff communicated to others his position that he would not participate in any such plan. However, he did provide the information because he believed the            detainees were simply testing his commitment to engage in *jihad* overseas. In that context, he provided information that he believed would not be helpful (because it was vague and easily and publicly available), but which would nevertheless satisfy the            detainees that Mr. Hasanoff was indeed committed to *jihad*).

> **E.** ***The Sentences Imposed In Other Terrorism-Related Cases Involving Similar or Far More Serious Criminal Conduct Mandate a Sentence for Mr. Hasanoff Significantly Below His Statutory Maximum Sentence In Order to Avoid Unwarranted Disparities Among Defendants In Accordance With §3553(a)(6)***

In sentencing a defendant the Court is required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). In that context, the statutory maximum sentence of 20 years' imprisonment for Mr. Hasanoff would be grossly disproportionate in light of the sentences imposed on others, as demonstrated by a comprehensive canvass of sentences imposed on defendants convicted of – in some instances similar, and in other instances far more serious – terrorism-related offense conduct.

As set forth below, when compared with the facts of those other cases and the sentences

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 31 of 54

imposed therein, Mr. Hasanoff's offense conduct is either (1) far less serious and extensive than that in many terrorism-related cases in which the sentences have been in the range of 15 years, or, in many such cases, far *less* than 20 years' imprisonment;  or (2)  commensurate with many offenders in terrorism cases in which the sentences have been at or below 13 years.  For example, there are a number of cases in which defendants have been convicted of *substantive* offenses that involved violence and plots to harm U.S. nationals, or completed conspiracies that involved violence, but did *not* receive sentences as high as 20 years.

Perhaps most illustratively, even persons convicted in the Guantanamo Bay military commissions – described by Secretary of Defense Donald Rumsfeld as "the worst of the worst"received sentences dramatically below that which the Guidelines prescribe for Mr. Hasanoff.  For example, the Guantanamo Bay military commissions have produced the following results:

- Salim Hamdan, the driver for Osama bin Laden in Afghanistan, was sentenced to time served (the approximately five years he had already served) after being convicted at trial in a military commission;

- David Hicks, who pleaded guilty in a military commission in 2007 to providing material support to *al Qaeda* in Afghanistan following the September 11, 2001, attacks, received a seven-year sentence (which amounted to an additional seven months served in Australia upon his release after five years at Guantanamo Bay);

- Omar Khadr, a Canadian who pleaded guilty in 2010 to killing a U.S. soldier in Afghanistan, received a sentence of 16 years, and has already been repatriated to Canada;

- Majid Khan, a U.S. citizen who pleaded guilty to conspiring to commit terrorist acts in the U.S., including bombing gas stations, and to providing logistical support to senior *al Qaeda* operatives, including Khalid Sheikh Mohamed, entered that guilty plea pursuant to an agreement that would cap his sentence at 19 years;

- Ali Hamza al Bahlul, who proceeded to trial *pro se*, and defiantly acknowledged his membership in *al Qaeda*, his service to the organization, and his commitment to its objectives, including the killing of Americans (even if he were ever released), was sentenced to life imprisonment;

- Ibrahim al Qosi, an accountant for *al Qaeda* in Sudan in the 1990's (and who migrated to Afghanistan with *al Qaeda* in the mid-1990's, remaining there with

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 32 of 54

the organization), pleaded guilty to an agreement pursuant to which he has been returned to Sudan after serving a total of nearly ten years in confinement.

Regarding cases in the U.S. courts, the catalogue demonstrates that a life sentence for Mr. Hasanoff would be disproportionate and create an unwarranted sentencing disparity, particularly for a defendant, like Mr. Hasanoff, who has pleaded guilty:

- Pete Seda (Pirouz Sedaghaty) – three years for money-laundering and tax evasion related to helping relay $150,000 to Muslim fighters in Chechnya through a charity. *U.S. v. Pirouz Sedaghaty*, 05 Cr. 60008 (D. Ore.);

- Ali Saleh Kahlah Al-Marri – who conspired to provide material support to *al Qaeda* by providing himself as personnel, attending military training camps to learn how to mix poisons, and committing acts in furtherance of a terrorist plot in the United States – pleaded guilty pursuant to a plea agreement that capped his sentence at 15 years. *See* Plea Agreement in *United States v. Al-Marri*, 09 CR 10030 (C.D. Ill.) (annexed hereto as Exhibit 3). Ultimately, he was sentenced to 100 months' imprisonment. *See* Judgment, Dkt. #47;

- Jose Padilla, convicted of "material support" involving training in *al Qaeda* facilities in Afghanistan, and volunteering for violent activity overseas (and initially held as an "enemy combatant" on suspicion of traveling to the U.S. to detonate a "dirty bomb"), was sentenced after trial to 17 years' imprisonment, although that sentence has been vacated, and the matter remanded for re-sentencing. *See United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011). His co-defendants, Kifan Jayyousi and Adham Hassoun, who also proceeded to trial, were sentenced, respectively, to 152 months and 188 months in prison. *Id*.

- Tarik Shah, who pleaded guilty in the Southern District of New York to agreeing to provide martial arts training to *al Qaeda* operatives, received a 15-year sentence;[19]

- Ali Asad Chandia, convicted of providing material support for terrorism for

---

[19] *Bronx Martial Arts Instructor Sentenced to 15 Years in Prison for Conspiring to Provide Material Support to al-Qaeda*, United States District Attorney, Southern District of New York press release, available at <http://nefafoundation.org/miscellaneous/FeaturedDocs/U.S._v_TShah_DOJPR_Sentencing.pdf>.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 33 of 54

purchasing military equipment and sending it overseas to a terrorist organization, received a sentence of 180 months' imprisonment.  *See United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008);

• Javed Iqbal, convicted of providing material support and resources to *Hezbollah* by broadcasting *al Manar* (*Hezbollah*'s television station) in the U.S., received a sentence of 69 months' imprisonment.  *See* Judgment, *United States v. Javed Iqbal*, 06 Cr. 1054 (RMB) (S.D.N.Y.), Dkt. #111;

• Ehsanul Islam Sadequee, convicted after trial in the Northern District of Georgia, received a sentence of 17 years' imprisonment for making "casing" videos of national landmarks in Washington, D.C., and sending them to *al Qaeda*-associated persons overseas for the purpose of facilitating terrorist attacks on those landmarks.  *See* Judgment, *United States v. Ehsanul Islam Sadequee*, 06 Cr. 147 (N.D. Ga.), Dkt. #622.  His co-defendant, Syed Haris Ahmed, received a sentence of 13 years' imprisonment.  *See* Amended Judgment and Commitment in *United States v. Syed Haris Ahmed*, 06 Cr. 147, Dkt. #651.

