LAW OFFICES OF

# JOSHUA L. DRATEL, P.C.

A PROFESSIONAL CORPORATION
29 BROADWAY, SUITE 1412
NEW YORK, NEW YORK 10006

---

TEL (212) 732-0707
FAX (212) 571-3792
E-Mail: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL
—
LINDSAY A. LEWIS

STEVEN WRIGHT
*Office Manager*

June 10, 2013

**BY HAND**

**FILED UNDER SEAL**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

        Re:   *United States v. Hasanoff*,
                S7 10 Cr. 162(KMW)

Dear Judge Wood:

      This letter constitutes the reply sentencing submission on behalf of defendant Sabirhan Hasanoff, whom I represent in the above-entitled case, and is respectfully submitted under seal because of information included herein that has not been made public.[1] Much of the government's May 31, 2013, sentencing submission was addressed in my May 17, 2013, letter (Mr. Hasanoff's sentencing submission), and therefore does not require rejoinder.

      As a result, this reply will simply highlight particular flaws in the government's submission. Ultimately, while the government maintains in its submission, at 1, that Mr. Hasanoff's conduct implies a United States Sentence Guidelines range of 360 months to life in prison – a sentence well in excess of the statutory maximum here of 20 years in prison" and that "[i]t is that sentence that should be imposed[,]" a close examination of Hasanoff's conduct in this case demonstrates that a sentence significantly below Mr. Hasanoff's Sentencing Guidelines range and the statutory maximum sentence of 20 years' imprisonment, commensurate with the recommendation of 13 years' imprisonment in the Pre-Sentence Report (hereinafter "PSR"), and

---

[1] We intend to publicly file a redacted version of this letter prior to Mr. Hasanoff's sentencing.

LAW OFFICES OF
# JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 2 of 13

which takes into account the factors set forth in 18 U.S.C. §3553(a), constitutes the appropriate sentence in this case.

I. *The Government Vastly Overstates and Mischaracterizes Mr. Hasanoff's Conduct Related to His "Surveillance" of the New York Stock Exchange*

The constant refrain in the government's submission that Mr. Hasanoff's "surveillance" of the New York Stock Exchange ("NYSE") warrants the maximum sentence of 20 years' imprisonment is a prime example of the tail wagging the dog given that this conduct has been known to the government since the inception of this case, but was never charged. Moreover, while the government claims, at 2 of its submission, that Mr. Hasanoff "now makes excuses for this appalling and dangerous conduct," in fact, Mr. Hasanoff merely seeks to place this conduct in its proper context. Herein, Mr. Hasanoff also seeks to correct a number of misleading statements contained in the government's submission regarding Mr. Hasanoff's conduct in relation to that incident and as to the          .

A. *Mr. Hasanoff Never Had Any Direct Conduct With "Suffian" or "the Doctor"*

The government asserts, at 19 of its submission, that "the Doctor . . . reported that he received information concerning the New York Stock Exchange from Hasanoff following [Mr. Hasanoff's February 2008] trip [to the U.S.]" and includes an email, at 20 of its submission, that Mr. Hasanoff allegedly wrote to "Suffian." In fact, however, Mr. Hasanoff *never* communicated directly with either "Suffian" or "the Doctor" by email, phone, in person, or any other means. Rather, all communications between Mr. Hasanoff and either of the          were through Mr. Hasanoff's co-defendant, Wesam El-Hanafi, in part because Mr. Hasanoff does not speak          , and he was under the impression that neither of the          spoke English. Thus, even the August 4, 2008 email alleged to have been from Mr. Hasanoff to "Suffian, would have been composed and sent by Mr. El-Hanafi, not Mr. Hasanoff.

B. *Mr. Hasanoff Never Sent a Report to the          Regarding the NYSE*

Accordingly, for the reasons set forth **ante**, the government also incorrectly asserts, at 21 of its submission, that Mr. Hasanoff "sent the Doctor a report of his surveillance of the New York Stock Exchange." Mr. Hasanoff never sent any report to either of the          .

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 3 of 13

Thus, the report allegedly submitted to the          was written and sent by Mr. El-Hanafi, not Mr. Hasanoff.

       C.    *The Report Was Rejected Wholesale by the          As Useless and "Silly"*

In addition, while the government includes in a parenthetical, at 21 of its submission, that "the report lacked sufficient detail about the New York Stock Exchange security matters to be as helpful as the Doctor had hoped," even this vastly overstates the utility of the information provided.

