1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          10 CR 162 (KMW)

5  SABIRHAN HASANOFF,

6                 Defendant.

7  ------------------------------x

8                                      New York, N.Y.
                                       September 30, 2013
9                                      10:08 a.m.

10

   Before:
11
                           HON. KIMBA M. WOOD,
12
                                      District Judge
13

14                           APPEARANCES

15

   PREET BHARARA,
16      United States Attorney for the
        Southern District of New York
17 BY:  JOHN P. CRONAN
        AIMEE HECTOR
18      GLEN KOPP
        Assistant United States Attorneys
19
   JOSHUA L. DRATEL
20 LINDSAY A. LEWIS
   DAVID A. RUHNKE
21      Attorneys for Defendant

22
   ALSO PRESENT:  Jessica Bondy, Intern with AUSA Office
23

24

25

```
 1                (In open court)

 2                (Case called)

 3           MR. CRONAN:  Good morning, your Honor.  John Cronan

 4    for the government.  I'm joined by Assistant U.S. Attorneys

 5    Aimee Hector and Glen Kopp and by Jessica Bondy, who is an

 6    intern in our office.

 7           THE COURT:  Thank you.

 8           MR. DRATEL:  Good morning.  Joshua Dratel for

 9    Mr. Hasanoff.  Mr. Hasanoff is seated to my left.  David Ruhnke

10    and, from my office, Lindsay Lewis.

11           THE COURT:  Good morning.  And good morning,

12    Mr. Hasanoff.

13           THE DEFENDANT:  Good morning.

14           THE COURT:  We are here today for Mr. Hasanoff's

15    sentencing.  I'd like to begin by asking defense counsel, have

16    you and your counsel had an adequate opportunity to review the

17    presentence report?

18           MR. DRATEL:  Yes, we have, your Honor.

19           THE COURT:  Do you wish any changes made to it, other

20    than those you've noted in your letter?

21           MR. DRATEL:  The only possible addition is that at the

22    time the presentence report was prepared, the financial

23    disclosure forms had not been completed.  They have since been

24    completed, and we've been in contact with the probation

25    officer, Dawn Dolito, who is ready to amend the report to
```

```
1   include those, if the Court wishes.

2              THE COURT:  Well, I need to know that today.

3              MR. DRATEL:  Yes.

4              THE COURT:  Do you have a copy of the financial

5   affidavit?

6              MR. DRATEL:  Yes.

7              MS. LEWIS:  Yes, your Honor.  I believe Dawn Dolito

8   has also seen these and has acknowledged the inability to pay

9   through the evidence and has offered to amend the report at the

10  Court's discretion.  Would you like us to pass this?

11             THE COURT:  Has the government seen this?

12             MR. CRONAN:  We have not, your Honor.

13             THE COURT:  The government needs to see it before you

14  hand it up to me.

15             (Pause)

16             MR. CRONAN:  Your Honor, should we hand it up?  Just

17  quickly looking at that material, your Honor, we have no reason

18  to think any of that is inaccurate, but again, this is the

19  first time the government has seen all of that.

20             THE COURT:  It would appear that Mr. Hasanoff has the

21  ability to forfeit an amount that the government seeks in its

22  forfeiture, or that could be characterized as a fine, because

23  his assets include Jumeirah Lake Towers, Dubai, United Arab

24  Emirates, what appears to be an apartment valued at $90,000.

25             He also has other real estate, a car and money in a
```

1  checking account in Dubai, where the balance is approximately

2  $49,000.  I'm not stating all of his assets.  I'm just stating

3  what I take away from my quick look at these documents.  Is

4  that roughly correct, Mr. Dratel?

5            MR. DRATEL:  One second, your Honor.  The bank

6  account -- My understanding is the money in the bank has been

7  exhausted in legal fees for the last couple of years that this

8  case has proceeded.  The apartment is Dubai is his wife's

9  apartment, in his wife's name.  His asset, the asset in

10  Mr. Hasanoff's name is a home jointly owned with his mother in

11  Queens, and that's the sole asset that he has.

12            THE COURT:  And the apartment in Dubai was bought with

13  what funds?

14            MR. DRATEL:  Some of it was Mr. Hasanoff's.  Primary

15  deposit was from his wife.

