UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

SABIRHAN HASANOFF,

                    Petitioner.

        - v. -

UNITED STATES OF AMERICA,

                    Respondent.

------------------------------------x

**REDACTED**

14 Civ. 7892 (KMW)
10 Cr. 162 (KMW)


### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO SABIRHAN HASANOFF'S MOTION PURSUANT TO 28 U.S.C. § 2255 TO CORRECT, VACATE, OR SET ASIDE HIS CONVICTION

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

John P. Cronan
Aimee Hector
Michael D. Lockard
Assistant United States Attorneys
        -Of Counsel-

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   BACKGROUND.........................................................................................................3

    A.    The Indictments ........................................................................................3

    B.    Hasanoff's Offense Conduct....................................................................4

    C.    Hasanoff's Guilty Plea.............................................................................5

    D.    Hasanoff's Sentencing .............................................................................6

    E.    Post-Conviction Proceedings ...................................................................6

III.  ARGUMENT ..............................................................................................................7

    HASANOFF WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL .....................................7

    A.    Applicable Law........................................................................................7

    B.    The Performance of Hasanoff's Prior Counsel Was Not Deficient........................8

        1.    Representation in Connection with Hasanoff's Guilty Plea ...........................8

            a.    Failure to File a Motion to Suppress.....................................9

            b.    The Typographic Error in the May 12, 2011 Memorandum ...............13

            c.    Hasanoff's Admission of His Involvement with Al Qaeda ................13

        2.    Hasanoff's *Brady* Argument......................................................14

        3.    Representation in Connection with Hasanoff's Sentencing...........................17

            a.    The Court's Reliance on the Interviews of Suffian and The Doctor at Sentencing ...................................................................18

    C.    Hasanoff Cannot Establish Prejudice..................................................21

IV.  CONCLUSION..........................................................................................................25

i

## TABLE OF AUTHORITIES

### CASES

*Amiel* v. *United States*, 209 F.3d 195 (2d Cir. 2000)................................................15

*Bousley* v. *United States*, 523 U.S. 614 (1998)...........................................................15

*Brady* v. *Maryland*, 373 U.S. 83 (1963) .............................................................2, 14, 15

*Campino* v. *United States*, 968 F.2d 187 (2d Cir. 1992) .........................................15

*Cotto* v. *Lord*, No. 99 Civ. 4874 (JGK), 2001 WL 21246 (S.D.N.Y. Jan. 9, 2001) ......................12

*DeLeon* v. *United States*, No. 02 Civ. 9745 (RPP), 2003 WL 21769836
(S.D.N.Y. July 30, 2003) ...............................................................................24

*Flores* v. *Demskie*, 215 F.3d 293 (2d Cir. 2000) .........................................................7

*Mayo* v. *Henderson*, 13 F.3d 528 (2d Cir.1994) .......................................................12

*Moran* v. *United States*, No. 96 Civ. 3657 (CSH), 1998 WL 54616
(S.D.N.Y. Feb. 10, 1998) ...............................................................................24

*Ramchair* v. *Conway*, 601 F.3d 66 (2d Cir.2010) ...................................................12

*Strickland* v. *Washington*, 466 U.S. 668 (1984) ..........................................7, 9, 24, 25

*United States* v. *Abad*, 514 F.3d 271 (2d Cir. 2008)..........................................10, 19

*United States* v. *Aguirre*, 912 F.2d 555 (2d Cir. 1990) ............................................7

*United States* v. *Martinez*, 413 F.3d 239 (2d Cir. 2005)..........................................18

*United States* v. *Reese*, 33 F.3d 166 (2d Cir. 1994)................................................18

*United States* v. *Thorn*, 659 F.3d 227 (2d Cir. 2011) ..............................................15

*United States* v. *Venturella*, 391 F.3d 120 (2d Cir. 2004) .........................................7

*Urena* v. *New York*, 160 F. Supp. 2d 606 (S.D.N.Y. 2001).................................24, 25

*Valentine* v. *Lord*, No. 03 Civ. 4834 (PKC), 2006 WL 1997708 (S.D.N.Y. July 18, 2006).........24

# FEDERAL STATUTES

18 U.S.C. § 371 .................................................................................................... 1, 5

18 U.S.C. § 2339B .......................................................................................... 1, 3, 5, 23

18 U.S.C. § 3661 ................................................................................................... 18

28 U.S.C. § 2255 ............................................................................................. 1, 6, 15

50 U.S.C. § 1705 ......................................................................................... 3, 4, 23, 24

50 U.S.C. § 1801 ..................................................................................................... 9

50 U.S.C. § 1806 ................................................................................................. 10, 11

50 U.S.C. § 1825 ................................................................................................... 11

50 U.S.C. § 1881a .................................................................................................. 8, 9

50 U.S.C. § 1881e .................................................................................................... 9

# FEDERAL RULES

Fed. R. Evid. 1101 ................................................................................................. 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
SABIRHAN HASANOFF,
                                                              :
                        Petitioner.
                                                              :
        - v. -                                                        14 Civ. 7892 (KMW)
                                                              :      10 Cr. 162 (KMW)
UNITED STATES OF AMERICA,
                                                              :
                        Respondent.
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## I. PRELIMINARY STATEMENT

The Government respectfully submits this opposition to the habeas petition (the "Petition")

filed by Sabirhan Hasanoff, pursuant to Title 28, United States Code, Section 2255. Through the

Petition, Hasanoff seeks to correct, vacate, or set aside his conviction for (1) providing and

attempting to provide material support and resources to al Qaeda, in violation of Title 18, United

States Code, Section 2339B; and (2) conspiring to provide material support and resources to al

Qaeda, in violation of Title 18, United States Code, Section 371. In the Petition, Hasanoff asserts

a host of allegations of ineffective assistance against his former counsel, Joshua Dratel, Esq., in

connection with Hasanoff's guilty plea and sentence and, as relief, Hasanoff seeks to be re-

sentenced. Each of these allegations should be rejected without a hearing.

