UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - v. -

SABIRHAN HASANOFF,
  a/k/a "Tareq,"

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        :
        :        S7 10 Cr. 162 (KMW)

**OPPOSITION TO DEFENDANT SABIRHAN HASANOFF'S MOTION
<u>FOR COMPASSIONATE RELEASE</u>**

                                AUDREY STRAUSS
                                Acting United States Attorney
                                Southern District of New York

Michael D. Lockard,
Assistant United States Attorney
 *- Of Counsel -*

**TABLE OF CONTENTS**

Page

BACKGROUND ......................................................................................................... 1

    A.    The Indictment, Information, and Guilty Plea ........................................... 1

    B.    Hasanoff's Offense Conduct ...................................................................... 2

    C.    Sentencing ................................................................................................. 5

    D.    Hasanoff's Administrative Requests for Home Confinement and
           Reduction in Sentence .............................................................................. 5

    E.    Hasanoff's Motion for Compassionate Release ....................................... 6

DISCUSSION ........................................................................................................... 7

    I.    Compassionate Release ............................................................................. 7

    II.    Hasanoff's Motion Should Be Denied ...................................................... 9

          A.    Hasanoff's Motion is Premature as to his COVID-19 Argument .............. 9

          B.    Hasanoff's Motion Does Not Show Extraordinary and
              Compelling Reasons to Reduce His Sentence to Time Served ................. 10

          C.    Hasanoff's Request to Reduce His Sentence Is Inconsistent
              with the Sentencing Factors ...................................................................... 18

CONCLUSION ......................................................................................................... 21

Pursuant to the Court's order dated July 23, 2020, the Government respectfully submits this memorandum of law in opposition to the motion by the defendant, Sabirhan Hasanoff ("Hasanoff" or the "defendant") to reduce his sentence pursuant to the First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018) (the "First Step Act"), as codified in 18 U.S.C. § 3582(c)(1)(A). Hasanoff seeks compassionate release based on his risk of exposure to COVID-19 at FCI Otisville, where Hasanoff is currently serving his sentence, family circumstances based on the recent death of his father and his mother's medical conditions, and Hasanoff's rehabilitation. (D.E. 257). Hasanoff's request for compassionate release based on risk of COVID-19 exposure is premature because he never requested release from the BOP on that basis. Even on the merits, Hasanoff cannot demonstrate extraordinary and compelling reasons warranting a sentence reduction because he has none of the high-risk factors for severe COVID-19 related diseases, and FCI Otisville has very few reported cases and is effectively managing the risk of spread. Moreover, the requested reduction in sentence would be inconsistent with the sentencing factors in 18 U.S.C. § 3553(a) in light of Hasanoff's serious terrorism offense, providing material support and resources to al Qaeda.

Hasanoff also has not shown other extraordinary circumstances warranting a reduction in sentence. The death of Hasanoff's father is not an extraordinary family circumstance where there are other family members in the New York area to provide care for his mother, and post-conviction rehabilitation is not a ground for a reduction in sentence. Accordingly, the motion should be denied.

## BACKGROUND

### A.    The Indictment, Information, and Guilty Plea

On September 13, 2011, Hasanoff and his co-defendant, Wesam El-Hanafi, were charged in a superseding indictment, S5 10 Cr. 162 (KMW), with conspiring to provide material support

to al Qaeda, a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count One); providing, and attempting to provide, material support to al Qaeda, in violation of 18 U.S.C. § 2339B & 2 (Count Two); conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-07, and the Terrorism Sanctions Regulations, 31 C.F.R. Part 595, in violation of 50 U.S.C. § 1705 (Count Three); and violating the Terrorism Sanctions Regulations, in violation of 50 U.S.C. § 1705 (Count Four).

On June 4, 2012, Hasanoff pleaded guilty, pursuant to a plea agreement, to a two-count superseding information, S7 10 Cr. 162 (KMW) (the "Information") charging him with providing and attempting to provide material support and resources to al Qaeda, in violation of 18 U.S.C. § 2339B; and conspiring to provide material support and resources to al Qaeda, in violation of 18 U.S.C. § 371.