• the defendants commonly known as the "Lackawanna Six"[20] were arrested in 2002 for traveling to Afghanistan and training at an *al Qaeda* camp.  The defendants were trained in war tactics, explosives, and weapons.[21]  All six defendants were convicted of providing material support to *al Qaeda*, the sentences ranged from seven years to ten years imprisonment;[22]

• another group, commonly known as the "Portland Seven,"[23] was charged with conspiracy to levy war against the U.S. and material support for terrorism.  The defendants possessed weapons and trained for combat in the United States, then traveled to China with the intention of entering Afghanistan to fight against the

---

[20] Shafal Mosed, Yahya Goba, Sahim Alwan, Mukhtar Al-Bakri, Yasein Taher, and Elbaneh Jaber.

[21] '*Lackawanna Six*' *Member Says Al Qaeda Ran Afghanistan Camp Linked to Padilla*, Fox News, May 18, 2007, available at http://www.foxnews.com/story/0,2933,273755,00.html.

[22] *Department of Justice Examples of Terrorism Convictions Since Sept. 11, 2001*, available at http://www.usdoj.gov/opa/pr/2006/June/06_crm_389.html.

[23] Maher Hawash, October Martinique Lewis, Habis Abduallah Al-Saoub, Patrice Lamumba Ford, Ahmed Ibrahim Bilal, Muhammed Ibrahim Bilal, and Jeffery Leon Battle.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 34 of 54

U.S..[24]  The sentences for the Portland Seven ranged from seven to eighteen years;

● Mohammed al-Moayad and Mohamed Zayed were convicted after trial in the Eastern District of New York for providing material support, in the form of fundraising, to *Hamas*.  Mr. al-Moayad was initially sentenced to 75 years' imprisonment, and Mr. Zayed received a sentence of 45 years' imprisonment. After their convictions were vacated, *see United States v. al-Moayad*, 545 F.3d 139 (2d Cir. 2008), and their cases remanded for retrial, they pleaded guilty and were sentenced to time-served (approximately 5½ years at MDC and ADMAX Florence), and deported.  The reasons for the resolution were provided in an August 5, 2009, letter from (then) United States Attorney Benton J. Campbell, which included Mr. al-Moayad's "failing health" as a basis.  A copy of Mr. Campbell's letter is annexed hereto as Exhibit 4;

● Sayed Mustajab Shah, Ilyas Ali, and Muhammed Abid Afridi were convicted of distributing large quantities of heroin and hashish, and material support for terrorism.[25]  The defendants made arrangements to exchange the heroin and hashish for four anti-aircraft "Stinger" missiles.[26]  Mr. Afridi and Mr. Ali were both sentenced to 57 months' imprisonment.[27]  Mr. Shah received a sentence of 225 months (less than 19 years' imprisonment).[28]  *See also United States v. Naji Antoine Abi Khalil* (E.D. Ark.), Dkt. #13 (60 months' imprisonment);

● Nuradin Abdi pleaded guilty to conspiracy to provide material support to *al Qaeda* for his plan to travel to Ethiopia for the purpose of obtaining military-style

---

[24] *3 Members of Terrorist Cell Sentenced,* Los Angeles Times, February 10, 2004, available at <http://articles.latimes.com/2004/feb10/nation/na-portland10>.

[25] *DoJ Examples Since 2001.*

[26] *U.S. Arrests Seven in Two Drugs-for-Weapons Deals, November 6, 2002*, available at <http://www.usembassy.it/file2002_11/alia/a2110604.htm>.

[27] *DoJ Examples Since 2001.*

[28] *Federal Prosecution of Terrorism-Related Offenses:  Conviction and Sentencing Data in Light of the "Soft-Sentence" and "Data-Reliability" Critiques,* Robert M. Chesney, available at <http://www.lclark.edu/org/lclr/objects/LCB_11_4_Art2_Chesney.pdf> (hereinafter "Chesney, *Federal Prosecution*").

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 35 of 54

training in radio usage, guns, guerilla warfare and bombs, in preparation for violent jihad.  He was sentenced to ten years in prison;[29]

● Yassin Muhiddin Aref, convicted after trial of offenses including conspiracy to provide material support in connection with an attack with a weapon of mass destruction (a shoulder fired surface to air missile), two substantive acts of material support in connection with an attack involving a weapon of mass destruction, conspiracy to provide material support to a known terrorist organization, two substantive acts of material support to a designated terrorist organization, and one count of lying to the FBI regarding whether he knew the founder of terrorist group Ansar al Islam, was sentenced to 15 years in prison. His co-defendant, Mohammed Mosharref Hossain was also sentenced to 15 years imprisonment;[30]

● Kevin James conspired to levy war against the U.S. government through terrorism, and to oppose the force of authority of the U.S. government.  While in a California prison he formed a domestic terrorist group that planned to attack military and Jewish facilities in the Los Angeles area.  After pleading guilty he was sentenced to 16 years in prison.[31]  His co-defendants Levar Washington and Gregory Patterson, who recruited others into the plot, and took other steps to further the goals of the conspiracy, were sentenced to 22 years and 151 months in prison, respectively;[32]

● John Walker Lindh, charged with conspiring to murder U.S. nationals and

---

[29]  *See Ohio Man Sentenced to Ten Years Imprisonment for Conspiracy to Provide Material Support to Terrorists*, U.S. DoJ Press Release, available at <http://nefafoundation.org/miscellaneous/FeaturedDocs/U.S._v_Abdi_DOJPR_Sent.pdf>.

[30]  *See Albany, New York Man Sentenced to a 15 Year Term in Federal Prison Following His Convictions for Money Laundering, Conspiracy, and Attempting to Provide Material Support and Resources to a Terrorist Organization*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Aref_DOJPR_Sentencing.pdf>.

[31]  *See Man Who Formed Terrorist Group That Plotted Attacks on Military and Jewish Facilities Sentenced to 16 Years in Federal Prison*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_James_dojprsent.pdf>.

[32]  *Id.*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 36 of 54

conspiring to provide material support to terrorists, for attending an al-Qaeda training camp, agreeing to conduct operations against the United States and Israel and participating in a violent prison uprising that resulted in the death of a CIA agent, pleaded guilty to supplying services to the Taliban and carrying an explosive during the commission of a felony.  He was sentenced to 20 years in prison;[33]

- Christopher Paul pleaded guilty to conspiring with others to use weapons of mass destruction (explosives) against a U.S. national outside the U.S. and against targets (including popular American tourist destinations) in Europe and the U.S. He was sentenced to 20 years in prison;[34]

- Shahawar Matin Siraj was convicted of conspiring to plant explosives at the Herald Square subway station in Manhattan.  He received a sentence of 30 years in prison;[35]

- Wesam al-Delaema pleaded guilty to conspiracy to murder Americans overseas, in part by planting roadside bombs targeting U.S. soldiers in Fallujah, Iraq and demonstrating in videos how these explosives would be detonated to destroy vehicles and people.  He was sentenced to 25 years imprisonment;[36]

- Ronald Allen Gregula pleaded guilty to attempting to provide material support to

---

[33] *See* Sentencing Memorandum of United States District Judge T.S. Ellis, III, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/u.s._v_lindh_sentencingmemo.pdf>.