As set forth in Mr. Hasanoff's initial sentencing submission, at 30, according to the FBI Form 302's (hereinafter "302's") of "Suffian" and "the Doctor," the information provided to the          by Mr. Hasanoff, through his co-defendant, Mr. El-Hanafi, was "'silly' and simple information on the NYSE" and given its complete lack of utility, "Suffian" remarked that "['the Doctor'] probably burned the report and 'warmed his hands with it,' and did not transmit it to any one." *Id.*, at 1149-50.

Indeed, this is consistent with Mr. Hasanoff's statement in his letter to the Court that

> I did supply the          with some very basic information about the NYSE but deliberately provided nothing beyond what anyone could have learned from GoogleEarth, a tourist map or a brochure. I was never going to provide anything useful and, had I been pressed for more, would have said no.

*See* Letter of Sabirhan Hasanoff, at 5 (attached hereto as Exhibit 1).[2]

---

[2] As Mr. Hasanoff also makes clear in his letter, "there was no further discussion of surveillance of the NYSE or any other U.S. tourist sites after August 2008, when that incident occurred, which was about 20 months before my arrest." *See* Hasanoff Letter, at 5 (Exhibit 1).

LAW OFFICES OF
## JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 4 of 13

**D.    *Mr. Hasanoff Did* Not *Travel to the U.S. to "Case"
the NYSE But Rather for a Legitimate Business Purpose***

Although the government contends, at 2 of its submission, that Mr. Hasanoff "traveled to New York from the United Arab Emirates and – at the direction of a senior terrorist leader – cased the New York Stock Exchange," in fact, Mr. Hasanoff traveled to New York for the purpose of pursuing a legitimate business venture, and did not even learn that the              wanted him to conduct surveillance of tourist sites until *after* he was in the U.S.

As Mr. Hasanoff explained           he went to the U.S. because "he was involved in a potential business proposition to build a luxury high-rise building in Dubai with Ralph Lauren."              Mr. Hasanoff had "asked through Wesam [El-Hanafi], if he could get anything for the           guys while he was there." *Id.*[3]  Thus, it was *while Mr. Hasanoff was in the U.S.* that he learned through Mr. El-Hanafi that the              wanted him to "check out some tourist sites." *Id.* Accordingly, Mr. Hasanoff was never "directed to the Wall Street area" and visited the NYSE only because he had "attended a meeting in the Wall Street area of New York" in order "to pitch the idea for the building" to individuals associated with              .

**E.    *Mr. Hasanoff Never Swore* Bayat *To "the Doctor" Or al Qaeda***

Moreover, contrary to the government's claim, at 16 of its submission, Mr. Hasanoff never swore *bayat* to "the Doctor." It is clear from the government's submission that its assertion that such an event took place is based on multi-level hearsay and pure speculation by "the Doctor," *i.e.*, when "the Doctor learned that Hasanoff and the CW affirmed that they were 'with' the Doctor . . . the Doctor understood [this] to mean that Hasanoff and the CW had sworn *bayat* to him through El-Hanafi."

Indeed, since it had been "arranged that the Doctor's future communication with El-Hanafi would be through Suffian" (*see* government submission at 16), the information upon which "the Doctor" concluded that Mr. Hasanoff had sworn *bayat* did not even come directly from Mr. El-Hanafi (let alone Mr. Hasanoff), but passed through "Suffian," as well, on its way to the Doctor. Thus, there is no credible evidence that Mr. Hasanoff swore *bayat* to "the Doctor."

Likewise, the government's assertion, at 10, that Mr. Hasanoff swore allegiance to *al Qaeda* is also suspect because it is based on a claim by the CW,              , that "Hasanoff

---

[3] Mr. Hasanoff was referring to material goods, such as apparel, which he had previously obtained for the           while in the U.S.

LAW OFFICES OF
# JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 5 of 13

and El-Hanafi revealed to the CW that upon El-Hanafi's return from ▓▓▓▓ (and consistent with the instructions El-Hanafi received in ▓▓▓), Hasanoff sworn (sic) allegiance to al Qaeda through El-Hanafi." *Id.* Notably, the CW does not claim to have witnessed Mr. Hasanoff swearing *bayat* to *al Qaeda*, nor even to El-Hanafi. Thus, the assertion that Mr. Hasanoff swore allegiance to *al Qaeda* is based entirely on hearsay, is not corroborated, and should be entirely disregarded.