16            THE COURT:  I'm sorry, I don't follow.

17            MR. DRATEL:  Some of the money was from Mr. Hasanoff,

18  but much of it was from his wife's money used to pay for the

19  apartment.

20            THE COURT:  And the source of his wife's money?

21            MR. DRATEL:  Her savings from her work.

22            THE COURT:  All right.  Roughly how much was

23  Mr. Hasanoff's money?

24            MR. DRATEL:  40,000, Mr. Hasanoff; 50,000, his wife.

25            THE COURT:  Okay.  Thank you.  Is there anything else

1    you'd like to correct or add to the presentence report?

2              MR. DRATEL:  Other than what has -- No.  Other than

3    what's in our papers, no.

4              THE COURT:  Thank you.  I have carefully reviewed your

5    entire submission, Mr. Dratel, along with the typed personal

6    statement from Mr. Hasanoff and the enormous number of letters

7    from his supporters who paint a picture of him pre-crime as a

8    charitable, loving, good family man.

9              I'd be glad to hear anything that you and your client

10   wish to say with respect to sentencing, but before that, I have

11   one question for the government.  The government seeks the

12   statutory maximum in this case, where Mr. Hasanoff, as we know,

13   pled guilty.  I have reviewed your summary of other sentences

14   where similarly situated defendants pled guilty, many of whom

15   were given the statutory maximum.

16             Does that leave any incentive for a person to plead

17   guilty, if I were to sentence at the statutory maximum?

18             MR. CRONAN:  Well, I believe it does, your Honor.  As

19   you know, in this case, the original charges were four counts;

20   two material support to Al-Qaeda counts, one is conspiracy, one

21   is substantive, and then two IEEPA counts that, I believe, with

22   IEEPA having a statutory max of 20 years, would have had a

23   total statutory max of 70 years in this case.

24             Here, the defendant pled guilty to an information that

25   was a max of 20 years.  I think even not withstanding our

1    request to statutory maximum, there certainly would be

2    incentive for a defendant to accept responsibility in advance

3    of trial.

4           THE COURT:  All right.  Thank you.  At this point,

5    Mr. Dratel, I'd be glad to hear anything that you and your

6    client wish to say.

7           MR. DRATEL:  Thank you, your Honor.  And I'm not going

8    to go through the entirety of our submissions.  I know you've

9    read it and are familiar with it.  I just want to concentrate

10   on a couple of things.  Mostly, as the Court alluded to in

11   terms of the letter, the type of person that Mr. Hasanoff is

12   outside of the conduct at issue here, the offense conduct.

13          And I think it's important for a couple of reasons,

14   one of which is that in these types of cases, usually the Court

15   is presented with two types of defendants.  There are

16   defendants who have not acknowledged more than just the offense

17   conduct.  They are defiant, committed, unrepentant, on a

18   certain level, philosophically, in terms of what they've done

19   and the impact on others, on their family.

20          This is very different.  This is someone who has not

21   only acknowledged his guilt, in terms of the crime, but also

22   has acknowledged that he was wrong and understands why he was

23   wrong and has demonstrated his remorse, not only pleaded guilty

24   but, also, he was prepared to plead guilty very early on in

25   this case.  We just could not reach an agreement until further

1    down the road.

2           In fact, he agreed to plead guilty when it was one

3    count at 20 years; so -- 15 -- I'm sorry, one count at 15, and

4    it just didn't work out.  And we're here now in a different

5    context, but he's not someone who comes from a background where

6    this is part of his support system or part of anything about

7    it.  I think his letter makes clear to your Honor as to how he

8    was sort of psychologically lured into this conduct, in a

9    manner, and also, to a certain extent, did not make the full

10   commitment beyond the conduct that's here.

11          He never went beyond that, and I think because he

12   didn't want to.  And he didn't want to do that, but he

13   understands the harm he's caused not only in the context of

14   what he's done but also how it's affected his family, how it's

15   affected him already.  This was a very successful, accomplished

16   person.  He's not a disaffected person.  He was a CPA with a

17   series of very good jobs and making a tremendous career for

18   himself.  And he recognizes that he has forfeited all of that

19   at this point and now has to rebuild that.

20          He's been in custody for three and a half years.  He

21   has not had any issues in that regard.  He has a family that

22   still supports him, that's waiting for him.  He has young

23   children.