Hasanoff's criticism of Mr. Dratel for failing to move to suppress suspected warrantless

surveillance related to his participation in a plot to attack the New York Stock Exchange fails for

multiple reasons. Most significantly, the Government did not use, or intend to use, any

information obtained or derived from Section 702 of the FISA Amendments Act of 2008 ("FAA"),

for which the defendant was an aggrieved party and would have had standing. Furthermore,

information regarding Hasanoff's involvement in that plot came from law enforcement interviews

of Hasanoff's Yemen-based terrorist contacts and, regardless, the Government was not planning to offer at trial any evidence of the plot.  The apparent typographical error in a memorandum that Mr. Dratel's office sent to Hasanoff regarding the maximum penalty he would face after trial certainly was harmless.  Hasanoff's suggestion that Mr. Dratel improperly coerced him to plead guilty to supporting al Qaeda also fails, where the Government made clear that any plea would have required an admission by Hasanoff of his involvement with al Qaeda, the Government's evidence proving that involvement was overwhelming, and Hasanoff's sworn allocution left no question that he was supporting not merely terrorists in general, but specifically, al Qaeda.

Hasanoff's suggestion that Mr. Dratel was ineffective for failing to argue that the Government violated its disclosure obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), in connection with the reports of Hasanoff's terrorist contacts, is meritless.  The reports – which were produced in classified discovery shortly after Hasanoff's arrest and well before his plea – were highly incriminatory and made clear that Hasanoff and his coconspirators were providing extensive material support to terrorists who had connections with al Qaeda.

Hasanoff's allegations of ineffective assistance in connection with his sentencing similarly lack merit.  His argument that Mr. Dratel was ineffective for failing to argue at sentencing that the Court should not rely on the interview reports of his terrorist contacts fails for the simple reason that Mr. Dratel aggressively pressed this argument prior to sentencing, notwithstanding caselaw to the contrary, and at the sentencing hearing, Mr. Dratel pursued a host of arguments. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

2

Lastly, Hasanoff has not come close to establishing prejudice. The Government's evidence against Hasanoff was overwhelming and, if convicted of all four counts at trial, he would have faced a statutory maximum of seventy years' imprisonment. Mr. Dratel secured for his client a plea to two offenses which carried a combined statutory maximum sentence of twenty years' imprisonment and in fact obtained a sentence that was two years below that statutory maximum and twelve years below the low end of the otherwise applicable Guidelines range of 360 months to life.

## II. BACKGROUND

### A.  The Indictments

On May 2, 2010, a Grand Jury in the Southern District of New York returned a sealed Indictment charging Hasanoff and El-Hanafi with one count of conspiring to provide material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Section 2339B. A superseding Indictment (the "Indictment") was returned on September 14, 2010, charging both defendants in four counts:  (1) conspiring to provide material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Section 2339B; (2) providing and attempting to provide material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Sections 2339B and 2; (3) conspiring to make and receive a contribution of funds, goods, and services to, and for the benefit of, al Qaeda, in violation of the International Emergency Economic Powers Act ("IEEPA"), in violation of Title 50, United States Code, Section 1705(a), and Title 31, Code of Federal Regulations, Sections 595.204 and 595.205; and (4) violating a regulation issued under IEEPA by attempting to provide and providing money, equipment, and technology to al Qaeda, in violation of  Title 50, United

3

States Code, Section 1705(a), Title 31, Code of Federal Regulations, Sections 595.204 and 595.205, and Title 18, United States Code, Section 2.  The charges in the Indictment carried a combined statutory maximum sentence of 70 years' imprisonment.

### B.   Hasanoff's Offense Conduct[1]

Over the course of multiple years, Hasanoff dedicated himself to al Qaeda and terrorist causes.  Working with his co-defendant Wesam El-Hanafi and another co-conspirator who after their criminal conduct would become a cooperating witness (the "CW"), Hasanoff provided extensive support that he intended and understood was going to al Qaeda.  Hasanoff made regular cash donations and provided other support to two individuals based in Yemen that Hasanoff understood were affiliated with al Qaeda and were known to Hasnoff only by their aliases, the Doctor and Suffian, and conducted surveillance of a potential domestic target for a terrorist attack at the direction of the Doctor.

After a period of time when Hasanoff, El-Hanafi, and the CW sent money to Suffian and the Doctor, Suffian facilitated an in-person meeting for El-Hanafi with the Doctor in Yemen in February 2008.  The Doctor, a self-proclaimed career jihadist, received an oath of allegiance, called *bayat*, from El-Hanafi; received regular money payments and various other items from Hasanoff, El-Hanafi, and the CW that had been solicited for the purposes of supporting terrorist causes; and professed to be able to arrange travel for Hasanoff, El-Hanafi, and the CW to a place where they could receive military-style training and fight in armed combat.

---

[1] Hasanoff's offense conduct was more fully set forth in the Presentence Investigation Report ("PSR"), which was issued by the United States Probation Office on October 15, 2012, and the Government's Sentencing Memorandum for Sabirhan Hasanoff, which was filed on May 31, 2013.  The Government respectfully incorporates the factual recitations in those documents herein.