## B.    Hasanoff's Offense Conduct

In 2003, in the wake of the al Qaeda terrorist attacks on September 11, 2001 on the World Trade Center in New York, the Pentagon in Washington, D.C., and a foiled attack on the U.S Capitol Building, and the U.S.-led coalition invasions of Afghanistan and Iraq, Hasanoff and his close friends aspired to join al Qaeda and fight as *mujahideen*. Ultimately, Hasanoff succeeded in his ambitions to join al Qaeda; swore an oath of allegiance to the terrorist group; provided al Qaeda tens of thousands of dollars and electronics equipment; and conducted surveillance on a major New York City institution to provide al Qaeda with information potentially of use in designing another terrorist attack. Hasanoff's desire to fight as an armed *mujahideen* was frustrated only by al Qaeda's conclusion that, as a U.S. citizen and white-collar professional, Hasanoff was more valuable to the group and its murderous aims away from the battlefield.

Hasanoff is a naturalized U.S. citizen, born in China to Uzbek parents and a resident of the United States since approximately 1989. (PSR ¶¶ 58, 64). He is a graduate of Baruch College and was previously a certified public accountant. While Hasanoff's terrorist fervor was growing, he worked for two different Big Four accounting firms, first in Manhattan and in Sharjah, UAE, from approximately 2000 to 2008. (*Id.* ¶¶ 76-82). He then working for various employers in Dubai from approximately 2008 until his arrest in April 2010. (*Id.* ¶¶ 79-80). Hasanoff's close friend and co-defendant, El-Hanafi, also moved to the UAE in late 2005 or early 2006. (*Id.* ¶ 10).

In the UAE, Hasanoff and El-Hanafi met a member of al Qaeda ("CC-2"), and established additional contacts within al Qaeda through this individual. (*Id.* ¶ 10). Through CC-2, Hasanoff and his friends made regularl payments to al Qaeda, applying various tools of financial deception to evade law enforcement scrutiny. (*See, e.g.*, *id.* ¶¶ 12-17). Over the course of approximately two years—from Hasanoff and El-Hanafi's introduction to CC-2 until approximately 2010, when Hasanoff and his friends began tempering their contact with their al Qaeda contacts for fear of law enforcement attention—Hasanoff and his co-conspirators provided a total of approximately $67,000 to al Qaeda. (Govt. Sent. Memo. (D.E. 126) at 12).

CC-2 introduced Hasanoff and El-Hanafi to al Qaeda operatives in Yemen, in particular, an operative named "Suffian," who also connected El-Hanafi with a more senior al Qaeda member, "The Doctor." (PSR ¶ 11; Govt. Sent. Mem. at 5-6). Hasanoff and El-Hanafi developed enough trust for El-Hanafi to be invited to meet the men in Yemen, where he travelled in early 2008. (PSR ¶¶ 21-28, 30; Govt. Sent. Mem. at 8-19). Hasanoff helped El-Hanafi devise a false cover story to tell his employer about his absence during the trip. (PSR ¶ 21). While in Yemen, El-Hanafi spent several days with Suffian and the Doctor, and delivered them $12,000 in cash, a

3

laptop, and a translation device. He swore an oath of allegiance to al Qaeda and received both training in operational security and numerous taskings: for his physical and doctrinal readiness, the recruitment of additional al Qaeda members, the procurement of technologies desired by al Qaeda, and for the surveillance of potential target attacks in New York City, specifically, the New York Stock Exchange. (Got. Sent. Mem. at 8-19).

After El-Hanafi's trip to Yemen, Hasanoff swore his oath of allegiance to al Qaeda, administered by El-Hanafi. (PSR ¶ 33). Hasanoff and El-Hanafi continued sending al Qaeda money, and also recruited another co-conspirator—a cooperating witness (CW)—to join al Qaeda. El-Hanafi travelled to New York in approximately May 2008 to administer the oath of allegiance to the CW and to task the CW on behalf of al Qaeda. (Govt. Sent. Mem. at 18-19). El-Hanafi also procured various remote control technology and digital watches for al Qaeda, and later supplied al Qaeda with additional digital watches and GPS devices. (*Id*. at 12, 16, 19, 22).

El-Hanafi relayed his surveillance tasking to Hasanoff, who travelled to New York shortly after El-Hanafi's visit to meet the CW. (Govt. Sent. Memo at 20 & n.12). Hasanoff surveilled the Stock Exchange and sent a short report to Suffian, who provided it to the Doctor. (*Id*. at 19-21). The report lacked the detail the Doctor had hoped for, but nonetheless contained information about security, traffic patterns, and the necessity for the attacker to approach the target on foot. (*Id*.).

Throughout his dealings with al Qaeda, Hananoff's principal desire was to fight as a *mujahideen*. (Govt. Sent. Mem. at 11, 14-15, 22-26). Hasanoff and his co-conspirators planned to sell their homes and belongings, evidencing their intent to die in battle. (*Id*.). Suffian and the Doctor's failure to make arrangements for the co-conspirators to join the battlefield—because al Qaeda believed they were more valuable elsewhere (*id*. at 17)—caused a rift in their relationship.