[34] *See Ohio Man Sentenced to 20 Years for Terrorism Conspiracy to Bomb Targets in Europe and the United States*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Paul_dojprsent.pdf>.

[35] *See Shahawar Matin Siraj Sentenced to 30 Years of Imprisonment for Conspiring to Place Explosives at the 24th Street Subway Station in New York*, U.S. DoJ Press Release, available at <http://nefafoundation.org/miscellaneous/FeaturedDocs/U.S._v_Siraj_DOJPRSentencing.pdf>.

[36] *See Iraqi-Born Dutch Citizen Sentenced to 25 Years In Prison for Terrorism Conspiracy Against Americans In Iraq*, FBI Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Delaema_fbiprsent.pdf>.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 37 of 54

*al Qaeda* by negotiating to build and sell an explosive device to terrorist groups targeting Americans in the U.S.  He was sentenced to five years in prison;[37]

●   several defendants in a plot commonly referred to as "Operation White Terror" were convicted of arrangements to exchange drugs worth $25 million for shoulder fired anti-aircraft missiles, 9,000 assault rifles, nearly 300,000 grenades, and 300 pistols.[38]  The plot was extinguished only after the weapons were delivered, yet only one defendant received a sentence longer than 360 months.  The other defendants received sentences ranging from 168 months to 300 months;[39]

●   after conviction in *United States v. Hassan Makki* 03 Cr. 80079 (E.D. Mich.), Dkt. #203, for deliberately raising money (sometimes under false pretenses) for the purpose of financing *violent* terrorist activities overseas, the defendant was sentenced to 57 months' imprisonment.  *See also United States* v. *Mahmoud Youssef Kourani,* 03 Cr. 81030 (E.D. Mich.), Dkt. #45 (54 months' imprisonment);

●   in *United States v. Cedric Carpenter* and *Lamont Ranson* (S.D. Miss.), a case involving facilitating the illegal entry of terrorists into the U.S. for purposes of committing violent terrorist acts, including obtaining false travel documents, Ranson was sentenced to 29 months' imprisonment and Carpenter (who also pleaded guilty to possessing a firearm at the time of his arrest) was sentenced to 63 months' imprisonment;

●   Khalid Awan was re-sentenced to 168 months followed by three years of

---

[37]  *See Ronald Gregula Sentenced to Prison in Plot to Sell Bomb to Terrorists*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Grecula_DOJPRSentencing.pdf>.

[38]  *Operation 'White Terror' A Tale of Drugs, Guns, and Murder*, Federal Bureau of Investigation press release, November 15, 2006, *available at* <http://www.fbi.gov/page2/nov06/white_terror111506.htm>.

[39]  *Terrorist Trial Report Card: U.S. Edition*, Appendix B at 10, New York University School of Law Center on Law and Security, available at <http://www.lawandsecurity.org/publications/TTRCComplete.pdf> (hereinafter "*Terrorist Trial Report Card 2006*").

LAW OFFICES OF
## DRATEL & MYSLIWIEC, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 38 of 54

supervised release in *United States v. Awan*, 06 Cr. 154 (following the Second Circuit's vacatur of his original sentence of 168 months) for providing material support to the Sikh terrorist organization, Khalistan Commando Force;

● Syed Hashmi pleaded guilty in April 2010 in the Southern District of New York to conspiring to provide material support to *al Qaeda* (in the form of military gear to be used against U.S. forces in Afghanistan), and was sentenced to 15 years' imprisonment;

● Yonathan Melaku was sentenced in 2012 to 25 years' imprisonment followed by a term of 5 years supervised release, after pleading guilty to performing five shootings at several locations, including the National Museum of the Marine Corps, the Pentagon, and Marine and U.S. Coast Guard recruiting stations. At the time of his arrest, Mr. Melaku was attempting to enter Arlington National Cemetery in order to desecrate grave markers with spray paint, and leave ammonium nitrate at the graves;

● Rezwan Ferdaus, who pleaded guilty to attempting to damage and destroy a federal building by means of an explosive, and providing material support to terrorists, was sentenced to 17 years' imprisonment in the District of Massachusetts. Mr. Ferdaus's offense conduct included constructing and delivering to undercover agents mobile phone detonation devices for use with improvised explosive devices ("IED's") intended to kill U.S. military personnel overseas. Mr. Ferdaus suggested to the agents that he could make 20-30 of such detonation devices per week. He also made a 20-minute training video on how to construct the devices. Mr. Ferdaus engaged in extensive plans and performed substantial steps toward bombing the Pentagon and the U.S. Capitol through the use of remote controlled aircraft packed with explosives. Mr. Ferdhaus sought assistance from the undercover agents in an armed ground assault on the Pentagon, as well as the assault with a remote-controlled aircraft loaded with grenades. An undercover FBI employee delivered explosives to Mr. Ferdaus, who placed some of them inside a remote controlled aircraft that he then locked inside a storage locker. He was then arrested;

● Ulugbek Kodirov was sentenced to 15 years and eight months' imprisonment in the Northern District of Alabama after pleading guilty to threatening to kill President Obama, providing material support to terrorism, and illegal possession of a weapon. Mr. Kodirov also cooperated with the U.S. government;

● Douglas L. Wright was sentenced to a prison term of 11½ years after pleading

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 39 of 54

guilty in the Northern District of Ohio to conspiracy to use weapons of mass destruction and other offenses in connection with a plot to destroy a bridge near Cleveland, Ohio. Mr. Wright and his co-defendants planted the explosives and attempted to detonate them remotely;

- Brandon L. Baxter, Mr. Wright's co-defendant, was sentenced to nine years and nine months' imprisonment;

- Connor C. Stevens, another co-defendant of Mr. Wright and Mr. Baxter, was sentenced to eight years and one month in prison;

- Shaker Masri was sentenced to 119 months' imprisonment after pleading guilty in the Northern District of Illinois to providing material support to *al Shabaab* in the form of himself (by attempting to travel to Somalia to join that organization); and

- Ahmed Ferhani was sentenced in New York State court to ten years' imprisonment after pleading guilty to charges that he plotted to blow up New York City synagogues, and was involved in a weapons-buying sting for that purpose. Mr. Ferhani's maximum exposure was 32 years in prison, and prosecutors had urged imposition of a 14-year sentence.

Even as a whole, the statistics establish that a sentence of 20 years' imprisonment well exceeds the average for terrorism-related charges and cases. The Center on Law and Security at New York University Law School has periodically compiled a "Terrorist Trial Report Card" that catalogs terrorism-related prosecutions and their results. The three most recent versions, published in 2006, 2010, and 2011, each analyze the data somewhat differently, but provide illuminating figures. The September 11, 2008, edition of that Terrorist Trial Report Card, based on the sentences imposed on the 370 defendants convicted of terrorism offenses (and sentenced) between September 11, 2001, and September 2008 reported that the average sentence for all defendants convicted of terrorism charges was approximately twelve years and eight months (12.67 years),[40] and the average sentence for convictions for material support for terrorism were 14.75 years (18 U.S.C. §2339A) and 11.92 years (§2339B). Even for violations of 18 U.S.C. §2332 (murder of U.S. nationals outside the U.S., a potential capital offense), the average sentence was 26 years.[41]

---

[40] *Terrorist Trial Report Card, September 11, 2008*, available at <http://www.lawandsecurity.org/Portals/0/documents/03_Sept08TTRCFinal1.pdf>.