### F.      The ▓▓▓▓ Were Not Members *of* al Qaeda

Despite the fact that the government repeatedly states in its submission that Mr. Hasanoff "provided extensive support to al Qaeda" and performed "work for al Qaeda," *see, e.g.,* government submission at 2, these statements are misleading. *Regardless* what Mr. Hasanoff may have believed, Mr. Hasanoff never provided any support to *al Qaeda*.[4] In fact, ▓▓▓ "the Doctor" explicitly "advised that he was not a member of Al-Qa'ida." *See* 302, at 1166. Furthermore, as "Suffian" stated, in his 302, and is explained in greater detail in Mr. Hasanoff's initial submission,"[the Doctor's] plan was to take the Americans' money" for his own personal use, not that of any terrorist organization. *See* "Suffian" 302, at 1150.

### II.     *The Government Cannot Cure the Confrontation and Related Issues With Regard to the Statements Made by the ▓▓▓▓ Detainees, and Therefore the Government Should Not Be Permitted to Use, and the Court Should Not Consider, the FBI Form 302's of the Interviews of the ▓▓▓▓ at Sentencing*

The government, in its submission, makes several assertions apparently intended to overcome the constitutional issues implicated the FBI Form 302's of the interviews of "Suffian" and "the Doctor" that Mr. Hasanoff identified in his initial submission, and which preclude their use at Mr. Hasanoff's sentencing. As set forth herein, and in Mr. Hasanoff's initial submission, at 22-28, the Court should not consider these interviews at sentencing because, despite the government's arguments (a) there are not sufficient indicia of reliability to permit them to be considered at sentencing; (b) the ▓▓▓▓ detainees cannot be produced to testify, and therefore cannot be cross-examined, thus denying Mr. Hasanoff his Sixth Amendment right to confrontation; and (c) ▓▓▓▓'s sordid history and reputation with respect to torture and

---

[4] In addition, while the government includes in its submission, at 14, and n.11, that "Suffian did not know if the advanced remote and receiver [Hasanoff sent Suffian] in fact were ever sent to Somalia" and that "[t]hese items were taken so that they could be sent to the *mujahidin* in Somalia" it should be noted that at the time these items were allegedly sent, in late 2008, there were no U.S. troops in Somalia and Somalia was engaged in a nearly 20-year *civil* war.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 6 of 13

maltreatment of prisoners renders the information from the _____ detainees inherently unreliable.

  A. *The Government's Attempt to Set Forth the Information Provided By "Suffian" and "the Doctor" In "Great Detail to Demonstrate That Their Respective Accounts Corroborate Each Other" Does Not Establish Constitutionally Sufficient Indicia of Reliability*

The government states at 11 n. 9, of its submission, that it "sets for[th] the information provided by Suffian and the Doctor in great detail to demonstrate that their respective accounts corroborate each other" in response to the fact that "the Defense has urged the Court not to consider the information provided by Suffian and the Doctor because it is 'unreliable.'"

Corroboration, however, does not provide the necessary indicia of reliability for the type of statement made by the _____ detainees, and *Crawford v. Washington*, 541 U.S. 36, 61-69 (2004), rejects the notion established in *Ohio v. Roberts*, 488 U.S. 56 (1980), that mere corroboration, or in fact anything other short of confrontation, i.e., cross-examination, can satisfy constitutional demands where testimonial statements, such as those of "Suffian" and "the Doctor," are at issue.

Indeed, in *Crawford*, the Supreme Court explicitly stated, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.*, at 68-69. Thus, the government's assertions in footnote 9 are without merit.

  B. *That the Statements of the _____ Detainees Lack Credibility Because the Detainees Were Likely Tortured While In Custody In _____ Is Not "Pure Speculation" Given _____'s Reputation With Respect to Torture As Confirmed By the U.S. State Department*

The government claims, at 42 of its submission, that the statements of "Suffian" and "the Doctor" should not be discounted on the basis that these individuals may have been tortured while in custody because Mr. Hasanoff "provides nothing beyond pure speculation as to whether these particular detainees (the Doctor and Suffian) were in fact tortured."