24          It's a situation in which I think, when the Court's --

25   if part of the Court's responsibility in sentencing is

1    projecting into the future, I think it's a very different type

2    of projection than some other types of defendants in these

3    types of cases, and that there's a certain level of comfort the

4    Court can have that this is someone who has recognized is

5    wrong, has articulated it to himself and to the Court, as well,

6    in a way that's very self-aware.  And that, I think, makes it

7    extraordinary, but also makes it something that should have an

8    impact on sentencing in that regard.

9            THE COURT:  I'm puzzled by one facet of this, which is

10   if I were to conclude that Mr. Hasanoff has essentially turned

11   over a new leaf, if he still believes that his afterlife will

12   be enhanced if he commits jihad, how can I believe that he can

13   be individually deterred?

14           MR. DRATEL:  Well, your Honor, jihad has many

15   different aspects to it, and the fulfillment of that obligation

16   can be accomplished in many ways.  And Mr. Hasanoff knows now

17   that he has to do that in a legal way, and I think that any

18   religious Muslim, any Muslim who follows the faith is obligated

19   to perform jihad and 99.9 percent of them do not break the law

20   to do it.

21           And he's going to be one of those 99.999 percent that

22   follow that path, as opposed to a path that was a wrong path,

23   which he acknowledges is a wrong path.  And there are

24   situations in which -- and they abound in this system, but they

25   abound in life as well, which is, there are two paths to

1    follow.   There's something that's a deeply held belief, one is

2    legal and one is not.   And the key is to stay to the one that

3    is legal.   That is a lesson that he has certainly learned, your

4    Honor, in abundance, and that is what I think the Court can

5    take with confidence from his letter, from his plea of guilty,

6    all the aspects of that.

7           So I think that to conflate his religious belief with

8    the notion that somehow it's going to lead to something illegal

9    in the future would not be correct, particularly for

10   Mr. Hasanoff.   Like I say, for other defendants -- and the

11   violence part of it is important too.   Mr. Ruhnke points out in

12   his letter that Mr. Hasanoff says:   I completely renounce any

13   view of Islam that says the violent jihad is in any way

14   acceptable.   So there's the distinction there that the Court

15   can draw and draw comfort from in sentencing.

16          The presentence report recommends 13 years.   That's,

17   obviously, less than the statutory maximum and we think an

18   appropriate sentence, at least, going down that far.   The

19   statutory maximum is a -- and these are all products of

20   guidelines that are very much automatic.   They don't

21   distinguish between defendants.   They automatically put

22   everyone in Category VI.   They put everyone in a position in

23   which it's very much -- we made the point through Dorvee.   It's

24   not unlike other situations that we face in the system, where

25   we have had a time line for the last 15 to, however long those

1   cases have been going on, where we've seen an amelioration of

2   those types of sentences and a more individualized sentencing

3   structure for defendants.

4          The same thing is necessary here, I think, because

5   each offender is different.  Each offender has a different past

6   and a different future and they're different people.  This is

7   an extraordinary person, with a lot of accomplishments, and can

8   do good things and be a great resource for his family, and has

9   been already and continues to be while in custody and will

10  continue to be.

11         What we ask is that he be allowed to do that as soon

12  as the Court feels is appropriate, and certainly far less than

13  the maximum, more in line with what the presentence report has

14  as sort of as a ceiling that we look at for someone in his

15  position, and for someone with the support group that does not

16  promote the kind of concern that the Court has about the

17  future.  So in other words, his family is not going to be

18  promoting that for him to get involved with.