In addition, the Doctor (through El-Hanafi) directed Hasanoff to conduct surveillance of the New York Stock Exchange in Manhattan in 2008, unquestionably with the purpose of gathering information for a future terrorist attack. Hasanoff conducted this surveillance and subsequently sent a one-page report to the Doctor with information about the New York Stock Exchange. While the report was rudimentary and of limited use to the Doctor in his efforts to plan a terrorist operation, Hasanoff's willingness to conduct surveillance of a densely-populated and high-profile domestic target in the heart of Manhattan made clear his commitment to terrorism and his support for the anti-American agenda for which al Qaeda stands.

## C.   Hasanoff's Guilty Plea

On June 4, 2012, Hasanoff pled guilty to a two-count superseding Information, docketed S6 10 Cr. 162 (KMW), pursuant to a plea agreement with the Government. The Information charged Hasanoff with (1) providing and attempting to provide material support and resources to al Qaeda, in violation of Title 18, United States Code, Section 2339B; and (2) conspiring to provide material support and resources to al Qaeda, in violation of Title 18, United States Code, Section 371. The plea agreement contemplated a Guidelines offense level of 37, which would result in an advisory Guidelines range of 360 months to life, if not for the combined statutory maximum term of imprisonment of 20 years for the statutes of conviction. *See* PSR ¶ 6. In the plea agreement, Hasanoff also admitted the forfeiture allegation in the Information, and agreed to forfeit, among other things, all right to assets involved in, used, and intended to be used to commit a federal crime of terrorism against the United States. *Id.*

At his plea hearing, Hasanoff clearly stated, under oath, that he provided and conspired to provide material support and resources to *al Qaeda*. Hasanoff allocuted, "Starting in around 2007, I agreed with other persons to provide material support to a designated foreign terrorist

organization," and that the "organization was al Qaeda." Transcript, *United States* v. *Hasanoff*, 10 Cr. 162 (KMW) (June 4, 2012), at 15-16. Hasanoff further admitted that he knew that al Qaeda was a designated terrorist organization. *Id.* at 16.

### D.   Hasanoff's Sentencing

On September 30, 2013, Hasanoff was sentenced by this Court. After receiving extensive briefing and hearing argument from the parties at sentencing, the Court sentenced Hasanoff to a term of imprisonment of 18 years, to be followed by a three-year term of supervised release, and ordered Hasanoff to pay forfeiture in the amount of $70,000. *See generally* Transcript, *United States* v. *Hasanoff*, 10 Cr. 162 (KMW) (Sept. 30, 2013). Judgment was entered on October 1, 2013.

### E.   Post-Conviction Proceedings

On or about October 16, 2013, Hasanoff, through his current counsel, filed a notice of appeal to the Second Circuit. The parties subsequently entered into a stipulation of dismissal, and on or about April 1, 2014, the Second Circuit issued a mandate dismissing Hasanoff's direct appeal with prejudice to its renewal. Approximately six months later, on or about September 30, 2014, Hasanoff filed the instant Petition, pursuant to Title 28, United States Code, Section 2255, in which he alleges ineffective assistance of his former counsel and seeks to be re-sentenced.[2]

---

[2] In the Petition, Hasanoff does not seek to vacate his guilty plea, but only requests that he be re-sentenced. *See* Petition at p. 14 ("Therefore, movant asks that the Court grant the following relief: To be resentenced or any other relief to which movant may be entitled."); Affidavit in Support of Motion to Vacate Sentence, signed by Sabirhan Hasanoff, Sept. 22, 2014, at p. 9 ("WHEREFORE, I move to be resentenced, and [that] such other and further relief be granted as is just and proper.").

## III. ARGUMENT

### HASANOFF WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL

The Petition asserts a host of claims of ineffective assistance of Hasanoff's prior attorney, Mr. Dratel, in connection with his guilty plea and sentencing. Each of these claims lacks merit and should be denied without a hearing based on the record in this case.[3]

### A.    Applicable Law

To prevail on a claim of ineffective assistance of counsel, a defendant must: (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from the alleged dereliction in counsel's performance. *Strickland* v. *Washington*, 466 U.S. 668, 687-88, 693-94 (1984). With respect to the first prong of this test, "a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States* v. *Venturella*, 391 F.3d 120, 135 (2d Cir. 2004) (internal quotation marks omitted); *accord United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990). With respect to the second prong, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Flores* v. *Demskie*, 215 F.3d 293, 304 (2d Cir. 2000). The burden is on a defendant to establish both elements. *Id.* at 687.

---

[3] For reasons that follow, the Petition can, and should, be denied on the papers without a hearing. In the event the Court determines that there is a material fact in dispute that must be addressed before the Court can resolve the Petition, the Government respectfully requests that the Court issue an order requiring Hasanoff to execute an attorney-client privilege waiver with respect to Mr. Dratel's representation and, upon execution of that waiver, further directing Mr. Dratel to provide an affidavit or sworn testimony addressing the allegations of ineffective assistance.

**B.      The Performance of Hasanoff's Prior Counsel Was Not Deficient**

Hasanoff's prior counsel, Mr. Dratel, effectively and zealously represented Hasanoff throughout the criminal prosecution.  Mr. Dratel made a number of pretrial motions challenging the indictment and the Government's proof, met repeatedly with the Government regarding the case, requested and arranged for a reverse proffer of his client on November 21, 2011, negotiated a disposition for his client that entailed a guilty plea to offenses carrying a statutory maximum well below the exposure Hasanoff otherwise would have faced post-trial, and advanced strong arguments at sentencing.  The effectiveness of Mr. Dratel's representation of Hasanoff was most clearly shown when it culminated with his client receiving a sentence of 18 years' imprisonment, well below the advisory Guidelines range and even below the post-plea statutory maximum of 20 years' imprisonment.  Indeed, in light of that result, Hasanoff cannot establish any prejudice in connection with Mr. Dratel's performance.