(*Id.* at 22). Hasanoff and his co-conspirators explored making their own arrangements, and their relationship with Suffian and the Doctor cooled by late 2009 in the face of fears that they were under law enforcement scrutiny. (*Id.* at 22-25; PS ¶ 37).

### C.    Sentencing

On September 30, 2013, the Court sentenced Hasanoff principally to a term of imprisonment of 18 years, to be followed by three years' supervised release. Judgment was entered on October 3, 2013. (D.E. 142).

In imposing sentence, the Court adopted the parties' agreement on the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), which resulted in a total offense level of 37, a Criminal History Category of VI, and an advisory sentencing range of 360 months' imprisonment to life. Because the statutory maximum sentence of the offenses of conviction was 20 years, the resulting Guidelines sentencing range was 20 years. (Sent. Tr. 19). The Court observed that Hasanoff's offense was "a very serious one, both in terms of the nature of his conduct and the length of his involvement." (*Id.*; *see also id.* at 19-20). The Court believed a 20-year sentence was appropriate, but reduced Hasanoff's sentence by 24 months based on his post-arrest rehabilitation. (*Id.* at 21).

Hasanoff is currently serving his sentence at the Otisville Federal Correctional Institution ("FCI Otisville"). According to BOP records, his projected release date (including calculation of good-time credit) is September 26, 2025.

### D.    Hasanoff's Administrative Requests for Home Confinement and Reduction in Sentence

According to BOP records, Hasanoff submitted an administrative request to be placed in home confinement pursuant to 18 U.S.C. § 3624 based on risk of COVID-19 exposure, which was denied on August 25, 2020.

According to BOP records, Hasanoff submitted an administrative request for a reduction in sentence ("RIS") (compassionate release) on June 1, 2020, based on his father's death from COVID-19-related illness, his mother's illness, and his post-sentencing rehabilitation. (Ex. 1). Hasanoff's request was not based on risk of COVID-19 exposure. BOP denied the request on July 13, 2020. (Ex. 2).

BOP is not currently considering Hasanoff for furlough pursuant to 18 U.S.C. § 3622. BOP has rated Hasanoff a minimum recidivism risk. His disciplinary record reflects one incident in 2015 where Hasanoff sought to disrupt BOP's ability to monitor inmate mailings. Hasanoff admitted the incident.

### E.    Hasanoff's Motion for Compassionate Release

On July 17, 2020, Hasanoff filed a *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), which permits the Court to reduce the defendant's sentence based on extraordinary and compelling reasons. (D.E. 257) ("Mot."). Hasanoff argues that a reduction of his sentence to time served is appropriate because of (1) his post-sentencing rehabilitation (Mot. 3, 4, 16-22); (2) his family circumstances, namely, the purported need for him to care for his elderly mother following his father's death in April 2020 (*id*. 3, 4-5, 14); and (3) Hasanoff's risk of exposure to COVID-19 at FCI Otisville. (*Id*. 3, 5, 14).

On July 23, 2020, the Court ordered Hasanoff to file any supplemental submissions in further support of his motion by September 21, 2020, and also for the Government to respond to the Motion by September 21, 2020. (D.E. 258). The Government's responses to the Court's questions are addressed *infra*.

On September 17, 2020, Hasanoff filed a supplemental *pro se* memorandum, a supplemental declaration, and letters from himself and his mother. (D.E. 259).[1] Hasanoff submits that his mother contracted, and later recovered from, COVID-19 with lingering breathing difficulties; suffers from degenerative disc disease and back pain; rheumatoid arthritis; dementia; and depression resulting from the loss of her husband. (D.E. 259-1 at 3-5). Though reportedly suffering from dementia, Mrs. Hasanoff also submitted a lengthy, detailed, and cogent letter. (D.E. 259-3). Hasanoff argues that he would be able to care for his mother at his home in Long Island and would be employed at a warehouse in New Jersey and potentially work-from-home employment from a Queens-based warehouse. (D.E. 259-1). He also argues that, although his sister has been providing care for their mother, she cannot continue to do so because she has young children and her husband is a healthcare worker.