[41] *Id.*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 40 of 54

The 2010 version of the Terrorist Trial Report Card, which covered U.S. federal prosecutions between September 11, 2001, and September 11, 2009, provided slightly different nomenclature:  (i)  the "average sentence for persons convicted of terrorism" was 16 years (191.9 months);  (ii)  the "average sentence for persons charged with terrorism" was 19.7 years (236 months);  (iii)  the "average sentence for persons charged with national security violations but not terrorism" was 10.4 years (124.5 months);  and (iv)  the "average sentence for persons convicted of national security violations and not charged with terrorism" was 7.5 years (90.3 months).[42]

The September 2011 edition of the Terrorist Trial Report Card, covering September 11, 2001, through September 11, 2011, again alters the characterization, and provides the following average sentences graphically (and not in precise numbers):

(i)      for "Terror or National Security Top Charge":  between 10 and 15 years;

(ii)     for "Material Support Top Charge":  also between 10 and 15 years, but less than for "Terror or National Security Top Charge;"

(iii)    for "Material Support Lesser Charge":  slightly less than 15 years;

(iv)     for "National Security Charge Conviction":  slightly more than 15 years;

(v)      for "Terror Charge Conviction":  also slightly more than 15 years, but slightly more than for "National Security Charge Conviction;" and

(vi)     for "Terror and National Security Charge Conviction":  25 years.[43]

These individual examples and collective statistics demonstrate that a sentence significantly below 20 years, and commensurate with the PSR recommendation of 13 years in this case is certainly "sufficient, but not greater than necessary," to achieve §3553(a)(2)'s stated goals of sentencing, and would, as required by 18 U.S.C. §3553(a)(6), avoid creating an unwarranted sentencing disparity between Mr. Hasanoff and other defendants whose offense

---

[42] *Terrorism Trial Report Card, September 11, 2001-September 11, 2009* (published January 2010), at 13, available at <http://www.lawandsecurity.org/Portals/0/documents/01_TTRC2010Final1.pdf>.

[43] *Terrorism Trial Report Card, September 11, 2001-September 11, 2011*, at 7, available at <http://www.lawandsecurity.org/Portals/0/Documents/TTRC%20Ten%20Year%20Issue.pdf>.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 41 of 54

conduct was either equivalent or demonstrably worse.

### F.   *Mr. Hasanoff's Personal History and Characteristics*

Mr. Hasanoff is 37 years old, and was born in Kuldja, China, though his parents met and married in Uzbekistan.  *See* PSR, at ¶ 57.   Before Mr. Hasanoff's birth, his parents were forced to flea Uzbekistan to avoid persecution.   Then, upon further persecution in China, when Mr. Hasanoff was very young, his parents relocated the family to Australia, where Mr. Hasanoff remained until he was a teenager, gaining Australian citizenship.  Finally, in 1989, Mr. Hasanoff came with his family to the United States, where he remained for the next approximately 15 years.  He became a naturalized U.S. citizen in 2004.  *See* Certificate of Naturalization, attached hereto as Exhibit 3.  *See also* U.S. Passport, attached hereto as Exhibit 2.

Although Mr. Hasanoff's parents came from meager beginnings, operating a small newsstand in New York to support their family, Mr. Hasanoff was determined to make the most of his family's immigration to America.  *See* PSR at ¶ 57.  Mr. Hasanoff, who was living with his family in Brooklyn, worked hard in school and graduated from CUNY Baruch College in 1999 with a Bachelors in Business Administration.  *See* Baruch Degree, attached hereto as Exhibit 4.

In 2000, Mr. Hasanoff met his wife,                             and they began a romantic relationship, which culminated in their marriage August 29, 2001.  *See* PSR at ¶ 62.

In 2002, Mr. Hasanoff got his license to practice as a Cerified Public Accountant.   *See* CPA License, attached hereto as Exhibit 9.  At that time he was working at KPMG, and he soon after began working at Pricewaterhouse Coopers in New York, a company he remained in the employ of, and excelled at, until the time of his arrest.   *See* Resume of Sabirhan Hasanoff, attached hereto as Exhibit 5.

Over the course of his accounting career, Mr. Hasanoff also became a member of the American Institute of Certified Public Accountants, the New York State Society of Public Accountants, and obtained his Certified Internal Auditor's Licence.  *See* Certificates, attached hereto as Exhibits 6, 7, and 8.

Yet, even as Mr. Hasanoff advanced in his career he remained devoted to building a family.  By the time Mr. Hasanoff relocated with his family to Dubai, in 2007, to pursue a job at PricewaterhouseCoopers's Dubai office, he already had two children, his son                   and his daughter,                  .  A third daughter,             was born just after Mr. Hasanoff was arrested.  His family returned from Dubai very soon after his arrest and now lives in                   in order to be close to him during his case.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 42 of 54

As set forth herein, Mr. Hasanoff's criminal conviction is entirely inconsistent with his lifelong commitment to his family, his career, and to those in need.

### 1.    *Mr. Hasanoff Is a Devoted Family Man*

Under §3553(a), family ties are a relevant and important factor in determining an appropriate sentence.  *See, e.g.*, *United States v. Nellum*, ____ F.Supp.2d ____, 2005 WL 300073, at *4 (N.D. Ind. 2005) ("under §3553(a), the history and characteristics of the defendant, including his family ties, are pertinent to crafting an appropriate sentence").  By all accounts, Mr. Hasanoff is extremely devoted to his family, and is an exemplary husband and father.  Indeed, the overwhelming majority of the letters on Mr. Hasanoff's behalf, whether from family, colleagues, friends, or neighbors, makes mention of that fact.

For example, Mr. Hasanoff's wife,          states in her letter, "Sabir is an extremely devoted father and our children miss him[,]" and describes Mr. Hasanoff as both her "husband" and "best friend."  *See* Letter of                    , attached hereto as Exhibit 1, Letter 3.  She adds that "[t]he qualities that attracted me to him 11 years ago have been unchanging since, caring, devoted and extremely generous.  It is very painful to read about him and al-Qaeda in the same sentence, as Sabir is the exact opposite of all they are.  He has taught me so much about being a giving, loving person and to care about people less fortunate."    *Id.*

In that context,          's mother,                    writes in her letter, "[o]f course no one is ever good enough for your daughter from a Father and Mothers perspective.  However upon meeting Sabir we knew he would take good care of          the way we wanted."  *See* Letter of                    , attached hereto as Exhibit 1, Letter 28.