However, to the contrary, Mr. Hasanoff's concern that the _____ detainees were tortured is based on an extensive Country Report, issued by the U.S. Department of State, a 2010 Amnesty International Report, and a report by _____ Civil Society Organizations on _____'s Compliance with the Convention against All Forms of Torture and Other Forms of Inhuman and Degrading Treatment, all of which are described in Mr. Hasanoff's initial sentencing submission

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 7 of 13

at 25-28, and for which document links are therein provided.

Thus, since a *Fatico* hearing at which it would be determined whether these detainees were in fact tortured is impossible in this case, and given the prevalence of torture in          , there should not be any presumption of regularity in this case.

### III. *Mr. Hasanoff Has Demonstrated Remorse and Full Acceptance of Responsibility*

In an apparent effort to undermine the Probation Department's well-reasoned analysis and recommended sentence of 13 years' imprisonment, which the government states (at 28 of its submission) it "strongly disagrees with," the government focuses on observations contained in the PSR that: (1) "because Hasanoff declined to provide a statement at the time of his presentence interview, [the Probation Department is] 'unaware of his motivation to commit the instant offense;'" (2) "'during his plea allocution, Hasanoff recited the minimum requirements for an acceptable plea to the Court;'" and   (3) "'[b]ecause of his lack of candor, lack of any expression of remorse or an explanation for his motivation, [the Probation Department] do[es] not believe that Hasanoff has fully accepted responsibility for his actions.'" *See* Government Submission, at 27-28, *quoting* PSR at 21-22.

It should be noted that despite these "observations," the Probation Department nonetheless concluded that a sentence of 13 years' imprisonment – well-below the maximum sentence allowable – was the appropriate sentence in this case, and that Mr. Hasanoff *has* demonstrated significant remorse, as well as full acceptance of responsibility, throughout this process,                          , and in his letter to the Court, which is attached hereto as Exhibit 1, and quoted herein.

Indeed, in Mr. Hasanoff's letter he makes a number of powerful statements demonstrating his full recognition of his role in the offense, and responsibility for his actions. He states

> [a]s best I can explain it, a sense of guilt at living a comfortable life, and not somehow acting on my beliefs and standing up for fellow Muslims, led me, step-by-step, to start making plans to go and fight for my faith and my community . . . I was certainly influenced by radical clerics, and sermons by people such as the American, Anwar Alaki, but I made my own decisions. As I said earlier, I blame no one for this but myself.

*See* Letter of Sabirhan Hasanoff (Exhibit 1), at 4.  He also adds,

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 8 of 13

> [t]he fact that I stand to lose a significant portion of my adult years, my children' growing up years, and the simple opportunity to participate in the affairs of a free society is my fault and my fault alone. I blame no one else.

*Id.*, at 1.

In full appreciation and awareness of the wrongheadedness of his motivations and offense conduct, Mr. Hasanoff "reject[s] violence" and renounces "any interpretation of Islam that would condone or approve of violent or terrorist acts," stating, "I am glad of only one thing, that it got no further than it did. Violence is no answer. I completely renounce any view of Islam that says that violent jihad is in any way acceptable." *Id.*, at 1, 4.

Mr. Hasanoff also acknowledges that his offense conduct requires punishment. In his letter he admits, "I understand the need for punishing me and for deterring others from doing what I did." *Id.*, at 5. Ultimately, however, Mr. Hasanoff expresses not only full acceptance of responsibility, but, in his discussion of           's death (which he learned of from the government's May 31, 2013, submission), relief that his "actions never went that far." *Id.*, at 5-6. Mr. Hasanoff states,

> 's death brought home to me powerfully the ultimate consequences of what I was considering, and the impact on my family. I know you are going to sentence me to time in prison, and I have to live with the fact that I am responsible for doing that to my family. But, when I think that I was making any effort towards possibly putting myself in           's position, I am relieved that I was arrested.

*Id.*, at 5.

In addition, Mr. Hasanoff's failure to discuss his offense conduct at his Probation interview should not be held against him. It is counsel's standard practice to submit a separate letter to the Probation Officer in regard to offense conduct, and we advised Mr. Hasanoff not to discuss offense conduct in light of the fact that we planned to submit such a letter. The fact that a letter regarding his offense conduct was not submitted to the Probation Office was counsel's oversight, and Mr. Hasanoff should not be blamed.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 9 of 13

IV. *The Notion That Terrorism Cases Require Maximal Deterrence Is Entirely Unfounded, and Mr. Hasanoff Should Not Be Sentenced To the Maximum Term of 20 Years' Imprisonment On That Basis*

The government contends in its submission that Mr. Hasanoff "should be sentenced to "the statutory maximum here of twenty years in prison" because "[t]errorism is a crime that requires maximal deterrence." *See* Gov't Submission at 1-2, *citing United States v. Meskini.* 319 F.3d 88, 93 (2d Cir. 2003). Neither sentencing statistics nor the statutes of conviction support this theory.