19         And I've had the opportunity to meet with members of

20  his family, and they've been in -- you know, it's a combination

21  of the best of what I consider in these, in cases.  I've

22  represented a lot of people throughout the years, but the best,

23  which means where there is something -- they don't make excuses

24  for him, and they don't condone behavior, but at the same time,

25  he's a loved one.  He's family.  He's important to them.  They

```
1   know his potential.  So they are still supportive of him

2   despite the fact that he's done wrong, and they haven't given

3   him quarter in that regard, as if to say, you know, that's

4   okay.  They've been part of his understanding of where his

5   priorities lay in the future and in the importance of

6   fulfilling them, and I think that's an important part of it as

7   well.  So unless the Court has additional questions.

8            THE COURT:  No.  Would you like to speak to forfeiture

9   and the fine?

10           MR. DRATEL:  Yes.  Forfeiture is an issue that it's --

11  with respect to the numbers, it's -- you know, we would think

12  that the correct amount would be 46,000, and then we think

13  there are deductions that should be -- First of all, there was

14  money seized by the government that ought to be deducted.

15           THE COURT:  How much?

16           MR. DRATEL:  Just one second, your Honor.  Okay.  Here

17  are the numbers.  The government -- we have the government at

18  67.  Then you would reduce that by the contribution of the

19  cooperating co-defendant, Wesam, at 23-and-a-half thousand.

20           THE COURT:  Didn't your client pass that money on to

21  the terrorist facilitators?

22           MR. DRATEL:  Yes.  Yes, your Honor.  But in a sense,

23  that -- In the confiscations, there were 20,000, and there was

24  another 4,000 in his possession and 16,000 relating to an

25  automobile, and then we have another 1,500 that went for --
```

1    that was in the same basket of money but that did not go to

2    that purpose.  It went for someone suffering from cancer.

3    So --

4            THE COURT:  You're saying the government has seized a

5    total of $40,000?  I'm sorry -- yes, $40,000?

6            MR. DRATEL:  Yes, yes.

7            THE COURT:  Okay.

8            MR. DRATEL:  Your Honor, it may not be -- some of it

9    may have been seized by the Yemeni government in terms of when

10   they arrested the two persons involved.

11           THE COURT:  Do you know the difference?

12           MR. DRATEL:  I do not because I don't know what the

13   relationship is in terms of -- just one second.

14           This is from the detainees in Yemen; so it was

15   complicated by the Yemeni government.  One had 20,000, one had

16   4,000, one had 16,000.

17           THE COURT:  So none of that was seized by the U.S.

18   government?

19           MR. DRATEL:  No, no.

20           THE COURT:  All right.  Thank you.  Mr. Hasanoff,

21   there's no requirement for you to speak, but if you would like

22   to speak, I'd be glad to hear you now.  I have read your letter

23   to me.

24           THE DEFENDANT:  Okay.  Yes, your Honor, I would like.

25   The first thing I want to say is I'm very sorry for my conduct.

1    I should have known better, and I don't have any excuses to

2    offer.  I want to apologize to the Court, to the country, to my

3    family, in particular, and especially my kids.  One was just in

4    the hospital and spent some time.  She was born premature.  I

5    feel responsible partly for that.  I'm grateful to my family,

6    who's standing behind me.  Look, what I did was wrong.  I don't

7    have excuses.  So I'm prepared to take the sentence, your

8    Honor.  I don't really have much to add.

9              THE COURT:  Thank you.  Would the government like to

10   be heard?

11             MR. CRONAN:  Yes, your Honor.  I'll be brief.  This

12   case has been before your Honor for a long time.  I know the

13   briefing has been very extensive; so the Court is well aware

14   about the facts.  But I'll just say this.  There is simply no

15   aspect of this case that called for any leniency when

16   sentencing the defendant.

17             This is someone who, just a matter of years after

18   pledging an oath to become a U.S. citizen, agreed to support an

19   organization, a terrorist organization whose very purpose is to

20   attack the United States.  He agreed to support al Quaeda, and

21   I want to emphasize that because reading the defense's

22   submissions, it's hard to even tell that this case is about

23   attempting to support al Quaeda.  And it's understandable why

24   today, at sentencing, that's not the best cluster of facts.  Al

25   Quaeda has a very negative stigma, as it very well should.

1          That's what the defendant was charged with.  That's

2    what the government would have proven at trial, and that's what

3    he pled guilty to doing in very clear terms before your Honor.

4    He made substantial financial contributions, understanding that

5    the money would go to Al-Qaeda.  He obtained -- helped obtain

6    equipment, including a remote control device that could be used

7    to be modified to form an explosive.

8          THE COURT:  That he, in fact, assumed would be used to

9    do that?

10         MR. CRONAN:  I think that's correct, your Honor.  I

11   think that's a very fair assumption.  And he worked very hard

12   to ingratiate himself with terrorist operatives with the very

13   hope that he would become a so-called mujahideen and travel to

14   receive training and fight and maybe die in the fight.

15         And on top of all that, he conducted surveillance of a

16   location here in Manhattan, the New York Stock Exchange.  Now,

17   let me be clear.  This surveillance he did was not advanced.