**1.      Representation in Connection with Hasanoff's Guilty Plea**

The first portion of the Petition alleges a variety of allegations of ineffective assistance in connection with Mr. Dratel's representation leading to Hasanoff's guilty plea.  *See* Affidavit in Support of Motion to Vacate Sentence, signed by Sabirhan Hasanoff, Sept. 22, 2014, ("Hasanoff Aff.") ¶¶ 5-7.  In essence, Hasanoff advances three main arguments in this regard: *first*, Mr. Dratel was constitutionally ineffective because he failed to move to suppress evidence of his involvement in a plot to attack the New York Stock Exchange on the ground that the evidence was the fruit of "warrantless wiretapping" under the FAA[4], *id.* ¶ 5; *second*, Mr. Dratel's office sent

---

[4] The FAA, in particular Section 702, permits the Attorney General and the Director of National Intelligence to "authorize jointly, for a period of up to 1 year from the effective date of the authorization, the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information."  50 U.S.C. § 1881a(a).  Such authorization "(1) may not intentionally target any person known at the time of acquisition to be located in the

Hasanoff a memorandum in May 2011 (over a year before he pled guilty) that contained a typographical error, which incorrectly stated that the combined maximum penalty of the four counts in the Indictment was 20 years' imprisonment, *id.* ¶ 6; and, *third,* Mr. Dratel threatened to withdraw as his attorney if Hasanoff refused to admit his relationship with al Qaeda as part of his guilty plea, *id.* ¶ 7.  Each of these claims patently lack merit and should be denied without a hearing.

### a.  Failure to File a Motion to Suppress

Mr. Dratel's decision not to challenge the evidence of the New York Stock Exchange plot that Hasanoff alleges was the fruit of warrantless surveillance under the FAA was neither deficient nor prejudicial under *Strickland.*  As explained below, the Government did not use against Hasanoff any evidence obtained or derived from the FAA that Hasanoff would have had standing to challenge.  Accordingly, any motion to suppress on that ground would have been futile.

The Government did not use against Hasanoff any evidence that was obtained or derived from the FAA as to which he is an "aggrieved person."[5]   If the Government had decided to use any such information against Hasanoff, the Government would have provided Hasanoff and the Court with notice of such use, as the FAA requires.  *See* 50 U.S.C. § 1881e(a); 50 U.S.C.

---

United States; (2) may not intentionally target a person reasonably believed to be located outside the United States if the purpose of such acquisition is to target a particular, known person reasonably believed to be in the United States; (3) may not intentionally target a United States person reasonably believed to be located outside the United States; (4) may not intentionally acquire any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States; and (5) shall be conducted in a manner consistent with the fourth amendment to the Constitution of the United States."  *Id.* § 1881a(b).

[5] An aggrieved person is anyone "who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance."  50 U.S.C. § 1801(k).

§ 1806(c).[6]  The Government did not provide any such notice in this case because the Government

did not use any such information against Hasanoff at sentencing or in any other proceeding in the

case.  Accordingly, any motion to suppress evidence on the ground that it was the fruit of

warrantless surveillance under the FAA would have been meritless because there was no such

surveillance that Hasanoff had standing to challenge.  For that reason, Mr. Dratel's decision not to

challenge evidence on those grounds was neither deficient nor prejudicial.  *See United States* v.

*Abad*, 514 F.3d 271, 275-76 (2d Cir. 2008) ("counsel could not therefore have been ineffective for

failing to make a motion that would have been futile").

Hasanoff appears to suggest that Congressional testimony by Sean Joyce, then-Deputy

Director of the Federal Bureau of Investigation ("FBI"), supports his claim that evidence obtained

or derived from the FAA, as to which he was aggrieved, was used against him.  *See* Hasanoff Aff.

¶ 5.  In fact, however, that testimony provides no support for his claim.

In the testimony on which Hasanoff relies, Mr. Joyce discussed the role of the FAA (*i.e.*,

"702 authority") in the Government's investigation of a plot to attack the New York Stock

Exchange as follows:

> Another example, NSA, utilizing 702 authority, was monitoring a known extremist
> in Yemen.  This individual was in contact with an individual in the United States
> named Khalid Ouazzani.  Ouazzani and other individuals that we identified through
> a FISA that the FBI applied for through the [Foreign Intelligence Surveillance
> Court] were able to detect a nascent plotting to bomb the New York Stock

---

[6] The Government's notice obligations regarding its use or intended use of information obtained or derived from electronic surveillance authorized under the FAA apply only if the Government (1) intends to enter into evidence or otherwise use or disclose (2) "against an aggrieved person" (3) in a "trial, hearing or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States" (4) any "information obtained or derived from" (5) an "electronic surveillance of that aggrieved person." 50 U.S.C. § 1806(c).  Where all five criteria are met, the Government will notify the defense and the Court (or other authority) in which the information is to be disclosed or used that the Government intends to use or disclose such information.

Exchange. Ouazzani had been providing information and support to this plot. The FBI disrupted and arrested these individuals.

*See* http://www.ustream.tv/recorded/34527763, at 1:06:37-1:07:13.

That testimony indicates that the relevant FAA-obtained communications were between an extremist in Yemen and a person in the United States other than Hasanoff. Nothing in Mr. Joyce's testimony suggests that there were any communications obtained pursuant to the FAA as to which Hasanoff was an "aggrieved person." Thus, because the testimony does nothing to show that there was any FAA evidence that Hasanoff had standing to challenge, it does not support his claim that Dr. Dratel was ineffective for failing to challenge any collection under the FAA.