## DISCUSSION

### I.    Compassionate Release

"The court may not modify a term of imprisonment once it has been imposed" except in certain defined circumstances. 18 U.S.C. § 3582(c). Section 3582(c)(1)(A)(i) authorizes a district court to modify a defendant's sentence based on "extraordinary and compelling reasons." Prior to the enactment of the First Step Act, only the BOP could move for a sentence reduction under this provision, and its decision not to move for compassionate release was not reviewable by the district court. *See, e.g., Stewart v. United States*, 13 Civ. 5279 (JGK), 02 Cr. 395 (JGK), 2013 WL 4044756, *3-6 (S.D.N.Y. Aug. 9, 2013); *see also United States v. Iosifidis*, 13 Cr. 170 (JFK), 2016 WL 3267329, *2 (S.D.N.Y. June 9, 2016). The First Step Act amended this

---

[1] Though filed on September 17, 2020, these documents were entered on the morning of September 21, 2020, the same day as the Government's response is due. Accordingly, this memorandum will address those submissions only in brief.

subsection to permit inmates to file motions for compassionate release following the exhaustion of their administrative remedies or 30 days after submitting a request to the appropriate Warden, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

The First Step Act did not alter the requirements for eligibility for compassionate release, which are set forth in § 3582(c)(1)(A) and Section 1B1.13 of the Guidelines. The court may modify a sentence only if it finds, as relevant here, that "extraordinary and compelling reasons warrant such a reduction," § 3582(c)(1)(A)(i). The proposed reduction "must be consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). In addition, the district court must "consider[ ] the factors set forth in section 3553(a) to the extent that they are applicable." *Id.*

The relevant policy statement is found in Section 1B1.13 of the Guidelines. *See* U.S.S.C. § 1B1.13(3). Among other things, the Guidelines provide that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13, app. n.3.

The Guidelines provide that "extraordinary and compelling reasons" based on the defendant's medical condition exist when (i) "[t]he defendant is suffering from a terminal illness;" or (ii) the defendant is suffering from a "serious physical or medical condition," "serious functional or cognitive impairment," or "deteriorating physical or mental health because of the aging process" that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A).

Extraordinary and compelling reasons may also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and

8

compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" of note 1. *See* U.S.S.G. § 1B1.13, cmt. n.1(D).

## II.    Hasanoff's Motion Should Be Denied

Hasanoff's motion for compassionate release based on rehabilitation, family circumstances, and risk of exposure to COVID-19 should be denied. First, the motion is premature with respect to COVID-19 exposure because Hasanoff's RIS request to BOP was not based on his risk of COVID-19 exposure and, accordingly, he has not exhausted his administrative remedies with respect to that ground.

On the merits, Hasanoff's motion should be denied because it does not show extraordinary circumstances. Rehabilitation is not a ground for compassionate release, and the Court already took Hasanoff's rehabilitation into account in fashioning his sentence. Hasanoff's family circumstances are not extraordinary, because (a) the family member who needs care, his mother, is not a minor child or a spouse and because Hasanoff is not the sole available caregiver. Finally, Hasanoff is in good health and has none of the factors that contribute to a high risk of severe COVID-19 illness, and the risk of exposure at FCI Otisville is very low.

### A.    Hasanoff's Motion is Premature as to his COVID-19 Argument

Hasanoff's motion is premature as to his COVID-19 argument. Hasanoff never presented this ground for release to the BOP and, accordingly, he has not exhausted his administrative remedies. 18 U.S.C. § 3582(c)(1)(A) requires a defendant to first submit a request to BOP and prohibits a motion to the Court until the later of BOP's denial or 30 days. *See United States v. Ogarro*, 18 Cr. 373 (RJS), 2020 WL 1876300, *3 (S.D.N.Y. Apr. 14, 2020) (the statute's exhaustion requirements "clearly are mandatory"); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("the exhaustion requirement . . . presents a glaring roadblock

9

foreclosing compassionate release at this point."); *United States v. Roberts*, 18 Cr. 528 (JMF), 2020 WL 1700032, at \*2-3 (S.D.N.Y. Apr. 8, 2020); *United States v. Woodson*, 18 Cr. 845 (PKC), 2020 WL 1673253, at \*4 (S.D.N.Y. Apr. 6, 2020); *United States v. Hernandez*, 19 Cr. 834 (PAE), 2020 WL 1445851, at \*1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, 18 Cr. 602 (WHP), 2020 WL 1428778, at \*2 (S.D.N.Y. Mar. 24, 2020); *United States v. Monzon*, 99 Cr. 157 (DLC), 2020 WL 550220, at \*2 (S.D.N.Y. Feb. 4, 2020). *But see United States v. Scparta*, 18 Cr. 578 (AJN), 2020 WL 1910481, at \*5 (S.D.N.Y. Apr. 20, 2020). The Court should deny Hasanoff's COVID-19-based request until he satisfies this requirement.