Likewise, Mr. Hasanoff's sister-in-law,                    states, "[w]hat I most respect about Sabir is how he treats his wife and kids. . .  Sabir is definitely a family man.  I think that's how he sees everyone around him, as his family.  When we were at [his] house in Dubai, he would roll around on the floor with [his kids], help them read books, play with their toys, and teach them new things." *See* Letter of                    , attached hereto as Exhibit 1, Letter 36.  In fact, he was so present and engaged, she "always wondered how he had the energy after a long day at work."  *Id.*

In addition, Mr. Hasanoff's brother-in-law Dr.                    , states, "[w]hen I first met [Sabirhan], I saw what a great father he is;  although his work schedule was hectic he was always spending time with his kids and making sure they were having fun. *See* Letter of Dr.                    , attached hereto as Exhibit 1, Letter 8.  Thus, Dr.          "remember[s] thinking that was the type of father [Dr.          ] would like to be when [he] had kids." *Id.*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 43 of 54

2. *Mr. Hasanoff's Generosity and Charitable Nature Toward Others*

So many of the letters submitted on Mr. Hasanoff's behalf describe his considerable generosity and charity towards both friends and family, as well as near strangers, and his unwavering commitment to helping out those in need of assistance, whether financially, to put a roof over their heads, or simply to find their place in the community or the world at large.

Indeed, it is clear from the fact that Mr. Hasanoff was equally known for his charity in the U.S and Dubai, that his impetus to help others did not derive from a general climate in the community or from some other force outside of Mr. Hasanoff.  Rather, desire to take care of others was part of Mr. Hasanoff's character and was a defining quality.  As his sister, explains in her letter, Sabirhan is "generous, devoted to family and deeply concerned about those around him and in the larger world – traits that [she] hopes [her] children will have." *See* Letter of                    attached hereto as Exhibit 1, Letter 2.

Mr. Hasanoff's parents,           and                    recall that "[e]ven at a young age [Sabir] was very sensitive and giving. . . He was friendly with all the neighborhood shopkeepers and if he knew someone needed a job, he would immediately try to find one with one of the local stores.  As he got older and started his career he was extremely generous and charitable."  *See* Letter of           and                    attached hereto as Exhibit 1, Letter 1.  Thus, they note that, "[a]lthough [they] are saddened by circumstances he is in, and of the mistakes he acknowledges he has made, after reading the many letters of support from others whose lives he has helped, such as the abused woman and widows, we are proud of this part of him." *Id.*

In one such letter,                    and his wife                    , long time family friends of Mr. Hasanoff's parents from           discuss the generous assistance Mr. Hasanoff provided their daughter,                    when she arrived in New York in 2000 – Mr. Hasanoff "helped her to settle down in                    and also helped her to find a job in a local store and enroll in                    University to learn English"– and help Mr. Hasanoff provided them, after their daughter was tragically killed on September 11, 2001, in the World Trade Center, where she had been working at the time.  *See* Letter of                    and                    , attached hereto as Exhibit 1, Letter 32.

According to Mr.                    , "[i]n the confusing days following the [9/11] attacks, [their] nephew and [Mr. Hasanoff] went around searching for [Mr.                    's daughter] in hospitals, friends (sic) anywhere they could find her and ke[pt] [him] informed of events." *Id.* Then, in October 2001, when Mr.                    and his wife came to New York, Mr. Hasanoff "was always willing to help in any situation and was very sincere in his actions," including "when [Mr.                    ] had 2 surgeries in the following years" and Mr. Hasanoff "was the one who took care of [him and his wife] and treated [them] like his own family." *Id.* Thus, Mr.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 44 of 54

      states, "I lost a daughter on September 11, and if Sabir were to be sentenced for a long time I feel like I am losing a son." *Id.*

      Mr. Hasanoff has also helped many people financially over the years, and his been very selfless with his money.  His brother-in-law,           , states in his letter, "one [trait] that stood out and moved me personally is for a person who is well off financially, with a good career, he has never liked any luxury or expensive items for himself.  But without any hesitation he would help the needy."  *See* Letter of        , attached hereto as Exhibit 1, Letter 27.

      Indeed,       , a neighbor of Mr. Hasanoff's in the UAE remembers when Mr. Hasanoff "was involved in helping very needy children."  *See* Letter of       , Exhibit 1, Letter 38.  He recalls that "[t]here was a specific school located in a poorer section of the UAE where many of the students were either orphans or from very poor backgrounds" and that Mr, Hasanoff "was involved in a toy drive for these kids and he advised others in the building to get involved as well."  *Id.*   A former co-worker,       , explained that Mr. Hasanoff donated not only money, but time, noting that as one of his "volunteer projects" he "offered his accounting/auditing services to a school so the school [could] financially run efficiently."  *See* Letter of       , attached hereto as Exhibit 1, Letter 18.  Mr. Hasanoff also gave $300 towards the education of a young boy he had never met after learning the woman's mother, a Brooklyn resident, was "divorced, unemployed and unable to pay for her young son's school fees."  *See* Letter of       , attached hereto as Exhibit 1, Letter 53.

      Perhaps even more generously,       , an acquaintance of Mr. Hasanoff's in the UAE, describes how when her husband "suffered a heart attack at the age of 44, leaving [her] without a husband and father to our 4 children" and also with no funds to pay for his funeral, "[e]ven though Sabirhan barely knew [her or her husband] – he only met [her] husband a few weeks before he died, [Sabirhan] collected money from himself and his friends and arranged the funeral right away."  *See* Letter of       , attached hereto as Exhibit 1, Letter 25.

      Similarly,       , a close friend of Mr. Hasanoff's aunt, describes how, "10 years ago, [when her husband] left [her] and [her] 3 children for another woman, and did not . . . support [them] financially" Mr. Hasanoff "paid for 3 months of [her] rent because [she] could not afford to pay it" and "despite the fact that he "was engaged and preparing for his own wedding at the time."  *See* Letter of        attached hereto as Exhibit 1, Letter 42.  When she later "still needed help with [her] expenses," Mr. Hasanoff "raised $3,000."  *Id.*  As a result, she states that she "would always tell [her] kids about good role models, and Sabir is definitely one of them."  *Id.*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 45 of 54

Likewise, when _____, another letter writer, needed help getting out of a marriage to an abusive man, it was Mr. Hasanoff that "tried to talk to [her] husband many times to tell him to stop abusing [her]" when she refused to leave her husband, and later, when she finally did leave him, Mr. Hasanoff "gave [her] a job baby-sitting his kids and let [her] stay in his home free of charge." *See* Letter of _____, attached hereto as Exhibit 1, Letter 31. He also helped her to apply for a Green Card and paid her legal fees to do so, and, when the family was moving to Dubai, he "helped [her] financially so [she] could study and get [her] Home Health Aide License." *Id.*

As if that were not enough, when Ms. ____'s son, _____, moved to Dubai, it was because of Mr. Hasanoff that he was able to find work to earn a living. *Id.* _____' letter states that "[e]veryone who came looking for jobs in Dubai and needed help would always go to Sabir. Everyone knew how generous he was in helping people with nothing. . . . In Uzbek we have a saying 'open heart, open hands; and Sabir is exactly this kind of person." *See* Letter of _____, attached hereto as Exhibit 1, Letter 9. He adds, "[w]ith Sabir's help, [my mother and I] were able to get jobs and have a much better life." *Id.*