Mr. Hasanoff's offenses of conviction, 18 U.S.C. §2339B and 18 U.S.C. §371, each carry a range of sentencing options, from *probation* to the maximum sentence of 15 years and 5 years, respectively, thus debunking the notion – in particular as to §2339B – that a terrorism-related conspiracy conviction requires maximal deterrence.

Likewise, the catalogue of sentences in terrorism cases (*see, e.g.,* Mr. Hasanoff's initial submission at 31-40) demonstrates in both theory and practice that such cases and defendants do not require a maximal sentence for deterrence purposes.[5] Indeed, there is not a single study or statistic that indicates that sentences of a particular length – much less a sentence of 20 years' imprisonment – are a more effective deterrent in terrorism cases than sentences that do not reach that length.

---

[5] The following cases should also be added to that list:

- Mohamed Ibrahim Ahmed, who received a sentence of 63 months' imprisonment in the Southern District of New York, pursuant to a guilty plea, and whom the government alleged "had received bomb-making instructions from a[n] [*al*] *Shabab* explosives expert, had donated money to the group and had bought an AK-47 assault rifle and two grenades to be used in fighting on its behalf" (*see In U.S. Court, A Familiar Argument Over Intentions In Joining a Terrorist Group*, New York Times, March 27, 2013, available at http://www.nytimes.com/2013/03/28/nyregion/mohamed-ibrahim-ahmed-sentenced-in-terrorism-case.html?_r=0); and

- Nima Ali Yusuf, who received a sentence of eight years' imprisonment in the Southern District of California, for conspiring to provide material support to *al Shabaab* (*see San Diego Woman Sentenced For Providing Support to Foreign Terrorists*, FBI Press Release, December 11, 2012, available at http://www.fbi.gov/sandiego/press-releases/2012/san-diego-woman-sentenced-for-providing-support-to-foreign-terrorists).

LAW OFFICES OF
# JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 10 of 13

**V.      *Unconsummated Offenses Do Historically Warrant Lower Sentences***

While the government seeks, at 39 of its submission, to undermine the Second Circuit's stated position in *United States v. Stewart*, 590 F.3d 93, 139 (2d Cir. 2009), that a sentencing court can reasonably consider the absence of harm or injury when determining a just sentence, and also Judge Calabresi's concurring opinion that "it is not at all unprecedented for a district court to consider lack of harm relevant to sentencing in a terrorism case," *id.*, at 156, n.6, the government's argument rests on Judge Walker's opinion in that case. However, Judge Walker was in the minority in *Stewart*. The majority opinion and concurring opinions in that case are discussed in detail in Mr. Hasanoff's initial submission, at 15-22.

**VI.     *The Terrorism Enhancement Does Not Accurately
Reflect the Risk of Recidivism In Mr. Hasanoff's Case*[6]**

The government claims, at 33-34 of its submission, that the terrorism enhancement which raises Mr. Hasanoff's Criminal History Category to Level VI "accurately reflects his risk of recidivism in this case," and quotes *Stewart*, 590 F.3d at 143, for the proposition that "the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] §3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism[.]"

The government's contentions lack even the slightest empirical support. Nor does the case citation following, making the same claim, anter the fact that there is *zero evidence* for such an assertion.

Sentencing simply cannot be based on fictional popular notions that lack any factual foundation. The same is true with respect to deterrence, as explained **ante**. Indeed, as is the case with respect to deterrence, there is no single study or statistic that indicates that sentences of a particular length are more effective with regard to reducing recidivism, than sentences that do not reach that length.