18   It was not particularly detailed or thorough, but he did it.

19   He was asked to surveil a high-profile tourist location in a

20   densely populated part of Manhattan, and he agreed to do it.

21         Whether that information was useful to the terrorist

22   operatives that asked him to do it is completely irrelevant.

23   He agreed to do it.  He may have done that because he wanted to

24   ingratiate himself to the terrorist operatives.  What matters

25   is that he did do it.

1          THE COURT:  To be fair, the information he gave was so

2     sketchy that, as he himself said, it was probably all available

3     on Google, except for the fact that there were policemen with

4     dogs guarding the site.

5          MR. CRONAN:  That's correct, your Honor.  It was

6     rudimentary.  It was not advanced.  It was not detailed

7     surveillance, but it was still something that he agreed to do.

8     This is all serious and repugnant conduct.  It calls for

9     maximum deterrence, and the government believes a sentence at

10    the statutory max of 20 years would be appropriate.

11         Obviously, I'd be happy to answer any questions the

12    Court has regarding the various issues raised in the papers.  I

13    think we addressed them relatively thoroughly.

14         But I guess lastly, touching on the forfeiture issue.

15    When we briefly -- when the government briefly looked through

16    the financial information that the defense provided, our

17    response was similar to what the Court implied.  It seems like

18    there is money there.  There's money in the house in New York,

19    money in the apartment in the UAE.  There's money in a couple

20    of bank accounts, there's a car.  This isn't a defendant who

21    has no ability to pay.

22         THE COURT:  Mr. Dratel did say that his interest in

23    the apartment in Dubai has been expended on attorney's fees,

24    that's the only caveat.

25         MR. CRONAN:  Correct.  And, your Honor, I believe that

1    only goes to payment of a fine, not to forfeiture.  Forfeiture

2    doesn't really turn on a defendant's ability to pay.  There's a

3    consent order of forfeiture that was signed in this case at the

4    time of the defendant's plea, and that requires the defendant

5    to forfeit all interest and assets that were maintained with

6    the intent or purpose of supporting a federal crime of

7    terrorism.

8         So that would include all the money that was sent to

9    the individuals, the terrorist operative in Yemen, the

10   equipment sent, there was a laptop computer sent.  And the

11   Second Circuit has consistently held that criminal forfeiture

12   is joint and several; so it doesn't really matter who might

13   have footed the particular payment.

14        With respect to that $17,000 amount, I think that the

15   defense is missing the point a bit there.  The amount that the

16   cooperating witness provided, obviously, this was well before

17   he was cooperating, was 17,000 in total, but part of that went

18   to a legitimate business venture.  Of that, 6,500 went on to

19   the operatives in Yemen, at least that's the government's

20   understanding from talking to the cooperating witness and

21   reviewing other evidence in this case.

22        And unless the Court has any other questions, the

23   government would rest on its submissions.

24        THE COURT:  No, I don't have other questions.

25        MR. DRATEL:  Your Honor, may I just?

1          THE COURT:  Yes.

2          MR. DRATEL:  With respect to the government's

3    position, it's essentially a one-size-fits-all for these cases,

4    and that's the part that is not an appropriate sort of

5    sentencing principle in the sense that every case is the same

6    like this.

7          This is -- and -- Sorry.  The only way I can

8    articulate it is that there are young Muslim men in the west

9    who, for want of a better term, are guilt tripped into certain

10   types of conduct.  And Mr. Hasanoff is one of those people, but

11   he's essentially, from what you've read and what you've seen,

12   and his family is here, many members, that's an aberrational

13   episode in his life and --

14         THE COURT:  Aberrational but long lasting.

15         MR. DRATEL:  But, at the same time, also

16   demonstratively amateurish in the sense of the way they went

17   about it.  They were essentially scammed by these people.  I'm

18   not saying that doesn't make it a crime, but in terms of his

19   own part in it and the fact that he never got to the point --

20         THE COURT:  That's not entirely amateurish.  He got in

21   touch with the operatives through Mr. Sorensen --

22         MR. DRATEL:  Right.

23         THE COURT:  -- who fought jihad and died in combat.

24         MR. DRATEL:  Right.

25         THE COURT:  So he was in touch with a pretty good

1    source.