Hasanoff does not claim that Mr. Dratel was ineffective for failing to challenge the evidence of his involvement in the New York Stock Exchange plot on the ground that it was obtained in violation of other provisions of the Foreign Intelligence Surveillance Act, as to which he *did* receive notice from the Government.[7] But even if Hasanoff had raised such a claim, it would have been without merit, for a number of reasons.

The Government first learned about Hasanoff and El-Hanafi's involvement in that plot from interviews conducted by the FBI of the Doctor and Suffian in March 2009, approximately five months after Hasanoff performed the surveillance, *see* Exh. A at 11-12; Exh. B at 11,[8] and that information was later corroborated by email communications between Hasanoff, El-Hanafi, and Suffian. Accordingly, the Government's proof of Hasanoff's participation in the surveillance

---

[7] During discovery, the Government provided Hasanoff's counsel with notice for purposes of 50 U.S.C. §§ 1806(c) and 1825(d).

[8] Redacted reports of the FBI's interviews of Suffian and the Doctor were declassified prior to Hasanoff's sentencing and were attached to the Government's brief for Hasanoff's sentencing as Exhibits A and B, respectively. Those redacted reports are attached to this opposition as well, with the report of Suffian's interview attached as Exhibit A and the report of the Doctor's interview attached as Exhibit B.

11

came from multiple sources.  Therefore, even assuming *arguendo* that Hasanoff successfully could have suppressed electronic surveillance evidence, the Government would have been able to establish Hasanoff's surveillance of the New York Stock Exchange by other evidence, negating any claim of prejudice by Hasanoff.

Furthermore, in light of the Government's overwhelming evidence of Hasanoff and his co-conspirator's criminal activity – which included information from the CW, the Doctor, and Suffian, as well as the extensive independent corroboration of that information, *see infra* III.C – there would have been no meritorious legal argument in support of suppression.  To be sure, Mr. Dratel was vigorous during pretrial litigation and was not hesitant to file motions that had a colorable basis in law.  *See Cotto* v. *Lord*, No. 99 Civ. 4874 (JGK), 2001 WL 21246, *17 (S.D.N.Y. Jan. 9, 2001) ("[I]t is important to assess a claim of ineffective counsel not only by an examination of each specific instance of alleged incompetence, but also by assessing the lawyer's representation as a whole.").  Mr. Dratel moved before this Court for a bill of particulars, to dismiss Count Two of the Indictment for failure to state an offense and as unconstitutionally vague as applied to Hasanoff, to strike certain language in the Indictment, and to dismiss certain counts on multiplicity grounds.  While these motions were denied by the Court, there was a legal basis for making them – unlike a motion to suppress collection from Hasanoff.

In light of all this, it certainly was not objectively unreasonable for Mr. Dratel to fail to move to suppress evidence establishing Hasanoff's involvement in the New York Stock Exchange plot, where such a motion plainly would have been futile.  *See Ramchair* v. *Conway*, 601 F.3d 66, 73 (2d Cir.2010) ("'[I]t is not sufficient for [a] habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made.'" (quoting *Mayo* v. *Henderson*, 13 F.3d 528, 533 (2d Cir.1994)).

### b.  The Typographic Error in the May 12, 2011 Memorandum

Next, Hasanoff claims that, on May 12, 2011, Mr. Dratel's office sent him a memorandum that incorrectly stated the four Counts of the Indictment carried a maximum penalty of 20 years. *See* Hasanoff Aff. ¶ 6.  Even assuming that there was a typographical error in this May 12, 2011 memorandum that reflected a maximum exposure of 20 years' imprisonment rather than 70 years' imprisonment (were the sentences to be imposed consecutively), this oversight in no way prejudiced Hasanoff.  The memorandum was dated over a year before Hasanoff pled guilty on June 4, 2012.  Moreover, Hasanoff pled guilty to two offenses which had a maximum consecutive penalty of 20 years' imprisonment, which is well below the actual maximum exposure of 70 years' imprisonment that Hasanoff faced if convicted of the four Counts of the Indictment.[9]

### c.  Hasanoff's Admission of His Involvement with Al Qaeda

Hasanoff's suggestion that his attorney coerced him into admitting his involvement with al Qaeda similarly lacks merit.  *See* Hasanoff Aff. ¶ 7.[10]  Hasanoff's guilty plea allocution could not have been clearer.  After being placed under oath, Hasanoff admitted that, since around 2007, he "agreed with other persons to provide material support to a designated foreign terrorist organization," that the "organization was al Qaeda," and that he knew al Qaeda was a designated terrorist organization.  Transcript, *United States* v. *Hasanoff*, 10 Cr. 162 (KMW) (June 4, 2012), at 15-16.

---

[9] If, in contrast, instead of *undercalculating* the maximum exposure at trial, an attorney had *overcalculated* the maximum exposure, and Hasanoff pled guilty soon thereafter before that error was corrected, Hasanoff would have a stronger argument to advance, based on a claim that he decided to plead guilty to avoid facing a perceived inaccurately high exposure at trial.

[10] Hasanoff's affidavit has two paragraphs that are numbered 7.  The above citation is to the first Paragraph 7.

13

Moreover, the Government made clear to Hasanoff's attorneys that any guilty plea from Hasanoff would have required him to admit his efforts to support al Qaeda – support which the Government would have proved at trial through the CW's testimony and a host of corroborating evidence. *See infra* Part III.C.