**B.      Hasanoff's Motion Does Not Show Extraordinary and Compelling Reasons to Reduce His Sentence to Time Served**

Hasanoff's motion should also be denied on the merits, because it does not demonstrate extraordinary and compelling circumstances within the meaning of the statute and relevant policy statements.

*Rehabilitation*. The primary focus of Hasanoff's Motion is his rehabilitation while incarcerated. (Mot. 3, 4, 16-22). Section 3582 provides that any requested reduction in sentence "must be consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The Sentencing Commission has provided that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13, app. n.3; *see also* 18 U.S.C. § 944(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."). *Accord United States v. Reyes*, 91 Cr. 358 (KPF), 2020 WL 5518483, at \*3 (S.D.N.Y. Sep. 14, 2020) ("The Court is heartened by Mr. Reyes's growth and accomplishments while incarcerated," including "his deep-seated piety, evidenced by his public and private Christian ministries to other inmates," but "these developments, however commendable, do not by themselves support the

10

extraordinary relief of compassionate release."); *United States v. Sanchez*, 07 Cr. 789 (RJS), 2020 WL 2571074, *2 (S.D.N.Y. May 21, 2020) (denying compassionate release motion based on defendant's rehabilitation while incarcerated); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (denying compassionate release based on rehabilitation in light of Application note 3); *United States v. Reese*, 12 Cr. 629 (VM), 2020 WL 1847552, *1 (S.D.N.Y. Apr. 13, 2020) ("Courts have thus found that good behavior alone does not constitute an adequate basis to justify immediate release under Section 3582."). "Indeed, every inmate should strive for a productive institutional record while incarcerated because that is what is expected." *United States v. Saleh*, 93 Cr. 181 (WHP), 2020 WL 2829626, *4 (S.D.N.Y. Jul. 8, 2020).

Moreover, Hasanoff's post-offense rehabilitation is already reflected in his sentence. At sentencing, Hasanoff argued for a reduced sentence based on, among other things, having turned over a new leaf, as reflected by his conduct while incarcerated. (Hasanoff Sent. Ltr. (D.E. 131) at 47, 53 & Ex. 1; Hasanoff Reply Sent. Ltr. (D.E. 132) at 7-8; Sent Tr. 6-10). At sentencing, the Court credited these arguments and explicitly reduced the sentence Hasanoff would otherwise have received by two years as a result. The Court observed that, while it was impossible to know whether Hasanoff would pose a risk of danger in the future or not, "I do think that the Court should take into account that, according to Reverend Steve Mung, the chaplain of the MCC, that while Mr. Hasanoff has been at the MCC for three-and-a-half years, he has conducted himself as what Reverend Mung described as an outstanding role model for other Muslim inmates, assisting faithfully others in the Muslim community. That is a suggestion that the defendant has turned over a new leaf. . . In my view, although the defendant has acknowledged the appropriateness of a 20-year sentence in his plea agreement, I believe that he should receive 24 months' credit for what appears to be rehabilitation while at the MCC." (Sent. Tr. 21).

11

Accordingly, the Court should deny the Motion to reduce Hasanoff's sentence to time served based on rehabilitation.

*Family circumstances*. Family circumstances provide the second principle ground of Hasanoff's Motion for a reduction in his sentence to time served. Hasanoff argues that his mother contracted, and later recovered from, COVID-19 with lingering breathing difficulties; suffers from degenerative disc disease and back pain; rheumatoid arthritis; dementia; and depression resulting from the loss of her husband. (D.E. 259-1 at 3-5). Hasanoff's sister has been providing care services for their mother. (*Id*.; D.E. 259-3). Though Hasanoff's sister resided in Brooklyn, approximately one block away from their mother's apartment, at the time of sentencing and at least as recently as late April 2020 (PSR ¶ 59; Ex. 1), she and her family apparently have very recently moved to the same Long Island town where Hasanoff's wife and children live. (D.E. 259 Ex. H). Publicly available real estate records indicate that Hasanoff's sister continues to owns their mother's apartment as well as her Brooklyn apartment. (Ex. 4). Hasanoff argues that it is an inconvenience for his sister to provide care for their mother because of the drive from Long Island to Brooklyn, because she has young children, and because her husband's job in the medical profession puts the family at increased risk of COVID-19 exposure.[2] Like his father and mother, Hasanoff's sister and her family were exposed to COVID-19 at the beginning of the pandemic. (D.E. 259 Ex. H).