Mr. Hasanoff also helped _____, a Canadian citizen, and the wife of a family friend of Sabirhan Hasanoff's in the UAE, to leave her abusive marriage in the UAE and return to Canada with her five children. *See* Letter of _____, attached hereto as Exhibit 1, Letter 11. As she explains, "I had been struggling in an abusive marriage for years and being in a foreign country, I had absolutely no clue how to get out safely with all 5 of my children." *Id.* She describes how "Sabir took [her] daughter and ]her] under his wing as though [they] were his blood famiy and ensured [their] safety, arranged for a place for [them] to stay, and advocated for [them] in their legal matters." *Id.* Her parents, _____ and _____ also letter writers, states "[r]ight until the very end of ____'s stay in the UAE, Sabir stayed true to his promise to us [to help their daughter to safety] and was a key element in paving a safe way for _____ and her children to return home to Canada. *See* Letter of _____ and _____ attached hereto as Exhibit 1, Letter 50.

Thus, it is not surprising in light of these letters that Mr. Hasanoff's sister-in-law, _____ references, in particular, his charitability toward women, borne out of his great "respect for women." *See* Letter of _____ attached as Exhibit 1, Letter 29. In her letter, she recalls, "[o]ne of my relatives works with an organization called Women for Afghan Women.org that were raising money to build schools for girls in Afghanistan. Sabir and my family attended the fundraiser; Sabir did not hesitate to donate money to them especially because it went toward educating women." *Id.* Yet, she also notes that she has "witnessed [Sabir's] generosity and bigheartedness for so many people, for battered women, widows, abused, parentless children," noting also that "[h]e has done so much good and will do so much more if given back his freedom." *Id.*

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 46 of 54

Indeed, Mr. Hasanoff's younger brother,                states in his letter,

> I have seen him so many times spend his time and money to help
> others, even people he did not know that well.  My friend who
> returned from Iraq as a depressed Alcoholic, a family who lost
> their daughter on Sept 11, orphans I third world countries, and of
> course, myself, when I was a somewhat unruly teenager.  I wish I
> could tell all the stories of the peoples lives he has touched,
> whether they are in the U.S., Dubai, Australia, or anywhere else in
> the world.

*See* Letter of                      attached hereto as Exhibit 1, Letter 4.

His sister,            who "has been deeply involved in [her] brother's case . . not just
because he is [her] brother, but because of the deep love and respect [she has] for him," noted in
her letter that her brother's help had blossomed over time to include a whole range of things,
including "accounting help, match-making single friends & family, translating for [their]
grandparents, gathering used clothes for clothing drives at the local mosque, sending charity
money to poor relatives in Uzbekistan and beyond, or just massaging [their] mother's arthritic
legs" in addition to all of the other generous assistance he provided, that is described herein. *See*
Letter of                  (Exhibit 1, Letter 2).

The availability of public service and good works has been recognized since *Booker* as
both a downward departure ground, and/or a basis for a non-Guidelines sentence.  *See United
States v. Canova*, 412 F.2d 331, 358 (2d Cir. 2005).  Indeed, even under the pre-existing
mandatory Guidelines system, §5H1.11 (which discouraged certain departure grounds) did not
"absolutely" bar departures for public service and good works.  *See Canova*, 412 F.3d at 358.

In *Canova*, the Second Circuit affirmed a downward departure based on the defendant's
"public service and good works." *Id.,* at 358-59.  The Court in *Canova* also noted that the
sentencing court could, upon remand, re-calibrate the extent of the departure, or the reduction in
the sentence on a non-Guidelines basis, to arrive at the same sentence in light of the increased
Guidelines range applicable following the government's successful appeal of the District Court's
loss amount computation. *Id,.* at 359 & n.29.

Also, here, as in *Canova*, Mr. Hasanoff's good works have been authentic and long-
standing – an integral and defining feature of his life– and were not instigated and initiated only

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 47 of 54

after becoming the subject of a criminal investigation.  *Id*., at 358-59.[44]

### 3.    *Mr. Hasanoff's Role As a Mentor To Others*

Throughout his life, Mr. Hasanoff has also been a mentor to many – both within and outside of his family.

Mr. Hasanoff's brother,        explains, "[i]n our neighborhood in Brooklyn, the kids on the block, including many of my friends, looked up to my brother as a role model due to his success in his life."  *See*              Letter (Exhibit 1, Letter 4).

Similarly, his sister-in-law,            stated in her letter, that he "was a mentor to [her] brother and nieces and nephews [i]n deciding which path to take [i]n their careers.  Sabir was always informing them of the best schools or career paths they should focus on."  *See* Letter of        (Exhibit 1, Letter 29).

Mr. Hasanoff was also particularly instrumental in aiding                    , an Iraq War veteran that he lived next door to in Brooklyn for several years to re-acclimate to the U.S. after a 13-month tour in Baghdad, Iraq.  *See* Letter of              attached hereto as Exhibit 1, Letter 5.  Mr        struggled after he returned, was "drinking on a consistent basis," and it was Sabir who "gave [him] guidance and preached positivity to [him]."  *Id*.  But, Mr. Hasanoff did more than just talk to Mr.     .  He "assisted Mr.        ] in applying to Baruch, and gave [him] guidance" such that Mr.        was able to eventually graduate with an accounting degree.  *Id*.

Even while at MCC, Mr. Hasanoff has been regarded as a mentor.  Rev.             the                  states that "[t]he Religious Services Department sees Mr. Hasanoff [as] a positive model for other Muslim inmates, and prays that he continues to strive for excellence in faith."  *See* Letter of                attached hereto as Exhibit 1, Letter 40.

### 4.    *Mr. Hasanoff's Exemplary Reputation In His Field*

---

[44]  *See also United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (securities fraud and tax case in which a four-level departure for "good works" and sentence of probation was warranted due to defendant's exceptional" good works – "hands on personal sacrifices which have a dramatic and positive impact on the lives of others"); *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000) (community service and charitable works sufficiently "extraordinary and exceptional" to merit three-level downward departure.  Involved generosity of *time* and money); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (departure available for defendant's history of community service).

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 48 of 54

Mr. Hasanoff is also regarded universally by his peers as a hard worker, and one who has excelled in his career in accounting, at Pricewaterhouse Coopers (hereinafter "PwC") in both New York and Dubai, and in his other roles prior to that.

As evidenced by a July 1, 2006, letter from                        Mr. Hasanoff was recognized in 2006 "by both [his] peers and the leadership of [his] office as one of the local winners in the nomination process for the national Chairman' Award Program."  *See* Letter, attached hereto as Exhibit 11.  On a personal note, Mr.              added that he was "proud" of Mr. Hasanoff's professionalism and noted Mr. Hasanoff was "a great role model for [their] workplace." *Id.*  Accordingly, Mr. Hasanoff was vested with important responsibilities, and represented the company in many contexts.