---

[6] Also with regard to Criminal History Category ("CHC"), it should be noted that the government's point, at 33 n.17, that Mr. Hasanoff is precluded by his Plea Agreement from arguing for a downward departure based on his CHC, is correct. Mr. Hasanoff's argument with regard to his CHC is made under 18 U.S.C. §3553(a), and is not a downward departure argument. We apologize for any imprecision in our papers.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 11 of 13

### VII. The Government's Forfeiture Estimate is Too High

The government, at 32 n. 16, "estimates the total amount of forfeiture for Hasanoff and El-Hanafi to be $70,000, for which Hasanoff and El-Hanafi should be jointly and severally liable." Mr. Hasanoff contests the government's forfeiture estimate on the basis that it includes an additional $23,500 which did not come from either Mr. Hasanoff or his co-defendant, Mr. El-Hanafi, but was instead contributed by the CW,                      . The amount of $23,500 is comprised of two separate contributions from Mr.              for $17,000 and $6,500, respectively.

It should also be noted that

Mr.            s contributions are underestimated (                      includes the $6,500 as part of the $17,000, rather than as a separate amount beyond the $17,000 that Mr. contributed).

Accordingly, when Mr.              's contribution of $23,500 is deducted from the total forfeiture amount estimated by the government, Mr. Hasanoff and Mr. El-Hanafi would properly be jointly and severally liable for $46,500, not $70,000.

### VIII. *It Is Respectfully Submitted that the Court Should Provide a Judicial Recommendation to the Bureau of Prisons That Mr. Hasanoff Be Designated to* FCI Otisville

Pursuant to Mr. Hasanoff's term of imprisonment, we respectfully urge the Court to provide a judicial recommendation to the Bureau of Prisons that Mr. Hasanoff:

- be designated to FCI Otisville's medium-security facility in upstate New York,[7] to facilitate meaningful family visitation and, importantly, his continued involvement with the lives of his children who have experienced severe emotional hardship as a result of their father's incarceration.[8] *FCI Otisville* is well suited to manage the security

---

[7] *FCI Otisville* would be an ideal facility in which Mr. Hasanoff can benefit from the goals associated with a term of incarceration. It is close enough to his home and family to allow for regular and supportive contact with family members              , and will go far in keeping the children close with their father for the sake of stable and healthy emotional development for Mr. Hasanoff's six-year-old and nine-year-old.

[8] The letters, enclosed with Mr. Hasanoff's initial submission, from three of Mr. Hasanoff's family members and additionally from              who has been treating Mr. Hasanoff's young children for emotional complications and developmental issues arising from

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 12 of 13

considerations of the BoP regarding the circumstances of Mr. Hasanoff's offense, with the added beneficial support of meaningful family visitation to assist in a successful rehabilitative outcome to his period of incarceration;

- not be designated to one of the two BoP "Communication Management Units" (CMUs) given that case circumstances and the defendant's particulars do not require that level of added security – and that the medium-security facility at Otisville, NY will clearly provide the requisite security status and level of supervision;[9]

- eventually be transitioned back to the community through a Residential Re-Entry Center for the maximum period allowed under the law.[10]

---

lack of routine access and interaction with their father are also relevant to the designation issue.

[9] Of note, Mr. Hasanoff's behavior throughout his stay at the MCC has been consistently exemplary and provides a reliable indicator of his adjustment to incarceration thus far, as well as logical reasoning for the approval of *FCI Otisville* for designation placement, rather than a CMU placement which does not at all appear necessary. *See* Discipline Data for Sabirhan Hasanoff as of June 5, 2013, attached hereto as Exhibit 2, indicating the lack of *any* discipline data for Mr. Hasanoff.

[10] Pursuant to the provisions and spirit of H.R. 1593, The Second Chance Act of 2008.

LAW OFFICES OF
# JOSHUA L. DRATEL, P.C.

Hon. Kimba M. Wood
United States District Judge
Southern District of New York
June 10, 2013
Page 13 of 13

### Conclusion

Accordingly, for all the reasons set forth above, as well as those set forth in my May 17, 2013, letter, it is respectfully submitted that Mr. Hasanoff should be sentenced to a term of imprisonment significantly below his Sentencing Guidelines range and the statutory maximum sentence of 20 years' imprisonment, and commensurate with the recommendation of 13 years' imprisonment in the PSR, which represents a reasonable sentence in this case, and that the Court recommend that Mr. Hasanoff be designated to *FCI Otisville* so that he can be as near as possible to his family.

Respectfully submitted,

Joshua L. Dratel

JLD/lal
Encl.

cc: John Cronan
Glen Kopp
Aimee Hector
Michael Lockard
Assistant United States Attorneys
(By Electronic Mail)