2         MR. DRATEL:  Yes, but that was the source.  And I

3    think that, to a certain extent, the proof is in sort of how

4    far he went, in the sense that people do go and train and fight

5    and die, like Mr. Sorensen.  Mr. Hasanoff didn't.  And I submit

6    it's because, ultimately, that was not for him, that he was not

7    going to do that.

8         And so the limits of his participation were what we

9    see in this case, and I just think, given the full nature of

10   who he is as a person and his understanding of the nature of

11   his conduct is important looking towards the future, in terms

12   of sufficient but not greater than necessary.

13        THE COURT:  All right.  Thank you.

14        MR. CRONAN:  Your Honor, I apologize.  If I may just

15   briefly respond to that one-size-fits-all comment?  Just to be

16   clear, the Second Circuit has specifically endorsed the

17   terrorism enhancement that is at issue in this case that puts

18   us above the statutory maximum.  In terrorism cases, you don't

19   need some empirical study to figure out why a strong blunt

20   force, like in the terrorism enhancement, is appropriate.  The

21   circuit in Meskini have endorsed that.  Judge Walker's

22   concurrence in Stewart similarly endorsed it.  There's no

23   question that this enhancement is appropriately applied.

24        MR. DRATEL:  And if I may, your Honor, just in

25   3553(a), courts have now routinely gone below those guidelines

1    in fashioning individualized sentences for individual offender

2    even in terrorism cases because of that gulf between the actual

3    sentence and the guideline level.

4              THE COURT:  Thank you.  I begin, as I must, by

5    calculating the advisory sentencing guideline level, which is

6    37, as acknowledged by defendant and is set forth on pages 25

7    to 26 of the government's sentencing memorandum.  That would

8    lead to a sentence far in excess of the statutory maximum in

9    this case, and so what we are really looking at is the

10   statutory maximum with the advisory sentencing guidelines in

11   mind.

12             With respect to the seriousness of the conduct, I

13   think Mr. Hasanoff rightly acknowledges that his offense is a

14   very serious one, both in terms of the nature of his conduct

15   and the length of his involvement.  His interest in extremist

16   ideology began in 2003 when he was living in Brooklyn,

17   New York, as a naturalized U.S. citizen.  He later moved to the

18   United Arab Emirates, where he met Kenneth Sorensen, who later

19   was killed while in combat in Syria with the Muhajireen

20   Brigade.  Sorensen put him in touch with two men in Yemen, who

21   were terrorist facilitators.

22             In 2007, Mr. Hasanoff began to provide financial and

23   other forms of support to Al-Qaeda, and continued to do so

24   through approximately March 2010.  He provided various forms of

25   support, which he intended to be utilized to support the

1    mujahideen fighting against his fellow citizens, American

2    forces in Afghanistan and other locations.

3          He not only sent money, which could be used in various

4    ways to further acts of terrorism, but he also provided an

5    advanced remote control device that he, himself, has said he

6    assumed would be used to trigger an explosive.  He repeatedly

7    made attempts to join armed combat against coalition forces in

8    Afghanistan and elsewhere.

9          In response to a request from one of the terrorist

10   facilitators, he conducted surveillance of the New York Stock

11   Exchange in Manhattan to assist in planning an explosive attack

12   on it.  He was asked to provide its location, size and

13   security.  He did so in a vague way to demonstrate his bona

14   fides as a jihadist.  The report he brought back, as we know,

15   was too skimpy to be useful other than his saying that someone

16   would have to walk to the building to accomplish the goal of

17   the attack.

18         With respect to defendant's history and character,

19   everything before the Court suggests that until his conversion

20   to extremism, he was a hard working, good family man who

21   contributed greatly to his community.  The many letters in his

22   support characterize him as a responsible and charitable

23   person.  None of that, however, deterred him from planning to

24   leave his family and die fighting jihad against Americans.

25         I think it's important for me to respond to

1    Mr. Dratel's characterization of his client as having turned

2    over a new leaf.  There's no way for me to know now whether he

3    has changed and whether, when he leaves prison, he will go back

4    to seeking to be a combat jihadist, but I do think that the

5    Court should take into account that, according to Reverend

6    Steve Mung, the chaplain of the MCC, that while Mr. Hasanoff

7    has been at the MCC for three-and-a-half years, he has

8    conducted himself as what Reverend Mung described as an

9    outstanding role model for other Muslim inmates, assisting

10   faithfully others in the Muslim community.  That is a

11   suggestion that the defendant has turned over a new leaf.