Hasanoff's suggestion that the reports of the interviews of the Doctor and Suffian somehow demonstrate that his crime did not involve support to al Qaeda is wrong and legally immaterial. As discussed more fully in the next section, *see infra* III.B.2, the Doctor admitted to swearing an oath of allegiance to the man who was second-in-command of al Qaeda at the time of the offense, *see* Exh. B, at 19, and to being in the Sudan with Usama Bin Laden, *id.* at 3; and Suffian discussed al Qaeda's interest in having terrorist operatives in the United States and having al Qaeda members return to their home countries for terrorist operations (unmistakably referring to Hasanoff, El-Hanafi, and the CW), *see* Exh. A at 12. Moreover, the Doctor and Suffian did not need to in fact be affiliated with al Qaeda to support Hasanoff's guilty plea. Hasanoff pled guilty to conspiracy and substantive (including attempt) counts of providing material support and resources to al Qaeda. Therefore, if in Hasanoff's mind, the support he was providing was going to al Qaeda (which was made clear by his plea allocution and supported by overwhelming evidence), then he is guilty of conspiracy and attempt, regardless of whether that support in fact went to al Qaeda.

### 2. Hasanoff's *Brady* Argument

Hasanoff claims that the Government violated its *Brady* obligations by failing to disclose "materials that would negate an al-Qaeda connection with the defendants," namely the interview reports of the Doctor and Suffian. Hasanoff Aff. ¶ 7[11]. Hasanoff argues that the Doctor and

---

[11] The above citation is to the second Paragraph 7 in Hasanoff's affidavit.

14

Suffian were "not members of 'Al-Qa'ida,'" and that Mr. Dratel was ineffective because, when he received those reports at sentencing, his attorney "did nothing further." *Id.* ¶ 9. This argument is flawed for a number of reasons.

This argument relies on the premise that the Government violated its duties under *Brady*. That premise is categorically wrong.[12] First, the subject reports were not, as Hasanoff claims, provided to his attorney for the first time on February 13, 2013. *See* Hasanoff Aff. ¶ 9. Rather, in 2010, well before Hasanoff's guilty plea, those reports (which at the time were still classified) were provided to cleared defense counsel. It was only after Hasanoff's guilty plea that redacted versions of those interview reports were declassified for purposes of sentencing.

More importantly, nothing in those reports was at all exculpatory. Far from containing *Brady* material, these reports were exceedingly inculpatory. Those reports revealed that Hasanoff, El-Hanafi, and the CW were providing support to two terrorist leaders, who were using their money to support terrorist causes and who were connected to al Qaeda. *See, e.g.*, Exh. A at 8, 10 (El-Hanafi's money supported the mujahideen, including the family of mujahideen).

---

[12] Hasanoff only presses his *Brady* argument in connection with his allegation of ineffective assistance. To be sure, Hasanoff would not be able to raise a *Brady* argument in this Petition, because Hasanoff and his current attorney were in possession of the subject reports at the time he filed a direct appeal. When a habeas petitioner fails to bring a claim on direct appeal that could have been raised, that petitioner is precluded from raising that claim in a subsequent Section 2255 habeas proceeding absent showing both cause for the failure and actual resulting prejudice. *See United States* v. *Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." (citations omitted)); *Amiel* v. *United States*, 209 F.3d 195, 198 (2d Cir. 2000); *Campino* v. *United States*, 968 F.2d 187, 189 (2d Cir. 1992) (defining the "cause and prejudice" standard in habeas petitions). If an issue could have been raised on direct appeal and was not, a habeas petition is not a substitute remedy for raising that issue. *See Bousley* v. *United States*, 523 U.S. 614, 621(1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." (citations and internal quotation marks omitted)).

Moreover, Suffian revealed his connections to al Qaeda when he discussed the interest of Suffician's associates (including al Qaeda) in utilizing Hasanoff, El-Hanafi, and the CW for operations in America. *See* Exh. A at 12. As detailed in the report of the interview of Suffian:

> Furthermore, Al-Qa'ida (AQ) in Pakistan would like to have operatives in the United States. Subject added that whoever goes to AQ, if his circumstances (i.e.: desire) and security circumstances in his home country permit him to go back to his home country, that AQ members would go back home for the purposes of conducting operations.

*Id.* While the Doctor stated that he was not "a member of Al-Qai'da," he told the FBI that he "had fought in Afghanistan against the Soviets and communism" and that he "had been in the Sudan with Usama Bin Laden." Exh. B at 3. Moreover, the Doctor reported to the FBI that, in the mid-1990s, he swore an oath of allegiance called *bayat* to the leader of the Egyptian Islamic Jihad[13] who became al Qaeda's second-in-command (and who held that leadership position in al Qaeda at the time that Hasanoff was sending money and other items to the Doctor). *See* Exh. B at 19. In addition, like Suffian, the Doctor reported that he discussed Hasanoff, El-Hanafi, and the CW with another "fellow jihadi" who fought with the Doctor in Afghanistan, and they determined that it would make most sense for the Americans to be used for an attack in America:

> It was agreed by them that they (the Americans) would be better used for attacks on US soil than to allow them to travel into Afghanistan, Pakistan, Somalia or any other front because they are potentially a valuable asset for attacks within the US. Through [redacted], the Americans continued to make requests to travel for training and jihad, but [the Doctor] continued to state that the path for them to travel was not clear (NFI). [The Doctor] and [redacted] discussed that if the Americans were going to do jihad, they should do it in America.

*Id.* at 9.