The Sentencing Commission has provided that extraordinary family circumstances may exist where (1) the caregiver of the defendant's minor child or children has died or become incapacitated; or (2) the defendant's spouse or partner has become incapacitated, and the

---

[2] According to publicly available records, it appears that Hasanoff's brother-in-law is a radiologist specializing in neuroradiology and practicing at a radiology center with numerous offices in the New York City area, including locations throughout Brooklyn and Long Island.

defendant is the only available caregiver. U.S.S.G. § 1B1.13 Application Note 1(C). Hasanoff's motion does not meet these criteria: he seeks a reduction of his sentence to time served based on the care needs of his mother, not his minor children or spouse.

The health care needs of a parent are not ordinarily extraordinary circumstances. Indeed, "[m]any, if not all inmates, have sick and aging parents," and "[s]uch circumstance is not extraordinary." *United States v. Ingram*, No. 2:14-cr-40, 2019 WL 3162305, at *2 (S.D. Ohio. Jul. 16, 2019); *see also United States v. Nevers*, No. 16-88, 2019 U.S. Dist. LEXIS 223249 at *10 (E.D. La. Dec. 27, 2019) (that defendant had an aging mother with heart and lung conditions who was also responsible for taking care of an elderly stepfather and the defendant's disabled daughter was not an extraordinary circumstances). In cases where courts have been willing to accept that an ill or aging parent presents an extraordinary circumstance, the defendant must show that he or she truly is the "only available caregiver," including the availability of home health aides and similar professional care options. The court in *Lisi*, , for example, found extraordinary and compelling circumstances where uncontested evidence "indicat[ed] that [the defendant's mother] is both incredibly unwell, and has been for some time, and that whatever assistance she is currently receiving from home health aides is inadequate," and "the only available caregiver for his mother, due to both the apparent incompetence or neglect of her hired aides and her daughter's ([the defendant's] sister's) either inability or complete aversion to helping her." 440 F. Supp. 3d at 251-52. In contrast, another court found no extraordinary or compelling circumstances where the defendant was "not the only available caregiver – a home health aide provides daily care for [the defendant's] parents." *United States v. Henry*, 13 Cr. 91 (RMM), 2020 WL 3791849, at *4 (E.D.N.Y. Jul. 6, 2020).

The circumstances surrounding the loss of Hasanoff's father and his mother's medical needs are deserving of sympathy. However, they do not warrant a reduction of Hasanoff's sentence. Here, even assuming that Hasanoff's mother's medical conditions as described in his submissions require a caregiver, Hasanoff has not met his burden of showing that he is the only available caregiver. Indeed, his sister already has been regularly providing care for their mother since their father's death. Hasanoff's sister and his wife both live relatively nearby to his mother, and Hasanoff has not explained why his mother could not, if she requires live-in care, reside with either of them, including with precautions to address any risk of COVID-19 exposure his mother may face, as so many families have done and continue do to during the pandemic. Hasanoff's brother-in-law's medical profession does not mean that his sister and her family cannot safely and effectively provide care for their mother. Moreover, it appears that professional care services may well also be available, and Hasanoff has not explained why such services, including a home health aide, could not be used to assist his sister and his wife in caring for their mother. Nor does Hasanoff explain how he would care for his mother full time and also work full time for a wholesaler in New Jersey; or how his mother's living with Hasanoff and his wife and children (ranging from elementary- to high-school aged), along with their interactions with his sister and her family, would significantly alter the family's risk of re-exposure to COVID-19 compared to the risk based on his mother living with either his sister or wife during the remainder of Hasanoff's sentence.

In short, it appears that Hasanoff's request is based on convenience rather than necessity, and at the very least does not show circumstances that are both extraordinary and compelling. Accordingly, the Court should deny the Motion to reduce Hasanoff's sentence to time served based on his family circumstances.

14

***Risk of COVID-19 exposure***. The final ground for Hasanoff's request for compassionate release is his risk of exposure to COVID-19 in prison. Hasanoff has not shown extraordinary and compelling circumstances, however, because he has none of the underlying health conditions associated with a high risk of severe COVID-19 illness, and his risk of exposure at FCI Otisville is low.