For example, one former colleague and friend,                        recalls a presentation that Mr. Hasanoff did for Mr.              's boss,              of the royal family in          UAE.  Mr.              recalls that Mr. Hasanoff "was very professional and              was very impressed with his presentation on behalf of [PwC]."  *See* Letter of              attached hereto as Exhibit 1, Letter 30.

Another colleague,              who worked on a legal project that included "top NY attorneys and CPAs," including Mr. Hasanoff who was then at PwC in New York, stated that "[d]uring that time, [h]e got to know Sabir better than most colleagues [he'd] worked with" and that Mr. Hasanoff was "such a friendly personality and very intelligent" that he "would work with him again in a heartbeat."  *See* Letter of              attached hereto as Exhibit 1, Letter 6.

### G.  *Mr. Hasanoff Has Spent Three Years In Pre-Trial Confinement at MCC*

Mr. Hasanoff has been in custody since April 2010– first in the UAE, upon his arrest, where he was kept in inhumane and unsanitary conditions and exposed to tuberculosis (which, as a  result, he tested positive for upon his arrival in the U.S.,) and then, once he was returned to the U.S., at MCC, where the difficult conditions of pretrial confinement have been considered grounds for either a downward departure, or non-Guidelines sentence based on §3553(a)'s sentencing factors.  In addition, the prospect of Mr. Hasanoff being placed in a Communications Monitoring Unit upon designation by the Bureau of Prisons further compels accounting for the harsh *future* conditions of confinement in fashioning an appropriate sentence.

The harsh conditions at MCC have been observed by several courts.  *See, e.g., United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006).  *See also Bell v. Wolfish*, 441 U.S. 520 (1979);  *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y. 1986).  In *Behr*, the court noted that a judge had recently, "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]"  *Behr*, at * 5.  In light of the harsh conditions at MCC,

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 49 of 54

the defendant in *Behr* was sentenced to a non-Guidelines sentence. *Id.*

Mr. Hasanoff has been at MCC for three full years. For much of his time there, a Separation Order prevented him from participating in programs and religious services, as he could not be in the same location as his co-defendant. He was also housed on 9-North, a unit known to be one of the worst.

During his time at MCC, Mr. Hasanoff, also contracted a Methicillin-resistant Staphylococcus aureus (hereinafter "MRSA") infection. *See* Sabirhan Hasanoff's MCC medical records, attached hereto as Exhibit 12. MRSA is a bacterial infection that is dangerous because it is resistant to antibiotics. Moreover, medical literature on MRSA infections makes clear that overcrowded conditions where poor hygiene practices can proliferate increase the risk of contracting MRSA, and therefore inmates are at high risk for MRSA. *See* David, Micheal Z. and Daum, Robert S., Community-Associated Methicillin-Resistant Staphylococcus aureus: Epidemiology and Clinical Consequences of an Emerging Epidemic 23 (3), in Clinical Microbiology Review, at 616–687.[45]

Mr. Hasanoff's prolonged incarceration in harsh conditions warrants a non-guidelines sentence. Indeed, Judge Feinberg, concurring in *United States v. Melendez-Carrion*, 790 F.2d 1008 (2d Cir. 1986), commented that such lengthy pretrial incarceration is "rendered so harsh by its length that it . . . degenerate[s] into punishment." 790 F.2d at 1008 (Feinberg, J., *concurring*).

Even prior to *Booker*, courts held that pre-sentence confinement conditions could in appropriate cases constitute a permissible basis for a downward departure. *See United States v. Carty*, 264 F.3d 191 (2d Cir. 2001); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996). *See also United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

In *Carty*, 264 F.3d at 196, the Second Circuit recognized the validity of downward departures due to the conditions of pre-trial confinement. In *Carty*, the defendant was held for

---

[45] In addition to the infection Mr. Hasanoff contracted while at MCC, he also suffered while there from pre-existing conditions, including high cholesterol, *see* PSR at ¶ 68, and severe lower back pain that is likely the result of misaligned vertebrae, pinched nerves, and possibly also scoliosis, all of which Mr. Hasanoff was diagnosed with prior to his arrest. *See* Sabirhan Hasanoff's Dubai Medical Records, attached hereto as Exhibit 13.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 50 of 54

eight months in a prison in the Dominican Republic before extradition to the United States. 264 F.3d at 193.  In addressing the defendant's claim, the Circuit noted that "[t]he Sentencing Commission has not categorically proscribed consideration of this factor, and we cannot say that conditions of pre-sentence confinement may not be so severe as to take a particular case 'outside the heartland of the applicable Guideline.'" 264 F.3d at 196, *citing and quoting Koon v. United States*, 518 U.S. 81, 109 (1996).  *See also United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003) (citing *Carty*).  *Cf. United States v. Jayyousi*, 657 F.3d 1085, 1118  (11th Cir. 2011) (endorsing conditions of pretrial confinement as a basis for reducing a sentence below the Guidelines range, but finding the extent of the reduction unreasonable).

As a result, in *Carty* the Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure." 364 F.3d at 196.  *See also United States v. Hernandez*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs).[46]

Similarly, courts have also granted downward departures based on the severity of anticipated  *post*-sentence conditions of incarceration. *See, e.g.*, *United States v. Bruder (Schwarz)*, 103 F. Supp.2d 155 (E.D.N.Y. 2000);  *United States v. Volpe*, 79 F. Supp.2d 76 (E.D.N.Y. 1999).  *See also United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (remand to permit District Court to depart downward because defendant's status as deportable alien increased severity of confinement);  *United States v. Lara*, 905 F2d 599 (2d Cir. 1990) (affirming downward departure due to more restrictive confinement as a result of defendant's physical vulnerability).

Here, there exists the distinct possibility that Mr. Hasanoff could be designated to serve his sentence at the Communications Management Unit at either FCI Terre Haute or FCI Marion, at which a significant number of persons convicted of terrorism-related offenses are confined. *See, e.g.*, "Facility Holding Terrorism Inmates Limits Communication," *The Washington Post*, February 5, 2007, available at <http://www.washingtonpost.com/wp-dyn/content/article/2007/02/24/AR2007022401231.html>. Those conditions would be far more onerous than at an ordinary BoP facility, thereby justifying a shorter sentence to account for the enhanced hardship during the sentence itself. *See, e.g.*, Christopher S. Stewart, "'Little Gitmo,'" *New York Magazine*, July 10, 2011, available at <http://nymag.com/news/features/yassin-aref-2011-7/>;  Scott Shane, "Beyond Guantanamo, a Web of Prisons for Terrorism Inmates," *The New York Times*, December 10, 2011, available at

---

[46]  In *Carty*, the Circuit did not decide whether the defendant was entitled to the departure, but instead remanded the matter to the District Court for a factual determination in the first instance. 364 F.3d at 197.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 51 of 54

<http://www.nytimes.com/2011/12/11/us/beyond-guantanamo-bay-a-web-of-federal-prisons.html?pagewanted=4&n=Top/Reference/Times%20Topics/Subjects/I/Islam?ref=islam>.