12        I think that the most important factor in this

13   sentencing is general deterrence.  Mr. Hasanoff indicated in

14   his letter to me that he knows that the sentence should be one

15   that takes into account the needed goal of general deterrence.

16   In my view, although the defendant has acknowledged the

17   appropriateness of a 20-year sentence in his plea agreement, I

18   believe that he should receive 24 months' credit for what

19   appears to be rehabilitation while at the MCC.

20        Mr. Hasanoff, please stand for sentencing.  On Count

21   One, I sentence you to 200 months in prison.  On Count Two, I

22   sentence you to 40 months in prison -- I'm sorry, 24 months in

23   prison.  I'm backing up because my math is not right.

24        I'm beginning with the 24 months that was assumed to

25   be appropriate in your plea agreement.  I'm subtracting 24

months as credit for rehabilitation and imposing a total

sentence of 216 months in prison.  That consists of a sentence

of 200 months on Count One and 16 months on Count Two to run

consecutively with one another.  You'll be on supervised

release for three years.

I impose forfeiture in the amount of $70,000, which is

payable jointly and severally with your co-conspirators.  I

impose the special assessment of $200, which is mandatory.  You

may sit while I read the conditions of supervised release.  The

standard conditions and the mandatory ones are imposed.  In

addition, the following special condition is imposed.

You must submit your person, residence, place of

business, vehicle or any other premises under your control to a

search on the basis that the probation officer has reasonable

belief that contraband or evidence of a violation of the

conditions of release may be found.  The search must be

conducted at a reasonable time and in a reasonable manner.

Failure to submit to a search may be grounds for revocation.

You must inform any other residents that the premises may be

subject to search pursuant to this condition.

You must report to the nearest probation office within

72 hours of your release from custody.  You will be supervised

by the district of residence.  I note that Mr. Dratel has made

three recommendations.  The first of which is that Mr. Hasanoff

be housed at Otisville, to assist his family in visiting him

1    often.  I will make that recommendation.

2          The second request was that he not be designated to

3    one of the two Bureau of Prisons' "communication management

4    units."  I don't believe it's in my expertise to decide whether

5    he should be in such a unit or not; so I will not make that

6    recommendation.

7          I accept the third recommendation, that I recommend

8    that he be transitioned back to the community through a

9    residential reentry center for the maximum time allowed under

10   the law.

11         Is there anything further before I read defendant his

12   appeal rights?

13         MR. CRONAN:  Your Honor, there is an underlying -- I

14   think a couple of underlying indictments.  The government moves

15   to dismiss any open counts against the defendant.

16         THE COURT:  I grant that motion.  Yes, Mr. Dratel?

17         MR. DRATEL:  Your Honor, I think I'm -- I think the

18   sentence on Count One is in excess of the statutory maximum.

19         THE COURT:  Thank you for pointing that out.  I

20   believe that it's 180 months.

21         MR. DRATEL:  That's right, your Honor.

22         THE COURT:  I amend the sentence by imposing on Count

23   One, 180 months.  On Count Two, I impose 36 months for a total

24   of 216 months.  Thank you for that reminder.  Is there anything

25   further?

1          MR. DRATEL:  No, your Honor.

2          THE COURT:  Mr. Hasanoff, I read every defendant his

3     appeal rights, and I'm reading yours to you right now.  You can

4     appeal your conviction if you believe your guilty plea was

5     somehow unlawful or involuntary, or if there is some other

6     fundamental defect in the proceedings that was not waived by

7     your guilty plea.

8          You also have a statutory right to appeal your

9     sentence under certain circumstances.  However, a defendant may

10    waive those rights as part of the plea agreement, and you have

11    waived some or all of your rights to appeal.  Such waivers are

12    generally enforceable, but if you believe the waiver is

13    unenforceable, you can present that theory to the appellate

14    court.

15         With few exceptions, any notice of appeal must be

16    filed within ten days of judgment being entered in your case.

17    Judgment is likely to be entered today or within the next few

18    days.  If you cannot pay the cost of an appeal, you may apply

19    for leave to appeal in forma pauperis.  If you request, the

20    check of the court will prepare and file a notice of appeal on

21    your behalf.

22         I thank counsel, and we're adjourned.

23         (Adjourned)

24

25