At most, Suffian suggested that the Doctor may have been stringing Hasanoff, El-Hanafi, and the CW along, with the promise of travel for jihad, in order to get additional money from

---

[13] In or about June 2001, the Egyptian Islamic Jihad merged with al Qaeda.

them, which Suffian felt that the Doctor was using to help his "needy friends." Exh. A at 12.  The Doctor further reported that, while El-Hanafi, Hasanoff, and the CW may have thought that their money was for their future training, the money was being sent to the Doctor "to help the mujihadeen and the families of the martyrs and deceased jihadis." Exh. B at 22-23.  The Doctor further reported that he used some of the money received from El-Hanafi to buy cars, and other money went toward, among other things, a veteran of the anti-Soviet jihad in Afghanistan who was ill.  *Id.* at 23.  Certainly, the fact that the Doctor may have been squeezing more money out of Hasanoff and his associates in no way means that Hasanoff was not still conspiring and attempting to support al Qaeda.

Accordingly, those reports in no way established that the Yemeni detainees were supporting al Qaeda, as Hasanoff claims.  *See* Hasanoff Aff. ¶ 9.  But regardless, Hasanoff pled guilty to providing *and attempting to provide* material support to al Qaeda, as well as conspiring to do the same.  Whether the individuals Hasanoff was supporting were in fact members of al Qaeda is simply immaterial to an attempt or conspiracy theory of guilt, where Hasanoff and his co-conspirators believed they were supporting al Qaeda.

### 3.  Representation in Connection with Hasanoff's Sentencing

Hasanoff also makes several allegations in connection with his sentencing.  First, Hasanoff argues that Mr. Dratel failed to object at sentencing to the Court's reliance on the interviews of the Doctor and Suffian.  *See* Hasanoff Aff. ¶ 10.

### a. The Court's Reliance on the Interviews of Suffian and the Doctor at Sentencing

Hasanoff's criticism of Mr. Dratel for failing to argue at sentencing that the Court should not have relied upon the interview reports of Suffian and the Doctor can be quickly disposed of.

To be clear, Mr. Dratel aggressively challenging this Court's reliance at sentencing on the interview reports of the Yemeni detainees. *See* Letter of Joshua L. Dratel to The Honorable Kimba M. Wood, May 27, 2013, ("Deft. Sent. Ltr.") at 21-27. Mr. Dratel argued that reliance on the reports would deprive Hasanoff of his Fifth Amendment due process rights, *id.* at 23, and his Sixth Amendment right to confront witnesses and evidence, *id.* at 23-25, and additionally that the reports were inherently unreliable based on conditions in Yemen, *id.* at 25-27. The Government also briefed this issue, pointing the Court to well-settled Second Circuit law supporting the Court's consideration of these statements, because they contained powerful indicia of reliability. *See* The Government's Sentencing Memorandum for Sabirhan Hasanoff, May 31, 2013, at 40-43. In particular, the Government argued that the Second Circuit has squarely rejected Hasanoff's argument that reliance on the testimony regarding detainee interviews would violate the Confrontation Clause of the Sixth Amendment. *See id.*; *United States* v. *Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("Both the Supreme Court and this Court . . . have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."); *United States* v. *Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("when determining sentence, a sentencing court is free to consider hearsay evidence"); Fed. R. Evid. 1101(d)(3) (hearsay rule inapplicable at sentencing); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Mr. Dratel aggressively argued that the Court should not rely on the interviews of Suffian and the Doctor prior to the sentencing hearing, but in the end, the law was not on his side.  At the sentencing hearing on September 30, 2012, the Court made clear, "I have carefully reviewed your entire submission, Mr. Dratel," Transcript, *United States* v. *Hasanoff*, 10 Cr. 162 (KMW) (Sept. 30, 2012), at 5, and Mr. Dratel opted to press other, more compelling arguments, in his oral presentation, including his client's acceptance of responsibility and remorse, the asserted limited nature of the criminal conduct, and Hasanoff's successful professional career and family, *id.* at 6-7, 10, 17.  The Court ultimately imposed a sentence below the Guidelines range and below the statutory maximum, granting Hasanoff 24 months of credit for his apparent rehabilitation while incarcerated.  *Id.* at 21.  Mr. Dratel certainly cannot be considered deficient for failing to continue to press at sentencing an argument that lacked legal support, in lieu of more compelling arguments.  *See, e.g.*, *Abad*, 514 F.3d at 275-76 ("counsel could not therefore have been ineffective for failing to make a motion that would have been futile").







### C.    Hasanoff Cannot Establish Prejudice

Finally, even if there were any deficiencies in Mr. Dratel's representation of Hasanoff —

and for the reasons above, *see supra* III.B, plainly there were not any deficiencies — Hasanoff

---

[14] In the report, NFI means "no further information."

cannot show any prejudice. The Government's evidence against Hasanoff was overwhelming and, had he proceeded to trial and was convicted, he would have faced a potential statutory maximum sentence of 70 years' imprisonment. The fact that his attorney negotiated a plea agreement with a 20-year maximum sentence, and persuaded the Court to impose a sentence even below that maximum, makes plain the absence of any prejudice.

The Government's proof against Hasanoff was overwhelming. The Government would have offered testimony from the CW who worked with Hasanoff throughout the criminal conduct and would have told the jury the entire story of their crimes. Among other topics, the CW would have testified about Hasanoff's radicalization at a mosque in New York City; the financial support that Hasanoff, El-Hanafi, and the CW provided to al Qaeda; the contacts that Hasanoff and El-Hanafi made in the United Arab Emirates including with an individual who put Hasanoff and El-Hanafi in contact with al Qaeda members in Yemen; the regular monthly contributions that Hasanoff, El-Hanafi and the CW made to "the brothers," which was understood to be al Qaeda; El-Hanafi's travel to Yemen in February 2008 to meet with al Qaeda and provide assistance to al Qaeda; Hasanoff's formal recruitment of the CW into al Qaeda in May 2008 in New York City; and Hasanoff, El-Hanafi, and the CW's efforts to travel to train and fight in the jihad in Somalia or Afghanistan.