Hasanoff is 44 years old. He is not assessed with any medical condition that, according to the CDC, places individuals at increased risk of severe COVID-19 illness—conditions like cancer, chronic kidney disease, COPD, a solid organ transplant, obesity, serious hear condition, sickle cell disease, or Type II diabetes—nor any condition that might place an individual at increased risk of severe COVID-19 illness—conditions like asthma, pulmonary hypertension, or liver disease. *See* CDC, *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions* (Sept. 11, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Hasanoff has high cholesterol, which is controlled with medication, and other minor ailments, but nothing placing him at increased risk from COVID-19 exposure. (Ex. 3).

Moreover, the risk of exposure at FCI Otisville is controlled. According to information provided by BOP, FCI Otisville has 598 total inmates, with 532 inmates in the Federal Correctional Institution and the Federal Detention Center and 66 inmates at an adjacent minimum security satellite camp. Since the beginning of the pandemic, there have been a total of 46 inmates diagnosed with COVID-19; as of the writing of this memorandum, all 46 have recovered with no fatalities, and there are no active cases at FCI Otisville. There have also been a total of 15 diagnosed cases of COVID-19 among FCI Otisville staff, with 14 having recovered

15

and one remaining active case.[3] As a percentage of the FCI Otisville inmate and staff populations, this translates to a total of 7.7% of FCI Otisville's 598 total inmates and approximately 5.5% of FCI Otisville's staff.

FCI Otisville has administered a total of 1059 COVID-19 tests as of September 14, 2020 (the most recently available figures). Of the administered tests, 994 inmates tests were negative with 19 pending as of September 14; 38 tests administered to staff were negative. Tests are administered in accordance with CDC and BOP testing guidelines, which provide for testing of inmates prior to release from incarceration, upon arrival at the facility, for contact tracing purposes, and to determine which a previous positive test has resolved and the inmate is recovered from the infection. Testing has been ongoing since approximately March 17, 2020, and no suspected cases have gone untested. Hasanoff has not been administered a COVID-19 test, but his medical records reflect dozens of diagnostic screening encounters since the beginning of April 2020, with no high temperatures and no reports of any symptoms consistent with COVID-19.

The housing unit where Hasanoff is housed has no positive cases currently. There have been two positive cases in the unit, with the last one being approximately five-and-a-half months ago, April 7, 2020. It cannot be determined whether Hasanoff was in contact with either of the two COVID-19-positive inmates, but with the last positive case having been more than five months ago, either he was exposed and his case resolved without incident or he has not been exposed. In either case, his risk of exposure to the disease from this point forward is significantly mitigated.

---

[3] Staff diagnosed with COVID-19, or exhibiting any symptoms of COVID-19, are not permitted to enter the facility.

FCI Otisville, like BOP generally, continues to follow modified operating procedures designed to reduce the risk of the disease being introduced into the facility, to prevent its ability to spread, and to contain any infections within the smallest number of patients possible. *See generally* BOP, *BOP Implementing Modified Operations*, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp. Among other things, incoming inmates are quarantined before moving into the population; visitors are restricted; inmate movement within the facility is limited; inmates with a positive test for COVID-19 or symptoms consistent with COVID-19 are placed in quarantine until they are symptom-free for a sufficiently long period of time; all staff are screened daily prior to entering the facility and are not permitted to enter if they exhibit any symptoms; and the facility has adopted enhanced cleaning and disinfecting protocols, ensured availability of masks and hand sanitizer and hand soap of inmates, and has increased education for inmates on proper cleaning and hygiene protocols to reduce the risk of transmission. Medical staff is available for screening and treatment, and local hospitals are available for any inmate requiring hospitalization.

In sum, FCI Otisville has had a relatively low number of COVID-19 cases, and has used widespread testing to ensure that positive cases are identified and isolated appropriately. There are no current cases at the facility. Even if Hasanoff were exposed, he suffers from no conditions that would, or even might, place in at high risk of severed COBID-19 illness under CDC guidelines, and appropriate medical care is available even if he were to contract the disease. For all of these reasons, Hasanoff has not shown extraordinary and compelling reasons to reduce his sentence. *See, e.g.*, *Reyes*, 2020 WL 5518483, at *4 (no extraordinary and compelling circumstances where inmate was diagnosed with hyperlipidemia, hypertension, and tuberculosis exposure and conditions were under control); *Henry*, 2020 WL 3791849, at *4 (inmate with

17

hypertension and no other conditions relevant to increased risk of severe COVID-19 disease did not demonstrate extraordinary and compelling circumstances) (colleting cases).