The conditions of confinement to which Mr. Hasanoff has been and will be subjected to throughout the term of his sentence constitute an important factor, as their harsh nature makes each day of incarceration for Mr. Hasanoff more onerous, and, in effect, constitute more *punishment* than ordinary defendants suffer in ordinary cases.

In addition, defendants over 40 years of age present a dramatically reduced danger of recidivism.  As discussed **ante**, Mr. Hasanoff is nearly that age now, and will almost certainly be over 40 when he is released from prison  That fact, considered together with Mr. Hasanoff's long history as a productive member of society, effectively minimizes the need to protect the public from any further crimes by Mr. Hasanoff.  *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 ("[r]ecidivism rates decline relatively consistently as age increases," from 35.5% for those under age 21 to 9.5% for those over age 50) (available at <http://www.ussc.gov/publicat/Recidivism_General.pdf>.  *See also Nellum,* 2005 WL 300073, at *3 (N.D. Ind. 2005);  Daniel Glaser, *Effectiveness of A Prison and Parole System*, 36-37 (1964); P.B. Hoffman & J.L. Beck, *Burnout – age at release from prison and recidivism*," 12 J. Crim.Just. 617 (1984).

**H.      *Mr. Hasanoff Has Already Suffered Severe Consequences As a Result of His Actions and Further Punishment Is Not Necessary to Deter Future Criminal Conduct Nor To Protect the Public From Future Crimes of the Defendant***

Regarding deterrence, both general and specific, Mr. Hasanoff's wife,          as well as many other letter writers, describe in their letters the severe consequences that Mr. Hasanoff has endured as a result of his offense, and conviction, not the least of which has come in the form of his family's suffering and hardship. Mr. Hasanoff's wife,          states,

> [w]hen Sabir was arrested in Dubai I was 7 months pregnant and alone with 2 young children. I was threatened by Dubai authorities. . . . I was forced to fly back to the U.S. against my doctor's orders. . . . I had sever stress and anxiety as a result of Sabir's arrest and it caused me to give birth to my daughter prematurely.  My daughter          was in the NICU for other a week with breathing and feeding tubes and an IV. . . . Since her birth, she has been in the care of a neurologist, physical and speech therapists.  She has been seen by a cardiologist for an atrial spetal defect in her heart.  Just recently her pediatrician advised me to see an orthopedic doctor

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 52 of 54

>        because she might have scoliosis.  Up until his arrest I had a
>        perfectly healthy pregnancy and my husband's arrest not has
>        lifelong impact on my daughter's health and future.

*See* Letter of                         (Exhibit 1, Letter 3).  *See also*                         Medical
Records, attached hereto as Exhibit 14; Evaluations of                    , attached hereto as
Exhibit 15 (including evaluations from an Occupational Therapist, an educational evaluation, a
speech and language evaluation, and others, all of which demonstrate the need for further
therapy and delays in development); Letter of                .         Speech-Language Pathologist,
attached hereto as Exhibit 16; Letter of                  , MPST, attached hereto as Exhibit 17.

        In addition, Mr. Hasanoff's two other children,          , 9, and          6, are in treatment for
separation anxiety and adjustment issues, as a result of their father's incarceration, which
                            the social worker who treats them, has described as a "traumatic" event in
their lives, given the fact that          and          were so close to their father before his arrest.  *See*
Letter of                          LCSW , attached hereto as Exhibit 18.  Family members, too,
have observed the toll Mr. Hasanoff's incarceration has taken on his children.  Mr. Hasanoff's
sister-in-law,                    , stated in her letter, "[t]he past two years have affected them
tremendously.  His son          is lost without a father. . . His eldest daughter          has also
suffered . . . She does not like to hug or feel close with anyone." *See*                    Letter
(Exhibit 1, Letter 36).  Mr. Hasanoff's brother-in-law, Dr.                 commented in his
letter, "I try to fill the void by helping with [Sabirhan's] kids, but it is not the same. . . . I see the
affect his arrest has had on his family every single day." *See* Letter of Dr.                 .(Exhibit
1, Letter 8.

        Indeed, Mr. Hasanoff's wife notes that it has been a "heart wrenching thing" to suffer
these hardships, "and even worse without [her] husband at [her] side." *See* Letter of
         (Exhibit 1, Letter 3).  It is equally difficult for Mr. Hasanoff to be away from his
family, and not to be able to care for them, especially given that it is his incarceration that has
led to their suffering, and his as well.

        Mr. Hasanoff's offense and conviction, have cost him not only the ability to care for his
family and to be with them, but also the ability to provide for them financially.  As a result of his
conviction, Mr. Hasanoff has lost his CPA license, and therefore his livelihood and income.  Nor
will he ever be able to return to his career upon his release, which as his former co-worker
         explains, "is significant punishment for someone like Sabir who has worked so hard to be
accomplished in his field" and thus that "further punishment do[es] not accomplish anything at
this point." *See*                 Letter (Exhibit 1, Letter 6).

        It is clear that the punishment Mr. Hasanoff has already suffered – loss of his business,

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 53 of 54

destitution, leaving his family without economic support, and physical and mental hardship to his loved one – in addition to any sentence the Court will impose, is more than sufficient to deter Mr. Hasanoff from any future criminal conduct, and to deter others who might contemplate similar conduct.

**III.**   *Mr. Hasanoff's Objections to the PSR*

Mr. Hasanoff raises several objections to the final PSR including that:

● the PSR states Mr. Hasanoff is subject to an ICE detainer.  As noted subsequently in the PSR, however, Mr. Hasanoff is a naturalized U.S. citizen.  *See* Naturalization Certificate and U.S. Passport (Exhibits 2 and 3);

● the PSR only mentions Mr. Hasanoff's U.S. citizenship.  He is, in fact, a dual citizen of both the U.S. and Australia;

● the PSR lists Mr. Hasanoff's race as "white."  He is, technically, Asian, and was born in China.;   and

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
May 17, 2013
Page 54 of 54

- the PSR indicates at ¶ 7 that Mr. Hasanoff's co-defendant, Wesam El-Hanafi, pled guilty March 27, 2012, before Mr. Hasanoff.  In fact, Mr. El-Hanafi pled guilty *after* Mr. Hasanoff did so.


### Conclusion

Accordingly, for all the reasons set forth above, it is respectfully submitted that Mr. Hasanoff should be sentenced to a term of imprisonment substantially below the the statutory maximum sentence of 20 years' imprisonment (as well as his Guidelines range) and commensurate with the PSR's recommendation of 13 years, which constitutes a reasonable sentence in this case.

Respectfully submitted,

Joshua L. Dratel

JLD/lal
Encls.

cc:    John Cronan
       Glen Kopp
       Aimee Hector
       Michael Lockard
       Assistant United States Attorneys
       (By Electronic Mail)