The CW's testimony would have been corroborated by a wealth of independent and unimpeachable evidence. For instance, the Government would have introduced lawfully intercepted phone calls between the CW and Hasanoff and El-Hanafi, talking in code (that would have been explained by the CW), as well as emails in which Hasanoff and El-Hanafi wrote to each other in coded messages. The Government would have introduced emails discussing El-Hanafi's February 2008 trip to Yemen, as well as travel records showing that the trip occurred. The

Government would have offered bank records and other records showing purchases that the group made of items for al Qaeda. The Government would have offered bank records showing money that the CW sent to Hasanoff to support al Qaeda, wire transfer records from El-Hanafi and Hasanoff to support al Qaeda, and emails between Hasanoff and the CW discussing the CW's commitment to provide financial support to their cause, *i.e.*, to support al Qaeda. The Government also would have offered email messages between Hasanoff, El-Hanafi, and the CW, which discussed such topics as travel, items purchased for al Qaeda, their desire to join the fight in jihad, and obtaining a visa to permit them to travel to fight in jihad. The Government also would have offered internet chats from 2009 between the CW, on one end, and Hasanoff and El-Hanafi, on the other end, discussing reestablishing contact with al Qaeda and their desire and efforts to travel to fight in jihad. The Government additionally would have sought to offer testimony from an international terrorism expert to put this evidence in context and explain the significance of the conduct. In short, the evidence against Hasanoff at trial would have been overwhelming and he likely would have been convicted of all four Counts of the Indictment.

Those four Counts entailed a maximum consecutive sentence of 70 years' imprisonment: (1) conspiring to provide material support and resources to a designated foreign terrorist organization, namely al Qaeda, in violation of Title 18, United States Code, Section 2339B (15-year maximum); (2) providing and attempting to provide material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Sections 2339B and 2 (15-year maximum); (3) conspiring to violate IEEPA by conspiring to make and receive a contribution of funds, goods, and services to, and for the benefit of, al Qaeda, in violation of Title 50, United States Code, Section 1705(a), and Title 31, Code of Federal Regulations, Sections 595.204 and 595.205 (20-year maximum); and (4) violating IEEPA, by making and receiving a

23

contribution of funds, goods, or services to, and for the benefit of, al Qaeda, in violation of Title 50, United States Code, Section 1705(a); Title 31, Code of Federal Regulations, Sections 595.204 and 595.205; and Title 18, United States Code, Section 2 (20-year maximum). Thus, after trial, Hasanoff would have faced a statutory maximum sentence of 70 years, with a Guidelines range of 360 months to life imprisonment.

However, Hasanoff's counsel worked out a plea that entailed Hasanoff pleading guilty to two charges and facing a maximum sentence of 20 years' imprisonment. Moreover, even though Hasanoff's Guidelines range was above that statutory maximum, at sentencing, Mr. Dratel was able to secure a sentence for his client of 18 years' imprisonment, two years below the statutory maximum. This considerable benefit obtained by Mr. Dratel precludes Hasanoff from establishing any prejudice. *See Valentine* v. *Lord*, No. 03 Civ. 4834 (PKC), 2006 WL 1997708, at *7 (S.D.N.Y. July 18, 2006) ("courts have usually concluded that a habeas petitioner does not satisfy the second prong of an ineffective assistance claim where the plea agreement provided the petitioner with substantial benefit due to the strength of the evidence and the potential sentence if the defendant were found guilty"); *DeLeon* v. *United States*, No. 02 Civ. 9745 (RPP), 2003 WL 21769836, at *6 (S.D.N.Y. July 30, 2003) (finding that the petitioner failed to establish prejudice under *Strickland* "because there was strong, irrefutable evidence against him, and [because he] received a considerable benefit under the terms of his plea agreement"); *Moran* v. *United States*, No. 96 Civ. 3657 (CSH), 1998 WL 54616, at *5 (S.D.N.Y. Feb. 10, 1998) (finding that the petitioner was unable to show prejudice under *Strickland* because "the plea agreement that [his attorney] negotiated for [the petitioner] was very favorable in light of the government's overwhelming evidence and the penalties that [the petitioner] faced if convicted at trial"); *see also Urena* v. *New York*, 160 F. Supp. 2d 606, 611 (S.D.N.Y. 2001) (Cote, J.) (rejecting ineffective

24

assistance of counsel claim, where former counsel secured a plea to fewer than all counts in the indictment and below the maximum sentence that the petitioner was facing at trial).

Thus, Hasanoff has failed to demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (or at least more favorable to Hasanoff) if Mr. Dratel has performed differently leading to his guilty plea or at sentencing. *Strickland*, 466 U.S. at 694.

## IV. CONCLUSION

For the reasons stated above, the Court should deny Hasanoff's Petition without a hearing. In addition, because Hasanoff has not made a substantial showing of the denial of a constitutional right, no certificate of appealability should issue.

Dated: New York, New York
      December 12, 2014

                            Respectfully submitted,

                            PREET BHARARA
                            United States Attorney for the
                            Southern District of New York

By:     /s/_____
             John P. Cronan
             Aimee Hector
             Michael Lockard
             Assistant United States Attorneys
             Tel: (212) 637-2779
             Fax: (212) 637-0097