### C.    Hasanoff's Request to Reduce His Sentence Is Inconsistent with the Sentencing Factors

Even if the Court were to find that Hasanoff's motion demonstrated extraordinary and compelling reasons, the requested reduction would still be inconsistent with the sentencing factors in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Lisi*, 15Cr. 457 (KPF), 2020 WL 881994 (S.D.N.Y. Feb. 20, 2020) (denying compassionate release motion where "The sentencing factors weigh heavily against the reduction of [the defendant's] sentence to time served); *United States v. Daugerdas*, 09 Cr. 581 (WHP), 2020 WL 2097653, at *4 (S.D.N.Y. May 1, 2020) (same). As in *Lisi* and *Daugerdas*, the sentencing factors "weigh heavily against" reducing Hasanoff's sentence to time served.

With respect to the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), Hasanoff's offense was extraordinarily serious. (Sent. Tr. 31). Shortly after the most deadly terrorist attack on American soil, Hasanoff decided to join the terrorist organization that committed that attack and desired most to travel overseas to participate in armed battle against U.S. and U.S-allied forces. Hasanoff fostered that desire for at least three years before successfully introducing himself to the al Qaeda terrorist organization, and for the succeeding two or three years consistently sought to receive military-style training and arrangements to travel to conflict zones; provided al Qaeda with tens of thousands of dollars and technologies highly sought-after by the organization; swore an oath of allegiance; employed deceptive financial techniques, coded languages, and secure communications techniques to evade law enforcement detection; and surveilled potential targets of future attack in New York City. During the years that Hasanoff harbored his desire to join al Qaeda and, as a member, provided

18

financing and technology to the group, al Qaeda and its affiliates were responsible for numerous bombings, kidnappings, shootings, and other attacks against military and civilian targets around the world, principally aimed at U.S. and U.S.-allied personnel or undermining U.S. policy and security objectives. *See, e.g.*, *Timeline: Major Attacks By al Qaeda*, REUTERS (May 11, 2011), *available at* https://www.reuters.com/article/idINIndia-56711920110502. It is exactly these kinds of attacks that Hasanoff knowingly and purposefully sought to support and, ultimately, participate in.

As the Court observed at sentencing, "the most important factor in this sentencing is general deterrence." (Sent. Tr. 21). That remains as true today as at the time sentence was imposed, not only with respect to deterring the provision of support and resources to al Qaeda and its affiliates, but also with respect to deterring support for extremist organizations with similar ambitions to harming U.S. interests and harming and killing U.S. citizens and personnel, and those of our allies. "Global jihadist groups in parts of Africa and Asia in the last year have expanded their abilities to strike local US interests, stoke insurgencies, and foster like-minded networks in neighboring countries," and it appears "al-Qaʻida's global network will remain a CT [counterterrorism] challenge for the United States and its allies during the next year." *See* Office of the Director of National Intelligence, *Worldwide Threat Assessment of the US Intelligence Community* (Jan. 29, 2019), at 10-12, *available at* https://www.dni.gov/files/ODNI/documents/2019-ATA-SFR---SSCI.pdf. Terrorism, including state-sponsored terrorism and non-state terror organizations, remain among the most serious threats to U.S. national security. Department of Defense, Summary of the 2018 National Defense Strategy of the United States of America, at 2-3, *available at*

https://dod.defense.gov/Portals/1/Documents/pubs/2018-National-Defense-Strategy-Summary.pdf.

A reduction of Hasanoff's sentence to time served thus would be contrary to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence. 18 U.S.C. § 3553(a)(2)(A), (B). Not only is Hasanoff's offense extremely serious, but the sentence imposed of 18 years' imprisonment already represents a significant variance from the advisory Guidelines range of 20 years—a range that, in turn, is substantially below the sentencing range of 30 years' imprisonment to life that would apply absent the statutory maximum. The Court imposed Hasanoff's sentence based on individualized sentencing factors, including its recognition of Hasanoff's new leaf while incarcerated. (Sent. Tr. 21).

Eliminating an additional five years from Hasanoff's sentence, by imposing a sentence of time served, is contrary to the sentencing factors and does not appropriately reflect the gravity of Hasanoff's offense or serve the goal of general deterrence.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court enter an

order denying Hasanoff's motion.[4]

Dated:  New York, New York
        September 21, 2020

                                         Respectfully submitted,

                                         AUDREY STRAUSS
                                         Acting United States Attorney


                               by:       _____/s/ Michael D. Lockard_____
                                         Michael D. Lockard
                                         Assistant United States Attorney
                                         (212) 637-2193

---

[4] In the event the Court were to grant the Motion, the Government requests the imposition of the same conditions of supervised release as imposed with respect to El-Hanafi.

21